**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

FEDERAL TRADE COMMISSION,

STATE OF ALASKA,

STATE OF ARIZONA, *ex rel.* Kristin K. Mayes, Attorney General,

PEOPLE OF THE STATE OF CALIFORNIA,

STATE OF COLORADO, *ex. rel.* Philip J. Weiser, Attorney General,

STATE OF FLORIDA,

STATE OF IDAHO,

STATE OF ILLINOIS,

STATE OF INDIANA, *ex rel.* Todd Rokita, Attorney General,

STATE OF IOWA,

COMMONWEALTH OF KENTUCKY, *ex rel.* Russell Coleman, Attorney General,

STATE OF LOUISIANA,

CONSUMER PROTECTION DIVISION, OFFICE OF THE MARYLAND ATTORNEY GENERAL,

STATE OF NEBRASKA, *ex rel.* Michael T. Hilgers, Attorney General,

STATE OF NEW JERSEY, by Attorney General Jennifer Davenport,

STATE OF NEW YORK,

STATE OF NORTH CAROLINA, *ex rel.* Jeff Jackson, Attorney General,

Case No. ____________

**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF**



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

STATE OF OKLAHOMA,

COMMONWEALTH OF PENNSYLVANIA, Office of Attorney General, By Attorney General David W. Sunday, Jr.,

STATE OF RHODE ISLAND,

STATE OF SOUTH CAROLINA, *ex. rel.* Alan Wilson, in his official capacity as Attorney General of the State of South Carolina,

STATE OF VERMONT, and

STATE OF WASHINGTON,

Plaintiffs,

v.

AMAZON.COM, INC., a corporation,

Defendant.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

# TABLE OF CONTENTS

**INTRODUCTION ....... 1**

**JURISDICTION AND VENUE....... 6**

**PLAINTIFFS....... 6**

**DEFENDANT....... 13**

**COMMERCE....... 14**

**OVERVIEW OF AMAZON'S ADVERTISING AUCTIONS ....... 14**

**BACKGROUND ....... 26**

A. Search Advertising Auctions ....... 26

1. Types of Auctions ....... 26

2. Use of Auctions in Digital and Search Advertising....... 28

**DEFENDANT'S BUSINESS ACTIVITIES ....... 31**

A. Amazon's "Sponsored Ads" Search Advertising Products ....... 31

B. Amazon's Second Price Auction Representations to Advertisers ....... 36

1. Amazon's Representations in Training and Marketing Materials ....... 37

2. Amazon's Second Price Auction Representations Are Repeated by its Account Managers, and Even the Head of Amazon Ads ....... 44

3. Amazon Is Aware That Its Second Price Auction Representations Have Been Widely Understood and Repeated By Amazon's Partner Network and Throughout the Industry....... 47

4. Amazon's Advertising Customers Believe That It Conducts Genuine Generalized Second Price Auctions, As Promised ....... 49

C. Amazon's Implementation and Concealment of Its Reserve Pricing Systems....... 53

1. In 2018, Amazon Began Inflating Prices Above Second Price Auction Results Using Secret Reserve Pricing ....... 53

2. Amazon Knew Its Auction Results Reporting Hid Its Reserve Pricing ....... 58

3. Amazon Designed and Implemented Its Undisclosed Reserve Pricing Systems to Avoid Detection ....... 60

4. Amazon Placed Guardrails on Reserve Prices to Keep Surcharges Secret ....... 62

5. Amazon Set Reserve Prices to Limit Advertisers' Return on Ad Spend....... 66

6. Amazon Further Expanded Reserve Pricing Systems After 2021 ....... 67

D. Amazon Continued to Increase Surcharges While It Decreased Advertisers' RoAS....... 70

E. Amazon Orchestrated Multiple Cover Ups to Conceal Its Surcharges....... 74

1. December 2021 CPC Spike Escalations ....... 76

2. Prime Day 2023 CPC Spike Escalations ....... 82



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

3. Customer Escalation in 2024 ........ 88
**AMAZON DEPRIVES ADVERTISERS OF A COMPETITIVE AUCTION PROCESS .. 91**
**AMAZON'S CONDUCT RESULTS IN SUBSTANTIAL HARM ........ 96**
**VIOLATIONS OF THE FTC ACT ........ 97**
**VIOLATIONS OF STATE LAW ........ 97**
**CLAIMS BROUGHT BY THE FEDERAL TRADE COMMISSION ........ 98**
**STATE LAW CLAIMS BROUGHT BY THE PLAINTIFF STATES ........ 101**
**CONSUMER INJURY ........ 154**
**PRAYER FOR RELIEF ........ 154**



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission"), and the States of Alaska, Arizona, Colorado, Florida, Idaho, Illinois, Indiana, Iowa, Commonwealth of Kentucky, Louisiana, Nebraska, New Jersey, New York, North Carolina, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Vermont, and Washington, and the People of the State of California, by and through their respective Attorneys General, and the Consumer Protection Division of the Office of the Maryland Attorney General (together, the "Plaintiff States," and collectively with the FTC, "Plaintiffs"), for their Complaint allege:

**INTRODUCTION**

1. Since 2019, Amazon.com, Inc. ("Amazon") has secretly and systematically overcharged its approximately 1.2 million advertising customers by manipulating the "auctions" that it uses to set the price of ads on its platform. Amazon represents, and advertisers believe, that competitive auctions set the prices for advertising on its leading e-commerce website. But, in reality, Amazon overrides and replaces the actual auction results with higher prices set by Amazon to increase its profits. For years, Amazon has secretly inflated the auction prices for three of its advertising products: Sponsored Products, Sponsored Brands and Sponsored Display. With respect to its largest advertising product, Sponsored Products, Amazon significantly inflated prices with an average "surcharge rate" of approximately [redacted] — which increased to over [redacted] on peak shopping days. Based on numerous internal documents describing its "hidden" "surcharges," Amazon's scheme has likely illegally extracted over 20 billion dollars from its unwitting advertising customers.

2. Since launching its advertising auctions in approximately 2012, Amazon has represented to customers that its advertising prices are set by "second price" auctions that rank participants by a combination of their bid and relevance to shoppers' searches, and where the winning advertiser only pays the minimum amount necessary (e.g., one cent more) to beat the



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

second-place bidder. However, in 2018, Amazon began secretly manipulating its auction results to increase its ad prices. Amazon gave its customers no notice of this change and took affirmative steps to conceal it, while continuing to represent that it operated second price auctions.

3. Amazon determined in late 2018 that it was no longer satisfied with the prices resulting from its competitive advertising auctions. As a result, Amazon's advertising organization ("Amazon Ads") decided to set and charge customers higher prices for advertising placements itself. *After* Amazon runs its ad auctions and determines the winning and second-place bidders, it then replaces the price determined by the auction with a higher price designed to maximize Amazon's profits and decrease the cost efficiency of its advertisers' campaigns. As explained internally by Amazon's Senior Vice President in charge of Amazon Ads, in Amazon's auctions "the second price isn't set by an actual bidder, but rather by" Amazon in the form of a "proxy 2nd price that we calculate."

4. Amazon's scheme has resulted in substantial overcharges and cost increases paid by its approximately 1.2 million U.S. advertising customers, which include over 500,000 small and medium-size businesses. A 2022 study conducted by Amazon revealed that [redacted] of its customers for its most lucrative advertising placements are new or small business owners.

5. Amazon's advertising customers sell millions of products to U.S. consumers, including groceries, pharmacy products, clothes, school supplies, and other essentials. Sellers on Amazon incur substantial costs in the form of fees and surcharges to participate and advertise on Amazon's leading e-commerce platform. A significant portion of these costs, including the advertising costs paid by Amazon sellers, are ultimately passed through to and paid by Amazon shoppers in the form of higher prices.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

6. In 2021, using a snapshot of data, Amazon analyzed how its undisclosed surcharges artificially increased the price of advertising of various categories of products (referred to as "general ledgers" or "GLs") bought by U.S. consumers on its platform. The analysis found that Amazon levied its highest surcharges on advertisements for [redacted]. These typically low-margin products are likely to pass on cost increases to consumers. Amazon also applied high surcharges to other necessities including [redacted], as reflected in an internal chart below (emphasis added).

[redacted]

7. Internally, Amazon refers to the differences between the actual auction prices and the artificial prices it charges customers as auction "surcharges." While many of Amazon's fees or surcharges are disclosed to its customers, Amazon does not disclose that its auction pricing has "**a surcharge hidden in it.**" In fact, Amazon actively conceals this information from its customers to avoid "irrevocable damage to advertiser trust" and a "downward



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

spiral" of advertisers lowering their bids or decreasing their advertising spending with Amazon.

8. Amazon takes great pains to actively conceal from customers the fact that it inflates its purported auction prices. These efforts include: extensive testing of incremental surcharge increases to assess the risk of detection, adding and fine-tuning design features to its pricing system to help "mask" the surcharges from customers, and responding to customer complaints about suspicious price increases by falsely denying that Amazon played any role in raising the prices.

9. Through its testing process, Amazon has repeatedly confirmed that its advertising customers are unable to detect its scheme. As Amazon's confidence that its advertising customers are unaware of its conduct has grown, it has substantially increased its hidden surcharges. Amazon has been able to successfully exploit the fact that its "opaque" auction process and reporting ensures that advertisers cannot know whether the price they are charged is the minimum amount needed to win the auction, as promised, or instead an inflated amount fabricated by Amazon. As a result, Amazon has successfully and profitably led advertisers to believe — falsely — that they continue to compete in second price auctions.

10. Amazon has used its unique position as both the auctioneer and seller of the advertising placements to distort and subvert the competitive process inherent in auctions. As the head of Amazon Ads explained, Amazon does not rely on the competing bids it receives to determine its pricing because "doing so can result in the [] loss of economic value" to Amazon. Instead, he acknowledged, Amazon has "inserted" a "bid" into its auctions to increase prices. According to Amazon, this enables Amazon to "adjust" prices "beyond what would be organically achieved through advertiser competition." As an Amazon Senior Scientist similarly explained, to increase its auction prices, Amazon employs "an **invented**


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

**auction participant** representing how much Amazon thinks that particular ad slot is worth." (emphasis added). In executing its scheme to misrepresent and rig its auctions against its customers, Amazon has deceived its customers and deprived them of the benefits of competition and fair and transparent dealing.

11. As shown in the chart below, from approximately 2019 to the present, Amazon has increasingly overcharged its customers while representing to them, across multiple communications channels, that its pricing is set by second price auctions.[*]

[redacted]

[*] "GSP" or "generalized second price" is the term both the advertising industry and Amazon use to describe its second price auctions to reflect that it sells multiple placements on the same search page in an auction. The surcharge rate for Sponsored Products search placements was calculated for 2020 to 2024 based on Amazon's internal data; the surcharge rate for 2019 was estimated based on Amazon's internal documents, which indicate that Amazon began using surcharges for Sponsored Products search placements in July 2019.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

12. The FTC brings this action for Defendant's violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). For these violations, the FTC seeks a permanent injunction and other relief pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

13. The Attorneys General bring this action for Defendant's violations of the below enumerated state laws. For these violations, the Attorneys General seek relief, including injunctive relief, recission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten gains, civil penalties, attorneys' fees, expenses, and costs.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

15. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFFS

16. The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

17. Plaintiff State of Alaska, through its Acting Attorney General Cori Mills, brings this action under her authority in AS § 45.50.501(a) to enforce the Alaska Unfair Trade Practices Act, AS §§ 45.50.471– 561. Under AS § 45.50.471(a) of that Act, unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful.

18. The Arizona Attorney General is authorized to bring an action under the Arizona Consumer Fraud Act (the "Arizona CFA"), A.R.S. §§ 44-1521 to -1534, pursuant to her authority under A.R.S. §§ 41-193(A)(3) and 44-1528. The Arizona CFA prohibits the act, use or



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

employment of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged. A.R.S. § 44-1522.

19. Plaintiff the People of the State of California bring this action by and through Attorney General Rob Bonta, who is authorized by California Business and Professions Code §§ 17535 and 17536 to enforce the California False Advertising Law, California Business and Professions Code § 17500 *et seq*., and authorized by California Business and Professions Code §§ 17203, 17204, and 17206 to enforce the California Unfair Competition Law, California Business and Professions Code § 17200 *et seq*. Among other relief, California Business and Professions Code §§ 17203 and 17535 authorize the Attorney General to obtain injunctive relief to halt violations of, and enforce compliance with the Unfair Competition Law and False Advertising Law, respectively, and also authorize the Attorney General to seek all orders or judgments as may be necessary to restore to any person in interest any money or other property acquired through violations of the Unfair Competition Law and False Advertising Law. The Attorney General is also authorized by California Business and Professions Code §§ 17206 and 17536 to obtain civil penalties. The Attorney General is also authorized by California Government Code § 12527.6 to obtain disgorgement.

20. The State of Colorado brings this action by and through Attorney General Philip J. Weiser pursuant to the Colorado Consumer Protection Act, Colo. Rev. Stats. §§ 6-1-101, *et seq.*, ("CCPA"), which prohibits unfair and deceptive trade practices in the course of a defendant's business, vocation, or occupation. The CCPA authorizes the Colorado Attorney


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

General to seek, and the Court to grant, civil penalties, injunctive relief, and such orders as may be necessary to prevent the use or employment of deceptive trade practices, to completely compensate or restore to the original position of any person injured, or to prevent any unjust enrichment. Colo. Rev. Stats. §§ 6-1-110 and 112.

21. Plaintiff State of Florida brings this action for Defendant's violations of the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes. For these violations, Florida seeks relief, including injunctive relief, equitable monetary relief, consumer restitution, the refund of monies paid, disgorgement of ill-gotten monies, civil penalties, attorney's fees, and other relief pursuant to Sections 501.207(b), 501.207(3), and 501.2075, Florida Statutes.

22. James Uthmeier, the Florida Attorney General, is the enforcing authority of the Florida Deceptive and Unfair Trade Practices Act pursuant to Section 501.203(2), Florida Statutes, is afforded the authority to seek the full range of relief available under Florida Deceptive and Unfair Trade Practices Act, and has determined that this enforcement action serves the public interest. The Florida Attorney General enforces Section 501.204(1), Florida Statutes, which prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

23. Raúl R. Labrador is the Attorney General for the State of Idaho and has authority under Idaho Code § 48-606 to bring this lawsuit on behalf of the State in its sovereign capacity and in the public's interest against Defendant for violating the Idaho Consumer Protection Act, title 48, chapter 6, Idaho Code, and the Idaho Rules of Consumer Protection, IDAPA 04.02.01.000 et seq.

24. Plaintiff State of Illinois is one of the fifty sovereign states of the United States. Attorney General Kwame Raoul is the duly elected and qualified Attorney General and brings this



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

action in his official capacity for and on behalf of the People of the State of Illinois, pursuant to the Provisions of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud Act"), 815 ILCS 505/7, and his common law authority as Attorney General to represent the People of the State of Illinois.

25. The Illinois Attorney General believes this action to be in the public interest of the citizens of the State of Illinois and brings this lawsuit pursuant to Section 7(a) of the Illinois Consumer Fraud Act, 815 ILCS 505/7(a).

26. Plaintiff State of Indiana, through Attorney General Todd Rokita, brings this action under his authority in Ind. Code § 24-5-0.5-4(c) to enjoin unfair, abusive, or deceptive acts, omissions, or practices in connection with a consumer transaction, and obtain other relief under Indiana's Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5, *et seq*. For these violations, Indiana seeks permanent injunctive relief, consumer reimbursement, disgorgement, civil penalties, restitution, attorneys' fees and costs, and other equitable and monetary relief.

27. Plaintiff State of Iowa brings this action for Defendant's violations of Iowa Code § 714.16, the Iowa Consumer Fraud Act. Iowa Code § 714.16(7) authorizes Iowa Attorney General Brenna Bird to enforce the Iowa Consumer Fraud Act. For these violations, Iowa seeks permanent injunctive relief, consumer reimbursement, disgorgement of ill-gotten gains, civil penalties, and attorneys' fees and costs.

28. Plaintiff Commonwealth of Kentucky *ex rel.* Russell Coleman, Attorney General is responsible for the enforcement and administration of Kentucky law, including but not limited to the Kentucky Consumer Protection Act, KRS § 367.110 *et seq.* (hereinafter "KCPA"). The Attorney General is authorized to bring this suit under KRS § 367.190. He



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

brings this action in the name of the Commonwealth of Kentucky and has determined it to be in the public interest to do so.

29. The Attorney General of the Plaintiff State of Louisiana is authorized to bring this action pursuant to the Unfair Trade Practices and Consumer Protection Act, La. Rev. Stat. 51:1401, *et seq.* ("LUTPA"). La. Rev. Stat. 51:1405(A) makes unlawful "unfair and deceptive acts or practices in the conduct of any trade or commerce." The Defendant's acts as alleged herein violate Louisiana's prohibition on unfair and deceptive acts or practices.

30. Plaintiff Consumer Protection Division of the Office of the Maryland Attorney General is the Maryland agency charged with the enforcement of Maryland's consumer protection laws, including but not limited to, the Maryland Consumer Protection Act, Md. Code Ann., Commercial Law Article §§ 13-101 through 13-501 ("MD CPA"). The Consumer Protection Division is authorized to bring this action pursuant to § 13-406 of the Maryland Consumer Protection Act for relief that includes an injunction and disgorgement of restitution pursuant to § 13-406(c) of the Act, costs pursuant to § 13-409 of the Act, and penalties of up to $10,000 per violation under § 13-410 of the Act.

31. Plaintiff State of Nebraska is a sovereign state. Michael T. Hilgers, as Attorney General of the State of Nebraska, is expressly authorized to bring this action under Nebraska's Uniform Deceptive Trade Practices Act on behalf of the State of Nebraska to protect the state and its residents from Defendant's unlawful business practices. Neb. Rev. Stat. §§ 87-303.05(1), 303.11(1).

32. Plaintiffs Jennifer Davenport, Attorney General of the State of New Jersey, Christopher L. Peterson, Acting Director of the New Jersey Division of Consumer Affairs (collectively, the "State of New Jersey" or "New Jersey") bring this action to enforce the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1 *et seq.* ("New Jersey CFA"). The State of New


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

Jersey brings this action pursuant to its authority under the New Jersey CFA, N.J.S.A. §§ 56:8-8, 56:8-11, 56:8-13, and 56:8-19, to permanently enjoin Defendant from engaging in unconscionable commercial practices, acts of deception, misrepresentations, false promises, concealments, and/or knowing omissions of material fact, in violation of N.J.S.A. § 56:8-2, and to recover statutory civil penalties, restitution, attorneys' fees and costs and other equitable and monetary relief.

33. Plaintiff the People of the State of New York, by their attorney Letitia James, Attorney General of the State of New York ("NYAG"), brings this action pursuant to New York Executive Law § 63(12), which authorizes the NYAG to seek injunctive and other relief to enjoin repeated and persistent fraud or illegality in the carrying on, conducting or transaction of business, and New York General Business Law §§ 349 and 350, which authorize the NYAG to seek injunctive relief, restitution, damages, costs, civil penalties, and other equitable relief, including disgorgement, when a person or business engages in false, deceptive, abusive, or unfair acts and practices, or false advertising, in the conduct of any business, trade, or commerce. In accordance with New York General Business Law § 349(c), the NYAG provided pre-litigation notice to Amazon.

34. The North Carolina Attorney General is charged with, inter alia, enforcing North Carolina's Unfair or Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1 *et seq.*, which prohibits unfair and deceptive conduct by businesses operating in North Carolina. North Carolina's Unfair or Deceptive Trade Practices Act authorizes the State of North Carolina to seek injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, civil penalties, attorneys' fees, expenses, costs, and other equitable relief for Defendant's acts or practices in violation of N.C. Gen. Stat. § 75-1.1.


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

35. Plaintiff State of Oklahoma, Office of the Oklahoma Attorney General, by Attorney General Gentner Drummond is the chief legal officer of the State of Oklahoma and brings this action in the name and on behalf of the people of the State of Oklahoma to protect the state, its general economy, and its residents from Amazon's unlawful business practices. 74 O.S. § 18b(A). The Attorney General has authority under the Oklahoma Consumer Protection Act, 15 O.S. 751 *et seq.*, to bring this action and seek injunctive relief, civil penalties, disgorgement, restitution, and other equitable relief, as well as attorneys' fees, expenses, and costs.

36. Plaintiff Commonwealth of Pennsylvania, Office of Attorney General, by Attorney General David W. Sunday Jr. ("PA-OAG" or the "Pennsylvania Attorney General") is the chief legal officer of the Commonwealth of Pennsylvania. 71 P.S. § 732-206(a). Pursuant to the *Pennsylvania Unfair Trade Practices and Consumer Protection Law*, 73 P.S. § 201-1, *et seq.* ("*PA Consumer Protection Law*"), the Pennsylvania Attorney General is authorized to obtain injunctive relief, civil penalties, restitution, costs, and other equitable relief whenever he has reason to believe a person is using or is about to use any method, act or practice declared to be unlawful under section 201-3 of the act and that the proceedings would be in the public interest. 73 P.S. § 201-4; § 201-4.1; § 201-8(b). Section 3 of the *PA Consumer Protection Law* declares as unlawful unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of Section 201-2(4) of the *PA Consumer Protection Law*. 73 P.S. § 201-3.

37. Plaintiff Rhode Island Office of the Attorney General ("Rhode Island") is the chief legal officer for the State of Rhode Island. Pursuant to the Rhode Island Deceptive Trade Practices Act, R.I. General Laws §§ 6-13.1–1 *et seq.,* Rhode Island seeks relief, including



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

injunctive relief, civil penalties, restitution, disgorgement, attorneys' fees and costs, and other relief available under the Rhode Island Deceptive Trade Practices Act.

38. Plaintiff State of South Carolina brings this action, by and through its Attorney General, Alan Wilson, in its sovereign capacity in order to protect the interests of the State and its citizens. The Attorney General brings this action pursuant to his parens patriae, constitutional, statutory, and common law authority, including the authority granted to him by the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-20, 50, and 110.

39. Plaintiff State of Vermont, through its Attorney General Charity R. Clark, brings this action under 9 Vt. Stat. Ann. § 2458 to enforce the Vermont Consumer Protection Act. Defendant's actions violate § 2453, which prohibits unfair methods of competition and unfair or deceptive acts or practices in commerce. Vermont seeks all remedies available under § 2458, including civil penalties, injunctive and other equitable relief, including disgorgement, fees and costs, and such other relief as the Court deems just and equitable.

40. Plaintiff Washington State Attorney General's Office, Consumer Protection Division ("Washington") brings this action for Defendant's violations of the Washington Consumer Protection Act (WA CPA), Wash. Rev. Code § 19.86. For these violations, Washington seeks relief, including injunctive relief, civil penalties, restitution, disgorgement, attorneys' fees and costs, and/or other relief, pursuant to the WA CPA, Wash. Rev. Code §§ 19.86.080 and 19.86.140.

## DEFENDANT

41. Defendant Amazon is a Delaware corporation with its principal place of business at 410 Terry Avenue North, Seattle, Washington 98109. Amazon transacts and has transacted business in this District and throughout the United States.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

## COMMERCE

42. At all times relevant to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## OVERVIEW OF AMAZON'S ADVERTISING AUCTIONS

43. Amazon is one of the world's largest digital advertising companies. In addition to operating the world's largest e-commerce platform, Amazon generates more than 68 billion dollars of annual advertising revenue, primarily by selling advertising space on its e-commerce website and app ("Amazon.com").

44. Amazon sells advertising placements that appear on Amazon.com through online auctions. These "Sponsored Ads" consist of three types of advertisements — Sponsored Products, Sponsored Brands, and Display Ads — each relating to different advertising placements shown alongside search results whenever a consumer searches for a product on Amazon.com using a keyword or keywords. Amazon typically charges advertisers who win the auction each time a shopper clicks on their advertisement, and the price charged to the advertiser for each click is called the cost-per-click or "CPC." Sponsored Products is by far the most lucrative product, accounting for more than [redacted] of Amazon's Sponsored Ads annual revenue, and over [redacted] in the 2024 fiscal year.

45. Since at least 2012 and through 2026 (nearly two years after Amazon learned of the FTC's investigation in 2024), Amazon has represented to advertisers and advertising agencies on its website, in its marketing and training materials, online training portals, YouTube channel, and in direct presentations given by Amazon's account representatives, that it operates "second price" auctions. These materials represent that ads are ranked "based on the combination of bid and the ad's relevance to shopping queries," and that Amazon



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

charges the winning bidders "the minimum required to beat the ad with the next highest ranked score in the auction." Amazon represents it runs a second price auction using a basic and commonly used example in its materials where the winner pays a price "slightly higher than the second highest CPC [cost-per-click] bid" or "one penny more than the next highest bid." The core message Amazon conveys to its customers is the winner pays an amount based on its competitor's bid and not its own bid, as is done in a "first price" auction and that prices are set by a competitive bidding process (not by Amazon).

46. Amazon adopted the GSP auction model because it has been the "industry standard" in search advertising since the early 2000s. As the advertising industry widely understands, GSP auctions are sealed-bid auctions that rank bids by both their price and relevance to the shopper's query and then charge winning bidders the minimum amount necessary to beat the next-highest ranked bidder.

47. Amazon's statements that it operates second price auctions have been widely repeated publicly in news articles and on the websites of companies that assist and represent businesses and individuals advertising on the Amazon website, including agencies that Amazon itself promotes to advertisers.

48. Contrary to Amazon's representations and advertising customer expectations, in late 2018 and early 2019, Amazon began secretly overriding the CPCs set by the second price auction results and instead charged its customers higher prices set by Amazon after the auctions finished. Amazon executives approved this course of action even in the face of their subordinates' "concern about advertiser pricing expectations" given that "we currently tell advertisers that we run a second price auction." Amazon executives and auction managers were aware that Amazon continued to tell advertisers that Amazon operates second price auctions and that these representations were no longer true.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

49. Internally, Amazon executives referred to the process Amazon uses to set artificially higher prices as a "soft reserve" pricing system. The term "reserve price" is commonly used in auctions to mean the lowest offer that a seller will accept — in other words, the minimum price set by the seller in advance of the auction running that a buyer has to bid in order to compete in the auction. But Amazon's "soft reserve" prices work differently. They are not a minimum amount that an advertiser has to bid to compete in Amazon's ad auction. Instead, after Amazon runs the auction, it secretly replaces the GSP auction price with a higher "soft reserve" price. Amazon's Sponsored Products team members internally referred to its "reserve pricing" as "post-hoc pricing adjustments," which have "an element of unfairness" since "[a]dvertisers may not be expecting" them.

50. Internal Amazon documents describe how Amazon calculates CPCs "in two stages." First, Amazon runs a GSP auction to determine the winning bid and calculate the price resulting from the auction, the "GSP CPC." Amazon then "transforms the GSP CPC to the final CPC" by calculating a "soft reserve" price that can secretly raise prices by as much as [redacted] on ordinary days, and by as much as [redacted] on special shopping days like Prime Day or Black Friday.

51. To facilitate its scheme, Amazon controls and limits the auction data available to customers. Amazon internally has referred to its aggregated price reporting as "opaque." As a result, Amazon's customers are unable to verify auction results and how prices are set and therefore have no way to know whether the price they are charged is the minimum amount needed to beat the second-place bid or instead an inflated amount set by Amazon.

