# Exhibit A

**NO. ________________**

| | | |
|---|---|---|
| THE STATE OF TEXAS,<br>*Plaintiff,*<br><br>v.<br><br>AMAZON.COM, INC.,<br>AMAZON.COM SERVICES LLC, and<br>AMAZON ADVERTISING LLC,<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT<br><br><br>_______ JUDICIAL DISTRICT<br><br><br><br>COLLIN COUNTY, TEXAS |

**PLAINTIFF'S ORIGINAL PETITION AND**
**<u>APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION</u>**

There is no auction. Not the one Amazon sells to Texas businesses.

Every time a shopper types a search into Amazon.com, Amazon sells the advertising space beside the results. More than 18,000 Texas sellers, vendors, and authors buy it. For more than a decade, Amazon has told them how the sale works: bids are ranked by amount and relevance, the top-ranked advertiser wins, and the winner pays only what it takes to beat the next bid—"one penny more." Amazon says so in its training courses and videos. It shows them a picture: an advertiser who bids 75 cents pays 61. That is a lie.

Amazon's auction picks the winner, but it does not set the price. Amazon calculates the price the auction's winning bid produces, then discards it. In its place Amazon substitutes a higher price of its own. The only ceiling is the advertiser's own bid. The advertiser told it would pay 61 cents pays 70, or 74.

Amazon calls the substituted number a "soft reserve." A real reserve price is a floor, announced before the bidding. Amazon's is neither announced nor a floor. Amazon applies it after

the bidding closes, to a price the advertiser has already won. Internally, Amazon's employees call it a "post-hoc pricing adjustment." In reality, it is nothing more than a shill bid.




**Amazon said the winner pays one cent above the runner-up. Here it pays thirteen.**

Amazon knew advertisers could not catch it. It does not report what happens in any individual auction. Its invoices show blended averages, not clicks. Many advertisers do not even know their own bids, because Amazon sets them. So Amazon tested how far it could go—increasing the amount paid by winning bidders over time. Advertisers did not cut their bids, so Amazon kept the increase. The sums are not small. In 2024, these improper surcharges produced billions of dollars that Amazon's advertised auction would never have generated.

Today, Amazon still gives advertisers no record. When the auction ends, the advertiser learns what it was charged and nothing else. Amazon alone knows the rest. That gap is what makes the scheme work.

Texas businesses should not have to take Amazon's word for what happened to their money. If Amazon says it runs a second-price auction, they are entitled to one—and to a record

showing they got it. Under the Deceptive Trade Practices—Consumer Protection Act ("DTPA"), a misrepresentation is a misrepresentation. Amazon does not get to decide that the truth is optional.

The State of Texas brings this action under the DTPA, Tex. Bus. & Com. Code §§ 17.41–.63. The Federal Trade Commission ("FTC") is filing a parallel action today. The State asks this Court to stop the misrepresentations, to require Amazon to tell Texas advertisers what it charges them and why, to assess civil penalties of up to $10,000 per violation, and to award the State its attorney's fees under Tex. Gov't Code § 402.006(c).

## DEFENDANTS

1. Defendant Amazon.com, Inc. is a Delaware corporation with its principal place of business at 410 Terry Avenue North, Seattle, Washington 98109. It is not registered to do business in Texas and may be served through the Texas Secretary of State. Tex. Bus. Orgs. Code § 5.251(2)(B).

2. Defendant Amazon.com Services LLC is a Delaware limited liability company registered to do business in Texas. It may be served through its registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

3. Defendant Amazon Advertising LLC is a Delaware limited liability company. It may be served through its registered agent, at Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

4. This petition refers to the Defendants collectively as "Amazon." Each allegation about Amazon is made against each Defendant.

5. Amazon.com, Inc. dominates and controls Amazon.com Services LLC and Amazon Advertising LLC, and operates them as a single business enterprise. It owns them directly or indirectly in full. It appoints their managers. It sets the advertising auction rules, the reserve pricing policies, and the revenue targets those entities carry out. It controls the customer-facing representations at issue here, including the training courses, help pages, developer documentation, and advertising console that the subsidiaries publish and maintain. The subsidiaries observe no meaningful separateness from the parent in the conduct of the advertising business: they share officers, personnel, systems, and financial reporting, and Amazon.com, Inc. reports their advertising revenue as its own. Amazon.com, Inc. used that control to direct the acts and practices alleged here.

6. Amazon.com, Inc. is therefore liable for the conduct of Amazon.com Services LLC and Amazon Advertising LLC as their alter ego. Honoring the corporate separateness of these entities would work an injustice: it would let the parent that designed, directed, and profited from the deception avoid answering for it, and would leave Texas advertisers to pursue subsidiaries that hold themselves out to the public as nothing more than "Amazon." Tex. Bus. Orgs. Code § 21.223(b).