52. Amazon is aware that long after it started to secretly inflate prices, its customers continue to believe that Amazon's prices are set by second price auctions (as Amazon continues to represent) and bid accordingly. For example:



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

- In 2021, Amazon's Sponsored Products auction team acknowledged that ad agencies whose services Amazon promotes to its advertisers "**are operating under the assumption that Amazon uses a GSP auction**." (emphasis added)

- In a 2023 internal document, Sponsored Products team members wrote: "**Many advertisers set a relatively high bid i.e. $100 or $1000 because they trust Amazon is not running a first price auction**; and advertisers choose smart bidding, especial [sic] Up & Down, because they believe Amazon will not simply charge their first price. This should be obvious, just to make sure everyone is on the same page." In an accompanying chat, a team member elaborated: **"[M]any advertisers set a default high bid because they trust our Generalized Second Price Auction process**." (emphasis added)

- In 2024, the Sponsored Products manager overseeing auction pricing wrote internally that "**many advertisers bid far higher than what they are willing to pay…[b]ecause they assume its GSP [a generalized second price auction].**" (emphasis added)

- In 2024, a Sponsored Products team member who had helped conduct a large-scale pricing experiment that concluded that Amazon could increase surcharges without fear of detection by advertisers wrote internally: "**We don't tell them about the surcharge, we let them assume GSP-based**." (emphasis added)

- In 2024, a core member of the Sponsored Products team wrote that "**only GSP logic is known publically** [sic]" and that even "the mention of" Amazon Ads "tuning pricing controls is new information that is not available publically [sic]." (emphasis added)

53. Internal Amazon documents noted that, if its artificial auction price increases were discovered, Amazon would risk facing severe consequences from advertisers in response. For example, in 2022, the Vice President of Sponsored Products expressed concerns that if a paper authored by Amazon employees that described a method for estimating advertisers' willingness to pay for ad slots were published, it might "lead others to infer we are using soft floor prices which if true, will lead to bid shading and other dynamic bidding responses." Similarly, in 2023, an economist in Amazon Ads acknowledged internally that "[i]f we say (or advertisers think) we are running a second price auction, but we aren't and what we are doing charges the advertisers more," then "that's a reputational risk when it



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

eventually becomes clear." He added that advertisers would start bidding lower amounts if they learned that they were not actually bidding in a second price auction.

54. Amazon therefore sought to conceal its escalating level of undisclosed surcharges to ensure its advertising customers continued to believe that prices were still being set by second price auctions — and not by Amazon. As an Amazon manager in charge of Sponsored Products auctions explained in 2023: "All of our proposals are about how we can tune parameters to increase prices and move away from a GSP while hoping that advertisers don't notice and decrease bids or ad spend."

55. Accordingly, Amazon kept its use of "soft reserve" prices a closely guarded secret, even from its own sales and marketing employees in charge of interacting with advertisers. And Amazon designed the soft reserve pricing system so its existence would be imperceptible to advertisers. An internal Sponsored Brands memorandum noted "one of the characteristics of a 'good' reserve price is that it simulates a 'natural'" second price bid.

56. Amazon has used several different reserve pricing mechanisms to set prices above its second price auction results without being detected. In 2019, the Sponsored Products auction team was "extremely cautious" when it began inserting surcharges into its pricing and initially limited the percentage of auctions where it artificially raised prices up to the amount of the winning bid to just [redacted] Amazon refers to this percentage as the "First Price" or "FP" rate. Similarly, the Sponsored Brands auction team initiated a secret reserve pricing experiment in 2019 using a "slow rollout schedule" to avoid "a rapid increase in price" that could "raise concerns among advertisers about the fairness of the auction."

57. After conducting experiments in 2019 and 2020 to test advertisers' reactions to larger hidden surcharges, Amazon confirmed that advertisers were unable to detect the surcharges or determine whether they were charged their own bid, in part because of Amazon's opaque



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

and aggregated price reporting. Amazon recognized internally that its reporting does not enable advertisers to "see performance results (CPC, original bids, etc.) at the per 'click' level" and so advertisers do not have "visibility into the behavior of individual auctions." For example, Amazon's invoices are not itemized by click or other charge, presenting only averages that combine multiple keyword auctions across multiple types of advertising placements.

58. As a result, the Sponsored Products auction team understood that the surcharges remained hidden from advertisers. A Sponsored Products team member wrote in 2022 in an internal team chat that "advertisers don't see the surcharge over GSP." He further explained that advertisers would attribute pricing increases resulting from surcharges to competition, adding: "[T]here is a general understanding that CPCs are determined by competition. This also helps with external communication."

59. In 2021, Amazon's Sponsored Products team tested a new pricing mechanism that uses Amazon's estimate of the ordered product sales (or "eOPS") that will be generated by a click on the winning bidder's ad to set higher CPC prices. Within Amazon this is known as "eOPS Based Pricing," and is the primary pricing method Amazon uses to set surcharges for Sponsored Products ads. Starting in 2022, Amazon began using its eOPS Based Pricing system to set hidden soft reserve prices for almost all Sponsored Products ads on the Amazon search page.

60. This eOPS Based Pricing system sets surcharges [redacted] "Return on Advertising Spend," or "RoAS" is the amount of money in sales an ad generates divided by the cost of the ad. RoAS is the leading measure of the cost-efficiency of advertisements used by advertisers. Amazon employees wrote in an internal memo in 2021 that "for many advertisers, [RoAS] is the most important metric that



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

advertisers look at when they evaluate the performance of their campaigns. In fact, many advertisers use ROAS to decide how to allocate their budget across Amazon's different ad programs." RoAS is measured in dollar amounts such that a RoAS of 4.00 means that for each dollar spent on the ad, the advertiser generated $4.00 of sales revenue. In general, a higher RoAS benefits the advertiser, while a lower RoAS benefits the ad seller (i.e., Amazon). Amazon strategically sets its hidden surcharges to try and attain a consistently lower market-wide RoAS for the United States than its actual auction prices provide to advertisers.

61. An internal Sponsored Products memorandum noted in 2024 that Amazon can control [redacted] by using secret reserve pricing levers. It displayed the graph below where [redacted] are on the x and y axes to show that Amazon can generate more revenue by using secret reserves to [redacted]

[redacted]

62. [redacted]



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

[redacted] Stated differently, Amazon is seeking to use surcharges to capture more than [redacted] of its customers' sales revenues in the U.S. tied to Sponsored Products ad placements. These inflated advertising charges allow Amazon to extract additional revenue from sellers on its platform, on top of the account fees, referral fees, and fulfillment and storage fees that increasingly both cut into Amazon sellers' profit margins and lead to price increases borne by Amazon shoppers.

63. While the eOPS system generates soft reserve prices for each auction, these amounts are modified further to ensure they do not exceed the winning bid [redacted] to reduce the risk that advertisers detect and react negatively to the price increases.

64. As the head of Sponsored Products auctions explained in 2021 to the Vice President of Sponsored Products, the surcharge constraint allows Amazon to track "how much we've moved away from an auction mechanism."

65. After the launch of eOPS Based Pricing, the percentage of clicks on Sponsored Products ads that Amazon priced at the winning bid (the "first-price rate") increased to between 30% and 40% in 2021, and then to 70% in 2022. Amazon continued conducting pricing experiments on advertisers without their knowledge to test how much higher it could raise surcharges and reduce RoAS without detection. This notably included a large-scale pricing experiment in 2023 that raised surcharge limits from [redacted] in the United States. Amazon determined that advertisers subjected to this experiment did not react by reducing their bids or their advertising budgets, and as a result it implemented the price increase across its United States customer base.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

66. Amazon currently allows customers to be overcharged by up to [redacted] above the second price auction result on normal shopping days (capped by the amount of the winning bid).

67. In addition to its pricing experiments, Amazon also conducted surveys and interviewed advertisers to discern their internal bidding strategies and surreptitiously help it determine when to increase surcharges and at what level. In an internal 2022 chat, a Sponsored Products auction team member noted: "we can ask advertisers in interviews to see if/how much they pay attention to FP [first price] rate (subtly, without tipping them off)."

68. While Amazon's undisclosed surcharges increase advertising prices year-round, they have an outsized impact on advertising pricing during peak shopping days. For example, during the Christmas holiday season and other peak shopping events (referred to as "high velocity events" or "HVEs"), Amazon often raises its maximum surcharge levels by [redacted] — allowing surcharges to potentially more than [redacted] the GSP auction price.

69. Amazon began increasing the surcharge levels after it determined that, in its view, advertisers were not sufficiently raising their bids and were therefore benefitting from a higher RoAS during these peak shopping days. Amazon estimated that advertisers would (or should) be content with the lower RoAS associated with normal shopping days and that Amazon was entitled to capture the same percentage [redacted] of its advertisers' ad attributed sales during peak shopping days that they targeted during normal shopping days. To accomplish this scheme, Amazon deliberately calibrated its surcharges during peak shopping periods to drive down advertisers' RoAS to match the advertisers' lower RoAS during normal shopping days.

70. Amazon believed that the increased shopping activity during these periods would "obfuscate" the resulting price increases so that advertisers would not suspect a change in the auction process. A Sponsored Brands employee confirmed that a reserve price


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

experiment in 2018, designed to assess the impact of pricing changes on advertiser behavior, illustrated that "our price increases were masked by holiday increases in advertiser demand." The head of Sponsored Products auctions later explained internally the "main thinking" when they "ramped up" surcharges during Prime Day in 2023 was that advertisers would falsely believe the price increases were caused by advertiser competition: "Advertisers may expect other advertisers to be increasing bids in preparation for PD [Prime Day], so the CPC increases may not be unexpected." He added that "**we relax surcharge constraints**" to inflate prices more "**when there are enough confounders (e.g., seasonality) that make it difficult to detect bid shading opportunities**." (emphasis added).

71. Amazon refined its surcharge tactics over time. For example, during the early December holiday shopping period in 2021, Amazon's secret holiday pricing efforts resulted in price increases that were so sudden and large that Amazon's efforts to conceal its conduct nearly failed. During what Amazon described internally as the "CPC Spike" incident, Amazon received nearly two dozen complaints, including from some of its largest customers and advertising agencies. Amazon assembled a damage control team which included its auction team members, who knew it was their surcharge increases that caused the price spike. However, instead of disclosing its conduct to the complaining advertisers, Amazon sent emails to complaining customers containing a false explanation vetted by Amazon's public relations and legal departments attributing the cause of the "CPC spike" to higher advertiser and shopper demand.

72. Instead of being transparent with its customers and disclosing its surcharge practices, Amazon determined that it should try to mask future surcharge increases by gradually implementing them in advance of peak shopping days. In 2022, Amazon successfully tested


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

this concealment strategy with its auction team, touting that it had "prevented advertisers from seeing confusing steep increases in their CPCs" resulting in "no advertiser escalations" or significant complaints.

73. In 2023, Amazon again received complaints from several of its large customers after its hidden surcharges more than doubled CPCs during Prime Day 2023. Amazon chose again to cover up its conduct and repeated its false explanations that the CPC increases were caused by higher shopper activity. It also put in place "surcharge alarms" and caps to prevent what it described as "egregious CPC increases during HVEs" from recurring.

74. Currently, Amazon continues to phase in surcharge increases more gradually to avoid advertisers and ad agencies observing the sudden price changes that led to the complaints in 2021 and 2023 and has developed standard "scripts" for "escalated advertisers" raising questions about increased CPCs.

75. Amazon has also successfully concealed surcharge increases on normal shopping days. In 2024, Amazon permanently raised its secret surcharges for the whole Sponsored Products marketplace, and overcharged advertising customers by about [redacted] for Sponsored Products search ad placements, generating about [redacted] in additional revenue from advertisers.

76. This surcharge increase also resulted in Amazon charging Sponsored Products advertisers their own winning bid close to 80% of the time. Thus, for the vast majority of its auctions, Amazon effectively and secretly converted its nominally "second price" Sponsored Products auctions into first price auctions.

77. Similarly, Amazon's surcharges in Sponsored Brands auctions extracted a hidden [redacted] surcharge on average from its Sponsored Brands customers in 2024. For these advertising placements, Amazon secretly sets the prices for 70% of ad clicks, and charges winning bidders the amount of their bid 50% of the time.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

78. In January 2025, Amazon engineers and applied scientists estimated that advertisers would save at least [redacted] in 2025, and increase their RoAS from [redacted] if they engaged in "perfect" bid shading and paid the prices actually determined by the second ranked bidder (the "GSP CPC") instead of Amazon's inflated price "which includes soft reserves." They added that even these estimates "likely understate" the total advertiser savings because they did not account for a likely decrease in all bids in an auction as all advertisers sought to shade their bids, which "would also decrease the GSP CPCs for many clicks."

79. Multiple Amazon employees with knowledge of its use of hidden soft reserves expressed their concerns within Amazon that the practice was not consistent with Amazon's representations to advertisers or advertisers' understanding of how Amazon's auctions functioned. Amazon employees said expressly that Amazon was not "doing the right thing" and was "playing with the auction rules" to increase Amazon's revenue at the expense of advertisers.

80. For example, an internal memo on auction economics written by Amazon employees in 2023 recognized that Amazon's use of undisclosed reserve prices in its purported GSP auctions was not "doing the right thing for the advertisers." The memo further argued that "[a] lot of changes that we have introduced in recent years for closing the gap between the auction clearing price and the highest bid in the auction are not right from an economics perspective," and that because Amazon was "playing with the auction rules" by "introducing soft floors" — i.e. soft reserve prices — the "customer-obsessed thing to do is to shade the bids on behalf of the advertisers; but we never do that for our onsite inventory." The memo acknowledged that Amazon's use of undisclosed reserve prices "increases our short-term revenue," but predicted that it would "hurt us in the long run."


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

81. Amazon's long and sustained efforts to deceive its customers about its auction pricing have resulted in billions of rigged auctions. As a result, Amazon has been able to successfully impose hidden surcharges on advertisers almost every time a shopper clicks on an advertisement on the Amazon website. Amazon's deception continues to this day.

## BACKGROUND

### A. Search Advertising Auctions

#### *1. Types of Auctions*

82. Sellers who are uncertain how much to charge for their products use auctions to set prices through competition. Indeed, auctions are a pure representation of competition. The most common type of auction is the "first price" auction, where the highest bidder wins the auction by outbidding rival bidders and pays the value of that bid. "Second price" auctions occur when the highest bidder wins the auction but pays a price equal to the second-place bidder (or the minimum amount needed to exceed the amount of the second bid). Auctions can be either open auctions, in which the bids are known to the other auction participants, or "sealed bid" auctions where the bids are only shown to the auctioneer. In both first price and second price auctions, both the winner and the resulting price are a direct function of competition.

83. In sealed bid first price auctions, the bidders are confronted by the risk that their bid may greatly exceed the amount needed to win the auction, *i.e.* their bid will be far above the second highest bid. Bidders in first price auctions therefore face the risk of overbidding. As a result, in sequential or repetitive auctions for identical or near-identical goods, winning bidders will often reduce their bids to test how far above their competition (set by the second highest bidder) their bid came in and try to reduce their bids to the minimum level needed to win future auctions. This strategy—called "bid shading"—allows the winning


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

bidders to pay less for the auctioned goods and decrease their costs. Bid shading can reduce the prices collected by sellers and decrease their revenue.

84. Second price auctions with sealed bids are called "sealed-bid second price auctions" or *Vickrey* auctions after Dr. William Vickrey, the Nobel-prize winning economist generally credited with their invention. Bidders in such auctions are incentivized to bid their true valuation of the auctioned product (*i.e.*, their willingness to pay) because they will only pay the minimum amount needed to exceed the amount of the second bid. Accordingly, participants do not face a risk of overbidding. Thus, when bidding for the same item again, bidders do not need to shade their bids downward to try to win at a lower price. In other words, a bidder in a sealed-bid second price auction does not have the same incentives to engage in *bid shading*, because doing so would increase the risk of losing the auction without reducing the price that will be paid if the bidder wins again. As a result, Amazon internally referred to second price auctions as "incentive compatible" since bidders "can achieve the best outcome to themselves just by" bidding their true value.

85. The prices set by sealed bid first price auctions are more transparent to winning bidders than their second price counterparts since they do not rely on the auctioneer to inform them of the amount of their own winning bid. By contrast, the winners of sealed second price auctions must rely on the auctioneer to inform them of the value of the second-place bid, and therefore the resulting price owed to the seller, unless other verification procedures are put in place.

86. Accordingly, in his article, *Counterspeculation, Auctions, and Competitive Sealed Tenders, Journal of Finance,* vol 16, no. 1, (1961), Dr. Vickrey acknowledged that sealed-bid second price auctions are vulnerable to fraud. He counseled that measures should be put in place to "prevent the use of a 'shill' to jack the price up by putting in a late bid just under the top


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

bid" and that "it would be necessary to show the second-best bid to the successful top bidder so that he would be able to assure himself that the price he is being asked to pay is based upon a bona fide bid." The practice of shill bidding has long been recognized as fraudulent. Dr. Vickrey advised that it "would probably be desirable to have all bids delivered to and certified by a trustworthy holder, who would then deliver all bids simultaneously to the seller." Under these circumstances, Dr. Vickrey concluded "the seller would have no incentive to do other than sell to the top bidder, showing him as his price the second-best bid."

87. Absent such preventive measures, the seller retains an incentive to secretly unseal the bids, identify the highest offer, and submit a phony bid higher than the second-place bid but slightly lower than the winning bid before the auctioneer announces the winner. That incentive is even stronger when, as is the case here, the seller and auctioneer are one and the same, controlling both the rules and the information needed to exploit the auction.

### *2. Use of Auctions in Digital and Search Advertising*

88. When platforms use an auction to sell advertising space on their own digital real estate — for example, when Amazon sells ads on Amazon.com — that is referred to as a "closed loop" auction. As the sole "publisher" of the advertising, these "closed loop" platforms typically operate their own proprietary auction systems and require advertisers to use these systems to access their available advertising space inventory. Thus, the digital platform serves as both the auctioneer and the seller of the advertising space to be auctioned. These digital platforms also control and can limit the type and level of auction data and metrics available to advertisers.

89. Digital advertising placements sold at such closed loop auctions are often displayed on search results pages which are generated in response to search terms or queries entered into



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

search bars or fields by users. Advertisers often pay for the advertising placement on a "CPC" or "cost per click" basis, meaning that the advertiser pays the website or digital platform each time a user clicks on the ad displayed. Some advertising placements are also sold based on how often the ad is seen by a user — typically, these ads are priced on a cost per 1000 impressions basis, also known as cost per mille or "CPM." Each auction happens in about a tenth of a second in a process known as real-time bidding. The winning bid or bidders get their advertisement displayed on webpages to viewers (each individual view is referred to as an impression) where the ads may be clicked by customers. Hundreds of billions of ad impression opportunities, leading to clicks by customers, are auctioned by digital platforms across the world every day.

90. Search advertising has been, and continues to be, largely sold through a form of *Vickrey* or "sealed-bid second price" auction. These auctions are *generalized* to reflect the fact that they sell and price multiple placements on the same search pages at the same time. Generalized second price or "GSP" auctions are widely considered the industry standard model used in digital search advertising. GSP auctions used in digital search advertising rank advertisers' bids based both on the amount of the bid (the proposed CPC) and by the relevancy of the ads to the search terms or query that will generate a search results page on which the winning ad will be displayed. This process is designed to ensure that users see the ads that they are most likely to click on, benefiting both the publisher and the advertiser. Publishers have an incentive to identify and display the ads that are most likely to be clicked by users, because they are paid on a per-click basis. Once advertisers are ranked by bid and relevance, and winners are determined, each advertiser's price is set at the minimum amount necessary to beat the next best advertiser and retain the slot — in other words, an amount just slightly higher than the bid of the next-highest-ranked advertiser.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

91. Such GSP auctions have been the industry standard for decades and are widely understood in the advertising industry. As discussed further below, when launching its search advertising auctions, Amazon adopted the industry standard GSP auction model.

92. Advertisers develop their bidding strategies based on the type of auction model employed by the seller or exchange, which is a fact Amazon knows well as both an ad seller and ad buyer. For example, after one of the largest advertising exchanges announced that it was moving from a second price auction (GSP) to a first price auction, Amazon, a frequent bidder (*i.e.*, advertising buyer) in these auctions, immediately adopted an aggressive strategy to shade its bids for advertising space.

93. Amazon also operates a separate business, called Amazon Demand Side Platform (DSP), which offers services and advice to advertisers who want to place ads in locations other than Amazon.com through third-party advertising auctions. With regard to those auctions, Amazon expressly advises advertisers to factor in the "declared auction model" of the advertising auction when devising their bidding strategy. A 2023 internal memo on Sponsored Ads auction economics prepared by Amazon employees explained that if an auction is first-price rather than second-price, or even if it is a second price auction that uses soft reserve prices, then "the right thing to do … is to shade the bids on behalf of the advertisers."

94. In a 2024 article promoting its DSP bid-shading algorithm, Amazon noted "the fundamental difference" between a second price auction and a first price auction "impacts bidding strategies and pricing dynamics, as participants must consider whether to bid their true value or shade their bid to potentially pay less." Amazon added: "Accurately adjusting bids based on the auction type is a core DSP functionality and plays a major factor in achieving advertiser goal KPIs and managing costs."



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

95. In January 2026, a coalition of advertising industry groups issued a report called "Digital Advertising Auction Transparency Standards." The report emphasized that advertisers' bidding strategies "are devised based on the understood rules of an auction system."

96. As described further below, Amazon publicly represents and leads its customers to believe they are bidding in a genuine generalized second price auction. Fundamentally, Amazon's representations communicate to advertisers that they are not participating in a first-price auction where they would be charged the amount of their bid, and that prices were set by a competitive bidding process, rather than arbitrarily by Amazon. By maintaining these representations and perpetuating its customers' misunderstanding, Amazon sought to maximize its profits from its scheme at the expense of its customers.

97. In reality, Amazon rigs its auctions to extract surcharges, misrepresents its auction model, and suppresses its advertising customers' RoAS.

## DEFENDANT'S BUSINESS ACTIVITIES

### A. Amazon's "Sponsored Ads" Search Advertising Products

98. Amazon allocates and prices advertising placements sold to advertisers on its website through real-time auctions lasting milliseconds, which are conducted each time a shopper enters a search query on its website. Amazon charges an advertiser a CPC each time a consumer clicks on its ad displayed on the search results or product pages. Amazon also auctions some advertising placements on a CPM basis where advertisers pay a set price based on the number of impressions each ad placement receives on a monthly or quarterly basis.

99. Advertisers bid on keywords that they expect will match Amazon shoppers' search queries. When a shopper enters a query, Amazon matches advertisers' bids to the query and then ranks the bids by the amount of the bid and a relevance factor based on, among other things,



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

the advertisement's predicted click-through-rate (CTR) and conversion rate of clicks that will result in sales (CVR). The advertisements are assigned to available slots from top to bottom within the search results in descending ranked score order.

100. Amazon's most profitable advertising program is Sponsored Ads, which is a suite of self-service products used by more than one million advertisers, including small businesses and authors, to set up advertising campaigns and purchase advertising on Amazon's website through these auctions. Sponsored Ads offers three main self-service products — Sponsored Products, Sponsored Brands, and Display Ads — for different advertisement placements displayed alongside organic results on Amazon's search results pages and product detail pages (which are webpages shoppers are transferred to when they click on a product appearing in the search results).

101. More than [redacted] of Amazon's overall advertising revenue — and more than [redacted] of Amazon's Sponsored Ads' revenue — is from Sponsored Products. Sponsored Products runs auctions to allocate advertisement placements in different locations on the search results page — referred to as top of the search page (TOP), middle of the search page (MOP), and bottom of the search page (BOP) — as well as on product detail pages. The auctions are used to sell advertising placements on both mobile devices and desktop computers.

102. Sponsored Brands runs auctions to allocate advertisement placements on the top of search results pages and on detail pages. **Figure 1** illustrates Sponsored Products and Sponsored Brands advertisement placements at the top of a search results page for a search query for "headphones." The advertisements are labeled "Sponsored."



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

**Figure 1: Sponsored Products and Sponsored Brands Placements**




103. Display Ads (or "Sponsored Display" ads) are similar to Sponsored Products and Sponsored Brands ads, but Display Ads appear on certain search results pages and detail pages based on audience targeting instead of keyword searches. **Figure 2** illustrates a Display Ads/Sponsored Display advertisement placement on a search results page.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

**Figure 2: Sponsored Display Placement**




104. Advertisers can set up and manage their Sponsored Ads advertising campaigns through an "advertising console" that Amazon provides. Amazon also assigns account representatives to larger advertisers that meet certain annual advertising spending thresholds.

105. Within the advertising console, advertisers or their advertising agencies or other agents set budgets for their campaigns and can place bids for their ads to be displayed based on targeted keywords that match a shopper's search query entered in the search field on Amazon's website.

106. Amazon offers advertisers the option through the advertising console to enable Amazon to adjust their bids up and down through automatic bidding strategies, using either (1) "dynamic bidding" where Amazon represents it will adjust bids up to 100% in either direction for certain placements "based on the likelihood of potential click converting to a



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

sale," or (2) "rule-based bidding (RBB)" where Amazon represents it will adjust bids up to 500% for each ad placement opportunity "based on how likely that opportunity is to result in a sale, working to meet the ROAS [return on ad spend metric] goals" set by the advertiser.

107. Automatic bidding strategies can currently adjust advertisers' bids up to 900% for specific, especially valuable Sponsored Products ad placements, which Amazon represents "can help you be more strategic with where your budget is set."

108. For Amazon sellers, which make up the vast majority of Amazon's advertising customers, securing placements on a search results page is critical to ensure visibility and drive sales on Amazon. The top of the page in search results is highly valuable advertising space and a leading source of sales revenue for Amazon's advertising customers. Within its advertising console, Amazon also provides its advertising customers "suggested bid" amounts to win auctions for impressions that can lead to clicks.

109. Amazon's advertising console is designed as a self-service platform offered directly to Amazon sellers, authors, and brands. Amazon has continuously offered its customers instructional materials, videos, and programs on its advertising console to explain how its search advertising auctions function, including how winners are selected and prices set, as well as how customers can access, enter, and input bids into its advertising console in order to participate in the auctions.

110. In addition to offering this self-serve approach, Amazon also provides advertisers on its website a list of agencies that are members of Amazon Ads Partner Network (https://advertising.amazon.com/partners/overview), who can manage advertisers' advertising campaigns or provide them with tools to improve their performance. Internally,



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

Amazon noted its goal was for these "partners [to] becom[e] amplifiers of Amazon Ads messaging and accelerators of product adoption."

111. Amazon represents that the agencies listed on its website as Amazon Ads Partners are "vetted" by Amazon and "have a range of expertise across Amazon Ads products and services, and can help your business achieve your goals in the Amazon store or beyond." Amazon also displays on its website the number of certifications each advertising agency within its Partner Network received each year for completing Amazon's online training courses. When advertising agencies submit bids on behalf of advertisers, they act as those advertisers' agents, a fact that their contracts with Amazon specifically confirm.

**B. Amazon's Second Price Auction Representations to Advertisers**

112. Since at least 2014, Amazon has represented in its Sponsored Ads marketing and training materials on its website, YouTube channel, and online training portals that it operates a "second price" auction where the winning bidder only pays an amount just "slightly higher than" or "one penny more than" the second-place bid (the bid that is ranked second based on both dollar amount and relevance).

113. Amazon also has hundreds of account executives in the U.S. who have been trained and encouraged to personally make these same pricing representations to advertisers and agencies in presentations. For example, a 2019 internal evaluation report for account executives contained the following comments to emphasize the second price representations in their oral presentations:

- "Loved your explanation of cpc and second price auctions" [Comments for "Sponsored Ads Pitch"]
- "You explained Second-Price Auction well." [Comments for "Sponsored Ads S&D"]
- "Make sure to go into the details of CPC model - specifically 2nd price auction for



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

client. Explain Win Rate in relation to Relevancy to helping a client to understand [sic] their chances of winning." [Comments from "Follow Up call on Condition1 for a Dive Deep on Sponsored Ads"]

- "Watch 'second-price auction' explanation and make sure there is clarity with paying .01 more than second highest." [Comments for "Sponsored Ads S&D – Shadow"]
- "Overall good call, brought in value prop for sponsored brands and explaining second price auction" [Comments for "Call Shadow"]

114. Amazon's second price representations are also understood to be true and repeated by companies that act as the agents of businesses and individuals with respect to their advertising on Amazon, including advertising agencies in Amazon's Partner Network.

### *1. Amazon's Representations in Training and Marketing Materials*

115. Amazon directs its advertising customers and their advertising agencies to online materials it posts about its Sponsored Products program on its YouTube channel and in online training portals. In 2014, Amazon's "primary" training resources for Sponsored Ads were available on its YouTube channel, which advised advertisers they "will only be charged a penny more than the next highest bidder" in its advertising auctions. Amazon has continuously made this second-price pricing representation with slightly varying examples in its Sponsored Ads' online training materials since that time.