7. Alternatively, each Defendant is liable for its own conduct. Each participated in the acts and practices alleged here, and each is a "person" who engaged in false, misleading, and deceptive acts and practices in the conduct of trade or commerce. Tex. Bus. & Com. Code § 17.45(3).

## JURISDICTION

8. The Attorney General of Texas, through the Consumer Protection Division, brings this enforcement action in the name of the State of Texas and in the public interest under Tex. Bus. & Com. Code § 17.47.

9. This Court has personal jurisdiction over Amazon. Amazon has established minimum contacts with Texas such that maintaining this suit here does not offend traditional notions of fair play and substantial justice.[1] Amazon also transacts business in Texas within the meaning of the long-arm statute. Tex. Civ. Prac. & Rem. Code §§ 17.041–.045. For more than a decade, Amazon has sold millions of dollars of products annually in Texas, employed and contracted with thousands of Texans, and operated warehouses and other facilities in Texas.

10. Amazon.com Services LLC and Amazon Advertising LLC are subject to this Court's jurisdiction through their own Texas contacts. Because Amazon.com, Inc. operates those entities as its alter egos, their Texas contacts are attributed to it as well.

11. Alternatively, this Court has specific jurisdiction over Amazon because Amazon purposefully availed itself of the privilege of conducting activities in Texas, and the State's claims arise from or relate to those contacts.[2] Amazon operates an interactive website through which it solicits and conducts advertising auctions with Texas advertisers; offers advertising space to Texas businesses; communicates with Texas advertisers about its auction process and advertising services; and makes representations and omissions to Texas advertisers about its auction mechanics, its auction results, and the expected return on advertising spend. The

---

[1] *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).

[2] *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 412–13 (Tex. 2023); *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 9 (Tex. 2021).

misrepresentations and omissions at issue in this suit were made through those Texas-directed activities.

12. Texas' claims seek non-monetary relief and monetary relief over $1,000,000—including civil penalties, reasonable attorney's fees, litigation expenses, restitution, and costs—and are within the jurisdictional limits of the Court.

**VENUE**

13. Venue is proper in Collin County under Tex. Bus. & Com. Code § 17.47(b) because Amazon has done business here. Amazon operates a delivery station at 1398 Industrial Boulevard, McKinney, Texas 75069; employs people who live and work in Collin County; and has sold millions of dollars of goods and services to Collin County residents through its platform. Those contacts are the contacts of Amazon.com Services LLC and, through its control of that entity, of Amazon.com, Inc. *See also* Tex. Civ. Prac. & Rem. Code § 15.002(a)(1).

14. Venue is also proper because transactions giving rise to this suit occurred in Collin County. Tex. Bus. & Com. Code § 17.47(b). Amazon advertised its second-price auctions in Collin County. Advertisers and authors in Collin County were misled by those representations and bought advertising in Amazon's auctions, and advertisers bought advertising targeted at Collin County shoppers.

**PUBLIC INTEREST**

15. Texas has reason to believe that Defendants have engaged in, and continue to engage in, the unlawful acts and practices described herein. In addition, Texas has reason to believe that Amazon has caused injury, loss, and damage to Texas, and has caused adverse effects to the lawful conduct of trade and commerce, thereby directly or indirectly affecting the people of this

State. Therefore, the Consumer Protection Division of the Office of the Attorney General initiates this proceeding in the public interest. Tex. Bus. & Com. Code § 17.47.

## DISCOVERY CONTROL PLAN

16. Discovery should be conducted under Level 3. Tex. R. Civ. P. 190.4. The expedited-action rules do not apply because the State seeks non-monetary injunctive relief and monetary relief, including penalties and attorney's fees, exceeding $250,000. *See* Tex. R. Civ. P. 169.

## FACTS

### A. Amazon's Advertising Empire.

17. Amazon is the third-largest digital advertising company in the world. It takes in more than $68 billion in advertising revenue a year.[3]

18. Most of that money comes from Sponsored Ads—advertisements that appear on Amazon.com alongside search results and on product detail pages. Amazon has over 1.2 million advertisers who have purchased ads. Sponsored Products is by far the largest of the Sponsored Ads programs, generating the majority of Sponsored Ads revenue. Sponsored Brands and Sponsored Display account for the remainder.

19. Most Sponsored Products advertisers are new or small business owners. More than 18,000 Texas sellers, vendors, and authors advertise on Amazon.com.

20. Amazon sells its ad space using auctions. When a shopper types a search query, Amazon runs an auction in a fraction of a second. Advertisers bid on keywords they expect shoppers to use. Amazon ranks the eligible advertisements by bid amount and by relevance

---

[3] Amazon.com, Inc., Form 10-K (Feb. 2025) at 67 (worldwide advertising revenue of $56.2 billion in 2024, $46.9 billion in 2023, and $37.7 billion in 2022); *see also* "26 Amazon execs powering its $31 billion advertising business," Business Insider (May 10, 2022) (Amazon is the third-largest digital-advertising company, behind Google and Meta).

measures it alone computes—predicted click-through rate and predicted conversion rate—and gives the top-ranked advertisements the available placements. Amazon runs billions of these auctions every year.