116. In 2015, Amazon launched "Seller University" to provide access to online video tutorials and other "help" content to businesses that sold products on Amazon's website. Seller University's curriculum included training courses on advertising on Amazon, where sellers learned about Sponsored Ads services, including how to position, bid, and budget their advertising campaigns.

117. In October 2018, Amazon's head of marketing and training for advertisers provided the Senior Vice President of Amazon Ads, the Vice President of Sponsored Products, and other



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

senior executives in Amazon's advertising business "an aggregation of how the auction is represented across various training and marketing materials" for Sponsored Ads. She confirmed that Amazon's customers were told that "[t]he winner of the auction will pay an amount slightly higher than the second highest CPC bid if their ad is clicked. This is referred to as a second-price auction."

118. In 2020, Amazon launched the "Learning Console," an online portal to provide training content and certifications to Amazon advertisers, which Amazon rebranded as "Ads Academy" in 2024 (located at https://advertising.amazon.com/academy). At its launch, Amazon described the Ads Academy to advertisers as "your comprehensive learning destination for expanding your advertising expertise, driving business growth, and validating your skills."

119. Advertisers and agencies can become "certified" through the Ads Academy in subjects such as "Sponsored Ads" and "Sponsored Ads Advanced," by reviewing relevant content on the website and passing a certification assessment. Upon passing the assessment, advertisers and agencies receive a digital badge and a certificate, which Amazon touts as "demonstrat[ing] to your network that you're a pro at driving results with Amazon Ads."

120. From its launch through 2026, training materials available to advertisers across Amazon's Ads Academy continued to represent that Amazon runs a second price auction where the prices advertisers pay are set by the amount of the second-place ranked bid, such that the winner only pays an amount necessary to win the auction, or an amount just "slightly higher than" the second-place bid.

121. For example, Amazon Ads Academy provides online training courses that are designed for advertisers to "[l]earn the sponsored ads' fundamentals" and that "cover the essentials of sponsored ads." In these courses, Amazon represents: "Your bid is the maximum amount



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

you're willing to pay if your ad is clicked. If your ad is clicked, you will pay an amount slightly higher than the second highest CPC bid."

122. Amazon Ads Academy also provides a series of webinar training videos which represent:

> Your cost per click may actually be lower than your bid, because Amazon Ads uses a second price auction … you will only pay what the advertiser who came in second place bids plus approximately 1 cent.

These videos are directed to: (i) advertisers "who haven't started advertising on Amazon" under the header "Getting started with Amazon Ads and brand building;" and (ii) to self-published Kindle authors under the header titled "Getting started with Amazon Ads for KDP [Kindle Direct Publishers] Authors." As seen below, the webinar titled "Introduction to bids and budgets," which is included in the series of videos under both headings, explains "How auctions work" by ranking ads "based on a combination of bid and the ad's relevance to shopping queries." It then graphically shows an illustrative auction where the winning bidder (who bids $0.75) based on relevance and bid amount pays only a cost-per-click charge of approximately 61 cents — a price one cent more than the second-place bid.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829




123. Amazon posted on Amazon Ads' YouTube channel similar webinar training videos that made the same second-price pricing representations. For example, Amazon posted a webinar video from 2023 through at least 2024 titled "Learn about auctions and the cost-per-click model," which states: "Your cost per click may actually be lower than your bid because Amazon Ads uses a second price auction. This means that the advertiser who bids with the most relevancy on a keyword wins the auction and has their ad displayed. However, you only pay what the advertiser who came in second place bids, plus approximately one cent more."

124. Amazon's "Getting Started with Sponsored Ads for KDP Authors," targeted at self-published Kindle authors, has also been available on its YouTube channel since 2020. It states: "Once your ad is actually clicked, your cost-per-click is going to be approximately 61 cents. This is because we use a second-price auction, so we will charge you one cent more than the next highest bidder." As seen below, the webinar graphically shows a similar



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

illustrative auction as displayed in the Ads Academy where the winning bidder (who bids $0.75) pays only a cost-per-click charge of approximately 61 cents — a price one cent more than the second-place bid.




125. Amazon repeats the representation that it operates second price auctions in other training materials for its advertising customers. For example, from at least 2025 to July 2026, Amazon posted on its website a "developer guide" for Sponsored Brands campaigns — a resource for advertising customers who want to use "advanced tools" "to programmatically create and manage campaigns" — that states: "With how the Amazon Ads auction's [sic] work, advertisers only pay the least bid amount needed in order to win, so they don't need to worry about strategizing about how to set bids."

126. Amazon also repeated the representation that it used second price auctions on at least four additional webpages on Amazon's main website about its advertising products (located at https://advertising.amazon.com).



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

127. From at least 2022 through 2024, the Amazon Ads website home page linked to a webpage titled "Creating Your Brand Foundation on Amazon" (located at https://advertising.amazon.com/library/guides/creating-your-brand-foundation-on-amazon), that stated, as shown below: "Bidding on Amazon Ads is a second price auction. This means that the advertiser who bids with the most relevancy wins the auction and has their ad displayed. However, the advertiser pays the amount of the second-place bid."

## Auctions

Through auctions, Amazon determines which ads to show to customers based on a combination of the advertiser's bid and the ad's relevance to shopping queries.

Bidding on Amazon Ads is a second price auction. This means that the advertiser who bids with the most relevancy wins the auction and has their ad displayed. However, the advertiser pays the amount of the second-place bid.

For example: A shopper browses for a 4K professional video camera. Three sellers have the following bids:

- Seller 1 bids $0.75 for the keyword "4K video camera"
- Seller 2 bids $0.60 for the keyword "video camera"
- Seller 3 bids $0.45 for the keyword "camera"

Seller 1 wins this auction because of their keyword relevancy and their high bid, but will only have to pay $0.61.

**Learn more about auctions**

(Amazon removed this second price auction representation displayed above from this page only after learning of the FTC's investigation in October 2024 but did not disclose this information to the FTC until August 26, 2026.)

128. Additionally, from at least 2023 to 2024, two pages targeted at authors selling books in Amazon's store titled "The author's guide to Sponsored Products" and "The author's guide to Sponsored Brands" — located at https://advertising.amazon.com/library/guides/authors-guide-to-sponsored-products and https://advertising.amazon.com/library/guides/sponsored-brand-authors — repeated the claim that Amazon's advertisements were sold through "an



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

auction-based … system" where the winner would "only pay $0.01 more than the second-highest bid," and provided an example shown below.

### Example

If your book is a novel about war, then your campaign is targeting the keyword "war novels," and you have chosen to bid $0.75.

There is also an author bidding $0.60 for the same keyword, and another author bidding on the keyword "war books," also for $0.60.

Since you're the highest bidder and the keyword you bid on matches the shopper's query exactly, you will win the auction and your ad will be shown. However, you only pay $0.01 more than the second-highest bid—meaning that although you bid $0.75, you will pay $0.61, one cent more than the second-highest bid of $0.60.




129. Further still, from at least November 2023 to November 2024, the mobile version of the Sponsored Products webpage (located at https://advertising.amazon.com/solutions/products/sponsored-products), as shown below, stated that "Sponsored Products ads are placed into a second-price auction where they are ranked based on expected click-through rate, advertiser bid, and how relevant the ad is to the customer context."

## How does Sponsored Products work?

Ad placements are determined by matching advertiser-provided keywords and products to customer context. Sponsored Product ads are placed into a second-price auction where they are ranked based on expected click-through rate, advertiser bid, and how relevant the ad is to the customer context.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

130. This language led at least one Amazon employee to raise concerns about experiments Amazon was running to charge advertisers prices higher than the second price auction result, given that "Amazon explicitly stated that Sponsored Products ads are running under a second-price auction on our website."

### ***2. Amazon's Second Price Auction Representations Are Repeated by its Account Managers, and Even the Head of Amazon Ads***

131. Amazon also trained its account representatives to represent to advertisers that Amazon operates a second price auction where the winning bidder only pays the amount necessary to win the auction.

132. For example, in a February 2024 Amazon training video titled "Sponsored Ads Proficiency Training," the speaker says: "Amazon Ads is what's known as a generalized second price auction. The CPC that you're charged is the minimum required to beat the ad with the next highest ranked score in the auction. What this really means is that your advertiser is never going to pay more than they need in order to win the auction." The training video displayed the graphic below, illustrating that the highest bidder (Bidder C who bid $10) is charged only $7.01, or one penny more than the second-place bidder.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829




133. Amazon account representatives repeated these second-price representations in communications and presentations they gave directly to advertisers and agencies where they provided the same or substantially similar illustrative examples that appeared on Amazon's Ads Academy online training materials.

134. For example, a 2023 presentation by an Amazon account representative titled "Workshop: Jump start your sponsored ads campaigns" contained a slide titled "How auctions work" illustrating how Amazon's second price auction worked with the winning bidder only paying an amount determined by the second-place bid:



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829




135. The presenter's notes accompanying the slide above state: "Bidding on Amazon Ads is a second price auction. This means that the seller who bids with the most relevancy on a keyword wins the auction and has their ad displayed. However, you only pay what the seller who came in second place bids."

136. Similar representations were embedded in "pitch deck" presentations that were approved by Amazon's public relations and legal departments for Amazon sales representatives to use to describe Sponsored Ads "in 1:1 meetings with clients and onboarding new advertisers" through at least 2023, and from at least 2020 to 2023, Amazon representatives regularly gave presentations that stated that Amazon Ads auctions "use a generalized second-price auction model" to Amazon sellers including Sony, Samsung, Harman JBL, and Coach.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

137. These explicit false representations that Amazon Ads uses a second price auction were not limited to sales meetings. In February 2024, the Senior Vice President in charge of Amazon Ads was personally emailed by the CEO of an advertiser, who asked: "Regarding pay per click[,] If I put in a very high dollar amount per click, does that mean it will cost me that much per click, or will the system only charge me the going rate for that keyword at that time. So for example, if the competition is bidding between $1.50 and $2.00, if I bid $5, will it charge me 5 or will it charge me somewhere between 1.50 and 2.00[?]"

138. The head of Amazon Ads replied with the same false representation that Amazon consistently makes to its advertising customers: "Generally, the amount you pay is governed by a generalized second price auction - which means that the amount you pay for a click is dependent on what the next lowest bid is. So, if you bid $2.00 and the next lowest bid is $1.00, you win the auction and pay $1.01." The advertiser then confirmed that he had executed his bidding strategy in reliance on this false representation: "Yes that is perfect[.] So I just went ahead and put 5 dollars so that I for sure win every keyword. Thanks for everything."

### *3. Amazon Is Aware That Its Second Price Auction Representations Have Been Widely Understood and Repeated By Amazon's Partner Network and Throughout the Industry*

139. Amazon's representations that it operates second price auctions have also been widely understood and repeated by companies that assist businesses and individuals in advertising on the Amazon website, including ad agencies within Amazon's Partner Network whose services Amazon promotes to advertisers.

140. Within the last decade, an industry of companies has developed that assist companies and individuals in advertising on Amazon's e-commerce website. Members of this industry, ranging in size from large national advertising companies to small, highly specialized digital



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

advertising firms, have repeatedly described on their websites and online posts that Amazon runs a second price advertising auction in which the winning bidder would pay just slightly more than the next-highest bidder.

141. Amazon Ads partner agencies have repeated on their own websites the guidance they receive directly from Amazon in its training materials and presentations, including that Amazon operates a second price auction where the winning bidder pays only one penny more than the next highest bidder. For example:

- In January 2020, Amazon Ads partner Feedvisor posted a blog titled "Walmart vs. Amazon: A Comparison of Advertising Platforms," which contrasted Walmart's then "first price bid auction," with Amazon's "second-price bid auction" where "you would only pay 1 cent above the second-highest bid in the auction[.]"

- In August 2021, Amazon Ads partner PPC Entourage posted an article titled "Amazon Ad Bidding Strategies Every Seller Should Know," stating "Amazon follows Second-Price Auction rules in which the highest bidder only pays $0.01 more than the second-highest bidder."

- In August 2023, Amazon Ads partner Teikametrics posted a blog titled "Guide to Amazon Advertising for 2024," stating: "Keep in mind that Amazon Sponsored Products ads are purchased in a second-price auction. This means, assuming you have a winning bid for a given placement, you pay one-cent over the next highest bid, which may be less than your exact bid amount."

- In December 2023, Amazon Ads partner Jungle Scout posted a guide titled "2024 Amazon Advertising Guide for Sellers," which provides "you won't necessarily pay $0.50 either—your actual cost may be much lower, as it depends on what the next-highest bidder has budgeted. So if your closest competitor is bidding $0.35 per click, you'll only pay $0.36 for a click—just enough to one-up them."

- In January 2025, Amazon Ads partner Ads Badger posted a blog titled "Amazon Advertising Stats (2025 Update)," which states that "the price you pay is just a penny more than what is the next highest bidder is willing to pay for that keyword. For example, if you bid $3 and the next highest bid was $1.00, then your CPC would be just $1.01 even though the highest bid was $3."



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

- In September 2025, Amazon Ads partner Canopy Management posted an article titled "How Much Does Amazon Advertising Actually Cost in 2025?," which provides: "The system uses auctions, so you typically pay just one cent more than the second-highest bidder. If you bid $1.00 and the next person bids $0.75, you'll pay $0.76."

- In February 2026, Amazon Ads partner SellerMetrics posted an article titled "Amazon Bidding Strategies: Fixed vs Dynamic / New Prod vs Old," stating: "To optimize Amazon Ad bids, it's important to understand the logic behind winning the ad auction. Amazon uses what is called a 'Second Price Auction.' A second price auction refers to an auction where the winning offer will always be a penny more than the next highest bid, all else being equal. It is important to understand this because it means that you do not have to spend your maximum CPC bid to win an ad auction."

### ***4. Amazon's Advertising Customers Believe That It Conducts Genuine Generalized Second Price Auctions, As Promised***

142. In sum, Amazon continued through 2026 to represent to agencies and advertisers that it runs second price auctions where the winning bidder only pays an amount just necessary to win the auction even though by 2019 Amazon began overriding the second price auction results and instead inflated prices using secret reserve pricing.

143. Amazon knows that advertisers' incorrect understanding that Amazon runs second price auctions affects the way that they bid. For example, a manager in charge of pricing for Sponsored Products auctions wrote in a February 2024 message: "Many advertisers bid far higher than what they are willing to pay … because they assume its GSP." In the same message, he acknowledged that this assumption was false: "We don't strictly do GSP, since we have reserves." A 2023 Sponsored Products memorandum also acknowledged advertisers bidding "extremely high" based on their understanding that they were participating in a second price auction: "some advertisers bid extremely high in order to dominate auctions while continuing to pay second-price CPCs that are a small fraction of the unadjusted bids."



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

144. A principal scientist on the Sponsored Products auction team also explained in 2024 that advertisers were unaware that Amazon did anything other than apply second price auction rules. When another member of his team asked if he thought that she could publish a paper about some of her work on Amazon's "black box auction changes" including its reserve prices, he told her it was unlikely, because "the mention of" Amazon Ads "tuning pricing controls is new information that is not available publically [sic]" and "only GSP logic is known publically [sic]."

145. Others on the Sponsored Products auction team have expressed similar sentiments. In June 2023, a pricing team document acknowledged:

> "[M]any advertisers set a default high bid because they trust our Generalized Second Price Auction process."
>
> "Many advertisers set a relatively high bid i.e. $100 or $1000 because they trust Amazon is not running a first price auction; and advertisers choose smart bidding, espcial [sic] Up & Down, because they believe Amazon will not simply charge their first price. This should be obvious, just to make sure everyone is on the same page."

146. On October 30, 2025, almost a year after learning of the FTC's investigation, Amazon first added a reference to "reserve pricing" to a single place on its website — a page labeled "Understand Amazon Ad auctions" in its "Support Center." To reach this page from the Amazon Ads Support Center homepage, a user needs to either specifically search for it in the search bar (using a term like "auction"), or click first on the "Bidding and Budget" link on the Support Center homepage, and then "Understand Amazon Ad auctions" — but not on other available links such as "Understand bidding" or "Bidding strategies for Sponsored Products."

147. The October 30, 2025 language on this page regarding "reserve pricing" stated only:

> Reserve pricing functions help establish the value of an ad based on a variety of factors that may include placement, context, and potential performance (e.g., the same ad placement may have a different value during peak shopping period than a non-peak period).



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

Amazon did not define “reserve pricing functions,” or disclose that its use of that term means that it replaces auction results with higher prices that it sets itself.

148. In March 2026, Amazon again updated the reference to “reserve pricing functions” on the “Support Center” page to read as follows:

> Because different ad placements offer different value to advertisers, shoppers, and Amazon, reserve pricing functions may affect the cost of your ad. Some reserves help allocate ad space by setting a bid threshold. Your bid must meet this amount to be allocated, and you'll be charged at least this amount if your ad wins. Other reserves influence your final CPC or vCPM based on factors including the likelihood that the ad will lead to a sale, predicted return on your ad spend, the value of any competing bids, placement, context, and predicted performance (e.g., the same ad placement may have a different value during a peak shopping period than a non-peak period). As a result, the price charged to you may exceed the runner-up bid but will never exceed the maximum bid you authorize.

149. The quoted paragraph above is one of several on the “Amazon Ads auctions” page under the header “Ad selection and pricing.” An example of the page’s appearance, with the above paragraph highlighted, is below:



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

# Understand Amazon Ads auctions

Learn how Amazon Ads auctions work and how to effectively manage your campaigns.

## Ad selection and pricing

Within the Amazon store, we offer a range of ad formats and placements across a variety of pages and contexts. Our goal is to connect advertisers to shoppers at the right moment in their shopping journeys. Shopping involves searches, visiting product detail pages, comparing products, considering products others have purchased or offerings from different brands, and other steps—often in a single purchase. Customers may encounter a brand or product several times during their journey in different formats and contexts. Often, a single search or product detail page will contain multiple different ad units—each of which has unique characteristics. To help choose the ads that appear in those placements and to determine the price, we usually run auctions.

We run billions of auctions each day with multiple auctions often running simultaneously on a single page because of the variety of placements and ad formats. You may win one auction and not others on that page because of the unique qualities of each placement, your ad, and what else is on the page. No two auctions are entirely alike.

Our auctions evaluate a variety of factors in determining what ads to show, placing particular value on the ad's expected relevance to the customer. We predict what will help customers find, discover, and buy the products and services they want based on variables like:

- The content surrounding where the ad will go
- The customer's search query (if applicable)
- The likelihood a customer will engage with the advertised product or service
- The customer's shopping interests

How these variables interact may change across ad opportunities as we try to place your ad in the context the customer will find most useful. As a result, ads with lower bid amounts, but higher relevance to the customer, can and do win our auctions.

Because different ad placements offer different value to advertisers, shoppers, and Amazon, reserve pricing functions may affect the cost of your ad. Some reserves help allocate ad space by setting a bid threshold. Your bid must meet this amount to be allocated, and you'll be charged at least this amount if your ad wins. Other reserves influence your final CPC or vCPM based on factors including the likelihood that the ad will lead to a sale, predicted return on your ad spend, the value of any competing bids, placement, context, and predicted performance (e.g., the same ad placement may have a different value during a peak shopping period than a non-peak period). As a result, the price charged to you may exceed the runner-up bid but will never exceed the maximum bid you authorize.

We are continually experimenting to refine and improve our ad auctions, customer experience, and the performance of the ads we show. This might include introducing, removing, or modifying the data points or factors used in the auction process, or introducing new formats and features that help make ads more useful to customers while delivering returns to advertisers.

## Campaign management

Given the variety of factors that go into ad auctions, you can effectively manage your advertising investment by reviewing your campaign performance and adjusting your bids to meet your goals. Rather than trying to optimize for specific auctions, focus on setting bids that align with your overall goals and adjust them based on the balance between performance and cost that works for you.

As your campaign runs, you should closely monitor your performance using the various reporting metrics we provide to ensure your campaign is meeting your goals; if it's not, you can adjust your campaign settings anytime to achieve a set-up that works for you.

As you consider what to bid, be sure to review relevant product materials to understand bidding strategies and options, and other campaign features and options, so you can set up your campaign in a way that's most likely to help reach your advertising objectives.

**Note**: We will never charge you more than the maximum bid you authorize and you should only bid what you are willing to pay. Accordingly, as you enter your bids, make sure to account for applicable bid adjustments and dynamic bidding features that may increase or decrease your entered bid amount for some ad opportunities.

150. This reserve pricing reference on one page on Amazon's website fails to clearly and conspicuously disclose the nature, scope, and extent of Amazon's secret reserve pricing systems that have been in place since 2018. There are no other references to Amazon's use of reserve pricing to raise prices on Amazon's public website, and Amazon has not taken any additional steps to correct the affirmative false statements it made (and continues to make) regarding the functioning of its auctions.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

### C. Amazon's Implementation and Concealment of Its Reserve Pricing Systems

151. In late 2018, Amazon started to employ undisclosed "soft reserve pricing" systems that added secret surcharges on top of the price set by the second price auctions. Amazon initially launched these hidden pricing systems to extract more profit from its Sponsored Brands customers. Then, Amazon began to deploy similar systems to raise its Sponsored Products prices in 2019. By 2023, Amazon also added hidden reserve prices to Display Ads auctions.

#### *1. In 2018, Amazon Began Inflating Prices Above Second Price Auction Results Using Secret Reserve Pricing*

152. From 2012 to 2018, Amazon ran generalized second price auctions, which Amazon internally recognized as the "industry standard" for search advertising, consistent with its representations to advertisers. An internal 2021 Amazon document titled "SP Pricing Historical Context and Future Direction" recounted this history: "As of 2018, SP [Sponsored Products] ran a GSP auction without any reserves," explaining that the "perspective was that this was an industry standard mechanism and we didn't want to interfere with the auction[]."

153. By 2018, however, Amazon determined it was no longer satisfied with the prices competitively set by its second price auctions, so it began to devise ways to use secret reserve pricing systems to add hidden surcharges above competitive pricing set by the GSP auctions.

154. In January 2019, Amazon's auction managers considered moving to a "first price auction" model where the winning bidder is charged the price of its own bid (rather than a price that is just enough to exceed the second-highest ranked bid), but recognized that if



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

they did so, advertisers would lower their bids or start bid shading to avoid overpaying for ad placements.

155. Internally, Amazon managers noted that a "first price auction would incentivize advertisers to lower bids in many cases, which will likely destabilize the market and likely be a one-way door," meaning a decision that cannot easily be reversed.

156. Amazon sought to preserve advertisers' belief that they were still competing in genuine GSP auctions so that they would continue to bid as high as possible, even after Amazon secretly discarded GSP pricing. While working to maintain this false belief, Amazon introduced undisclosed reserve-pricing mechanisms that allowed it to override the auction's competitively determined second-price outcome and impose higher, algorithmically generated prices that Amazon internally described as the "fair market" it believed it was entitled to collect.

157. For example, an internal 2021 Amazon document called "Pricing Introduction" discussed the rationale Amazon used for adding pricing controls "on top of the GSP auction" where there is a large gap between the winning bid price and GSP auction price. The document explained that: (1) prices set by GSP auctions can, in Amazon's view, be "significantly below 'fair market value'" because advertisers in GSP auctions bid "the maximum amount [they] are willing to pay when [their] ad is clicked" but can only "end up paying a small fraction of [their] bid"; (2) this "gap between bid and charged amount" in GSP auctions "leads to significant revenue opportunity cost" for Amazon; and (3) Amazon can capture this "revenue opportunity" by secretly using a "soft floor reserve pricing mechanism" to set prices that are closer to the winning bids to levels "beyond what would be organically achieved through advertiser competition." That document is excerpted below:



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

> Prices computed according to GSP logic can be significantly below 'fair market value' in some contexts because of a multitude of reasons (demand deficiency, large heterogeneity in auction scores or budgets running out mid-day). For instance, in 2019, advertisers ended up paying less [than] 50% of their bid, in average, for Sponsored clicks on the top of search page. Reserve price controls applied on top of the GSP auction enable us to adjust CPCs beyond what would be organically achieved through advertiser competition.
>
> Sponsored Brands (formerly Headline Search Ads) is an Amazon native CPC advertising program, that helps Amazon shoppers discover brands through branded ad impressions. SB auction follows a 2nd-price auction mechanism, where highest ranked ad in the auction is provided price-support by 2nd highest ranked ad. Due to lack of auction depth and large difference in expected cost between top-2 ranked ads, the highest ranked ad can end up paying a small fraction of its bid amount when clicked. Here, bid amount is the maximum amount the advertiser is willing to pay when her ad is clicked. The gap between bid and charged amount leads to significant revenue opportunity cost to Amazon. In 2019, SB auction implemented soft- floor reserve pricing mechanism to monetize the revenue opportunity. A soft floor reserve price offers (floor) price support in a 2nd price auction mechanism, and switches the auction to follow a 1st price mechanism when bid of winning ad falls below the reserve price. Initially, we launched query level and keyword level reserve prices. Before Black Friday, we introduced seasonal adjustments to reserve prices, which enabled SB to monetize large-scale seasonal events till the end of the year. Finally, we launched automated reserve price adjustment technique, which continually ensures a controlled tradeoff between marketplace level revenue and ROAS. Reserve pricing has been a key driver in helping SB reach its revenue goals for 2019.

158. In short, Amazon believed that it could extract more revenue from advertising customers than it was obtaining using a second price auction, and that the way to do it was to secretly charge prices that were closer to the bid submitted by the winning advertiser. A Sponsored Products team member concisely summarized Amazon's motivation for implementing "soft reserve" pricing in an internal memo: "**Reserve prices are good for Amazon because they don't change the allocation [of ads] and advertisers must pay more for the same advertising. Obviously, the benefit to Amazon comes at the cost of advertisers**." (emphasis added).

159. Similarly, another internal Amazon document titled "Pricing for Sponsored Products" memorialized when Sponsored Products started "using soft reserve controls" in GSP



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

auctions that "had a low monetization rate," on the grounds that "we [Amazon] were leaving money on the table."

160. As Amazon explained in its internal documents, beginning with Sponsored Brands in 2018, Amazon started to employ undisclosed "reserve pricing" systems that added secret surcharges on top of the price set by the second price auctions. Sponsored Brands team members internally described its reserve pricing as "soft floors" that are "the same thing" as a "surcharge," and referred to the actual prices charged by Amazon as a "surchargedSecondPrice" that has a "a surcharge hidden in it."

161. In early 2019, Amazon's Sponsored Products "Allocation and Pricing" team also began to "explore alternative pricing mechanisms." A 2019 team planning document stated: "Sponsored Products currently uses a Generalized Second Price (GSP) auction. This maintains an ***invariant*** that an advertiser is charged the minimum amount necessary to win the specific slot they were awarded" (emphasis added). Similarly, another team document stated: "Our current pricing follows Generalized Second Price mechanisms and excludes direct revenue maximizing variations" including "reserves."

162. In March 2019, the Director responsible for Sponsored Products' auctions acknowledged that Amazon was increasingly "moving away from thinking about pricing with rigid rules" including the rule "that we must maintain GSP." Instead, he continued, Amazon was "thinking about pricing as the policy which empirically produces the best long-term profitability taking into account advertiser behavior."

163. Although up until 2018 Amazon's Sponsored Products auction team had been adhering to the GSP auction model represented to advertisers, in 2019, they proposed a new plan that included running experiments including the use of "non-GSP" pricing and a "blended average of first and second price" auctions, despite the representations made to advertisers



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

concerning how GSP auctions functioned. While the team acknowledged that the experiments "must be done to minimize risk of irrevocable damage to advertiser trust," they also knew they would have to consider "tradeoffs" with respect to "fairness." Weighing heavily in favor of proceeding with these plans was the "huge opportunity" to increase advertising revenue.