21. The winner pays when a shopper clicks. That price is the cost-per-click, or CPC. Some placements are sold instead by the thousand impressions, on a cost-per-thousand, or CPM, basis.

22. Amazon stands on both sides of the transaction. It owns the advertising space, and it runs the auction that leases the advertising space. An advertiser who wants a placement on Amazon.com cannot buy it anywhere else.

23. Advertisers manage their campaigns through Amazon's self-service advertising console. They set budgets, bid on keywords, and may authorize Amazon to adjust their bids for them. Amazon markets "dynamic bidding," which it says can raise or lower a bid by up to 100% depending on the odds that a click produces a sale, and "rule-based bidding," which it says can raise a bid by up to 500% to meet the advertiser's return on advertising spend. The console also suggests bid amounts that Amazon says will improve an advertiser's chance of winning.

24. Placement decides whether a seller is found or invisible. Most of Amazon's advertising customers are sellers on its own platform, and for them a top-of-search placement is among the most valuable things Amazon sells.

**B. Second Price Auctions.**

25. In a second-price auction, the winner does not pay its own bid. It pays the least amount needed to beat the next-highest-ranked bidder.[4] That format has been the standard in search advertising since the early 2000s.

26. The format has a purpose. A bidder in a first-price auction pays whatever it bids, so it has every reason to bid low and guess at what will win. A bidder in a second-price auction has no reason to guess. It can bid the most it is truly willing to pay, knowing it will be charged only what it takes to win.

27. The format also has a known weakness. The winner never sees the runner-up's bid; it must take the auctioneer's word for the price. Thus, a seller could exploit that blind spot by slipping in a late bid just under the winner's bid to drive up the price. The Federal Trade Commission's public guidance defines shill bidding the same way: a seller or its partner bidding on the seller's own item to drive up the price.[5]

**C. Amazon Claims to Run a Second Price Auction.**

28. Since at least 2014, Amazon has told advertisers it runs a second-price auction. It has said so in marketing and training materials, in online training portals, on its YouTube channel, and in presentations its account representatives give to advertisers.

29. Amazon tells advertisers that it ranks ads "based on the combination of bid and the ad's relevance to shopping queries," and that it charges the winner "the minimum required to beat

---

[4] The industry term for a second-price auction that sells several placements on a single page is a "generalized second-price" auction, or "GSP." Amazon uses that term in its customer-facing materials. This petition uses "second-price auction."

[5] Federal Trade Commission, *Internet Auctions: A Guide for Buyers and Sellers*, https://www.govinfo.gov/content/pkg/GOVPUB-FT-PURL-LPS104571/pdf/GOVPUB-FT-PURL-LPS104571.pdf.

the ad with the next highest ranked score in the auction"—a price "slightly higher than the second highest CPC bid," or "one penny more than the next highest bid."

30. Amazon's training courses say it. Amazon Ads Academy, the online portal where Amazon trains and certifies advertisers and agencies, tells advertisers: "Your bid is the maximum amount you're willing to pay if your ad is clicked. If your ad is clicked, you will pay an amount slightly higher than the second highest CPC bid." Its webinars tell them: "Your cost per click may actually be lower than your bid because Amazon Ads uses a second price auction . . . you will only pay what the advertiser who came in second place bids plus approximately 1 cent."[6]

31. Amazon's videos say it. A webinar on the Amazon Ads YouTube channel titled "Learn about auctions and the cost-per-click model," posted from 2023 through at least 2024, tells advertisers they "only pay what the advertiser who came in second place bids plus approximately one cent more." Amazon's training video for self-published authors, "Getting Started with Sponsored Ads for KDP Authors," says the same.[7]

32. Amazon's technical documentation says it. Its Sponsored Brands Developer Guide, written for advertisers using Amazon's advanced campaign tools, tells them that "advertisers only pay the least bid amount needed in order to win, so they don't need to worry about strategizing about how to set bids."[8]

33. Amazon's Sponsored Products webpage said it. From at least November 2023 through January 2026, the mobile version told advertisers that "Sponsored Products ads are placed

---

6 Amazon Ads Academy, https://advertising.amazon.com/academy, "Learn the sponsored ads fundamentals" course and webinar series.

7 Amazon Ads, *Learn about auctions and the cost-per-click model* (YouTube, 2023–2024); Amazon Ads, *Getting Started with Sponsored Ads for KDP Authors* (YouTube).