164. In its 2019 operating plan reviewed by the Vice President of Sponsored Ads and other members of Amazon's senior executive team, Amazon's Sponsored Products division reported that it "introduced CPC reserves" in 2019, and that "[o]ur data shows a [redacted] ad revenue opportunity by improving monetization through pricing." However, a Sponsored Products team document added "we cannot unlock this opportunity without a precise understanding of how pricing changes influence advertiser trust and responses (e.g. changes to bids or budgets)," and so the reserves were initially implemented "with extremely conservative guardrails on advertiser impact to minimize risk of a permanent damage." Amazon's Sponsored Products division was primarily concerned that Amazon's short-term revenue gains might be reversed in the long-run if advertisers discovered Amazon's tactics to surreptitiously raise advertisers' prices.

165. Amazon senior executives sanctioned and directed Amazon Ads' employees to continue using hidden reserves to increase revenues and, at times, even to hit periodic financial targets. For example, in 2023, after noting that Display Ads was going to "miss" its then-current financial "plan by [redacted]," the head of Amazon Ads told the Senior Vice President of Ad Products and Tech: "I'd like to pull out all of the stops (without doing unnatural acts) to close our gaps to plan. I suspect that the entire gap won't be closed, so whatever can be done with reserves (ideally at least [redacted] would be helpful)." The Senior Vice President



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

confirmed: "Will come back with a bridge that includes improving monetization using reserves."

### *2. Amazon Knew Its Auction Results Reporting Hid Its Reserve Pricing*

166. Included in Amazon's assessment of these risks was the fact that Amazon knew the auction results it presented to advertisers were "opaque" and that advertisers would not be able to verify that their CPCs were set by second price auctions, as Amazon represented. Because Amazon did not provide invoices or auction results at an individual CPC or individual auction level, it knew that advertisers could not detect whether Amazon manipulated or misrepresented the auction results.

167. Amazon's Sponsored Products auction team understood that advertisers' "perceptibility" of Amazon's reserve pricing is affected by Amazon's "reporting frequency/aggregation," which masked individual auction results. An internal 2020 Sponsored Products pricing document noted that because "[a]dvertisers do not necessarily observe the individual outcomes of repeated auctions" but instead only "observe aggregate performance over sometimes very heterogeneous actions," their "ability to causally attribute changes in outcome [the CPC charged] to changes in bids" is "impair[ed]."

168. Ultimately, Amazon was able to leverage its lack of detailed data reporting and advertisers' inability to verify individual auction results. For example, despite the increasingly high first price rate in Amazon's Sponsored Ads auctions, advertisers are unaware that they frequently pay the amount that they bid for a click, rather than the minimum amount needed to win the slot they were awarded, as would be the case in a legitimate GSP auction.

169. One reason that advertisers cannot detect a high first price rate is the manner in which Amazon reports the results of its Sponsored Ads auctions. The Sponsored Products team's



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

operating plan for 2019 described Amazon's auctions as having "highly obfuscated reporting." As one Amazon internal memo about the institution of surcharges for Sponsored Brands put it, advertisers are unlikely to "adjust their bids in an attempt to lower their payout" because "[a]dvertisers do not have visibility into the behavior of individual auctions." Instead, "[r]eporting is provided at a keyword level," and "[t]his would make it very difficult for advertisers to detect and react to a 1st-price opportunity."

170. In addition, soft reserve prices are applied differently for different placements on the Amazon website — for example, at the top of the search results versus in the middle or on a product detail page. And Amazon's reserve pricing systems generate different prices for desktop versus mobile device placements in ways that are difficult for advertisers to detect. In 2019, when the Vice President of Sponsored Products asked whether the use of surcharges might create "first price problems" for Sponsored Products, he was told that "[a]dvertisers can only see placement level reports that aggregate impressions across all devices [*i.e.* desktop and mobile] and cannot readily understand the relationship between CPC and [their bid] as they tweak their bids."

171. Moreover, advertisers often do not even know the amount of their bids because they adopt tools provided by Amazon to adjust their bids automatically. An FAQ document prepared by the head of Sponsored Products auctions in advance of a 2020 meeting between the Vice President of Sponsored Products and the Senior Vice President of Amazon Ads stated that because of the effect of these automatic bid adjustments (sometimes referred to as "proxy bidding" or "smart bidding"), "an advertiser doesn't even know what bid is being entered (and thus can't know if the CPC charged was first price)." Or, as the head of Sponsored Products auctions put it in an earlier email to the Vice President of Sponsored Products, the combined effects of "bid adjustments and pricing" make Amazon's ad


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

auctions a "black box" to advertisers, and "since advertisers only see the amount they get charged, they can't differentiate between adjustments made by smart bidding and auction pricing."

172. As explained in internal memos, Amazon also believed it could further mitigate the risk of detection by "setting guardrails on aggressiveness" of its reserve pricing systems and "closely monitor[ing] advertiser response to pricing changes."

### *3. Amazon Designed and Implemented Its Undisclosed Reserve Pricing Systems to Avoid Detection*

173. Amazon developed its undisclosed reserve pricing systems with several guardrails and constraints to conceal their existence from advertisers, who believed that they were participating in a genuine second price auction for advertising space. As Amazon documents acknowledged at the time, Amazon "currently use[s] second price like language when explaining CPC calculation," and so pricing that appeared to deviate from GSP rules would result in "eroding trust." Accordingly, Amazon employees internally discussed the need to use guardrails to set a "reserve price" that "simulates a 'natural' second price CPC based on the second highest bid/auction runner up[.]"

174. Amazon initially launched its reserve prices in Sponsored Brands auctions during the Christmas holidays in 2018, so that the "price increases were masked by holiday increases in advertiser demand." Amazon then "dial[ed] up" its reserve prices for Sponsored Brands advertising in early 2019, but on a "slow rollout schedule" to "not increase advertiser prices too precipitously." After identifying a [redacted], the Sponsored Brands team further developed "reserve pricing controls" for Sponsored Brands auctions in order [redacted] and get "close to [its] forecasted target."



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

175. In mid-2019, Amazon launched reserve prices in Sponsored Products second price auctions as well. The Sponsored Products team initially used reserves to increase prices for search queries that had either the highest average RoAS (i.e., in order to reduce advertisers' RoAS for these queries) or the lowest monetization rate (the ratio between the CPC charged to the advertiser and that advertiser's winning bid). By 2020, Sponsored Products used two additional reserve pricing mechanisms. One reserve mechanism set the reserve price [redacted] The second reserve mechanism [redacted]

176. From 2019 to 2021, Sponsored Products selected the highest reserve price derived from these three alternative pricing systems (referred to internally as Smart Reserves V1, V2, and V3) to calculate a hidden surcharge added on top of the second price auction result. In 2022, Sponsored Products launched the "eOPS based" pricing reserve that is in effect today, and which raises advertisers' prices in order [redacted]

177. Amazon's policy was to keep the existence of these surcharges hidden from its account managers and sales representatives who interacted with its advertising customers.

178. Sponsored Ads employees who did know about Amazon's use of hidden reserve prices carefully controlled their language, even in internal documents, to avoid further exposing the secret. In April 2024, an Amazon scientist prepared a draft of a presentation on the economics of advertising auctions for an internal Amazon conference that included the slide below. Another Amazon scientist advised him that he needed to edit the slides, because they contained the word "surcharges," and "we have been advised to avoid this term in any internal or external communication."



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829




179. In July 2024, members of the Sponsored Products auction team discussed using a different word than "surcharge" in their internal communications. A team member prompted ChatGPT: "Give me some different terms for the term 'surcharge' in Sponsored Product pricing. This term is currently used to describe the additional price that we charge on top of the second price CPC we charge to advertisers for every click. This additional price is determined based on the performance/value we deliver to advertisers through the ad." The team then considered replacing "surcharge" with alternate terms which included, among others: "value adjustment," "price refinement," "price adjustment," "inflated CPC," "price exaggeration factor," "performance premium," and "profit extraction lever." The auction team ultimately suggested "performance premium."

### *4. Amazon Placed Guardrails on Reserve Prices to Keep Surcharges Secret*

180. To hide these surcharges and Amazon's abandonment of second price auctions from advertisers, Amazon used "guardrails" and "[redacted] constraints" on reserve prices that



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

capped the size of surcharges [redacted] Amazon applied both the guardrails and the [redacted] constraints after the auction established the winning and second-place bidders.

181. Amazon imposed a "[redacted] constraint or guardrail," which [redacted] due to hidden surcharges, rather than one penny or slightly more than the second-place bidder. Internally, Amazon discussed the need to be "extremely cautious" and having "strict bounds on [redacted]" when they started using reserve prices because [redacted]

182. Accordingly, the initial [redacted] constraint set by Amazon was only [redacted], so that the reserve pricing system would be restricted from charging [redacted]. In 2020, two applied scientists working on Sponsored Products' auctions discussed how [redacted] constraint should limit the likelihood that advertisers would discover the surcharges and realize they could reduce what they pay by lowering their bid: "Basically, we want to 'bound the probability that any advertiser shading their bid would find a soft operating point (where they win and get charged a lower cpc).'"

183. Amazon internally described "surcharge constraints" as "a way to bound how far we deviate from GSP [generalized second price auctions] to avoid discussions about us 'not running an auction'" and to "minimize the possibility of loss of advertiser trust." These surcharge constraints capped the "surcharge rate" (i.e., the percentage amount above the second price auction price that Amazon would charge customers as a result of its reserve prices) at two levels. [redacted]


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

[redacted]

184. In 2020, the Director who oversaw Sponsored Products auctions summarized for the Vice President of Sponsored Products why "the [redacted] guardrail" mattered even for an advertiser who used automatic bid adjustments, and as a result "doesn't know what bid is being entered [redacted] He explained that even with automatic bid adjustments, "if an advertiser adjusts their original bid up, they will get charged a higher CPC for existing clicks being charged first price," and "if they adjust their bids down, they'll see a corresponding decrease in the CPC." To avoid advertisers realizing that they were not, in fact, competing in a genuine second price auction, and could reduce what they paid by lowering their bids, the [redacted] constraint was still needed by Amazon to minimize the "risk" of "what advertisers observe if they change bids[.]"

185. Over time, Amazon experimented with higher [redacted] constraints in non-U.S. markets. In February 2021, Amazon "decided to target a cumulative 20% CPC increase" in Germany and an up to 9% CPC increase in the United Kingdom, France, Italy and Spain. To do so, Amazon implemented a "blend" of its then current auction, which it described as a "GSP with low/moderate soft reserve prices" and an "(effectively) first-price auction which it defined as a "GSP with very high soft reserve prices" across "all traffic at the marketplace level."

186. Internally, in 2022, the Sponsored Products auction team noted that they "have been closely monitoring and haven't detected significant behavior change regarding advertisers' budgets and bids due to the launch of eOPS based pricing." In particular, as the first price rate — the percentage of clicks charged at the winning bid price — increased to 70% in 2022, the Sponsored Products team observed "no sign of bid shading or budget decreases"



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

from advertisers who consistently were charged the price of their maximum bids for more than 90% of their CPCs. The Sponsored Products team recognized it could "test bid shading" by "analyzing the gap between advertisers' bid versus" the GSP auction result of the "minimum winning price (1 cents plus the runner up bid)."

187. In subsequent years, Amazon continued to experiment with increases in the first price rate (despite continuing to represent to its advertising customers that they were participating in a GSP auction). For example, in the summer and fall of 2024, Amazon conducted an experiment "to understand the impact of a first price rate … increase on advertisers and the marketplace" by increasing the first price rate for some advertising customers in Spain from 48% to 80%.

188. Amazon's pricing experiments confirmed its belief that its customers were unable to detect its increasing hidden surcharges and resulting first price rates.

189. An internal Sponsored Products operating plan noted that in 2024 the "first price rate was 79.1%," and further noted this "means that we are close to charging the maximum amount the winning ads are currently bidding," and "that the potential for future CPC growth is limited, unless we can nudge advertisers to increase their bids."

190. Amazon considered it important to make sure that advertisers were unaware of how often they paid their own bid, because if advertisers learned that information, they would understand that Amazon was operating its auctions like a first price auction, and therefore advertisers would likely bid shade in an effort to lower their prices. One Amazon employee succinctly summarized the issue with "advertiser perception" in a 2020 email: "**Imagine being an advertiser and seeing most of your clicks being charged a CPC equal to the bid you specified (original bid). It will alter how you approach bidding**." (emphasis added).



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

### *5. Amazon Set Reserve Prices to Limit Advertisers' Return on Ad Spend*

191. Amazon believed that its advertising customers focused primarily on their Return on Ad Spend, known in the advertising industry as "RoAS," to measure the success of their advertising campaigns. Accordingly, Amazon's use of soft reserve prices was focused on capturing the share of advertiser RoAS that it believed it could extract without a negative advertiser reaction. In a 2020 internal memorandum, the Sponsored Products auction team reported that "advertisers seem to be more directly responding to ad spend/RoAS changes as opposed to clicks being charged first price," and "given the empirical data we have on advertiser response to RoAS changes, we will use it as the main signal to tune our pricing controls."

192. That same year, Amazon's Sponsored Products auction team [redacted] Amazon then imposed a reserve pricing constraint for each cohort based on a [redacted]

193. In 2021, Amazon's Sponsored Products auction team tested a new pricing mechanism, known as the "eOPS [estimate of the ordered product sales] based pricing" reserve, [redacted]

194. The eOPS based pricing model was successfully deployed to secure Amazon's revenue targets for Prime Day in 2021, resulting in the below report in a July 2021 "Pricing Business Review":



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

> Prime Day Pricing Interventions: Prime Day pricing interventions resulted in [redacted]. The eOPS based pricing model was dialed up to [redacted] for Prime Day as planned. [redacted]. We had a goal of keeping [redacted] and we met the goal in all marketplaces.

195. The eOPS based reserve pricing [redacted] The percentage of eOPS used to calculate each reserve price was [redacted]. As an internal document explained, Amazon increases its GSP auction prices by adding [redacted]

196. Amazon initially [redacted] "can be changed at any point based on the business requirement." [redacted]

***6. Amazon Further Expanded Reserve Pricing Systems After 2021***

197. Amazon widely expanded its use of hidden reserve pricing in February 2022 when Sponsored Products launched the eOPS based reserve system across the U.S. marketplace. Internally, the Sponsored Products auction team observed in 2022: "[w]ith eOPS based Pricing, we apply reserve prices on 70% of clicks."

198. An internal Amazon memorandum from later that year titled "eOPS Based Pricing Deep Dive" presented the below chart showing the additional "Aggregate Surcharge" applied in Sponsored Products second price auctions from September 2021 to September 2022. The chart shows the gradual increase of the average surcharge rate from below [redacted], with spikes up during high shopping periods in November through



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

early December 2021 (weeks 45 to 50), and again in July 2022 (around Prime Day, weeks 26 to 29).

[redacted]

199. By the middle of 2024, an Amazon document reported that the average U.S. marketplace surcharge rate for Sponsored Products had increased to [redacted]. Thus, Amazon's advertising customers were on average paying [redacted] more than they would have if Amazon operated its GSP auction as represented. On peak shopping days, such as Prime Day, Amazon's average surcharge rate soared to as high as [redacted], driving prices and customer costs far above the actual pricing determined by Amazon's auctions.

200. Sponsored Products continuously tracked key pricing metrics for the United States showing the escalating impact of its reserve systems on the ad placements it sold, including the first price rate, monetization rate, and the percentage of revenue from reserves (which corresponds to the "aggregate surcharge" rate in the chart above). These metrics were displayed in weekly business review (or "WBR") reports distributed to the Sponsored Products auction team.

201. The Sponsored Products WBR reports also tracked the "Top 50 most impacted advertisers" by surcharges in the U.S. market. The reports identified the advertisers by name



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

and ranked them according to the total hidden surcharge amount they each paid that week ("Reserve Revenue"). The reports also displayed for each advertiser: (i) what percentage of their total weekly payments was due to surcharges ("% of Revenue from reserve"); (ii) the RoAS they should have earned at the GSP auction result ("GSP RoAS"); and (iii) the reduced RoAS they actually earned as a result of the surcharges added above the GSP auction result.

202. The Sponsored Products WBR report tracking the most impacted advertisers during a week in December 2023 illustrates how Amazon secretly overcharged its customers tens of thousands of dollars per week and dramatically reduced their RoAS. For example, according to the report, Amazon overcharged "Pampers" [redacted], while "Gatorade" [redacted]

203. The Sponsored Products WBR reports establish that Amazon's surcharges cause substantial increases in: (i) the percentage of times that customers who won the auction are charged the same price as their bid, rather than the second price, as a result of the hidden surcharges ("First Price Rate"); (ii) how close to customers' winning bids Amazon secretly set prices, expressed as a percentage ("Monetization Rate"), and (iii) the percentage of Sponsored Products revenue across the whole marketplace that is derived from the undisclosed surcharges ("Aggregate Surcharge Rate").

204. A comparison of the data contained in these reports between a five-week period covering late September 2020 to October 2020 to a five-week period covering mid-October 2023 to November 2023, reveals that over this 3-year period, Amazon had:

- raised the First Price rate from 4% to 52-64%;
- increased the Monetization Rate from approximately [redacted] and


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

- raised the Aggregate Surcharge Rate from [redacted]

205. During this time, the Sponsored Products auction team observed in 2022 that, since its launch, the "eOPS based [reserve] pricing has been nearly fully constrained" by either (i) the surcharge constraint (at the time, [redacted] above the GSP auction result) or (ii) the winning bidder's bid after any adjustments from automatic bidding strategies (or "max bid"). This means that the price calculated by the eOPS system often exceeded either the surcharge constraint or the winning bidder's max bid. As a result, the surcharge constraint and advertisers' max bids often constrained how high Amazon's eOPS reserve pricing could adjust the price Amazon charged advertisers.

206. According to an internal 2022 Amazon document, the "surcharge hit rate has been consistently [redacted] and the max bid rate" — i.e., the first-price rate — "has been 60%." As the Sponsored Products auction team put it: "CPC is still largely defined as [redacted] above GSP CPC or max bid for close to 90% of clicks." As the team acknowledged, 90% of the time, Amazon was charging advertisers an artificially inflated price that was either [redacted] more than the GSP auction result or was equal to their first price/maximum bid.

**D. Amazon Continued to Increase Surcharges While It Decreased Advertisers' RoAS**

207. Amazon continued to conduct pricing experiments, and surveyed and interviewed advertisers regarding their ROAS to assess how much higher Amazon could increase undisclosed surcharges without detection. An internal 2023 Sponsored Products memorandum discussed "[h]ow much more can we push for soft reserve," and "[a]t what point will we see advertisers respond to an increase in soft reserve."

208. As a result, Sponsored Products managers explored different mechanisms to increase hidden surcharges and generate more advertising revenue, which included raising the surcharge constraints in the eOPS reserve system, using the automatic bid adjustment



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

system to increase the winning advertiser bids, and increasing undisclosed price floors (referred to internally as "hard reserves" to distinguish from the "soft reserve" system) that advertisers' bids had to exceed to participate in the auction.

209. In 2023, Sponsored Products ran pricing experiments to test the impact of different hard reserve values on eOPS reserve prices. After observing no "significant changes in bids and budgets by advertisers" in response to changes in higher hard reserve values, Sponsored Products increased the hard reserves from [redacted] for TOP (Top of Page) placements in the U.S. marketplace.

210. Around the same time, Sponsored Products also began running a large-scale pricing experiment on advertisers to assess the impact of increasing the surcharge constraint in the U.S. [redacted]. An Amazon engineer on the Sponsored Products team explained that Amazon ran this experiment because "[i]n Q1 2023, US SP search RoAS [redacted] [was] significantly higher than other Amazon ads products or other ad platforms … so we hypothesized that a further increase in CPC and decrease in RoAS can be sustained by the marketplace." At the time, Amazon's [redacted] for Sponsored Products search ads was [redacted], so Amazon was hoping to increase surcharge constraints as part of its efforts to increase prices and further reduce advertiser RoAS by about 8%.

211. [redacted] Amazon then raised the surcharge constraints from [redacted] and from [redacted], with the result that the average CPCs paid by the advertisers in the experiment increased by 2%. The auction team chose to test a 2% increase as "a tradeoff of being large enough to detect the change in



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

CPC and advertiser response … while being small enough to limit negative effects if they occur."

212. Amazon initially ran the experiment for eight weeks in May and June 2023, and after observing "no significant changes in advertiser behavioral metrics including bids and budgets," elected to run a second phase for an additional 19 weeks from June to November 2023. In an internal report, the auction team attributed [redacted] of annualized revenue to the surcharge increase and concluded that these results showed that the revenue increase was "durable over the long run." The experiment also concluded that Amazon was able to both increase its prices and revenue from advertisers by 2% while decreasing their RoAS by 2%. As a result, Amazon kept the surcharge constraint at [redacted] permanently, which meant that hidden surcharges could increase advertisers' CPCs by as much as [redacted] above the GSP auction results.

213. In 2024, Amazon conducted another large-scale pricing experiment on advertisers to test the effects of a larger change in the soft reserve price on advertisers' bids and budgets. In this experiment, Amazon [redacted] Amazon found that when it did this, advertisers responded by only increasing their bids and budgets by less than [redacted]

214. Amazon's Consumer Behavioral Analytics team, an internal data science and engineering group, helped design the pricing experiment and prepared a research paper on the experiment design titled "How Do Advertisers React to Changes in Ad Auction Pricing?" for an international conference on Knowledge Discovery and Data Mining ("KDD") in August 2024. In September 2024, the research paper appeared on a publicly accessible



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

webpage on Amazon's website listing research papers from Amazon scientists and on the KDD conference's website listing papers submitted for the conference.

215. On September 20, 2024, the Sponsored Products' manager overseeing auction pricing immediately took steps to remove the paper from both websites so that it would no longer be publicly accessible as soon as he discovered it online. In an internal chat with another Sponsored Products' auction member, after discovering the paper "does mention soft pricing, reserve prices" and is "accessible outside Amazon," he stated: "I should have been on top of this." "Crap." "I am talking to the [KDD conference] organizers to see if we can take it down…. Update: it's been taken down now."

216. In mid-2024, Amazon reported internally that its advertisers' average ROAS "has been steadily declining over many quarters" and was "at an all-time low" at [redacted] in the U.S., declining by 10% in the first quarter of 2024, and that as a result of the higher advertising costs, a large share of sellers in several top product categories on Amazon's e-commerce website were "operating under negative margins."

217. A 2024 internal memorandum contained the graph below showing the downward trend of advertisers' average ROAS on Amazon in the U.S marketplace since 2020.

[redacted]



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

218. As reported after an August 2024 Quarterly Science Review, the head of Amazon Ads and Amazon's Vice President and Chief Digital Economist, among others, discussed that the surcharge from Amazon's hidden reserves "accounts for [redacted] of SB [Sponsored Brands] revenue" and is also "quiet [*sic*] prolific in SP [Sponsored Products]." It was also acknowledged that Amazon's soft reserve pricing system "has been [an] incredibly effective way to drive revenue." Amazon's Chief Digital Economist added that the "soft price is a clever non-transparent way to charge first price in some cases," but expressed "concern" that "the higher the number, the more nervous he would be given potential longer-term bid shading risks."

**E. Amazon Orchestrated Multiple Cover Ups to Conceal Its Surcharges**

219. On several occasions, Amazon's aggressive expansion of its hidden surcharges during peak shopping days drew questions from Amazon's customers, which Amazon responded to by orchestrating cover-ups using multiple internal teams to conceal its unlawful conduct.

220. Amazon's auction teams routinely "relaxed" the constraints on their hidden surcharges and raised surcharge levels during peak shopping days or HVEs. These include, for example, Prime Day (usually July), Prime Early Access Sale, and Prime Big Deal Days (early October), as well as holiday sales after Thanksgiving (including Black Friday and Cyber Monday in November) through Christmas.

221. As reflected in internal memos, Amazon theorized that advertisers' perception of increased "competition and shopper behavior" and daily variation during these big shopping events would be "large confounders" that would "obfuscate" the reason for even higher CPC increases.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

222. Internally, the Sponsored Products auction team discussed that "advertisers will not react adversely" from "more aggressive pricing interventions" and "high first price rates" so long as they "do not degrade the advertisers' RoAS much."

223. Amazon tested this theory by relaxing its [redacted] constraint in 2020. An Amazon internal memo recounted this successful effort:

> "In 2020, [redacted] constraints were intentionally breached for short-durations during peak days under the premise that seasonal fluctuations in competition and reporting lag would obfuscate changes to the incentives in the auction, expanding the mental model to consider that IC [Incentive Compatibility] constraints are a function of perceptibility. Perceptibility is affected by seasonality and reporting frequency/aggregation. Advertiser interviews showed no indication that they saw anything unusual and that they were generally satisfied with SP performance, although the sample size was small due to overhead of setting up interviews."

224. "Incentive compatibility" refers to auction rules that make it rational for advertisers to bid their actual willingness to pay. Accordingly, Amazon's internal memo was arguing that as long as advertisers could not perceive changes to the auction rules, they would continue to be incentivized to reveal their willingness to pay.

225. The following year, in 2021, Amazon's "objective" was to maintain the same "marketplace level RoAS" during high shopper events as other days throughout the year. Amazon referred to this as "RoAS parity," and sought to raise reserve prices high enough during HVEs to accomplish this objective.

226. In 2021 and 2022, Amazon raised surcharge constraints to [redacted] during Prime Day and after Thanksgiving. This allowed Amazon's auction teams to more than double second price auction prices through the reserve pricing systems.

227. Amazon's surcharge increases during HVEs created sharp "CPC spikes" that caused advertisers and agencies to raise concerns in 2021. Amazon concealed its unlawful conduct



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

from those who complained by attributing the increase in CPCs to higher shopper activity during these periods and even falsely denying that they had changed their auction process.

***1. December 2021 CPC Spike Escalations***

228. During the 2021 holiday shopping period, the Sponsored Products auction team applied a surcharge increase not only during the Black Friday and Cyber Monday period, but also for additional weeks in early December. On December 10, 2021, the Amazon team effectively removed the surcharge constraints — lifting the click level constraint to [redacted] and causing advertising prices to spike over the next five days, as the average CPC increased by [redacted] and, in some instances, advertisers' CPCs increased by more than [redacted]

229. Starting December 13, 2021, more than twenty agencies and advertisers raised concerns to Amazon account managers about the CPC spike and asked for an explanation. In some cases, Amazon account managers relayed specific concerns from these agencies to the Sponsored Products auction team that prices "seemed to be close to a first price-auction for branded keywords, where advertisers pay their bids" but "partners [] are operating under assumption that Amazon uses a GSP auction."

230. In an internal memo, Amazon's Sponsored Products auction team stated that agencies that "work with thousands of advertisers" had "flagged the fact that CPCs had increased across the board for branded keywords in a single day without any changes to bids."

231. On December 15, 2021, as a result of these complaints, the Vice President of Sponsored Products approved a plan from the auction team to dial down the surcharge increases earlier than planned and to do so in several phases "so that advertisers will see less abrupt changes to CPCs."

232. On December 17, 2021, Sponsored Products set up a "war room" at the direction of the Vice President of Sponsored Products. The group included members of the Sponsored



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

Products auction and product management teams, who tracked all CPC spike "escalations" from advertisers and prepared a coordinated response. That same day, a form was submitted by a member of the Sponsored Products auction team ordering the earlier-than-planned decrease in surcharges due to "multiple escalations about CPCs being high from Account managers." The expected results of the change listed in the order included: "Surcharge will decrease which will decrease CPC" and "Revenue is expected to decrease by [redacted]." In response to the question "What is the impact of not making this change?," Sponsored Products replied, "We will loose [sic] advertiser trust."

233. Also on December 17, 2021, Amazon Ads partner agency Teikametrics posted a video on its blog post titled "Amazon CPCs Increased: What Happened & How to Take Action" (formerly accessible at teikametrics.com/blog/amazon-cpc-increase-how-to-lower-cpc/).

234. In the video, a Teikametrics employee discusses how the recent "significant CPC increase" was different from the "usual CPC increases that we have seen around really competitive times of the year, Black Friday, Cyber Monday, around Prime Day," and noting: "We know that Amazon is a second price auction so rather than pay your actual bid you are getting a discount to pay essentially a penny more than the second place [bidder] of that auction." The Teikametrics employee added that the recent "very sharp increase" in prices "across all of our brands all of these categories" indicates this spike is not from "competition" but rather a result from something Amazon did: "I am hoping Amazon is fixing their algorithm that caused this change, my speculation, but everything indicates in that direction."