8 Amazon Ads Advanced Tools Center > Developer Guides > Sponsored Brands > Campaigns > Managing optimization rules, https://advertising.amazon.com/API/docs/en-us/guides/sponsored-brands/campaigns/managing-optimization-rules.

into a second-price auction where they are ranked based on expected click-through rate, advertiser bid, and how relevant the ad is to the customer context."

34. Amazon's illustrations depict it. In its "How auctions work" illustration—used in the Ads Academy "Introduction to bids and budgets" course, in the KDP Authors video, and on Amazon's Support Center as of March 2026—a shopper searches for a video camera. Three advertisers bid: $0.75, $0.60, and $0.45. The $0.75 bidder wins. Its cost-per-click, the illustration says, is "approx. $0.61." One cent above the runner-up.[9]

35. Amazon's partners say it. Amazon lists on its website the agencies in its Amazon Ads Partner Network, represents that it has "vetted" them, and promotes them to advertisers.[10] Those agencies tell their clients, on their own public websites, that the winner of an Amazon auction pays a penny more than the second-highest bid. Amazon knows that advertisers and their agencies set bids on that understanding.

## D. Amazon Does Not Operate a Second Price Auction.

36. Through 2018, Amazon operated a second price auction. Then it stopped. Beginning in late 2018 with Sponsored Brands, and by mid-2019 for Sponsored Products, Amazon started overriding the price its auctions produced and charging a higher price it set after the auction closed. It extended the practice to Sponsored Display in 2023. Yet it kept telling advertisers it ran a second-price auction.

37. Amazon consciously made a choice to deceive consumers in early 2019. Its auction managers considered switching openly to a first-price auction, in which the winner pays its own

---

[9] Amazon Ads Academy, "Introduction to bids and budgets" course; Amazon Ads, *Getting Started with Sponsored Ads for KDP Authors* (YouTube); Amazon Ads Support Center, "How auctions work" (as of Mar. 2026).

[10] Amazon Ads, *Partners*, https://advertising.amazon.com/partners/overview.

bid. They rejected it, because advertisers who knew they would pay their bids would lower them, and the change could not easily be undone. Amazon chose instead to keep the second-price representation and to change the price quietly.

38. Amazon prices a click in two stages. First it runs the auction and calculates the price that auction produces. Then it converts that number into a higher final price of its own.

39. Amazon misleadingly calls the substituted number a "soft reserve." A reserve price, as auctioneers and dictionaries use the term, is the seller's announced minimum—the floor a bidder must clear to compete at all.[11] Amazon's "soft reserve" is not announced and is not a floor. Amazon applies it after the auction ends to raise the price the winner pays in an auction they have already won.

40. What Amazon actually does is insert a bid. After the auction closes, Amazon unseals every advertiser's bid, identifies the winner and the runner-up, and calculates a new second-place number of its own that sits between them. The winner is charged as if that number were a competitor's bid. It is not. It is designed to lose by the smallest margin possible, it carries no risk that Amazon will win its own auction, and no advertiser ever learns it was there. That is a shill bid.

41. The advertiser who bids $0.75 and is told it will pay $0.61 may instead be charged $0.70, or $0.74. "One penny more," is what Amazon said, but nine or thirteen cents more is what Amazon charged. Amazon caps the substituted price at the advertiser's own bid, so the advertiser never pays more than it offered—but far more than the auction produced, and far more than Amazon said it would pay.

---

[11] *Reserve price*, Merriam-Webster.com Dictionary; *see also Price*, Black's Law Dictionary (12th ed. 2024) ("reserve price (1866) In an auction, the amount that a seller of goods stipulates as the lowest acceptable offer."); *Ad Rank thresholds: Definition*, Google Ads Help, https://support.google.com/google-ads/answer/7634668 (defining "reserve price" as "the threshold" that "determine[s] your ability to compete in an ad auction").

42. A second cap keeps the increases out of sight. Amazon limits how far the substituted price may exceed the auction price, a limit it calls the "surcharge constraint." Amazon did not set that limit to protect advertisers. It set it so advertisers would not react.

43. The substitution changes one thing. The same advertisement wins the same placement it would have won under the auction Amazon advertised. The advertiser simply pays more for it.

**E. Amazon Calibrates Surcharges.**

44. Starting in 2022, Amazon set a hidden price on nearly every Sponsored Products advertisement on its search results page.

45. Return on advertising spend, or RoAS, the sales an advertisement generates divided by what the advertisement cost. A RoAS of 4.00 means the advertiser earned $4 in sales for every $1 spent. Advertisers use RoAS to decide how to divide their budgets across Amazon's advertising programs. A higher RoAS is better for the advertiser. A lower RoAS is better for Amazon.

46. If an advertiser does not set its own target RoAS, Amazon says, "Amazon Ads will automatically determine an appropriate ROAS target to maximize sales."[12] An advertiser reading that sentence understands Amazon to be optimizing the advertiser's sales. Not so. Amazon optimizes Amazon's revenue.