235. By December 20, 2021, members of Sponsored Products auction and product management teams prepared an email for account managers handling the CPC spike escalations which falsely attributed the spike in CPCs to increased holiday demand:



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

> "Thanks for bringing this to our attention. Please note that advertisers using Sponsored Products will typically see changes in performance in the time periods leading up to and following Black Friday and Cyber Monday, when shopper and advertiser engagement may be greater. We expect these changes to taper as the pre-holiday period ends."

236. Amazon's account managers conveyed the Amazon-approved "holiday explanation" message to advertisers and agencies who had raised concerns about the CPC spike, claiming that it was a result of greater advertiser and shopper activity during the holiday period and denying any role that Amazon had in pricing fluctuations.

237. At least one Amazon account manager with responsibility for Amazon's relationship with its partner agency [redacted] internally expressed skepticism with Amazon's explanation, asking the Sponsored Products team coordinating the response: "Are we certain there is no other underlying/root cause for this volatility?" A member of the Sponsored Products coordinated response team denied there was any other cause for the CPC spike, reiterating that "during these holiday times, shopper and advertiser engagement can be greater causing a bigger than normal change in metrics," and instructed the representative to convey the prepared message "to our partners," and affirm "that we expect the volatility to subside as the holiday period shopping ends."

238. [redacted]



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

239. [redacted]

[redacted]

240. [redacted]

[redacted]

241. In a December 16, 2021 email, one advertiser specifically raised a concern about the "Amazon ad cpc situation" to his Amazon account manager, stating:

> It seems much more like that something has changed with respect to the second price auction process, either by design or mistake."

242. [redacted]

[redacted]



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

243. In January 2022, members of the Sponsored Products auction and product management teams who had coordinated the scripted response prepared an internal summary related to the "CPC spike escalation" for the "two most senior leaders in the GAPD [Global API & Partner Development] org responsible for our [agency] partners" — a group in Sponsored Products that works with agencies and software providers to use software tools to manage their advertising clients' campaigns. In early communications regarding drafting the summary, a member of the group acknowledged that "[w]hile there is sensitivity around what we communicate to customer facing representatives, I do believe we should share a 1-page detailed summary of what *actually* happened for the two most senior leaders in the GAPD org responsible for our partners." (emphasis added).

244. The group prepared an initial draft titled "SP CPC Spike Escalations — December 2021 v.1" that included a background on "Reserve Prices" that "apply on top of the competition based Generalized Second Price (GSP)," and discussed "increased reserve price adjustments" Amazon made in the "time period leading up to Christmas" that led to the CPC spike escalations. During a February 1, 2022 internal messaging chat concerning this draft document, a Director in Sponsored Products sent a message that they should not mention "GSP at all" and instead "should communicate traffic and sales increase significantly and we are under-monetized and need to correct it." A product management team member, also on the chat, critiqued the draft summary because it: "**makes it sound like Amazon Ads had no role in [the CPC] fluctuations, which isn't the case as we are having this discussion**." (emphasis added).

245. On February 9, 2022, the group circulated a revised version titled "Q4 Pricing Advertiser Communication Discussion" to the head of the GAPD group that worked with Amazon's



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

partner agencies. This version did not mention "GSP" or "reserve prices," and under a "Discussion Topics" section, noted that its partner agency [redacted] "put up a LinkedIn video and blog post related to the CPC spike and hinted at something being off on Amazon's side" (the same video referenced above). The memo continued, "[w]e would like to discuss the possibility of having more open channels between such large partners and us so that they do not see the need for such videos/blog posts in future."

246. Even though advertisers and advertising agencies complained about the December 2021 spike in CPC, that did not deter Amazon from continuing to surreptitiously raise prices beyond their "usual" hidden surcharge levels during peak HVEs, such as holidays or Prime Day events. The Sponsored Products pricing team simply discussed the need to be "more nuanced" going forward when increasing surcharges during HVEs. The Sponsored Products auction team noted that during the 2021 "pre-Christmas price intervention" advertisers raised concerns about "the sudden increase in CPC within a single day," and in 2022 implemented a plan to increase the surcharge levels more gradually.

247. On November 17, 2022, the Director for Sponsored Products auctions sent a weblink to the Teikametrics blog post and video from December 2021 (discussed above) in chat messages with at least two auction team members. In one chat, the auction team replied, mockingly quoting from the Teikametrics blog post: "'While the _exact_ reason for this significant change in CPCs is debatable, we can speculatively point to a potential change in an Amazon algorithm as the culprit.' 😂". The Director of Sponsored Products auctions responded by joking, "yeah, I should make this onboarding material for all new team members in pricing."

248. In the second chat, the Director added the message "this is what we're trying to avoid" along with the weblink to the Teikametrics blog post. The auction team member replied:


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

"Lol" and "so whatever we do in December must be very gradual." The Director replied: "or we keep it running," suggesting that they keep reserve prices running at elevated levels throughout the holiday period to minimize pricing volatility during this period.

249. For the December 2022 holiday period, the auction team did just what had been suggested, phasing in the surcharge increase more gradually to avoid advertisers observing sudden price changes like those that led to the 2021 CPC spike advertiser escalations.

250. An internal Sponsored Products memorandum noted that Amazon kept the reserve prices "dialed up at a lower allocation," which "prevented advertisers from seeing confusing steep increases in their CPCs at any point." The memorandum touted the team's success adding that the effort resulted in more than [redacted] in increased revenue worldwide, with "no advertiser escalations."

***2. Prime Day 2023 CPC Spike Escalations***

251. In 2023, Amazon again received at least seven escalations from multiple advertisers as a result of Amazon increasing surcharge levels during Amazon's Prime Day event, which took place on July 11 and 12, 2023.

252. On July 11, members of the Sponsored Products auction team reported to the Vice President of Sponsored Products that increases in advertisers' CPCs were [redacted] lower than expectation." To increase CPCs further, the team proposed, and the Vice President of Sponsored Products approved, "dialing up a higher CPC treatment across marketplaces," by raising the surcharge constraint to [redacted] for the entire U.S. marketplace for Day 2 of Prime Day (July 12). When submitting the order form to implement the increase, the Sponsored Products team listed the "purpose of this activity or change" as:



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

> **Prime Day RoAS Maintenance**
> **Bids did not increase as much as expected resulting in a lower CPC. Raising surcharge to [redacted] for the entire marketplace so CPC meets expectations.**

The team further noted on the form that the change was necessary so that "CPC meets expectations during PD [Prime Day]" and that the expected result was a [redacted] increase in Amazon's advertising revenue.

253. An internal 2023 Amazon report noted that "[o]ur inflight CPC changes were effective in bringing CPC closer to our expectations," but "there were pockets of advertisers that were significantly negatively impacted by our inflight changes." The internal report specifically identified one large food and beverage advertiser, [redacted]

254. Amazon's account manager for [redacted] reported internally that [redacted] CPCs had increased by over 90%: "Do we know if CPCs within US grocery are much higher this prime day than last? my client is saying they are seeing 90%+ increases killing RoAS and are curious if its a data issue or reality...I feel its reality but want to gut check."

255. The Sponsored Products team [redacted] The reports compared the CPCs actually charged to [redacted] ("2023 PD CPC") with the second price auction prices or GSP CPCs before they were adjusted to reflect Amazon's surcharge ("PD CPC_unadjusted").



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

| Advertiser ID | 2023 PD CPC_ unadjusted | 2023 PD CPC | Calculated surcharge increase from metrics reported internally by Amazon |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

256. Sponsored Products auction team managers, as well as Amazon's public relations and legal departments, approved a response for [redacted] that falsely attributed the Prime Day CPC increase on increased activity by shoppers and advertisers, stating:

> "CPCs change due to multiple factors related to shopper and advertiser engagement with Sponsored Products. The magnitude of changes is higher during Prime Day due to increased engagement. **We looked into CPC trends specifically for [redacted] campaigns and confirmed that the changes in performance align with shopper and advertiser engagement trends.** (emphasis added).

257. In August 2023, Sponsored Products conducted interviews with representatives from [redacted] and at least two other brand companies — [redacted] and [redacted] — whose concerns about the Prime CPC increase were escalated within Amazon. According to an internal 2023 Sponsored Products memorandum, these interviews were designed to inform the pricing team's "RoAS maintenance strategy for future HVEs," and "to understand their [the advertisers'] pain points," with questions about what "key KPI / Metrics" they monitor and "wish to achieve."

258. Despite the escalations by [redacted] and other advertisers, throughout 2023 Amazon continued to find ways to increase hidden surcharges during HVEs. For example, Amazon experimented with "a more granular level pricing intervention" by applying different surcharge limits to specific product types. For the peak shopping days after Thanksgiving



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

2023, Amazon clustered [redacted]

259. An internal 2023 Sponsored Products memorandum also discussed masking the HVE surcharge changes to "avoid an easily detectable spike in CPC," by dialing up the surcharge increases "gradually," and starting at midnight when CPCs "typically go up" when advertisers' budgets automatically refresh.

260. Sponsored Products also put in place a "monitoring plan" for Prime Day 2024 and established protocols to handle advertiser escalations. Amazon monitored the top 50 highest spending advertisers during Prime Day to see if their CPCs or "OOB" (out of budget) occurrences increased above certain levels. If they did, Sponsored Products would "consider lowering [the] Soft Reserve surcharge" to "reduce the risk of negative advertiser response." The internal plan further provided that if a "large CPC spike is only observed for a few advertisers," they would evaluate changes in other metrics including "average surcharge rate" to determine whether to contact the advertiser's account manager "regarding their CPC spike as precaution before actual escalation happens." In July 2024, the Vice President of Sponsored Products approved the surcharge increase for Prime Day with these "surcharge alarms" in place.

261. In October 2024, Sponsored Products added [redacted] which [redacted] The auction team added [redacted] to prevent recurring occurrences where "advertisers saw egregious CPC increases during HVEs."



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

262. Amazon further increased surcharge constraints to [redacted] repeatedly in 2023 and 2024, during its HVE holiday and Prime events, allowing reserve prices to more than [redacted] second price auction prices. For example, the chart below was generated by Amazon to track the amount that its reserve prices added to GSP auction results (referred to as the "surcharge rate") for the 2023 Black Friday period. As the chart shows, earlier in November, Amazon's reserve prices added between [redacted] to the prices paid by advertisers, but as Black Friday (November 24) approached, [redacted]

[redacted]

263. Amazon also surreptitiously gathered information on advertisers' bidding strategies, key pricing metrics they tracked, and plans for HVEs to help Amazon determine when to dial up higher surcharges during future HVEs. For example, in 2023, the Sponsored Products auction team interviewed at least nine partner agencies and advertisers to "[b]etter understand advertisers' expectations for special events" and "inform our future special event pricing strategies such as when to start special events pricing plan (i.e., RoAS maintenance plan)."



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

264. Amazon's Sponsored Products auction team prepared an interview script that provided a pretextual purpose for the interview, described as "to better serve your advertising needs," and included questions regarding advertiser and agency price "expectations," and bid plans for "special events":

- "Typically, what are the top key metrics/KPIs for you or your client's Sponsored Product campaigns, from most important to least important;" "how often do you or your client monitor these metrics," "at what level (overall, campaign, ad group, keyword)," and at "[w]hat time range do you consider a change in metric alarming";

- "What are your expectations for these metrics during special events vs. regular days. Is there a specific time period you use to base regular days metrics on? (e.g., special events CPC is 20% higher compared to 2 weeks before special events, 1 month before, annual average)";

- "What do you or your client usually do to plan for special events? Do you use the same strategy for all special events? For bid increase: do you turn off bidding algorithms for special events? (If turn off algorithmic bidding during special events), How do you decide how much to bid? How much do you increase bid by (<10%, 10-20%, 20-30%, 30-50%, 50%+) For budget increase: does the budget increase come from incremental budget or reducing budget from the rest of the month/quarter?";

- "What are your expectations for cost of SP campaigns (CPC) for each special event? e.g. higher CPC, by how much (<10%, 10-20%, 20-30%, 30-50%, 50%+)";

- "[W]hen do you expect the change to happen? e.g. I expect CPC to go up a day before Prime Day, a week before thanksgiving etc. What about after special events?";

- "What time range do you consider a change in metric alarming? Let's say you or your client observe an increase in CPC, when and how do you respond to changes in key metrics? (e.g., decrease in bids, budget)";

- "What are your expectations for cost of SP campaigns (CPC) for each special events?"

265. In an internal "Advertiser Interviews Report," the Sponsored Products auction team reported what "insight" they gained for "future pricing strategies" to continue and expand



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

Amazon's secret reserve pricing. In particular, they reported that "advertisers typically operate with a specific RoAS target in mind," which they could exploit by "cluster[ing] advertiser[s] … into groups with similar RoAS expectations, and set different RoAS targets for each group." They also confirmed that "advertisers expect CPC to increase by [redacted] … due to increased traffic" during HVEs, which "gives us confidence that the CPC increases resulting from our special days RoAS maintenance strategy are aligned with advertisers' expectations."

### *3. Customer Escalation in 2024*

266. Even after learning of the FTC's investigation in September 2024, Amazon continued to provide evasive responses to advertisers' questions about the reason for price increases.

267. On October 24, 2024, a consumer products manufacturer asked its account manager for more "transparency" about Amazon's auction process and raised concerns that "there may be an issue affecting fair auction processes." The manufacturer also referred to Amazon's express representations that it operated second price auctions: "In a previous call, Amazon confirmed that the bid modification cap [is] at $0.01 above the second highest bid. We would like a detailed explanation of how this process actually operates and how it impacts bids and CPC in our campaigns."

268. Also on October 24, 2024, an Amazon sales manager internally emailed members of the Amazon sales team and Sponsored Products auction team that the manufacturer "is under the impression our model operates as a second-price auction, and is deploying their strategy [as] such." The sales manager added that there "is a lack of clarity amongst PSS [Product Sales Specialists] and Sales on the updates" concerning "removing second-price auction references in our external facing language."



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

269. On October 25, 2024, Amazon's account manager responded that they were working "with legal and other partner teams at a senior level" to answer these questions. On October 30, 2024, Amazon's account manager responded: "All that we are able to share at this time is that our pricing is based on a variety of factors, but the CPC will not exceed your bid." Internal Amazon documents indicate that members of the Sponsored Products' auction team met with Amazon employees from its legal and public relations departments to prepare this response. (At this time, Amazon continued to publicly represent on its main website about its advertising products that it runs "a second price auction" along with this explanation: "This means that the advertiser who bids with the most relevancy wins the auction and has their ad displayed. However, the advertiser pays the amount of the second-place bid.")

270. On November 7, 2024, the manufacturer responded, asking for more "clarity" on whether Amazon still operated second price auctions and that "a basic overview of the functionality is necessary for transparency and proper optimization":

> "[We] still seek more clarity on the assurances that bid modifiers cap at **$0.01 above** the second highest bid. As you can imagine, avoiding this topic only continues to raise more concerns. This leads us to believe that the previous assurance may no longer be valid. Could you please confirm if there has been a change, **provide the date when this change was made**, and direct us to any press releases or notifications where Amazon informed advertisers of this update? Additionally, we would appreciate an explanation of how the **bid modifiers operate**. While we understand this involves multiple factors, a basic overview of the functionality is necessary for transparency and proper optimization. For example, does the bid modifier calculate the maximum bid while considering auction prices under a **first-price auction model**?" (emphasis in original).

271. After repeated emails that referred to continued "conversations with legal," Amazon's account manager replied on December 12, 2024 (approximately three weeks after Amazon received the FTC's Civil Investigative Demand for information relating to its search advertising auctions) with the following "approved coms from legal":



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

> "… CPC will never be more than your max bid and may be lower than your max bid. We cannot share any further details about CPCs due to the confidential nature of this information.
>
> The auction considers a number of factors, including bids, relevance of the product to the search query, and likelihood a customer may click and purchase a product through a sponsored product result. We understand your primary goal is to increase sales with greater efficiency. Please confirm those objectives, and if aligned, we will partner with product to run a few simulations to provide you some actionable campaign recommendations to consider.
>
> In summary, Amazon is unwilling to provide any further details on our auction model….”."

272. On December 17, 2024, the manufacturer responded that Amazon's "lack of transparency around CPC determination and auction mechanics remains deeply concerning" and that these issues are "fundamental to ensuring our campaigns are treated fairly." The manufacturer further noted that in addition to Amazon's "evasive responses to basic functionality questions" about "how CPCs are determined" and "how auction mechanics operate," Amazon had "explicitly assured" the company in 2024 that "bid modifiers cap at $0.01 above the second-highest bid and that Sponsored Product Ads system uses second-price auction dynamics" with "no CPC floors":

> "In February, Amazon explicitly assured [the manufacturer] that bid modifiers cap at $0.01 above the second-highest bid and that the Sponsored Product Ads system uses second-price auction dynamics. In October, Amazon further affirmed that: (1) it 'does not employ…algorithms designed to maximize ad profits,' (2) 'there are no manual applications to [our] accounts,' and (3) 'there are no CPC floors or manual bid overrides.' The latest communication contradicts those assurances. Amazon needs to provide a detailed explanation of these contradictions."

273. Internal notes prepared in December 2024 by a Sponsored Products auction team member discussed this escalation, noting that the advertiser "has been very combative" but they "aren't a huge advertiser" and this escalation "has been a case study on how we should prep advertiser-facing teams."


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

274. While Amazon provided evasive responses about its auction pricing to this advertiser, it continued to seek to increase revenue through the use of undisclosed soft reserve prices and surcharges. For example, on November 29, 2024 (on the day after Thanksgiving), the Vice President of Sponsored Products and the Sponsored Products auction team discussed "dial[ing] up" reserve prices immediately because revenue "came in under" Amazon's financial plan for Sponsored Products advertising. They decided to avoid the sort of "rapid dial up" on Black Friday that previously led to "sharp CPC increases … and escalations," and instead start a "periodic dialup" on Sunday as a "ramp leading to CM" [Cyber Monday]."

275. An internal December 2024 chat between Sponsored Products auction team members discussed how this "last minute" Thanksgiving reserve dial up occurred after the Vice President of Sponsored Products realized "we need money" to hit financial targets:

> J.N.: "[the Vice President of Sponsored Products] wanted to not do pricing intervention [for Thanksgiving 2024] so we didnt then was like wait we need money so we dialed something up last minute for cyber Monday"
>
> J.B: "😂 that's funny but also predictable"

**AMAZON DEPRIVES ADVERTISERS OF A COMPETITIVE AUCTION PROCESS**

276. Auctions are among the purest methods of competition, and illustrations of the competitive process at work. Auctions are used as a price setting mechanism because they harness competition to reveal the market value of a good or service. The amount of competition in an auction is a critical factor in realizing revenues. Manipulating or distorting auction results inherently deprives auction bidders of the benefits of this competition.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

277. Amazon's internal documents consistently acknowledge that its conduct was intentionally designed to distort, subvert, and even supplant the competitive process within its auctions. According to these documents:

- For years, Amazon's prices were "**primarily driven by competition**, by means of a generalized second price (GSP) auction mechanism" until Amazon "**pivoted our mental model for Search Pricing from competition based CPCs** to CPCs that are proportional to the expected sales from a click (eOPS based pricing)." (emphasis added)
- Amazon's pricing controls "enable us to adjust CPCs beyond what [can] be achieved **through advertiser competition**." (emphasis added)
- Amazon's surcharges enable Amazon to price clicks "**independent of competition**." (emphasis added)
- Amazon's pricing does not "iterate through **'competitors'** but instead can use its own support value to calculate CPCs." (emphasis added)
- Surcharges are "added on top of the second price in the auction to **correct market ineffectiveness for the lack of competition** or small bid values." (emphasis added)
- "CPC reserves" mitigate the effects of bidders lowering their bids by "offering a **stable source of competition**." (emphasis added)

278. As described above, Amazon has for many years purported to operate auctions, and specifically GSP auctions which, by definition, are sealed-bid auctions. With respect to these auctions, Amazon functions as both auctioneer and seller of the auctioned advertising placements. As the auctioneer, Amazon receives sealed bids from advertising customers, which it then must unseal to rank and determine the winners.

279. Until approximately 2018, Amazon had determined that it "didn't want to interfere with the auction" and operated GSP auctions as advertised. However, as detailed above, Amazon changed course and by 2019 was engaging in undisclosed "pricing interventions" including "smart reserves" designed to artificially increase its auctions' prices above competitive levels to the detriment of the auction participants. As one Amazon document recounted,



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

Amazon "first introduced smart reserves (SR), a pricing mechanism designed to address lack of competition under GSP." To do so, Amazon calculated and charged prices above its competitively determined auction prices.

280. Under its reserve pricing systems, after completing the auction, Amazon provides the results, including its customers' unsealed bids, to its pricing teams for the sole purpose of using them as inputs in algorithms that would then calculate an artificial auction price above the amount of the second-place bid, while not exceeding the winning bid. The goal of this effort is to generate higher prices that are undetectable to its auction participants.

281. While Amazon's pricing algorithms have immediate access to its advertising customers' sealed bid information, Amazon's auction participants are never provided such information — and certainly not the second-place bid information that would expose Amazon's conduct. While Amazon's ownership of both the search advertising placements and the GSP auction are likely common knowledge to customers, Amazon conceals from advertisers that Amazon also effectively assumes the role of the price-setting bidder in its auctions by inserting its own bid to set the prices charged after the auction has run.

282. Amazon's Senior Vice President in charge of advertising described how, after running GSP auctions for years, Amazon ceased relying on advertisers' bids to set prices because "doing so can result in the [] loss in economic value" for Amazon. Instead, Amazon determined that it was entitled to supracompetitive prices by using the information it obtained from advertisers' bids to calculate and insert its own alternative second-place bids as an undisclosed "participant in the auction."

283. Amazon's head of advertising also confirmed that both he personally, and Amazon as a company, have represented to customers that Amazon operates second price auctions where the price is set at a penny more than the second-place bid. He personally explained the


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

auction to an advertiser using a hypothetical scenario where the winning bid in a Sponsored Ads auction is $2 and the second-place bid is $1, with the winning bidder paying $1.01. However, he later acknowledged (though not to the advertiser) that in practice if Amazon's reserve "bid" was $1.50, then that would become the new second-place bid, and the winning bidder would be charged $1.50.

284. Amazon's purported "bids" are applied to its prices *only after* the auction is completed, since knowledge of both the winning and second-place bid amounts are required to calculate the amount of Amazon's higher artificial second-place "bid" that it uses to set prices. Unlike legitimate bids, Amazon's "bids" are expressly designed to lose the auction and finish second by the smallest amount possible, to maximize Amazon's revenue while avoiding detection. In setting these bids, Amazon bears no risk that these "bids" would result in Amazon winning the auction and thereby cause it to remove an ad placement from the auction and sacrifice potential revenue.

285. Bids with similar characteristics to Amazon's "after the auction" bids are generally called "*shill*" bids. As the FTC has explained in public guidance, shill bidding occurs "when fraudulent sellers or their partners, known as 'shills,' bid on sellers' items to drive up the price."

286. Amazon's practice of submitting undisclosed post-auction "bids" to inflate auction prices are indistinguishable as a practical matter from shill bids.

287. Auctions, including second price or GSP auctions, are competitive processes. In second price or GSP auctions, advertisers compete for second place, and that competition determines the price the winner must pay. Amazon's practice of secretly rigging this second-place bid by substituting its own bid after the fact is quintessential deceptive conduct resulting in significant harm to the first-place bidder and undermining the auction process.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

288. By disregarding, or artificially increasing, the price-setting bids in its auctions, Amazon's conduct secretly deprives all auction winners of the benefits of competition, leading to substantially higher prices for Amazon's advertisers. Indeed, instead of paying a price determined by rival advertisers' bids, Amazon's advertising customers pay a price manufactured by Amazon for Amazon's own financial advantage.

289. The operation of efficient auctions requires clear disclosure of the auction's rules, and auctions cannot function efficiently where, as here, they are subject to false representations and undisclosed and deceptive manipulation by seller/auctioneers. Amazon's conduct produces no efficiencies, and in fact is intentionally and specifically designed to reduce the cost-efficiency of advertising, measured in the advertising industry as RoAS. As described above, Amazon's artificially inflated prices are generated by an algorithm that was designed and implemented to reduce the cost-efficiency of Amazon's advertising for the entire U.S. market down to a level arbitrarily and subjectively set by Amazon to maximize its profits.

290. Amazon's use of undisclosed soft reserve prices does not improve or expand its advertising products for advertisers or shoppers. Soft reserve prices, by their nature, have only one effect: increasing the price for a given advertising placement above the price that the GSP auction sets. Internally, Amazon employees wrote explicitly that Amazon should use soft reserve prices for that very reason:

> **Reserve prices are good for Amazon because they don't change the allocation and advertisers must pay more for the same advertising. Obviously, the benefit to Amazon comes at the cost of advertisers**.

291. Within Amazon's auctions, the value proposition for bidders is defined by the winner being charged a price just above the second-place bid, because that mitigates the risk for the winner that they will overbid. GSP auctions benefit Amazon, the seller, for similar reasons: because bidders do not need to worry about overbidding, they can generally be truthful


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

about what they are willing to pay (or even bid more than that amount), providing the seller with useful information. Amazon's practices allow it to reap the benefits of that information to set prices for billions of ad placements, while advertisers are deprived of their side of the bargain.

292. While it was under no obligation to use auctions to sell its advertising space, once Amazon established, implemented, and sought the benefits of competition for *itself*, it was bound by fundamental principles of honesty not to secretly deny the competitive benefits of auctions to bidding advertisers.

**AMAZON'S CONDUCT RESULTS IN SUBSTANTIAL HARM**

293. By taking steps to conceal its reserve pricing and hidden surcharges from its advertisers and the public for more than seven years, Amazon has been able to generate billions of dollars in profits — at the expense of its auction advertising customers.

294. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendant is violating or are about to violate laws enforced by the Commission because, among other things:

A. Defendant engaged in its unlawful acts and practices repeatedly over a period of more than seven years;

B. Defendant engaged in this unlawful activity willfully;

C. Defendant earned and continues to earn billions of dollars from participating in these unlawful acts and practices;

D. To the extent that Defendant stopped certain unlawful conduct, it did so only after it learned of the FTC's investigation; and

E. Defendant remains in the digital advertising business and maintains the means, ability, and incentive to continue its unlawful conduct.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

## VIOLATIONS OF THE FTC ACT

295. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

296. Misrepresentations, deceptive omissions, and affirmative concealment of material facts constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

297. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## VIOLATIONS OF STATE LAW

298. The state statutes listed below generally prohibit deceptive and unfair trade practices in connection with the offer and sale of goods and services to consumers.

| **STATE** | **STATUTORY AUTHORITY** |
|---|---|
| Alaska | Alaska Statute §§ 45.50.471 *et seq.* |
| Arizona | A.R.S. §§ 44-1521 to 1534 |
| California | California Bus. & Prof Code §§ 17200 *et seq.* and 17500 *et seq.* |
| Colorado | Colo. Rev. Stats. §§ 6-1-101, *et seq.* |
| Florida | Fla. Stat. § 501.204 |
| Idaho | Idaho Consumer Protection Act, title 48, chapter 6, Idaho Code |
| Illinois | 815 ILCS 505/7, 815 ILCS 510/2 |
| Indiana | Ind. Code § 24-5-0.5, *et seq.* |
| Iowa | Iowa Code § 714.16 |
| Kentucky | Ky. Rev. Stat. §§ 367.110 *et seq.* |



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

| | |
|---|---|
| Louisiana | La. Rev. Stat. 51:1405(A) |
| Maryland | Md. Code Ann., Com. Law §§ 13-101 through 13-501 |
| Nebraska | Neb. Rev. Stat. §§ 87-302(a)(5), and (10). |
| New Jersey | N.J.S.A. § 56:8-2 |
| New York | New York Executive Law § 63(12)<br><br>New York General Business Law § 349<br><br>New York General Business Law § 350 |
| North Carolina | N.C. Gen. Stat. § 75-1.1 *et seq.* |
| Oklahoma | Okla. Stat. tit. 15, § 751-764.1 |
| Pennsylvania | 73 P.S. § 201-1, *et seq.* |
| Rhode Island | R.I. General Laws §§ 6-13.1–1 *et seq.* |
| South Carolina | S.C. Code Ann. §§ 39-5-20 *et seq.* |
| Vermont | 9 Vt. Stat. Ann. § 2451 *et. seq.* |
| Washington | Wash. Rev. Code § 19.86.020 |

## CLAIMS BROUGHT BY THE FEDERAL TRADE COMMISSION

### Count I

### Misrepresentations

299. In numerous instances in connection with the advertising, marketing, promotion, or offering for sale, or sale of digital advertisement placements on Amazon's website and app, Defendant represents, directly or indirectly, expressly or by implication, that Amazon operates generalized second price auctions where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

only pays the minimum amount necessary to win the auction or just above the second highest ranked bid.