47. These charges stack on top of everything else Amazon collects from its sellers—account fees, referral fees, fulfillment fees, and storage fees. As the seller's costs increase, they are passed along to Texas shoppers.

---

[12] Amazon Ads, *Bidding Rules for Sponsored Products*.

**F. Amazon's Auction Results Conceal Surcharges.**

48. Amazon does not give an advertiser a receipt. When the auction ends, the advertiser learns one thing: what it was charged. It does not learn which bids competed, which rules applied, what the second-highest qualifying bid was, whether a reserve or surcharge was applied, or how Amazon arrived at the final number.

49. Amazon has all of this information. Amazon knows the bids, the rankings, the auction price, the substituted price, and the arithmetic connecting them. It keeps that information to itself.

50. Amazon's reporting is built that way. It does not show results at the individual click level, so an advertiser cannot see what happened in any single auction. Amazon's invoices are not itemized; they show averages that blend many keyword auctions across several placement types. And many advertisers do not know their own bid amounts, because they have let Amazon set the bids. An advertiser cannot compare what it was charged against what the auction produced, because Amazon never reports what the auction produced.

51. The asymmetry is the point. An advertiser who cannot reconstruct the auction cannot test Amazon's representation about it, cannot challenge a charge, and cannot measure its true return on advertising spend. It can only take Amazon's word.

**G. Amazon Concealed its Surcharges.**

52. Amazon knew it was still telling advertisers it ran a second-price auction. It knew the statements were not true. It also knew why it mattered: advertisers bid high because they trusted Amazon not to charge them their bids, and advertisers who learned the truth would bid less. The scheme's revenue depended on their not knowing. Amazon kept the surcharges secret.

53. As advertisers began to ask questions, Amazon never provided clear answers. It never said whether the second-price auction representation was still true. The FTC served Amazon with a civil investigative demand about its advertising auctions in November 2024. Still, Amazon did not change course.

54. Amazon today allows an advertiser to be charged above the auction price on an ordinary shopping day, and even more on a peak shopping day, in each case capped at the advertiser's own bid.

55. Amazon collected billions it would not have collected from the auction it advertised. Advertisers paid their own bids more often than not, making Amazon's "second-price auction" closer to a first-price auction for most transactions.

56. Amazon knew if advertisers were aware of what Amazon was doing, they would reduce their bids and auction prices would fall further still.

### H. Amazon's Belated "Reserve Pricing" Disclosure Did Not Cure the Deception

57. Amazon learned of the FTC's investigation in 2024 and still did not tell advertisers what it had been doing. On October 30, 2025, it added an obscure single reference to "reserve pricing" to a Support Center page advertisers were unlikely to find.

58. That reference disclosed nothing that mattered. It did not tell advertisers that Amazon replaces auction-determined prices with higher prices of its own choosing.

59. In March 2026, Amazon expanded the language to say that some reserves "influence" the final price and that "the price charged to you may exceed the runner-up bid."[13] Even then, Amazon did not disclose the nature, the scope, or the duration of the practice, which

[13] Amazon Ads Support Center, *Understand Amazon Ads auctions* (as of Mar. 2026).

by then had run for more than seven years. And in the same month, Amazon's Support Center still showed advertisers the illustration in which the $0.75 bidder pays $0.61.

60. Amazon has never told advertisers that it altered their auction prices, and it has never corrected the representations it has spent more than a decade making. Its training courses and videos continue to tell advertisers they pay the second price plus a penny, while Amazon charges them something much closer to their own bids.

### I. Amazon's Conduct Violates the DTPA.

61. Amazon's conduct is not a technical departure from a published formula. Amazon announced one set of auction rules, applied another, used the difference to raise what Texas advertisers paid, and withheld the records those advertisers would have needed to discover the difference. Those acts and practices are false, misleading, and deceptive in violation of the DTPA.

## CAUSES OF ACTION

62. The State incorporates the foregoing allegations.

63. Amazon, in the course of trade and commerce, has engaged in false, misleading, and deceptive acts and practices declared unlawful by Tex. Bus. & Com. Code § 17.46(a) and (b)(5), (7), (9), (12), and (24).

64. Amazon represented that its goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, in violation of Tex. Bus. & Com. Code § 17.46(b)(5).

65. Amazon represented that its goods or services are of a particular standard, quality, or grade, or that its goods are of a particular style or model, when they are of another, in violation of Tex. Bus. & Com. Code § 17.46(b)(7).

66. Amazon advertised goods or services with intent not to sell them as advertised, in violation of Tex. Bus. & Com. Code § 17.46(b)(9).

67. Amazon represented that an agreement confers or involves rights, remedies, or obligations that it does not have or involve, in violation of Tex. Bus. & Com. Code § 17.46(b)(12).

68. Amazon failed to disclose information concerning goods or services that was known at the time of the transaction, and that failure was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed, in violation of Tex. Bus. & Com. Code § 17.46(b)(24).