300. In numerous instances where Defendant has made the representations in Paragraph 299, Defendant actually inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements.

301. Therefore, Defendant's representations constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II**

**Deceptive Auction Manipulation**

302. In numerous instances in connection with the advertising, marketing, promotion, or offering for sale, or sale of digital advertisement placements on Amazon's website and app, Defendant represents, directly or indirectly, expressly or by implication, that the prices Defendant charges its customers are set by auctions employing a competitive bidding process.

303. In numerous instances where Defendant has made the representations in Paragraph 302, Defendant has deliberately manipulated and altered the competitive process within its auctions, and the results of the competitive process, by secretly inserting a fake "bid" or price after determining the winning bids in order to inflate the auction pricing it charges customers.

304. Therefore, Defendant's representations constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

## Count III

## Concealment

305. In numerous instances in connection with the advertising, marketing, promotion, or offering for sale, or sale of digital advertisement placements on Amazon's website and app, Defendant has been aware that its advertising customers believe that Amazon operates generalized second price auctions where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid.

306. In numerous instances, Defendant has deliberately concealed from its customers that it inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements. This fact would be material to Defendant's customers in their conduct regarding the purchase of digital advertisement placements.

307. Therefore, Defendant's deliberate concealment of this information constitutes a deceptive act or practice in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

## Count IV

## Unfair Omissions

308. In numerous instances, Defendant has failed to disclose or disclose adequately that Amazon inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements on Amazon's website and app.

309. Defendant's advertising customers believe that Amazon operates generalized second price auctions where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

310. Defendant's acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

311. Therefore, Defendant's acts or practices as described in Paragraphs 308 – 310 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**Count V**

**Unfair Billing Practices**

312. In numerous instances, Defendant charges consumers without obtaining consumers' express informed consent for amounts above the prices resulting from its generalized second price auctions for digital advertisement placements on Amazon's website and app.

313. Defendant's acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

314. Therefore, Defendant's acts or practices as described in Paragraphs 312 – 313 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## STATE LAW CLAIMS BROUGHT BY THE PLAINTIFF STATES

**Claims and Relief Sought by the State of Alaska**
**Pursuant to the Alaska Unfair Trade Practices Act**

**Count VI**

**Misrepresentations in Violation of Alaska Statute 45.50.471(a)**
**(By Plaintiff State of Alaska)**

315. The State of Alaska realleges and incorporates by reference the allegations made in Count I.

316. This conduct constitutes a violation of AS 45.50.471(a).



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

**Count VII**

**Misrepresentations in Violation of Alaska Statute 45.50.471(a)**
**(By Plaintiff State of Alaska)**

317. The State of Alaska realleges and incorporates by reference the allegations made in Count II.

318. This conduct constitutes a violation of AS 45.50.471(a).

**Count VIII**

**Concealment in Violation of Alaska Statute 45.50.471(a)**
**(By Plaintiff State of Alaska)**

319. The State of Alaska realleges and incorporates by reference the allegations made in Count III.

320. This conduct constitutes a violation of AS 45.50.471(a).

**Count IX**

**Unfair Omissions in Violation of Alaska Statute 45.50.471(a)**
**(By Plaintiff State of Alaska)**

321. The State of Alaska realleges and incorporates by reference the allegations made in Count IV.

322. This conduct constitutes a violation of AS 45.50.471(a).

**Count X**

**Unfair Billing Practices in Violation of Alaska Statute 45.50.471(a)**
**(By Plaintiff State of Alaska)**

323. The State of Alaska realleges and incorporates by reference the allegations made in Count V.

324. This conduct constitutes a violation of AS 45.50.471(a).



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

**Claims and Relief Sought by the State of Arizona**
**Pursuant to the Arizona Consumer Fraud Act**

**Count XI**

**Deceptive Acts and Practices in Violation of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521 to -1534**
**(By Plaintiff State of Arizona)**

325. The Arizona Attorney General incorporates Paragraphs 1 through 298 as though fully set forth herein.

326. Defendant's conduct described in the preceding paragraphs of this Complaint constitutes deception or deceptive acts or practices in connection with the sale or advertisement of merchandise in violation of A.R.S. § 44-1522, including, but not limited to, misrepresenting to Arizona advertising customers that such customers are participating in generalized second price auctions where the winner only pays the minimum amount necessary to win the auction through a competitive bidding process, when instead Defendant manipulates and alters the competitive process by secretly inserting a fake "bid" or price after determining the winning bids to inflate the auction price it charges customers.

327. While engaging in the acts and practices alleged in this Complaint, Defendant knew or should have known that its conduct was of the nature prohibited by A.R.S. § 44-1522, subjecting itself to enforcement and penalties as provided in A.R.S. § 44-1531(A).

**Count XII**

**Unlawful Concealments and Omissions in Violation of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521 to -1534**
**(By Plaintiff State of Arizona)**

328. The Arizona Attorney General incorporates Paragraphs 1 through 298 as though fully set forth herein.

329. Defendant's conduct described in the preceding paragraphs of this Complaint constitutes


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

unlawful concealments and omissions of material information in connection with the sale or advertisement of merchandise in violation of A.R.S. § 44-1522, including, but not limited to, concealing, suppressing, and failing to disclose the material fact that Defendant inflates the prices it charges above the prices resulting from its generalized second price auction, with the intent that Arizona advertising customers rely on such suppressions or omissions.

330. While engaging in the acts and practices alleged in this Complaint, Defendant knew or should have known that its conduct was of the nature prohibited by A.R.S. § 44-1522, subjecting itself to enforcement and penalties as provided in A.R.S. § 44-1531(A).

**Count XIII**

**Unfair Acts and Practices in Violation of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521 to -1534**
**(By Plaintiff State of Arizona)**

331. The Arizona Attorney General incorporates Paragraphs 1 through 298 as though fully set forth herein.

332. Defendant's conduct described in the preceding paragraphs of this Complaint constitute unfair acts and practices in connection with the sale or advertisement of merchandise in violation of A.R.S. § 44-1522. Acts and practices are unfair when they cause substantial injury that is not reasonably avoidable by the injured party and that is not outweighed by countervailing benefits to consumers or competition.

333. Defendant engaged in unfair acts and practices including, but not limited to, misrepresenting that Defendant charges Arizona advertising customers based on a generalized second price auction where prices are set by a competitive bidding process, while concealing that Defendant charges substantial surcharges above the cost of a generalized second price auction and failing to provide Arizona advertising customers with



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

invoices or other information sufficient to understand how advertisements are priced.

334. With respect to the unfair acts and practices described above, these acts and practices caused or were likely to cause substantial injuries by deceptively charging Arizona advertising customers amounts substantially above the prices resulting from a generalized second price auction. Further, Defendant's inflated auction prices were not reasonably avoidable and were not outweighed by countervailing benefits to consumers or to competition, including because Arizona advertising customers did not have transparency into Defendant's true pricing methodology and were instead led to believe that they were engaging in a generalized second price auction where prices were set by a competitive bidding process.

335. While engaging in the acts and practices alleged in this Complaint, Defendant knew or should have known that their conduct was of the nature prohibited by A.R.S. § 44-1522, subjecting themselves to enforcement and penalties as provided in A.R.S. § 44-1531(A).

**Claims and Relief Sought by the People of the State of California Pursuant to the Unfair Competition Law and False Advertising Law**

**Count XIV**

**Violations of California Business and Professions Code § 17500 *et seq.***
**(False or Misleading Statements)**
**(By Plaintiff People of the State of California)**

336. Plaintiff the People of the State of California alleges and incorporate by reference paragraphs 1 through 298 above as though fully set forth herein.

337. Defendant has engaged, and continues to engage in, aided and abetted, and conspired to engage in acts or practices that constitute violations of Business and Professions Code § 17500 *et seq.* by making or disseminating, or causing to be made or disseminated, false or misleading statements with the intent to induce members of the public to purchase



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

Defendant's services or products when Defendant knew, or by the exercise of reasonable care should have known, that the statements were false or misleading.

338. Defendant's false or misleading statements include, but are not limited to, the following: Falsely representing that Amazon operates generalized second price auctions where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid, when in actuality Defendant inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements.

**Count XV**

**Violations of California Business and Professions Code § 17200 *et seq.***
**(Unlawful, Unfair, and/or Fraudulent Business Practices)**
**(By Plaintiff People of the State of California)**

339. Plaintiff the People of the State of California reallege and incorporate by reference Paragraphs 1 through 298 as though fully set forth herein.

340. Defendant has engaged, and continues to engage, aided and abetted, and conspired to engage in acts or practices that are unlawful, unfair, or fraudulent, and which constitute unfair competition within the meaning of California Business and Professions Code § 17200. These acts or practices include, but are not limited to, the following:

(a) Defendant has violated Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n), as alleged herein;

(b) Defendant has violated Business and Professions Code § 17500 *et seq.* as alleged in Count XIV;

(c) Defendant has engaged in fraudulent acts, including but not limited to making numerous untrue or misleading statements or omissions, such as (1) failing to disclose or disclose



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

adequately, or deliberately concealing, that Amazon inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements on Amazon's website and app; and (2) false statements that Amazon operates generalized second price auctions where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid, when in actuality Defendant inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements;

(d) Defendant has engaged in unfair acts, including but not limited to (1) failing to disclose or disclose adequately, or deliberately concealing, that Amazon inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements on Amazon's website and app; (2) charging consumers without obtaining consumers' express informed consent for amounts above the prices resulting from Amazon's generalized second price auctions for digital advertisement placements on Amazon's website and app; and (3) systematic rigging of Amazon's auction processes in its favor through its operation of hidden reserve pricing systems that harms both its customers and the competitive process.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

**Claims and Relief Sought by Colorado**
**Pursuant to the Colorado Consumer Protection Act**

**Count XVI**

**Deceptive Acts or Practices in Violation of the**
**Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1)(e)**
**(By Plaintiff State of Colorado)**

341. The Colorado Attorney General re-alleges and incorporates Paragraphs 1 through 298 as if they are fully alleged herein.

342. In numerous instances in connection with the advertising, marketing, promotion, and other representations regarding its auction and sale of digital advertising placements, including, but not limited to, representations in marketing and training materials and through account managers and employees, Defendant knowingly and/or recklessly made false representations regarding its digital advertising placements and auction services.

343. Such representations include, but are not limited to, those set forth in paragraphs 115 to 138. These and other false statements by Defendant were material to consumers' decisions regarding their use of Defendant's auctions and purchase of digital advertising placements. These representations also had the capacity to deceive consumers regarding Defendant's auctions and digital advertising placements.

344. When Defendant performed the deceptive trade practices described in the preceding paragraphs, it did so in the course of its business, vocation, or occupation.

345. The deceptive acts or practices alleged herein constitute separate violations of the Colorado Consumer Protection Act. By engaging in the acts and practices alleged herein, both separately and as taken together, Defendant violated Colo. Rev. Stat. § 6-1-105(1)(e).


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

**Count XVII**
**Deceptive Acts or Practices in Violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1)(i)**
**(By Plaintiff State of Colorado)**

346. The Colorado Attorney General re-alleges and incorporates Paragraphs 1 through 298 as if they are fully alleged herein.

347. In numerous instances in connection with the advertising, marketing, promotion, and other representations regarding its auction and sale of digital advertising placements, Defendant advertised that it operates a generalized second price auction in which a winning advertiser pays only the minimum amount necessary to win the auction or just above the second highest ranked bid, as set forth in paragraphs 115 to 138 above.

348. Defendant in fact intentionally inflated prices above generalized second price auction results through undisclosed reserve prices and surcharges.

349. When Defendant performed the deceptive trade practices described in the preceding paragraphs, it did so in the course of its business, vocation, or occupation.

350. The deceptive acts or practices alleged herein constitute separate violations of the Colorado Consumer Protection Act. By engaging in the acts and practices alleged herein, both separately and as taken together, Defendant violated Colo. Rev. Stat. § 6-1-105(1)(i).

**Count XVIII**

**Deceptive Acts or Practices in Violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1)(l)**
**(By Plaintiff State of Colorado)**

351. The Colorado Attorney General re-alleges and incorporates Paragraphs 1 through 298 as if they are fully alleged herein.

352. In numerous instances in connection with the advertising, marketing, promotion, and other representations regarding its auction and sale of digital advertising placements,



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

Defendant made false or misleading statements regarding the price of its digital advertising placements, including, but not limited to, that consumer advertisers would be charged "the minimum required to beat the ad with the next highest ranked score in the auction," "slightly higher than the second highest CPC [cost-per-click] bid" or "one penny more than the next highest bid" as detailed in paragraphs 115 to 138 above.

353. Consumers were in fact charged prices higher than represented by Defendant through undisclosed reserve prices and surcharges.

354. When Defendant performed the deceptive trade practices described in the preceding paragraphs, it did so in the course of its business, vocation, or occupation.

355. The deceptive acts or practices alleged herein constitute separate violations of the Colorado Consumer Protection Act. By engaging in the acts and practices alleged herein, both separately and as taken together, Defendant violated Colo. Rev. Stat. § 6-1-105(1)(l).

**Count XIX**

**Deceptive Acts or Practices in Violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1)(u) (By Plaintiff State of Colorado)**

356. The Colorado Attorney General re-alleges and incorporates Paragraphs 1 through 298 as if they are fully alleged herein.

357. In numerous instances in connection with the advertising, marketing, promotion, and other representations regarding its auction and sale of digital advertising placements, Defendant failed to disclose material information to consumer advertisers regarding its auctions and digital advertising placements. Such information includes, but is not limited to, that consumer advertisers would be charged undisclosed reserve prices or surcharges.

358. Defendant knew this information at the time it advertised, promoted, and sold its auction services and digital advertising placements but failed to disclose it. Defendant made these



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

and other material omissions with the intent to induce consumer advertisers to use its auction services and purchase its digital advertising placement.

359. When Defendant performed the deceptive trade practices described in the preceding paragraphs, it did so in the course of its business, vocation, or occupation.

360. The material omissions alleged herein constitute separate violations of the Colorado Consumer Protection Act. By engaging in the acts and practices alleged herein, both separately and as taken together, Defendant violated Colo. Rev. Stat. § 6-1-105(1)(u).

**Count XX**

**Deceptive Acts or Practices in Violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1)(rrr) (By Plaintiff State of Colorado)**

361. The Colorado Attorney General re-alleges and incorporates Paragraphs 1 through 298 as if they are fully alleged herein.

362. Through the above-described acts and omissions, Defendant knowingly and/or recklessly engaged in unfair, unconscionable, deceptive, deliberately misleading, false, and/or fraudulent acts and/or practices.

363. Defendant deliberately deceived consumers by inflating the prices charged for digital advertising placements above the prices resulting from a generalized second price auction and/or applied undisclosed soft reserve prices and hidden surcharges.

364. Defendant's conduct of inflating the price charged for digital advertising placements is also unfair because it violates Colorado public policy, as it has been established by its statutes and common law and because it has caused substantial injury to consumers, namely those consumers who unknowingly paid higher prices for digital advertising placements or who paid undisclosed soft reserve prices or hidden surcharges.

365. When Defendant performed the deceptive trade practices described in the preceding



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

paragraphs, it did so in the course of its business, vocation, or occupation.

366. The unfair and deceptive acts and/or practices alleged herein constitute separate violations of the Colorado Consumer Protection Act. By engaging in the acts and practices alleged herein, both separately and as taken together, Defendant violated Colo. Rev. Stat. § 6-1-105(1)(rrr).

**Claims and Relief Sought by the State of Florida**
**Pursuant to the Florida Deceptive and Unfair Trade Practices Act (FDUPTA)**

**Count XXI**

**Violations of FDUPTA**
**(By Plaintiff State of Florida)**

367. Section 501.204(1) of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") declares that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

368. The provisions of FDUTPA are to be "construed liberally" to promote the protection of the "consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202, Fla. Stat. Additionally, the Florida Legislature provided that when interpreting FDUTPA, "great weight shall be given to the interpretations of the [FTC] and the federal courts . . ." § 501.204(2), Fla. Stat.

369. Section 501.203(3), Florida Statutes, establishes that a violation of the Florida Deceptive and Unfair Trade Practices Act may be based upon any of the following: (a) any rules promulgated pursuant to the FTC Act; (b) the standards of unfairness and deception set forth and interpreted by the FTC or the federal courts; or (c) any law, statute, rule, regulation or



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

370. "[A]ny person, firm, corporation, association, or entity, or any agent or employee of the foregoing, who is willfully using, or has willfully used, a method, act, or practice declared unlawful under § 501.204 . . . is liable for a civil penalty of not more than $10,000 for each violation." § 501.2075, Fla. Stat. A violation is "willful" if the defendant knew or should have known that [its] conduct was unfair or deceptive. § 501.2075, Fla. Stat.

371. The Counts of Paragraphs 1 through 298 above are incorporated by reference as though fully set forth herein.

372. The State of Florida brings the following claims under FDUTPA: (a) misrepresentations, (b) deceptive auction manipulation, (c) concealment, (d) unfair omissions, and (e) unfair billing practices.

***Misrepresentations***

373. In numerous instances in connection with the advertising, marketing, promotion, or offering for sale, or sale of digital advertisement placements on Amazon's website and app, Defendant represents, directly or indirectly, expressly or by implication, that Amazon operates generalized second price auctions where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid.

374. In numerous instances where Defendant has made the representations in Paragraph 373, Defendant has actually charged substantially higher prices than the second highest ranked bid. Defendant's false or misleading representations have affected the people of the State of Florida.


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

375. Defendants' representations or omissions constitute a deceptive act or practice in violation of the Florida Deceptive and Unfair Trade Practices Act, as amended, Fla. Stat. 501.204.

***Deceptive Auction Manipulation***

376. In numerous instances in connection with the advertising, marketing, promotion, or offering for sale, or sale of digital advertisement placements on Amazon's website and app, Defendant represents, directly or indirectly, expressly or by implication, that the prices Defendant charges its customers are set by auctions employing a competitive bidding process.

377. In numerous instances where Defendant has made the representations in Paragraph 376, Defendant has deliberately manipulated and altered the competitive process within its auctions, and the results of the competitive process, by secretly inserting a fake "bid" or price after determining the winning bids in order to inflate auction pricing it charges customers.

378. Defendant's representations or omissions constitute deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, as amended, Fla. Stat. 501.204.

***Concealment***

379. In numerous instances, Defendant has deliberately concealed from its customers that it inflates the prices it charges above prices set by second price auctions for digital advertisement placements on Amazon. Defendant's concealment has affected the people of the State of Florida.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

380. Defendant's deliberate concealment of this information in numerous instances constitutes deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, as amended, Fla. Stat. 501.204.

***Unfair Omissions***

381. In numerous instances, Defendant has failed to disclose or disclose adequately that Amazon inflates the prices it charges above prices set by second price auctions for digital advertisement placements on Amazon. Defendant's acts or practices have affected the people of the State of Florida.

382. Defendant's acts or practices as described in Paragraph 381 are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition in violation of Section 501.204, Florida Statutes.

383. Defendant's acts or practices as described in Paragraph 381 offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to Florida governmental entities, to municipalities in the State of Florida, Florida businesses, and to consumers in the State of Florida in violation of Section 501.204, Florida Statutes.

***Unfair Billing Practices***

384. In numerous instances, Defendant charges consumers without obtaining consumers' express informed consent for amounts above prices set by second price auctions for digital advertisement placements on Amazon.

385. Defendant's acts or practices are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition in violation of Section 501.204, Florida Statutes.

386. Defendant's actions offend established public policy and are immoral, unethical,



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

oppressive, unscrupulous, or substantially injurious to Florida governmental entities, to municipalities in the State of Florida, Florida businesses, and to consumers in the State of Florida in violation of Section 501.204, Florida Statutes.

**Claims and Relief Sought by the State of Idaho**
**Pursuant to the Idaho Consumer Protection Act, title 48, chapter 6, Idaho Code, and the Idaho Rules of Consumer Protection, IDAPA 04.02.01.000 et seq.**

**Count XXII**

**Violations of Idaho Code § 48-603(5)**
**(By Plaintiff State of Idaho)**

387. Plaintiff State of Idaho, through Attorney General Raúl R. Labrador, alleges and incorporates by reference paragraphs 1 through 298 of this Complaint as though fully set forth herein.

388. As outlined in this Complaint, Defendant knew or in the exercise of due care should have known that it engaged in unfair competition or unfair or deceptive acts or practices in trade and commerce by misrepresenting the characteristics or benefits of Defendant's advertising auctions and sale of digital advertising placements.

389. Defendant's conduct constitutes multiple and separate violations of Idaho Code § 48-603(5) and subjects Defendant to the remedies provided in Idaho Code §§ 48-606 and 48-607.

**Count XXIII**

**Violations of Idaho Code § 48-603(17) & IDAPA 04.02.01.030**
**(By Plaintiff State of Idaho)**

390. Plaintiff State of Idaho, through Attorney General Raúl R. Labrador, alleges and incorporates by reference paragraphs 1 through 298 of this Complaint as though fully set forth herein.

391. As outlined in this Complaint, Defendant knew or in the exercise of due care should have


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

known that it engaged in unfair or deceptive acts or practices in trade and commerce by misrepresenting or failing to disclose material terms or conditions of Defendant's advertising auctions and sale of digital advertising placements in a manner that has the capacity, tendency, or effect of deceiving or misleading a consumer acting reasonably under the circumstances.

392. Defendant's conduct constitutes multiple and separation violations of Idaho Code § 48-603(17) and IDAPA 04.02.01.030 and subjects Defendant to the remedies provided in Idaho Code §§ 48-606 and 48-607.

**Count XXIV**

**Violations of Idaho Code § 48-603(17) & IDAPA 04.02.01.040**
**(By Plaintiff State of Idaho)**

393. Plaintiff State of Idaho, through Attorney General Raúl R. Labrador, alleges and incorporates by reference paragraphs 1 through 298 of this Complaint as though fully set forth herein.

394. As outlined in this Complaint, Defendant knew or in the exercise of due care should have known that it engaged in unfair or deceptive acts or practices in trade and commerce by conducting advertising auctions and offering its digital advertising placements without clearly and conspicuously disclosing all material contingencies, conditions, or qualifications related to Defendant's offer.

395. Defendant's conduct constitutes multiple and separation violations of Idaho Code § 48-603(17) and IDAPA 04.02.01.040 and subjects Defendant to the remedies provided in Idaho Code §§ 48-606 and 48-607.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

**Claims and Relief Sought by the State of Illinois Pursuant to the Illinois Consumer Fraud Act**

**Count XXV**

**Violations of the Illinois Consumer Fraud Act (By Plaintiff State of Illinois)**

396. The Illinois Attorney General re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs.

397. Defendant, in the course of trade or commerce, has in numerous instances engaged in conduct which constitutes unfair and deceptive acts or practices declared unlawful under section 2 of the Consumer Fraud Act, 815 ILCS 505/2, by:

A. Misrepresenting directly or indirectly, expressly or by implication, with the intent that Illinois consumers rely on the misrepresentation, that Amazon conducts generalized second price auctions where the final auction price is set by the second highest bidder where the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid, when in fact, Amazon inflates the prices it charges;

B. Omitting, by failing to disclose or adequately disclose with the intent that Illinois consumers rely on the omission, the material fact that Amazon inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements on Amazon's website and app;

C. Concealing, with the intent that Illinois consumers rely on the concealment, the material fact that Amazon inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements;

D. Engaging in the unfair act or practice of charging Illinois consumers without obtaining Illinois consumers' express informed consent for amounts above the prices resulting from its generalized second price auctions for digital advertisement placements on Amazon's



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

website and app which is offensive to public policy, immoral, unethical, oppressive or unscrupulous, or causes substantial injury to consumers that cannot be reasonably avoided; and

E. Engaging in the deceptive act or practice of manipulating and altering the competitive process, and the results of the competitive process, with respect to its auctions for digital advertising placements on Amazon's website and app which has the tendency or capacity to deceive or involves a material fact on which a consumer could be expected to rely in determining whether to engage in a transaction.

398. Defendant, in the course of a business, vocation, or occupation, has in numerous instances engaged in deceptive trade practices in violation of Section 2 of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, and therefore in violation of Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, by:

A. Representing to Illinois advertising customers that Amazon auctions for sale of digital advertisement placements on Amazon's website and app have the characteristics of a generalized second price auction where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid, when rather Amazon inflates the prices it charges above the prices resulting from its generalized second price auctions, in violation of 815 ILCS 510/2(a)(5);

B. Representing to Illinois advertising customers that Amazon auctions for sale of digital advertisement placements on Amazon's website and app utilize the style and model of a second price auction where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid, when


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

rather, Amazon inflates the prices it charges above the prices resulting from its generalized second price auctions, in violation of 815 ILCS 510/2(a)(7); and

C. Representing that Amazon operates generalized second price auctions in the sale of digital advertisement placements on Amazon's website and app where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid, when rather, Amazon inflates the prices it charges above the prices resulting from its generalized second price auctions, causing likelihood of confusion or misunderstanding as to whether Illinois advertising customers participate in a generalized second price auction, in violation of 815 ILCS 510/2(a)(12).

**Relief Under the Illinois Consumer Fraud Act**

399. The People of the State of Illinois respectfully pray that this Honorable Court enter an Order:

A. Finding that Defendant violated Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, by engaging in unlawful acts and practices including, but not limited to, the unlawful acts and practices alleged herein;

B. Issuing a permanent injunction pursuant to 815 ILCS 505/7 to prevent future violations of the Consumer Fraud Act;

C. Ordering Defendant to pay full restitution to consumers pursuant to Section 7 of the Illinois Consumer Fraud Act. *Id.*;

D. Ordering Defendant to pay the costs of this action, pursuant to Section 10 of the Illinois Consumer Fraud Act. 815 ILCS 505/10;

E. Ordering Defendant to pay penalties up to $50,000 per unfair or deceptive act or practice and an additional amount of $50,000 for each act or practice found to have been


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

committed with the intent to defraud, as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7; and

F. Awarding any other and additional relief as the Court may determine to be just and proper.

**Claims and Relief Sought by the State of Indiana**
**Pursuant to the Indiana Deceptive Consumer Sales Act**

**Count XXVI**

**Unfair, Abusive, or Deceptive Acts or Practices by Defendant in Violation of Ind. Code § 24-5-0.5-3(a)**
**(By Plaintiff State of Indiana)**

400. Plaintiff the State of Indiana realleges and incorporates by reference Paragraphs 1 through 298 as though fully alleged herein.

401. Plaintiff State of Indiana, through Attorney General Todd Rokita, brings this action under his authority in Ind. Code § 24-5-0.5-4(c) to enjoin unfair, abusive, or deceptive acts, omissions, or practices in connection with a consumer transaction, and obtain other relief under Indiana's Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5, *et seq.* For these violations, Indiana seeks permanent injunctive relief, consumer reimbursement, disgorgement, civil penalties, restitution, attorneys' fees and costs, and other equitable and monetary relief.

402. The Deceptive Consumer Sales Act ("DCSA") regulates unfair, abusive, and/or deceptive acts, omissions, and/or practices between a supplier and consumer when engaging in consumer transactions. Ind. Code § 24-5-0.5 *et seq.*

403. Under the DCSA, a consumer transaction includes services and other intangibles. Ind. Code § 24-5-0.5-2(a)(1).



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

404. In supplying Indiana consumers with products and services, namely Amazon "Sponsored Ads," Defendant was and remains involved in consumer transactions in Indiana, as defined by Ind. Code § 24-5-0.5-2(a)(1).