## CIVIL PENALTIES

69. The State incorporates the foregoing allegations.

70. Each violation of the DTPA subjects Amazon to a civil penalty of not more than $10,000. Tex. Bus. & Com. Code § 17.47(c)(1).

71. Amazon has committed, and continues to commit, a separate violation each time it conducts an advertising auction involving a Texas advertiser while misrepresenting or failing to disclose the true nature of its auction process. Amazon represented that its advertising placements are sold through second-price auctions, in which the winner pays only the minimum needed to beat the next-highest bidder. Amazon instead used undisclosed reserve pricing and other auction modifications that caused Texas advertisers to pay prices different from, and often substantially higher than, the prices Amazon's advertised auction produced.

72. The State pleads the following measures of violation in the alternative. The State does not elect among them at this stage.

a. **Each representation.** Every distinct public representation that Amazon's advertising auctions operate as second-price auctions is a separate violation.

b. **Each day.** Every day Amazon maintained such a representation while using undisclosed auction mechanics is a separate violation.

c. **Each bid.** Every bid a Texas advertiser submitted into an Amazon auction while Amazon represented that the auction operated as a second-price auction is a separate violation.

d. **Each advertiser, each auction.** Every Texas advertiser that bid in a given auction while that representation was in effect is a separate violation, counted once per advertiser per auction regardless of how many bids or bid adjustments that advertiser submitted.

e. **Each billed auction.** Every auction in which Amazon charged a Texas advertiser for a click or an impression while representing that the auction operated as a second-price auction is a separate violation.

f. **Each divergent auction.** Every auction in which Amazon's actual result differed from the result its represented second-price mechanism would have produced is a separate violation. An auction is divergent if reconstructing it under the represented rules yields a different winner, a different price, or both.

73. The State does not limit its request for civil penalties to any single methodology. Where the same conduct supports more than one measure, the State seeks the maximum penalty the law allows for each violation.

74. The maximum penalty is warranted. Amazon's conduct has continued for more than seven years and across billions of auctions. Amazon rejected an open first-price auction precisely because advertisers would have responded to it. Amazon kept the representation in place after advertisers complained, after it built tools to keep them from noticing, and after it learned it was under federal investigation.

## APPLICATION FOR TEMPORARY INJUNCTION

75. The State incorporates the foregoing allegations.

76. Ordinarily, an applicant for a temporary injunction must plead and prove (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim.[14]

77. But the Texas Supreme Court has held that "when it is determined that [a] statute is being violated, it is within the province of the district court to restrain it," so "[t]he doctrine of balancing the equities has no application to this statutorily authorized injunctive relief."[15]

78. And "when an applicant relies upon a statutory source for injunctive relief . . . the statute's express language supersedes the common law injunctive relief elements such as imminent harm or irreparable injury and lack of an adequate remedy at law."[16]

79. Even so, the State's inability to enforce its "duly enacted [laws] clearly inflicts irreparable harm on the State."[17]

80. Whether to grant a temporary injunction rests in the trial court's sound discretion.[18] The purpose of a temporary injunction is to preserve the status quo pending a full hearing on the merits, not to grant the complete relief sought.[19]

81. The Attorney General is charged with seeking a temporary or permanent injunction to prevent and restrain violations of Tex. Bus. & Com. Code § 17.46(a)–(b).

---

[14] *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Polston v. State*, No. 03-20-00130-CV, 2022 WL 91974, at *3 (Tex. App.—Austin Jan. 6, 2022, no pet.); Tex. R. Civ. P. 680.

[15] *State v. Texas Pet Foods, Inc.*, 591 S.W.2d 800, 805 (Tex. 1979).

[16] *West v. State*, 212 S.W.3d 513, 519 (Tex. App.—Austin 2006, no pet.); *see White Lion Holdings, L.L.C. v. State*, No. 01-14-00104-CV, 2015 WL 5626564, at *9 (Tex. App.—Houston [1st Dist.] Sept. 24, 2015, pet. denied) (mem. op.).

[17] *Texas Ass'n of Bus. v. City of Austin*, 565 S.W.3d 425, 441 (Tex. App.—Austin 2018, pet. denied) (quoting *Abbott v. Perez*, 585 U.S. 579, 602 (2018)); *see Washington v. Associated Builders & Contractors of S. Tex. Inc.*, 621 S.W.3d 305, 319 (Tex. App.—San Antonio 2021, no pet.).

[18] *In re MetroPCS Communications, Inc.*, 391 S.W.3d 329, 336 (Tex. App.—Dallas 2013, no pet.); *Butnaru*, 84 S.W.3d at 204.