405. Defendant regularly engages in or solicits consumer transactions with Indiana consumers. As such, Defendant is a supplier pursuant to Ind. Code § 24-5-0.5-2(a)(3).

406. Defendant engaged in unfair, abusive, and/or deceptive acts, omissions, and/or practices affecting Indiana consumers, in violation of Ind. Code § 24-5-0.5-3(a), by making misrepresentations and omissions and engaging in practices in connection with consumer transactions, including but not limited to:

a. Defendant represented that advertisers received the specific advantage of paying only the minimum amount necessary, or approximately one cent more than the next-highest bid, to win, when the final price had determinants which were hidden to the advertiser.

b. Defendant represented that certain price increases occurred due to holidays or peak shopping times when Defendant was responsible for said price increases.

c. Defendant concealed its reserve pricing system and bids from advertisers.

d. Defendant concealed limited auction level reporting from advertisers.

e. Defendant concealed its manipulated auction outcomes from advertisers.

f. Defendant concealed from advertisers that it used bids and other consumer information to determine where to target increased surcharges.

g. Defendant abusively used its position as an auctioneer and seller to increase charges to advertisers.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

407. Each of Defendant's unfair and deceptive acts, omissions and practices constitutes a separate violation of the DCSA actionable by the Attorney General of the State of Indiana.

408. Defendant committed the acts alleged in this Count with knowledge of their deceptive nature, and therefore committed knowing violations of the DCSA, subjecting Defendant to penalties under Ind. Code § 24-5-0.5-4(g).

**Count XXVII**

**Violations of the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-3(b).**
**(By Plaintiff State of Indiana)**

409. The State of Indiana realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 298 and the preceding paragraph as though fully alleged herein.

410. Defendant engaged in deceptive acts affecting Indiana consumers in violation of Ind. Code § 24-5-0.5-3(b)(1) by misrepresenting that its products and/or services had performance, characteristics, uses, and/or benefits they did not have, which the Defendant knew or reasonably should have known that they did not have, including by representing that its service used genuine second price auctions and charged only the amount necessary to win, while imposing undisclosed surcharges and post-auction pricing interventions.

411. Defendant engaged in deceptive acts affecting Indiana consumers in violation of Ind. Code § 24-5-0.5-3(b)(2) by misrepresenting that its products and/or services were of a particular standard, quality, grade, style, or model, which the Defendant knew or reasonably should have known that they did not have, including by representing that its advertising service operated under a generalized second price auction model, when the actual system often operated differently.

412. Defendant knowingly engaged in deceptive acts affecting Indiana consumers in violation



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

of Ind. Code § 24-5-0.5-3(b)(6) by misrepresenting that a specific price advantage existed as to the subject of a consumer transaction, which the Defendant knew or reasonably should have known that it did not have, including by representing that the winning bid in its auction-based model was determined only by price and relevance when Defendant knew that it could, and did, manipulate final prices.

413. Each of Defendant's unfair and deceptive acts, omissions and practices constitutes a separate violation of the DCSA actionable by the Attorney General of the State of Indiana.

414. Defendant committed the acts alleged in this Count with knowledge of their deceptive nature, and therefore committed knowing violations of the DCSA, subjecting them to penalties under Ind. Code § 24-5-0.5-4(g).

**Relief Under the Indiana Deceptive Consumer Sales Act**

415. Plaintiff State of Indiana on behalf of itself and its citizens seeks all remedies available against Amazon under the Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 *et seq.*, including, without limitation, the following:

416. Injunctive relief, pursuant to Ind. Code § 24-5-0.5-4(c)(1);

417. Restitution to aggrieved consumers pursuant to Ind. Code § 24-5-05.4(c)(2);

418. Voiding or limiting the application of contracts formed in connection to the unfair, abusive, or deceptive acts, omissions, or practices committed by Defendant, pursuant to Ind. Code § 24-5-0.5-4(d);

419. Reasonable costs of the attorney general's investigation and prosecution, expert fees, and court fees pursuant to Ind. Code § 24-5-0.5-4(c)(4), and;

420. Civil Penalties of $5,000.00 for each knowing violation of Ind. Code § 24-5-0.5-3, pursuant to Ind. Code § 24-5-0.5-4(g).

421. Plaintiff State of Indiana maintains that Defendant's acts, omission, or practices were and


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

are unfair, abusive, or deceptive and substantially injurious to the public welfare, and to all citizens of the State.

**Claims and Relief Sought by the State of Iowa**
**Pursuant to the Iowa Consumer Fraud Act**

**Count XXVIII**

**Violation of the Iowa Consumer Fraud Act**
**(By Plaintiff State of Iowa)**

422. The State of Iowa realleges and incorporates by reference the allegations made in Counts I through V.

423. This conduct constitutes unfair or deceptive acts and practices in violation of the Iowa Consumer Fraud Act, Iowa Code § 714.16.

**Claims and Relief Sought by the Commonwealth of Kentucky**
**Pursuant to the Kentucky Consumer Protection Act**

**Count XXIX**
**(By Plaintiff Commonwealth of Kentucky)**

424. Plaintiff the Commonwealth of Kentucky repeats and re-alleges each and every preceding allegation as if fully set forth herein. The aforementioned acts or practices by Defendant violate the Consumer Protection Act, Ky. Rev. Stat. § 367.110 *et seq.* ("KCPA").

425. Defendant is or was during all relevant times a "person" conducting "trade" or "commerce" as those terms are defined in Ky. Rev. Stat. §§ 367.110 - 367.300 of the KCPA.

426. Defendant engaged in and is engaging in unlawful conduct in the course of trade or commerce, within the meaning of Ky. Rev. Stat. § 367.170, that has harmed and is harming the Commonwealth and consumers. The above described conduct has been and is willful within the meaning of Ky. Rev. Stat. § 367.990.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

427. The Commonwealth states that the public interest is served by seeking a permanent injunction to restrain the acts and practices described herein. The Commonwealth and its citizens will continue to be harmed unless the acts and practices complained of herein are permanently enjoined pursuant to Ky. Rev. Stat. § 367.190.

428. Further, the Commonwealth seeks restitution to the Commonwealth and/or disgorgement pursuant to Ky. Rev. Stat. § 367.190 - 200, Ky. Rev. Stat. § 15.020, and Kentucky Common Law. The Commonwealth seeks a civil penalty of up to $2,000 for each such willful violation, or $10,000 for each such violation directed at a person over 60, pursuant to Ky. Rev. Stat. § 367.990(26). The Commonwealth is entitled to relief including but not limited to: disgorgement, injunctions, restitution, civil penalties, and its costs and attorney's fees pursuant to Ky. Rev. Stat. § 367.110-990, Ky. Rev. Stat. § 15.020, and Kentucky Common Law.

429. The Commonwealth of Kentucky seeks relief on behalf of itself and as *parens patriae* on behalf of its residents, pursuant to Ky. Rev. Stat. § 15.020, Ky. Rev. Stat. § 367.110 et. seq., Ky. Rev. Stat. § 367.990, and Kentucky Common Law.

**Claims and Relief Sought by the State of Louisiana**
**Pursuant to the Louisiana Unfair Trade Practices and Consumer Protection Act**

**Count XXX**
**(By Plaintiff State of Louisiana)**

430. Plaintiff State of Louisiana repeats and re-alleges each and every preceding allegation as if fully set forth herein.

431. The Attorney General of the State of Louisiana is authorized to bring this action pursuant to the Unfair Trade Practices and Consumer Protection Act, La. Rev. Stat. 51:1401, *et seq.* ("LUTPA").

432. La. Rev. Stat. 51:1405(A) makes unlawful "unfair and deceptive acts or practices in the


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

conduct of any trade or commerce."

433. The Defendant's acts as alleged herein violate Louisiana's prohibition on unfair and deceptive acts or practices.

434. Plaintiff State of Louisiana seeks the following remedies:

a. Injunctive relief enjoining defendant from violating LUTPA, including but not limited to conduct alleged herein pursuant to La. Rev. Stat. 51:1407(A);

b. Restitution to any person harmed by the defendant's conduct pursuant to La. Rev. Stat. 51:1408(A)(5);

c. Civil penalties pursuant to La. Rev. Stat. 51:1407(B);

d. Costs and attorneys' fees; and

e. Any other relief the Court may grant.

**Claims and Relief Sought by the Maryland Attorney General Pursuant to the Maryland Consumer Protection Act**

**Count XXXI**

**(Deceptive Practices)**

435. The Consumer Protection Division of the Maryland Attorney General incorporates paragraphs 1 through 298 as if they were fully alleged herein.

436. The Consumer Protection Division of the Maryland Attorney General's Office is the Maryland Agency charged with enforcing the MD CPA, Md. Code Ann., Com. Law §§ 13-101 through 13-501 and related consumer protection laws.

437. Defendant's practices, as set forth above, constitute deceptive trade practices in the offer or sale of consumer goods and services that violate the MD CPA.

438. Defendant's practices violate the MD CPA whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice. *Id.* at § 13-302.

439. The purchasers of the Defendant's goods and services are consumers pursuant to Md.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

Code Ann., Com. Law §§ 13-101(c)(2)(iv) and 13-101(d)(2).

440. The Defendant has engaged, and continues to engage, in acts or practices that have the capacity, tendency, or effect of deceiving or misleading consumers, and are deceptive trade practices prohibited by § 13-303 of the MD CPA, as defined in § 13-301(1) of the MD CPA, when it made misleading statements to consumers about how it conducted its second place auctions for digital advertisement placement, including that Defendant inflates the prices that were actually set by the auctions.

441. The Defendant has engaged, and continues to engage, in acts or practices that deceive or tend to deceive, and are deceptive trade practices prohibited by § 13-303 of the MD CPA, as defined in § 13-301(3) of the MD CPA, when it fails to disclose the true nature of its second place auctions for digital advertisement placement auctions, including that Defendant inflates the prices that were actually set by the auctions, facts that are material.

**Count XXXII**

**(Unfair Practices)**

442. The Maryland Attorney General incorporates paragraphs 1 through 298 as if they were fully alleged herein.

443. Defendant's practices set forth above have and are likely to cause substantial injury to consumers. Consumers were and are substantially harmed each time they were or are misled into overpaying for the Defendant's goods or services.

444. Consumers who purchased or continue to purchase Defendant's goods and services cannot reasonably avoid their injuries because of Defendant's misrepresentations and omissions of material fact.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

445. The injuries that consumers have suffered and are suffering as a result of Defendant's actions are not offset by any benefit to consumers or to competition and are unfair trade practices that violate § 13-303 of the MD CPA.

**Relief Under the Maryland Consumer Protection Act**

446. Defendant should be enjoined from engaging in its unfair and deceptive trade practices pursuant to § 13-406 of the MD CPA.

447. Defendant should be ordered to disgorge restitution in the amounts that it wrongfully received from Maryland consumers pursuant to § 13-406 of the MD CPA.

448. Defendant should be ordered to pay the costs of this action, including attorneys' fees, pursuant to § 13-409 of the MD CPA.

449. Defendant should be ordered to pay civil penalties in an amount up to $10,000 for each of its violations pursuant to § 13-410 of the MD CPA.

**Claims and Relief Sought by the State of Nebraska Pursuant to the Nebraska Uniform Deceptive Trade Practices Act**

**Count XXXIII**

**(By Plaintiff State of Nebraska)**

450. Plaintiff Nebraska re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

451. The Nebraska Uniform Deceptive Trade Practices Act ("NE UDTPA") specifies multiple acts or practices which, when conducted in the course of business, constitute deceptive trade practices, including, without limitation: representing that "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have," and advertising "goods or services with intent not to sell them as



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

advertised or advertises the price in any manner calculated or tending to mislead or in any way deceive a person[.]” Neb. Rev. Stat. § 87-302(a)(5), and (10).

452. The Attorney General is authorized to bring an action against any person who violates NE UDTPA for injunctive relief, restitution for Nebraska consumers, and civil penalties. Neb. Rev. Stat. §§ 87-303.05, 87-303.11.

453. In numerous instances in connection with the advertising, marketing, promotion, or offering for sale, or sale of digital advertisement placements on Amazon, Defendant represents, directly or indirectly, expressly or by implication, that Amazon operates second price auctions, where the winning advertiser pays only the minimum amount necessary to beat the next highest bid.

454. In numerous instances, Defendant has represented to Nebraska advertisers that its platform operates as a second price auction, where winning advertisers pay only the minimum amount necessary to beat the next highest bid. Defendant's platform does not operate as represented. By charging winning advertisers substantially more than the next highest bid through undisclosed soft reserve prices, Defendant has represented that its advertising services have a characteristic, competitive second price pricing, that they do not have.

455. In numerous instances, Defendant has charged winning advertisers substantially more than the next highest bid, a practice Defendant has never disclosed or disclosed adequately. This undisclosed inflation of auction prices misrepresents the nature of the service and constitutes deception by omission.

456. Defendant’s false or misleading representations and omissions constitute deceptive acts or practices in the course of business in violation of the Nebraska Uniform Deceptive Trade Practices Act. See Neb. Rev. Stat. § 87-302(a)(5), and (10).



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

457. Defendant engaged in the above deceptive acts and practices willfully, knowing them to be deceptive.

458. Defendant's false or misleading representations have affected the people of the State of Nebraska.

459. Each deceptive act or practice as alleged herein constitutes a separate violation of the Nebraska Uniform Deceptive Trade Practices Act.

**Claims and Relief Sought by the State of New Jersey**
**Pursuant to the New Jersey Consumer Fraud Act ("New Jersey CFA")**

**Count XXXIV**

**Violation of the New Jersey CFA: Unconscionable Commercial Practices, Acts of Deception, Misrepresentations, and/or False Promises**
**(By Plaintiff State of New Jersey)**

460. Plaintiff the State of New Jersey repeats and realleges the allegations contained in Paragraphs 1 through 298 above as if set forth more fully herein.

461. The New Jersey CFA, N.J.S.A. 56:8-2, prohibits:

> The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

462. The New Jersey CFA, N.J.S.A. 56:8-1(c), defines "merchandise" as including "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale."

463. At all relevant times in the course and conduct of advertising, marketing, promotion, offering for sale, and/or sale of digital advertisement placements on Defendant's website



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

and app to New Jersey consumers, Defendant has engaged in the advertisement and sale of merchandise within the meaning of N.J.S.A. 56:8-1(c).

464. In numerous instances in connection with such course and conduct, Defendant has engaged in the use of unconscionable commercial practices and acts of deception, misrepresentations, and/or false promises.

465. Each unconscionable commercial practice, act of deception, misrepresentation, and/or false promise by Defendant constitutes a separate violation of the New Jersey CFA, specifically N.J.S.A. 56:8-2.

**Count XXXV**

**Violation of the New Jersey CFA: Knowing Concealment and/or Omission of Material Fact**
**(By Plaintiff State of New Jersey)**

466. Plaintiff the State of New Jersey repeats and realleges the allegations contained in Paragraphs 1 through 298 above as if set forth more fully herein.

467. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, and/or sale of digital advertisement placements on Defendant's website and app, Defendant has known that its advertising customers believe that Amazon operates generalized second price auctions where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser pays only the minimum amount necessary to win the auction or just above the second highest ranked bid.

468. In numerous instances, Defendant has knowingly concealed from its customers that it inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements and/or knowingly failed to disclose or disclose adequately this fact.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

469. This fact would be material to Defendant's customers in their conduct regarding the purchase of digital advertisement placements.

470. Defendant knowingly concealed and/or omitted this fact from disclosure with intent that Defendant's advertising customers rely on this concealment and/or omission.

471. Each act of concealment and/or omission by Defendant constitutes a separate violation under the New Jersey CFA, specifically N.J.S.A. 56:8-2.

**Claims and Relief Sought by the State of New York**

**Count XXXVI**

**(Repeated and Persistent Fraud and Illegality Under N.Y. Exec. L. § 63(12))**

**(By Plaintiff State of New York)**

472. Plaintiff the People of the State of New York, by their attorney Letitia James, Attorney General of the State of New York ("NYAG"), repeat and reallege paragraphs 1 to 298 as if fully set forth herein.

473. New York Executive Law § 63(12) authorizes the NYAG to seek injunctive and other relief when any individual or entity engages in repeated and persistent fraud or illegality in the carrying on, conducting, or transacting of business in the state of New York.

474. New York Executive Law § 63(12) broadly defines fraud to include "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."

475. As set forth in detail above, Amazon has, in numerous instances in connection with the advertising, marketing, promotion, or offering for sale, or sale of digital advertisement placements on Amazon's website and app, engaged in repeated and persistent fraudulent and illegal conduct, including but not limited to:

a. falsely representing that Amazon operates generalized second price auctions where winners



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid, when in fact Amazon inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements; and

b. concealing from Amazon's customers that Amazon inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements.

476. Amazon's acts or practices constitute repeated and persistent fraudulent and illegal conduct in violation of New York Executive Law § 63(12).

**Count XXXVII**

**(Deception and False Advertising Under N.Y. G.B.L. §§ 349 and 350)**

**(By Plaintiff State of New York)**

477. Plaintiff the People of the State of New York, by their attorney Letitia James, Attorney General of the State of New York ("NYAG"), repeat and reallege paragraphs 1 to 298 as if fully set forth herein.

478. New York General Business Law § 349(a) prohibits deceptive acts and practices in the conduct of any business, trade or commerce, or in the furnishing of any service, in the State of New York.

479. New York General Business Law § 350 prohibits false advertising in the conduct of any business, trade or commerce, or in the furnishing of any service, in the State of New York.

480. As set forth in detail above, Amazon has, in numerous instances in connection with the advertising, marketing, promotion, or offering for sale, or sale of digital advertisement placements on Amazon's website and app, engaged in deceptive acts and practices and false



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

advertising, including, but not limited to:

a. falsely representing that Amazon operates generalized second price auctions where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid, when in fact Amazon inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements; and

b. concealing from Amazon's customers that Amazon inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements.

481. Amazon's acts or practices constitute deceptive acts and practices in violation of New York General Business Law § 349(a) and false advertising in violation of New York General Business Law § 350.

**Count XXXVIII**

**(Unfairness Under N.Y. G.B.L. § 349(a))**

**(By Plaintiff State of New York)**

482. Plaintiff the People of the State of New York, by their attorney Letitia James, Attorney General of the State of New York ("NYAG"), repeat and reallege paragraphs 1 to 298 as if fully set forth herein.

483. Effective as of February 17, 2026, New York General Business Law § 349(a) prohibits unfair acts and practices in the conduct of any business, trade or commerce, or in the furnishing of any service, in the State of New York.

484. New York General Business Law § 349(a)(1) provides that an act or practice is unfair "when it causes or is likely to cause substantial injury which is not reasonably avoidable and



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

is not outweighed by countervailing benefits to consumers or to competition."

485. As set forth in detail above, Amazon has, in numerous instances in connection with the advertising, marketing, promotion, or offering for sale, or sale of digital advertisement placements on Amazon's website and app, engaged in unfair acts and practices, including, but not limited to:

a. failing to disclose or disclose adequately that Amazon inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements on Amazon's website and app;

b. charging consumers without obtaining consumers' express informed consent for amounts above the prices resulting from its generalized second price auctions for digital advertisement placements on Amazon's website and app; and

c. manipulating and altering the competitive process, and the results of the competitive process, with respect to its auctions for digital advertising placements on Amazon's website and app.

486. Amazon's acts and practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

487. Amazon's acts and practices constitute unfair acts and practices in violation of New York General Business Law § 349(a).

## Claims and Relief Sought by the State of North Carolina Pursuant to the North Carolina Unfair and Deceptive Trade Practices Act

### Count XXXIX

488. Plaintiff State of North Carolina alleges and incorporates by reference paragraphs 1 through 298 above as though fully set forth herein.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

489. Defendant, in connection with the advertising, marketing, promotion, offering for sale, or sale of digital advertisement placements on Amazon's website and app, engaged in unfair or deceptive trade practices in or affecting commerce in North Carolina, in violation of N.C. Gen. Stat. § 75-1.1.

490. Defendant's unfair or deceptive acts, practices, representations and omissions, as described in the complaint, include but are not limited to the following:

(a) Representing, directly or indirectly, expressly or by implication, that Amazon operates generalized second price auctions where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid when Defendant actually inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements;

(b) Representing directly or indirectly, expressly or by implication, that the prices Defendant charges its customers are set by auctions employing a competitive bidding process when Defendant deliberately manipulated and altered the competitive process within its auctions, and the results of the competitive process, by secretly inserting a fake "bid" or price after determining the winning bids in order to inflate the auction pricing it charges customers.

(c) Concealing from advertising customers that it inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements when this fact would be material to Defendant's customers in their conduct regarding the purchase of digital advertisement placements;

(d) Failing to disclose or disclose adequately that Defendant inflates the prices it charges above prices resulting from its generalized second price auctions for digital advertisement placements on Amazon's website and app when Defendant's advertising customers believe


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

that Amazon operates generalized second price auctions where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid; and

(e) Charging advertising customers without obtaining customers' express informed consent for amounts above the prices resulting from its generalized second price auctions for digital advertisement placements on Amazon's website and app.

491. Pursuant to § 75-14 of the North Carolina Unfair or Deceptive Trade Practices Act, Defendant should be ordered to cease and desist from engaging in its unfair or deceptive trade practices.

492. Pursuant to § 75-15.1 of the North Carolina Unfair or Deceptive Trade Practices Act, Defendant should be ordered to cancel all contracts Defendant wrongfully obtained because of Defendant's violations of the North Carolina Unfair or Deceptive Trade Practices Act, restore all moneys that Defendant wrongfully collected because of Defendant's violations of the North Carolina Unfair or Deceptive Trade Practices Act, and disgorge all amounts Defendant or its agents, employees, representatives, subcontractors, successors and assigns have received, or in the future receive, in connection with Defendant's violations of the North Carolina Unfair or Deceptive Trade Practices Act.

493. Pursuant to § 75-15.2 of the North Carolina Unfair or Deceptive Trade Practices Act, Defendant should be ordered to pay civil penalties in an amount of up to $5,000 for each knowing violation of a statute, including but not limited to N.C. Gen. Stat. § 75-1.1, where Defendant violated N.C. Gen. Stat. § 75-1.1.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

494. Pursuant to § 75-16.1 of the North Carolina Unfair or Deceptive Trade Practices Act, Defendant should be ordered to pay Plaintiff State of North Carolina its costs, including reasonable attorneys' fees, incurred by the investigation and litigation of this action.

**Claims and Relief Sought by the State of Oklahoma**
**Pursuant to the Oklahoma Consumer Protection Act**

**Count XL**
**(False Representations)**

495. The Oklahoma Attorney General incorporates paragraphs 1 through 298 as if they were fully alleged herein.

496. Defendant's practices, as set forth above, constitute false representations made in the course of Defendant's business regarding the characteristics, uses, and benefits of the subject consumer transactions; advertising, knowing or with reason to know, the subject of the consumer transaction with intent not to sell it as advertised; and false or misleading statements of fact, knowingly or with reason to know, concerning the price of the subject of a consumer transaction that violate the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15, § 753(5), (9) and (12).

497. The advertising services that Defendant advertised, offered for sale, and sold, as set forth above, are consumer transactions pursuant to Okla. Stat. tit. 15, § 752(2) because the services were advertised, offered for sale, and sold for purposes that are business-oriented.

498. Defendant is a person within the meaning of the Oklahoma Consumer Protection Act pursuant to Okla. Stat. tit. 15, § 752 because it is a corporation, incorporated association, or other legal entity.

499. These false representations by Defendant include representations, directly or indirectly, expressly or by implication that Amazon operates generalized second price auctions wherein Amazon selects winners based on a combination of bid amount and relevance to shoppers'


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

searches, and that the winning advertiser only pays the minimum amount necessary to beat the second-place bidder when Defendant actually inflates the prices it charges above the prices resulting from its generalized second price auctions.

**Count XLI**
**(Unfair Trade Practices)**

500. The Oklahoma Attorney General incorporates paragraphs 1 through 298 as if they were fully alleged herein.

501. Defendant's practices, as set forth above, constitute unfair trade practices made in the course of Defendant's business that violate the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15, § 753(21).

502. Defendant's practices, as set forth above, constitute unfair trade practices because such practices offend established public policy or are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, Okla. Stat. tit. 15, § 752(14).

503. Defendant's practices set forth above are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, as consumers were harmed each time they were or are misled into overpaying for the Defendant's goods and/or services.

**Count XLII**
**(Deceptive Trade Practices)**

504. The Oklahoma Attorney General incorporates paragraphs 1 through 298 as if they were fully alleged herein.

505. Defendant's practices, as set forth above, constitute deceptive trade practices made in the course of Defendant's business that violate the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15, § 753(21).

506. Defendant's practices, as set forth above, constitute deceptive trade practices because Defendant's practices misrepresented, omitted, deceived, or could reasonably be expected to


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

deceive or mislead a person to their detriment into overpaying for the Defendant's goods and/or services.

**Relief Under the Oklahoma Consumer Protection Act (Counts XL, XLI, XLII)**

507. Defendant's practices, as set forth above, should be declared acts or practices that violate the Oklahoma Consumer Protection Act pursuant to Okla. Stat. tit. 15, § 756.1(A)(1).

508. In the public interest, Defendant should be enjoined and restrained from violating the Oklahoma Consumer Protection Act pursuant to Okla. Stat. tit. 15, § 756.1(A)(2).

509. The State of Oklahoma is entitled to relief including but not limited to restitution, disgorgement, injunctions, civil penalties, expenses, costs and attorneys fees. Defendant should be ordered to pay restitution to the State of Oklahoma and/or disgorgement and other equitable relief in the amounts that it has wrongfully received from Oklahoma consumers pursuant to Okla. Stat. tit. 15, § 756.1(A), (C). Defendant should be ordered to pay civil penalties in the amount of Ten Thousand Dollars ($10,000) per violation of the Oklahoma Consumer Protection Act, in addition to other penalties that may be imposed by the Court, pursuant to Okla. Stat. tit. 15, § 761.1. Defendant should be ordered to pay the reasonable expenses, attorney's fees, and investigative fees incurred pursuant to Okla. Stat. tit. 15, §§ 756.1(A)(4), 761.1(D).

**Claims and Relief Sought by the Commonwealth of Pennsylvania**
**Pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Act**

**Count XLIII**
**(Deceptive Practices)**
**(By Commonwealth of Pennsylvania)**

510. The Commonwealth of Pennsylvania, Office of Attorney General, by Attorney General David W. Sunday Jr. ("PA-OAG" or the "Pennsylvania Attorney General") incorporates Paragraphs 1 through 298 as if they are fully alleged herein.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

511. Defendant's practices, as set forth above, constitute deceptive trade practices in the advertising, offering for sale, or sale of goods and services that violate the *Pennsylvania Unfair Trade Practices and Consumer Protection Law*, 73 P.S. § 201-1, *et seq.* ("*PA Consumer Protection Law*").

512. The Pennsylvania Attorney General brings these claims pursuant to the *PA Consumer Protection* Law to restrain unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce declared unlawful by section 201-3 of the *PA Consumer Protection Law*. 73 P.S. § 201-3.

513. The *PA Consumer Protection Law* defines "trade" and "commerce" to mean, "The advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth." 73 P.S. § 201-2(3).

514. Defendant engages in trade and commerce within the Commonwealth of Pennsylvania, as defined by section 201-2(3) of the *PA Consumer Protection Law*, by advertising, offering for sale, and selling its digital advertisement placements to Pennsylvania advertisers. 73 P.S. § 201-2(3).