[19] *Intercont'l Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 891 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *In re Triantaphyllis*, 68 S.W.3d 861, 869 n.7 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

82. Under the DTPA, the State need only show (1) that the Attorney General has reason to believe that Amazon is engaging in, has engaged in, or is about to engage in an act or practice declared unlawful by the DTPA, and (2) that proceedings would be in the public interest. Tex. Bus. & Com. Code § 17.47(a).[20]

83. The list of deceptive acts in Tex. Bus. & Com. Code § 17.46(b) is not exhaustive, and an injunction is appropriate if Amazon engaged in any "[f]alse, misleading, or deceptive act[] or practice[]." Tex. Bus. & Com. Code § 17.46(a).

84. That a defendant has ceased, or may cease, its unlawful conduct does not affect the State's entitlement to injunctive relief.[21]

85. The DTPA itself creates a conclusive presumption that potentially violative conduct coupled with a public need presents a sufficient risk of harm.

86. The Attorney General has reason to believe that Amazon is engaging in, has engaged in, or is about to engage in acts and practices declared unlawful by the DTPA, and that a temporary injunction would be in the public interest. The State therefore asks this Court, after notice and hearing, to enter a temporary injunction enjoining Amazon and its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, from engaging in false, deceptive, or misleading acts or practices during the pendency of this suit, including the following:

a. **Misrepresenting the nature of Amazon's advertising auctions.** Amazon shall be enjoined from representing to Texas advertisers, expressly or by implication, that its advertising auctions operate as second-price auctions unless they do. Amazon shall not represent that advertisers pay only the minimum amount necessary to win an auction, the second-highest

20 *West*, 212 S.W.3d at 518–19.

21 *Id.*

qualifying bid, or any similar amount unless Amazon in fact calculates and charges advertisers on that basis.

b. **Failing to disclose material auction pricing practices.** Amazon shall be enjoined from failing to clearly and conspicuously disclose to Texas advertisers every material factor that affects the price advertisers pay for advertising placements, including the existence and operation of reserve pricing mechanisms; any pricing adjustment that overrides or modifies auction results; any circumstance in which the winning advertiser pays more than the amount determined by the next-highest-ranked bidder; and any factor used to increase an advertiser's CPC or CPM above the price produced by the advertised auction process.

c. **Conducting auctions that differ from the advertised auction model.** Amazon shall be enjoined from conducting advertising auctions for Texas advertisers in which (i) advertisers are led to believe they are participating in a second-price auction, (ii) Amazon independently increases the winning price through undisclosed pricing mechanisms, and (iii) the final price charged to a winning advertiser exceeds the amount determined by the disclosed auction process. If Amazon uses reserve prices, price floors, or other pricing mechanisms, Amazon must disclose them before advertisers participate in the auction.

d. **Providing accurate auction information to advertisers.** Amazon shall be required to revise the advertising materials, training materials, developer documentation, help pages, advertising console disclosures, and other customer-facing communications it directs to Texas advertisers to accurately describe how its auctions operate. Amazon shall be prohibited from publishing or maintaining statements that are false, misleading, or deceptive regarding (i) the auction format Amazon uses, (ii) how winning bids are calculated, (iii) the relationship between an advertiser's bid and the price ultimately charged, and (iv) whether advertisers pay the second-highest bid or a price determined through other mechanisms.

e. **Disclosure within the advertising console.** Amazon shall be required to provide clear and conspicuous disclosures within the advertising console before Texas advertisers create campaigns, submit bids, or enable automated bidding features, explaining (i) that Amazon may use reserve pricing or other mechanisms affecting auction outcomes, (ii) how those mechanisms affect CPC and CPM prices, (iii) that the final price charged may exceed the runner-up bid, and (iv) the factors that determine the final price charged.

f. **Preservation and disclosure of auction data.** Amazon shall be required to preserve all records relating to advertising auctions involving Texas

advertisers, including (i) bids submitted by advertisers, (ii) bid adjustments, (iii) auction ranking calculations, (iv) reserve prices, (v) soft reserve calculations, (vi) final CPC or CPM charges, and (vii) communications with advertisers regarding auction pricing. Amazon shall not alter, destroy, or modify auction records relevant to this action.

g. **Prohibition on concealment.** Amazon shall be enjoined from taking any action designed to conceal, obscure, or prevent detection from Texas advertisers of its auction pricing practices, including (i) manipulating the timing or implementation of pricing changes to avoid advertiser detection, (ii) providing false explanations for CPC or CPM increases, and (iii) directing employees or representatives to provide inaccurate explanations regarding auction pricing.

h. **Disclosure of each auction result ("post-auction record").** For each advertising auction in which a Texas advertiser participates, Amazon shall provide the advertiser with a contemporaneous, durable record of the auction result, notwithstanding the speed or automated nature of the auction. The record shall identify, at a minimum, (i) whether the advertiser won or lost the auction, (ii) the advertiser's qualifying bid, (iii) the winning bid, (iv) the second-highest qualifying bid, (v) the price determined under the published auction rules, (vi) any surcharges, adjustments, and fees, and (vii) the amount actually charged to the advertiser.

i. **Verification.** Amazon shall maintain records sufficient to permit the State to verify compliance with this Order, and shall produce those records to the State within thirty days after the end of each calendar quarter during which this Order is in effect.