515. Defendant, in connection with the advertising, marketing, promotion, offering for sale, or sale of digital advertisement placements on its website and app, as described in Paragraphs 1 through 298 above, engages in deceptive trade practices in violation of Section 201-3 of the *PA Consumer Protection Law*, as defined in Section 201-2(4) by:

A. Representing directly or indirectly, expressly or by implication that Amazon operates generalized second price auctions where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the


FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid when Defendant actually inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements;

B. Representing directly or indirectly, expressly or by implication, that the prices Defendant charges its customers are set by auctions employing a competitive bidding process when Defendant has deliberately manipulated and altered the competitive process within its auctions, and the results of the competitive process, by secretly inserting a fake "bid" or price after determining the winning bids in order to inflate the auction pricing it charges customers;

C. Concealing from advertising customers that it inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements when this fact would be material to Defendant's customers in their conduct regarding the purchase of digital advertisement placements;

D. Failing to disclose or disclose adequately that Amazon inflates the prices it charges above prices resulting from its generalized second price auctions for digital advertisement placements on Amazon's website and app when Defendant's advertising customers believe that Amazon operates generalized second price auctions where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid; and

E. Charging advertising customers without obtaining customers' express informed



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

consent for amounts above the prices resulting from its generalized second price auctions for digital advertisement placements on Amazon's website and app.

516. The aforementioned acts and practices have the capacity or tendency to deceive or mislead advertising customers.

517. Defendant's aforesaid methods, acts or practices constitute deceptive acts or practices in the conduct of trade or commerce by:

A. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have in violation of section 201-2(4)(v) of the *PA Consumer Protection Law*, 73 P.S. § 201-2(4)(v);

B. Advertising goods or services with intent not to sell them as advertised in violation of section 201-2(4)(ix) of the *PA Consumer Protection Law*, 73 P.S. § 201-2(4)(ix); and

C. Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of section 201-2(4)(xxi) of the *PA Consumer Protection Law*, 73 P.S. § 201-2(4)(xxi).

73 P.S. § 201-2(4)(v), (ix), and (xxi).

518. The Commonwealth alleges that, at all times relevant hereto, all of the methods, acts and practices described above were performed willfully by Defendant.

519. The Commonwealth believes and therefore avers that advertising customers in the Commonwealth are suffering harm and will continue to suffer harm unless the acts and practices complained of herein are permanently enjoined.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

**Count XLIV**
**(Unfair Practices)**
**(By Commonwealth of Pennsylvania)**

520. The Pennsylvania Attorney General incorporates Paragraphs 1 through 298 as if they are fully alleged herein.

521. Defendant's practices, as set forth above, constitute unfair practices in the advertising, offering for sale, or sale of goods and services that violate the PA Consumer Protection Law.

522. Defendant, in connection with the advertising, offering for sale, or sale of its digital advertisement placements, as described in Paragraphs 1 through 298 above, engages in unfair trade practices in violation of Section 201-3 of the PA Consumer Protection Law, as defined in Section 201-2(4) by:

A. Representing directly or indirectly, expressly or by implication that Amazon operates generalized second price auctions where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid when Defendant actually inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements;

B. Representing directly or indirectly, expressly or by implication, that the prices Defendant charges its customers are set by auctions employing a competitive bidding process when Defendant has deliberately manipulated and altered the competitive process within its auctions, and the results of the competitive process, by secretly inserting a fake "bid" or price after determining the winning bids in order to inflate the auction pricing it charges customers.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

C. Concealing from its advertising customers that Amazon inflates the prices it charges above the prices resulting from its generalized second price auctions for digital advertisement placements when this fact would be material to Defendant's customers in their conduct regarding the purchase of digital advertisement placements;

D. Failing to disclose or disclose adequately that Amazon inflates the prices it charges above prices resulting from its generalized second price auctions for digital advertisement placements on Amazon's website and app when Defendant's advertising customers believe that Amazon operates generalized second price auctions where winners are selected based on the combination of bid and the ad's relevance to shopping queries, and the winning advertiser only pays the minimum amount necessary to win the auction or just above the second highest ranked bid; and

E. Charging advertising customers without obtaining customers' express informed consent for amounts above the prices resulting from its generalized second price auctions for digital advertisement placements on Amazon's website and app.

523. Defendant's aforementioned acts and practices constitute unfair trade practices that violate Section 201-3, as defined by Section 201-2(4) of the PA Consumer Protection Law. Specifically, the aforementioned acts and practices: (1) offend public policy; (2) are immoral, unethical, oppressive, or scrupulous; and/or (3) cause substantial injury to advertising customers.

524. Defendant's aforesaid methods, acts or practices constitute unfair acts or practices in the conduct of trade or commerce by:



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

A. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have in violation of section 201-2(4)(v) of the *PA Consumer Protection Law*, 73 P.S. § 201-2(4)(v);

B. Advertising goods or services with intent not to sell them as advertised in violation of section 201-2(4)(ix) of the *PA Consumer Protection Law*, 73 P.S. § 201-2(4)(ix); and

C. Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of section 201-2(4)(xxi) of the *PA Consumer Protection Law*, 73 P.S. § 201-2(4)(xxi).

73 P.S. § 201-2(4)(v), (ix), and (xxi).

525. The Commonwealth alleges that, at all times relevant hereto, all of the methods, acts and practices described above are performed willfully by Defendant.

526. The Commonwealth believes and therefore avers that purchasers in the Commonwealth are suffering harm and will continue to suffer harm unless the acts and practices complained of herein are permanently enjoined.

**Relief Under the Pennsylvania Unfair Trade Practices and Consumer Protection Act (Counts XLIII and XLIV)**

527. Defendant should be ordered to cease and desist from unfair or deceptive acts or practices pursuant to Section 201-4 of the *PA Consumer Protection Law*. 73 P.S. § 201-4.

528. Defendant should be ordered to pay restitution to all persons, as that term is defined under Section 201-2(2) of the *PA Consumer Protection Law*, who have suffered losses as a result of the unfair methods of competition or unfair or deceptive acts or practices pursuant



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

to Section 201-4.1 of the *PA Consumer Protection Law*. 73 P.S. § 201-4.1. *See also* 73 P.S. § 201-2(2) (defining "person" to mean "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities").

529. Defendant should be ordered to pay the costs of this action, including but not limited to attorneys' fees, pursuant to Section 201-4.1 of the *PA Consumer Protection Law*, 73 P.S. § 201-4.1 and Section 1602-U of the Fiscal Code, 72 P.S. § 1602-U.

530. Defendant should be ordered to pay civil penalties in the amount of $1,000.00 for each instance of a willful violation of the *PA Consumer Protection Law*, and $3,000.00 for each instance of a willful violation of the *PA Consumer Protection Law* involving victims age 60 years of age or older pursuant to Section 201-8(b) of the *PA Consumer Protection Law*. 73 P.S. § 201-8(b).

**Claims and Relief Sought by the State of Rhode Island Pursuant to the Rhode Island Consumer Protection Act**

**Count XLV**

531. Plaintiff State of Rhode Island incorporates and realleges Paragraphs 1 through 298 as if fully set forth herein.

532. The Rhode Island Deceptive Trade Practices Act ("RI DTPA") prohibits unfair methods of competition and unfair and deceptive acts or practices in the conduct of any trade or commerce. R.I. Gen. Laws § 6-13.1-2.

533. Unfair methods of competition and unfair and deceptive acts or practices include, but are not limited to:

(a) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

(b) representing that goods or services are of a particular standard, quality, or grade, or that



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

goods are of a particular style or model, if they are of another;

(c) advertising goods or services with intent not to sell them as advertised; and

(d) using any other methods, acts, or practices that mislead or deceive members of the public in a material respect.

R.I. Gen. Laws § 6-13.1-1(6)(v), (viii), (ix), (iv).

534. When there is reason to believe that any person is violating or has engaged in unfair methods of competition or unfair or deceptive trade practices, and where an action would be in the public interest, the Rhode Island Attorney General has authority to bring an action in the name of the state for injunctive, monetary, and other appropriate relief under R.I. Gen. Laws § 6-13.1-5.

535. Defendant Amazon's acts or practices enumerated in the foregoing paragraphs have been in the conduct of trade or commerce in Rhode Island.

536. Defendant Amazon represented that its advertising services pricing used a competitive second price auction in which the winning advertiser pays a price just above the second-place bid.

537. Defendant Amazon secretly imposed undisclosed reserve prices and/or artificial bidding mechanisms, in which the actual pricing system differed materially from the advertised service. Defendant Amazon failed to disclose or disclose adequately that it inflates the prices it charges above prices resulting from its generalized second price auctions.

538. Defendants' misrepresentations were misleading and deceptive in a material respect.

539. Defendants' misrepresentations created a likelihood of confusion or misunderstanding.

540. This action is in the public interest because Defendants' misleading and deceptive conduct disrupted trade or commerce in Rhode Island.

541. Plaintiff State of Rhode Island alleges that the acts, practices, representations, and



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

omissions of Defendant Amazon described herein violate the prohibition against unfair or deceptive trade practices found in the RI DTPA, R.I. Gen. Laws § 6-13.1 *et seq*.

542. Plaintiff State of Rhode Island seeks all remedies available under R.I. Gen. Laws § 6-13.1-1 *et seq*, including declaratory relief, injunctive relief, civil penalties up to $10,000 per violation, restitution, reasonable costs and fees, and such further relief as the Court deems just and equitable.

**Claims and Relief Sought by the State of South Carolina**
**Pursuant to the South Carolina Unfair Trade Practices Act**

**Count XLVI**
**(By Plaintiff State of South Carolina)**

543. Defendant's acts and practices as alleged herein constitute unfair methods of competition and unfair or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-20 *et seq.*

544. Defendant's acts and practices as alleged herein are unfair, offensive to established public policy, immoral, and unethical.

545. These acts and practices have resulted in a substantial injury to South Carolina consumers that is not outweighed by any countervailing benefits to consumers or competition.

546. Defendant's acts and practices as alleged herein occurred in the conduct of trade and/or commerce.

547. Defendant's acts and practices as alleged herein are capable of repetition and affect the public interest.

548. By engaging in the acts and practices alleged herein, Defendant made or caused to be made to South Carolina consumers, directly or indirectly, explicitly or by implication, misrepresentations that, reasonably interpreted, are material, false, and have a tendency to deceive.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

549. At the time it made or disseminated its false or misleading statements or caused those statements to be made or disseminated, Defendant knew or should have known that the statements were false or misleading and therefore had a tendency to deceive the public.

550. Every deceptive or unfair act by the Defendant constitutes a separate and distinct violation of S.C. Code § 39-5-20.

551. Defendant's acts and practices as alleged herein are willful under S.C. Code § 39-5-110, subjecting the Defendant to a civil penalty of up to $5,000 per violation of S.C. Code Ann. § 39-5-20.

**Claims and Relief Sought by Vermont**
**Pursuant to the Vermont Consumer Protection Act**

**Count XLVII**

**Violation of the Vermont Consumer Protection Act**
**(By Plaintiff State of Vermont)**

552. The State of Vermont realleges and incorporates by reference the allegations in Counts I through V.

553. This conduct violates the Vermont Consumer Protection Act, 9 Vt. Stat. Ann. § 2453, as an unfair method of competition or unfair or deceptive act or practice in commerce.

**Claims and Relief Sought by the Washington State Attorney General's Office, Consumer Protection Division,**
**Pursuant to the Washington Consumer Protection Act**

**Count XLVIII**

**Deceptive Acts or Practices in Violation of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020**

**(By Plaintiff Washington State Attorney General's Office, Consumer Protection Division**



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

554. Washington realleges and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint.

555. Pursuant to the Washington Consumer Protection Act (WA CPA), Wash. Rev. Code § 19.86.020, "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

556. Amazon engaged in numerous deceptive acts and practices affecting Washington state consumers, and consumers across the United States, in violation of Wash. Rev. Code. § 19.86.020 related to the advertising, marketing, promotion, offering, and/or sale of digital advertisements on Amazon's e-commerce platform, including but not limited to:

(a) Misrepresenting and/or omitting that Amazon operates generalized second price auctions where the winner is selected based on a combination of the bid and the ad's relevance to shopper queries, and that the winning advertiser pays the minimum amount necessary to win the auction or just above the second highest ranked bid, when Amazon actually inflates the prices it charges the auction winner above the minimum amount necessary to win the auction or just above the second highest ranked bid.

557. At all relevant times, Amazon engaged in "trade or commerce" as defined in the WA CPA, Wash. Rev. Code § 19.86.010(2).

558. Amazon's deceptive acts and practices affected the public interest in that they impacted numerous Washington state consumers and consumers across the United States. These practices demonstrate a pattern of conduct that Amazon committed in the course of business and are likely to recur without relief from the Court.

559. Based on Amazon's above deceptive acts or practices, Washington is entitled to all appropriate relief under the WA CPA, including injunctive relief, civil penalties, restitution,



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

disgorgement, recovery of costs and fees, and/or any other additional relief as the Court may determine to be just and proper. Wash. Rev. Code §§ 19.86.080 and 19.86.140.

**Count XLIX**

**Unfair Acts or Practices in Violation of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020**

**(By Plaintiff Washington State Attorney General's Office, Consumer Protection Division=)**

560. Washington realleges and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint.

561. Pursuant to the WA CPA, Wash. Rev. Code § 19.86.020, "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

562. Amazon engaged in unfair acts and practices related to the advertising, marketing, promotion, offering, and sale of digital advertisements on Amazon's e-commerce platform, including but not limited to:

(a) Purportedly conducting a generalized second price auction, where the winner is selected based on a combination of the bid and the ad's relevance to shopper queries and where the auction winner pays the minimum amount necessary to win the auction or just above the second highest ranked bid, but in reality manipulating and altering the auction process by inflating the prices charged to the auction winner above the minimum amount necessary to win the auction or just above the second highest ranked bid.

(b) Charging a price inflated above the minimum amount necessary to win Amazon's generalized second price auction, where the winner is selected based on a combination of the bid and the ad's relevance to shopper queries, without advertiser consent to charge a price inflated above the minimum amount necessary to win Amazon's generalized second price auction.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

563. At all relevant times, Amazon engaged in "trade or commerce" as defined in the WA CPA, Wash. Rev. Code § 19.86.010(2).

564. Amazon's unfair acts and practices affected the public interest in that they impacted numerous Washington state consumers and consumers across the United States. These practices demonstrate a pattern of conduct that Amazon committed in the course of business and are likely to recur without relief from the Court.

565. Based on Amazon's above unfair acts or practices, Washington is entitled to all appropriate relief under the WA CPA, including injunctive relief, civil penalties, restitution, disgorgement, recovery of costs and fees, and/or any other additional relief as the Court may determine to be just and proper. Wash. Rev. Code §§ 19.86.080 and 19.86.140.

## CONSUMER INJURY

566. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act and the above-enumerated state consumer protection laws. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC and the Plaintiff States request that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act and the above-enumerated state consumer protection laws;

B. Award monetary relief and other relief within the Court's power to grant;

C. Award any additional relief as the Court determines to be just and proper; and

D. Award Plaintiff States civil penalties, restitution, disgorgement and/or forfeitures for each violation of their respective state laws, attorneys' fees, costs, and expenses as provided under state law.



FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829

Respectfully submitted,

Dated: August 31, 2026

/s/ Jonathan W. Platt

Jonathan W. Platt
Darren H. Lubetzky
Adam K. Hersh
Vikram Jagadish
Jason E. Kornmehl
Ishan Shivakumar

Federal Trade Commission, Northeast Region
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

Of Counsel

Christopher G. Mufarrige
Director, Bureau of Consumer Protection

Katherine White
Principal Deputy Director, Bureau of Consumer Protection

Jonathan Cohen
Acting Deputy Director, Bureau of Consumer Protection

FOR THE PLAINTIFF STATE OF ALASKA

CORI MILLS
Acting Attorney General

Ian R. Engelbeck (*pro hac vice* forthcoming)
Assistant Attorney General
Mark Cucci (*pro hac vice* forthcoming)
Senior Assistant Attorney General
Alaska Department of Law
Special Litigation Section
1031 West 4th Ave., Suite 200
Anchorage, AK 99501
Telephone: 907-269-5200
Email: ian.engelbeck@alaska.gov
Email: mark.cucci@alaska.gov
Attorneys for Plaintiff
THE STATE OF ALASKA

FOR THE PLAINTIFF STATE OF ARIZONA

KRISTIN K. MAYES
Attorney General

Kiersten Schneider, AZ Bar No. 039766
(*pro hac vice* forthcoming)
Jesse Stewart, AZ Bar No. 041176
(*pro hac vice* forthcoming)
Assistant Attorneys General
Office of the Arizona Attorney General
2005 North Central Avenue
Phoenix, AZ 85004
Phone: (602) 542-1517
Fax: (602) 542-4377
Email: consumer@azag.gov
Email: Kiersten.Schneider@azag.gov
Email: Jesse.Stewart@azag.gov

*Attorneys for the State of Arizona*

FOR THE PLAINTIFF STATE OF COLORADO

PHILIP J. WEISER
Attorney General

Katherine M. Field CO Reg. No 42024 (*Pro Hac Vice Forthcoming*)
Senior Assistant Attorney General
Lauren M. Dickey, CO Reg. No. 45773 (*Pro Hac Vice Forthcoming*)
First Assistant Attorney General
Colorado Department of Law
1300 Broadway, 9th Floor
Denver, Colorado 08020
Telephone: (720) 508-6208
Email: kate.field@coag.gov
Email: Lauren.Dickey@coag.gov

FOR THE PLAINTIFF PEOPLE OF THE STATE OF CALIFORNIA

ROB BONTA
Attorney General

Nicklas A. Akers (*pro hac vice* forthcoming)
Senior Assistant Attorney General,
Consumer Protection
Michael E. Elisofon (*pro hac vice* forthcoming)
Supervising Deputy Attorney General
Holly Mariella (*pro hac vice* forthcoming)
Deputy Attorney General
455 Golden Gate Ave, Suite 1100
San Francisco, CA 94102
Telephone: (415) 510-4400
nicklas.akers@doj.ca.gov
michael.elisofon@doj.ca.gov
holly.mariella@doj.ca.gov

FOR THE PLAINTIFF STATE OF FLORIDA

JAMES UTHMEIER
Attorney General of State of Florida

Lizabeth Brady (*Pro Hac Vice Forthcoming*)
Director, Antitrust Division
Lee Istrail (*Pro Hac Vice Forthcoming*)
Assistant Attorney General
Steven J. Orban (*Pro Hac Vice Forthcoming*)
Assistant Attorney General
Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Email: liz.brady@myfloridalegal.com
Email: lee.istrail@myflridalegal.com
Email: steven.orban@myfloridalegal.com

*Counsel for Plaintiff the State of Florida*

FOR THE PLAINTIFF STATE OF IDAHO

RAÚL R. LABRADOR
ATTORNEY GENERAL
STATE OF IDAHO

James J. Simeri (ISB No. 12332) (*pro hac vice* forthcoming)
Stephanie N. Guyon (ISB No. 5989) (*pro hac vice* forthcoming)
Idaho Attorney General's Office
Consumer Protection Division
P.O. Box 83720
Boise, ID 83720-0010
james.simeri@ag.idaho.gov
stephanie.guyon@ag.idaho.gov

FOR THE PLAINTIFF STATE OF ILLINOIS

KWAME RAOUL
Illinois Attorney General

Greg Grzeskiewicz (*pro hac vice* forthcoming)
Bureau Chief
Jacob Gilbert (*pro hac vice* forthcoming)
Deputy Bureau Chief
Wilton Person (*pro hac vice* forthcoming)
Assistant Attorney General
Office of Illinois Attorney General
Consumer Fraud Bureau
115 S. LaSalle Street
Chicago, Illinois 60603
Telephone: (224) 252-6458
Email: Greg.Grzeskiewicz@ilag.gov
Email: Jacob.Gilbert@ilag.gov
Email: Wilton.Person@ilag.gov

*Counsel for Plaintiff the People of the State of Illinois*

FOR THE PLAINTIFF STATE OF INDIANA

THEODORE E. ROKITA
Attorney General
State of Indiana

Scott L. Barnhart (IN Atty No. 25474-82)
(*pro hac vice* forthcoming)
Chief Counsel and Director of Consumer Protection
Brady Quackenbush (IN Atty No. 37730-30)
(*pro hac vice* forthcoming)
Jay Hong (IN Atty No. 39263-49)
(*pro hac vice* forthcoming)
Deputy Attorneys General, Consumer Litigation
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington St., 5th Floor
Indianapolis, IN 46203
Telephone: (317) 232-6309
Scott.Barnhart@atg.in.gov
Brady.Quackenbush@atg.in.gov
Jay.Hong@atg.in.gov

*Attorney for Plaintiff State of Indiana*

FOR THE PLAINTIFF STATE OF IOWA

BRENNA BIRD
Iowa Attorney General

Andrew Cederdahl (*pro hac vice* forthcoming)
Assistant Attorney General
Office of Iowa Attorney General
1305 E. Walnut St.
Des Moines, Iowa 50319
Telephone: (515) 281-3731
Email: andrew.cederdahl@ag.iowa.gov

FOR THE PLAINTIFF COMMONWEALTH OF KENTUCKY

RUSSELL COLEMAN
Kentucky Attorney General

John Christian Lewis (*pro hac vice* forthcoming)
Division Chief, Consumer Protection
Philip R. Heleringer (*pro hac vice* forthcoming)
Executive Director, Consumer Protection
Jonathan Farmer (*pro hac vice* forthcoming)
Deputy Executive Director, Consumer Protection
John Ghaelian (*pro hac vice* forthcoming)
Assistant Attorney General
Office of the Kentucky Attorney General
1024 Capital Center Drive, Suite 200|
Frankfort, Kentucky 40601
Telephone: 502.696.5314
Email: Christian.Lewis@Ky.gov
Email: Philip.Heleringer@Ky.gov
Email: Jonathan.Farmer@Ky.gov
Email: John.Ghaelian@Ky.gov

FOR PLAINTIFF STATE OF LOUISIANA

LIZ MURRILL
Attorney General

Lindsay Rabalais Coussan
(*pro hac vice* forthcoming)
Assistant Attorney General
Consumer Protection Section
Office of the Louisiana Attorney General
1885 N. Third St.
Baton Rouge, LA 70802
Telephone: 225-326-6438
Email: CoussanL@ag.louisiana.gov

FOR PLAINTIFF CONSUMER PROTECTION DIVISION,
OFFICE OF THE MARYLAND ATTORNEY GENERAL

PHILIP D. ZIPERMAN
(MD# 12430) (*pro hac vice* forthcoming)
Deputy Chief
Consumer Protection Division
Office of the Maryland Attorney General
200 St. Paul Place, 16th Floor
Baltimore, MD 21202
Telephone: (410) 576-6417
Fax: (410) 576-6566
Email: pziperman@oag.maryland.gov

FOR THE PLAINTIFF STATE OF NEBRASKA

MICHAEL T. HILGERS
Attorney General of Nebraska

BENJAMIN J. SWANSON
(NE #27675) (pro hac vice forthcoming)
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68508
Telephone: (402) 471-7759
Fax: (402) 471-4725
Email: benjamin.swanson@nebraska.gov

*Attorney for the State of Nebraska*

FOR THE PLAINTIFF STATE OF NEW JERSEY

JENNIFER DAVENPORT
Attorney General of the State of New Jersey

Conor C. Vance (*pro hac vice* forthcoming)
Zeyad Assaf (*pro hac vice* forthcoming)
Deputy Attorneys General
Division of Law
Consumer Fraud Prosecution Section
124 Halsey Street, Fifth Floor
Newark, NJ 07101
Telephone: (609) 696-5363
Email: conor.vance@law.njoag.gov
Email: zeyad.assaf@law.njoag.gov

FOR THE PLAINTIFF STATE OF NEW YORK

LETITIA JAMES
Attorney General of the State of New York

Jane M. Azia (application for admission *pro hac vice* forthcoming)
Bureau Chief
Bureau of Consumer Frauds & Protection
Office of the New York State Attorney General
28 Liberty Street
New York, New York 10005
Telephone: (212) 416-8727
Email: jane.azia@ag.ny.gov

Christopher L. McCall (application for admission *pro hac vice* forthcoming)
Assistant Attorney General
Bureau of Consumer Frauds & Protection
Office of the New York State Attorney General
28 Liberty Street
New York, New York 10005
Telephone: (212) 416-8365
Email: christopher.mccall@ag.ny.gov

Attorneys for Plaintiff State of New York

FOR THE PLAINTIFF STATE OF NORTH CAROLINA, *ex rel.* JEFF JACKSON, ATTORNEY GENERAL

JESSE RAMOS (*pro hac vice* forthcoming)
Special Deputy Attorney General

BRIAN RABINOVITZ (*pro hac vice* forthcoming)
Director of Major Litigation

Consumer Protection Division
North Carolina Department of Justice
Post Office Box 629
Raleigh, NC 27602
Tel: (919) 716-6000
Fax: (919) 716-6050
Jramos@ncdoj.gov
Brabinovitz@ncdoj.gov

*Attorneys for Plaintiff*
*State of North Carolina, ex rel. Jeff Jackson, Attorney General*

FOR THE STATE OF OKLAHOMA

GENTNER DRUMMOND
OKLAHOMA ATTORNEY GENERAL

Cameron R. Capps (*pro hac vice* forthcoming)
Deputy Attorney General
Kristin Siegel (*pro hac vice* forthcoming)
Assistant Attorney General
313 NE 21st Street
Oklahoma City, Oklahoma 73105
Telephone: (405) 522-9052
Facsimile: (405) 521-3921
Email: Cameron.Capps@oag.ok.gov
Kristin.Siegel@oag.ok.gov

*Attorneys for Plaintiff State of Oklahoma*

FOR THE PLAINTIFF COMMONWEALTH OF PENNSYLVANIA

DAVID W. SUNDAY, Jr.
Attorney General

Melissa H. Shirey (*pro hac vice* forthcoming)
Senior Deputy Attorney General
PA Attorney I.D. No. 89257
Pennsylvania Office of Attorney General
4801 Atlantic Avenue
Erie, PA 16506
Telephone: 814-240-1180
Email: mshirey@attorneygeneral.gov

Jill T. Ambrose (*pro hac vice* forthcoming)
Assistant Director, Bureau of Consumer Protection
Assistant Chief Deputy Attorney General
PA Attorney I.D. No. 323549
1251 Waterfront Place, Mezzanine Level
Pittsburgh, PA 15222
Telephone: 412-565-3050
Email: jambrose@attorneygeneral.gov

*Attorneys for Plaintiff, Attorney General of Pennsylvania*

FOR THE PLAINTIFF STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General

Alex Carnevale (*pro hac vice* forthcoming)
Managing Attorney, Consumer and
Economic Justice Unit
Special Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 x 1895
acarnevale@riag.ri.gov

*Attorney for Plaintiff, Attorney General of Rhode Island*

FOR THE PLAINTIFF STATE OF SOUTH CAROLINA

ALAN WILSON
Attorney General

Jared Q. Libet (*pro hac vice* forthcoming)
Assistant Deputy Attorney General
Jordan Martin (*pro hac vice* forthcoming)
Assistant Attorney General
Office of the Attorney General
Consumer Protection & Antitrust Division
Telephone: (803) 734-5251
Email: jlibet@scag.gov
Email: jordanmartin@scag.gov

*Attorneys for Plaintiff State of South Carolina*

FOR THE PLAINTIFF STATE OF VERMONT

CHARITY R. CLARK
Vermont Attorney General

Sarah L. Jameson (*pro hac vice* forthcoming)
Assistant Attorney General
Office of Vermont Attorney General
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3170
Email: sarah.jameson@vermont.gov

FOR THE PLAINTIFF WASHINGTON STATE ATTORNEY GENERAL'S OFFICE, CONSUMER PROTECTION DIVISION

NICHOLAS W. BROWN
Attorney General

/s/ Joseph K. Kanada
JOSEPH K. KANADA, WSBA No. 55055

/s/ Gardner U. Reed
GARDNER U. REED, WSBA No. 55630
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

*Attorneys for Plaintiff Washington State Attorney General's Office, Consumer Protection Division, and local counsel for Plaintiffs State of Alaska, State of Arizona, People of the State of California, State of Colorado, State of Florida, State of Idaho, State of Illinois, State of Indiana, State of Iowa, Commonwealth of Kentucky, State of Louisiana, Consumer Protection Division of the Office of Maryland Attorney General, State of Nebraska, State of New Jersey, State of New York, State of North Carolina, State of Oklahoma, Commonwealth of Pennsylvania, State of Rhode Island, State of South Carolina, and State of Vermont*