87. The State is not required to post a bond. Tex. Civ. Prac. & Rem. Code § 6.001(b)(1); Tex. R. Civ. P. 684.

## TRIAL BY JURY

88. The State requests a jury trial and tenders the jury fee to the Collin County District Clerk. Tex. R. Civ. P. 216.

## PRAYER

89. The State asks that Amazon be cited to appear and answer; that, after notice and hearing, the Court enter a temporary injunction on the terms set out above; and that, on final

hearing, the Court enter a permanent injunction restraining Amazon, its officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with Amazon who receive actual notice of the injunction, from:

a. representing that Amazon conducts second-price advertising auctions unless the auctions in fact operate as represented;

b. representing that winning advertisers pay only the amount necessary to win an auction, including the second-highest qualifying bid, when Amazon uses undisclosed pricing mechanisms that increase the amount charged;

c. failing to clearly and conspicuously disclose material information regarding Amazon's use of reserve pricing, pricing adjustments, or other mechanisms that affect auction outcomes and advertiser charges;

d. operating advertising auctions for Texas advertisers in a manner inconsistent with the representations Amazon makes about how bids are ranked and prices are determined; and

e. concealing its auction pricing practices, including by timing pricing changes to avoid detection, giving false explanations for price increases, or directing employees or representatives to give inaccurate explanations of auction pricing.

90. The State further asks that the permanent injunction require Amazon to:

a. correct its advertising materials, training courses, videos, developer documentation, help pages, and advertising console so that they accurately describe how its auctions operate, including the auction format used, how the winning price is calculated, the relationship between an advertiser's bid and the price charged, and whether the advertiser pays the second-highest bid;

b. disclose clearly and conspicuously within the advertising console, before a Texas advertiser creates a campaign, submits a bid, or enables automated bidding, that Amazon may use reserve pricing or other mechanisms that affect auction outcomes, how those mechanisms affect the price charged, that the price charged may exceed the runner-up bid, and what determines the final price;

c. provide each Texas advertiser, for each auction in which that advertiser participates, a contemporaneous and durable record of the auction result identifying whether the advertiser won, the advertiser's qualifying bid, the winning bid, the second-highest qualifying bid, the price produced by

Amazon's published auction rules, any surcharge or adjustment applied, and the amount actually charged;

d. preserve all records relating to advertising auctions involving Texas advertisers, including bids, bid adjustments, ranking calculations, reserve prices, final charges, and communications with advertisers about auction pricing; and

e. maintain records sufficient to permit the State to verify compliance, and produce those records to the State on a schedule the Court sets.

91. The State further asks that the Court:

a. adjudge against Amazon civil penalties in favor of the State of not more than $10,000 for each violation of the DTPA, Tex. Bus. & Com. Code § 17.47(c)(1);

b. order Amazon to restore money or property acquired by means of its unlawful acts or practices to the identifiable persons from whom it was acquired, Tex. Bus. & Com. Code § 17.47(d);

c. award the State its reasonable attorney's fees and costs of court, Tex. Gov't Code § 402.006(c);

d. award prejudgment and post-judgment interest on all monetary awards as provided by law; and

e. grant all other relief to which the State may show itself entitled.

Dated: August 31, 2026

**Ken Paxton**
Attorney General of Texas

**Brent Webster**
First Assistant Attorney General

**Ralph Molina**
Deputy First Assistant Attorney General

**Austin Kinghorn**
Deputy Attorney General for Civil Litigation

**Johnathan Stone**
Chief, Consumer Protection Division

Respectfully submitted,

*/s/ Eddie Hodges Jr.*
**EDDIE HODGES JR.**
Assistant Attorney General
State Bar No. 24116523
Eddie.Hodges@oag.texas.gov

**CLAYTON WATKINS**
Managing Attorney, Assistant Attorney General
State Bar No. 24103982
Clayton.watkins@oag.texas.gov

**JERRY BERGMAN**
Deputy Chief, Assistant Attorney General
State Bar No. 24081694

Jerry.bergman@oag.texas.gov

**KACHIRA LATTIMORE**
Assistant Attorney General
State Bar No. 24121258
Kachira.Lattimore@oag.texas.gov

**JOO PAEK**
Assistant Attorney General
State Bar No. 24138235
Joo.Paek@oag.texas.gov

**Office Of The Attorney General Of Texas**
Consumer Protection Division
P.O. Box 12548
Austin, Texas 78711-2548
Tel: (512) 463-2185
Fax: (512) 473-8301

**ATTORNEYS FOR PLAINTIFF,**
**THE STATE OF TEXAS**