OSCAR ERNESTO ROMERO
*Non-Party Movant, In Propria Persona*
4107 Villa Marena, Col. Puesta del Sol
Playas de Rosarito, B.C. 22710, México
+52 1 646 601 7866 (WhatsApp)
ozromeo338@gmail.com

FILED LODGED RECEIVED MAIL
OCT 05 2026
AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY DEPUTY

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, STATE OF ARIZONA, PEOPLE OF THE STATE OF CALIFORNIA, and the other Plaintiff States, | ) | **Case No. 2:26-cv-03097-JHC** |
| Plaintiffs, | ) | **NON-PARTY'S MOTION TO INTERVENE FOR THE LIMITED PURPOSE OF OPPOSING AMAZON'S MOTION TO SEAL AND UNSEALING THE COMPLAINT, WITH OPPOSITION TO DOCKET ENTRY 91** |
| v. | ) | |
| AMAZON.COM, INC., | ) | The Honorable John H. Chun |
| Defendant. | | NOTE ON MOTION CALENDAR: October 30, 2026 |
| | | *Filed by mail, pro se* |

# NON-PARTY'S MOTION TO INTERVENE FOR THE LIMITED PURPOSE OF OPPOSING AMAZON'S MOTION TO SEAL AND UNSEALING THE COMPLAINT, WITH OPPOSITION TO DOCKET ENTRY 91

*[Local Civil Rule 5(g)(8); Federal Rule of Civil Procedure 24(b). By a non-party, in propria persona. The opposition is a response to Docket Entry 91 under Local Civil Rule 7(d)(3), received within fifteen days of its filing. The movant asks that the Court decide this motion with Docket Entry 91 on 19 October 2026. A proposed order accompanies this motion and is sent in Word to chambers.]*

## I. WHAT THIS IS: A MANIPULATED METRIC THAT BECAME A COVER-UP

**1. The cap is a number the publisher sets and hides.** Amazon's subsidiary Twitch Interactive, Inc. sells advertising against an audience figure. Its Chief Executive said on his own broadcast that viewbotting "is a form of fraud," that "for channels where we see consistent and persistent viewbotting, we will compute what will be a CCV cap for that channel," and that "we will not publicly announce what channels are capped or the level of the cap" (*Romero*, Fourth Amended Complaint, Docket Entry 97, ¶ 18). Twitch now pleads the same thing as its defense: it "capped channels, eliminated payments, and deployed enhanced viewbot detection" (*Romero*, Docket Entry 132, at 5). A figure its publisher caps channel by channel, in secret, is a figure its publisher sets.

**2. Ms. Wilson's channel carries a cap.** Her count has been held to a ceiling that moves and then sits flat (Fourth Amended Complaint ¶ 17(d)).

On 13 September 2026 it was placed in four steps to 3,061 within fifteen minutes of her broadcast starting, then held between 2,900 and 3,095 for the rest of the day while the chat beneath it changed (Second Supplemental Pleading, *Romero*, Docket Entry 135, 28 September 2026, ¶ D).

**3. The same figure carries her visa, and with it the coercion.** Defendants in *Romero* describe one of their own as "Ms. Wilson's manager." She has said on her own broadcast that he "signed off on my visa vouching for me as a legitimate human being" and "is the reason that I am here right now" (Fourth Amended Complaint ¶ 59). The number on which her lawful presence and her livelihood rest is a number others set and can move. That leverage is what the Trafficking Victims Protection Reauthorization Act reaches (18 U.S.C. §§ 1589, 1595), and it is pleaded as such.

**4. Twitch delegates the channel to moderators, and they acted first.** Its Community Guidelines make the streamer answerable for "all content in your streams, including policy violations by third parties," and direct her to moderate through "AutoMod, timeouts, and channel bans" (pages 9 and 4). The moderators are the operating layer. At TwitchCon Paris on 8 July 2023, Ms. Wilson invited the movant to place his wallet, passport and telephone in her keeping and streamed beside him. Before he had asked anything, the layer intervened live: it walked her away, put him out under the threat of police, and banned on-stream the account by which she knew him (Fourth Amended Complaint ¶¶ 1, 34). A false characterization of him was manufactured that day and spread as a public, social-media cancellation, and they uphold it today. When he then asked about the coercion and control over her channel, the same persons procured his

arrest in the United Kingdom on a stalking report made live in her Discord (2 January 2025; about 161 days held) and obtained a restraining order (¶¶ 29, 40). They have never stated a ground for any of it, to him, to her, or to any court (¶ 40(e)); what they deployed instead was the "stalker" narrative, deployed that day with no investigation and no redress. All of it came before he knew what was going on. Only after the threats against her in late February 2026 did he find the reason: the figure. What they guard against now is discovery, in his proceeding and in the others. That is the motive for the retaliation and the cover.

**4-A. Section 230 does not reach it.** Section 230 does not reach this conduct. It protects a platform only as the publisher of information provided by another. The audience count is the platform's own content, and for it the platform is the information content provider. *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008). A claim resting on the platform's own promises is not a claim against it as publisher. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009); *Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024). And a claim that does not seek to hold the platform responsible as a publisher survives. *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021). The ban of the person asking about the count, carried forward by police, an arrest and an order, is conduct, not the editing of anyone's speech.

**5. The two people at the center of the figure spoke, and the tool was used again.** On 13 September 2026, at about 10:55 a.m. Pacific Time, she received him into her voice channel, before her audience. She greeted him: "Hello. Hello beautiful times two. Hello, my little snuggle muffin." He answered: "Hey gorgeous, how are you? Love you more than ever, you're

amazing." She returned it: "Ah, thank you! You're more amazing. Um, your, um, presence …" He was removed in the middle of it. She asked on air: "hold on, what, did he get kicked or did he leave?" The platform's own chat log records what the holders of moderator authority told her: at 10:56:21, "He left"; at 10:56:27, "@lydiaviolet he left." No one has said who started the removal. Every one of them upheld it. That was the same broadcast on which her count sat flat.

**5-A. Reported, in the proper forum, as the order requires.** After they spoke, the movant reported the contact himself, to every authority that holds the power to act on it, at the same time as he serves this motion: the United States Attorneys, the Federal Bureau of Investigation, the Department of Justice, the Commission, the Plaintiff States, and the authorities in the United Kingdom. The restraining order is an instrument with the force of law, and it cannot sit unused. Either the contact is a breach, or the order was procured to cover the conduct alleged here. Each authority that holds it has the power, and the duty, to decide which, and to act on the real threats and the real danger, which are to Ms. Wilson. He demands the same diligence that was shown to him. In his words: "they raced at code 3 to me or moved a swat team to wait my approach." That is what they have been saying from Paris to now: a moderation decision taken in bad faith: a vilification to ensure he would have no credibility. It is why he investigated for as long as it took and wherever it led, to these proceedings, where the conduct is now presented for what it is: criminal, and continued with knowledge. He is here, in a proper forum, and calls on every authority to investigate. An innocent man who was once held in custody asks for the full investigation that custody should have produced. What the other proceedings now present, from the Commission, the States

and the creators, bears out what he pleaded first. That is the gravity of this record as it relates to the metric and to its value.

**6. What it has become.** A manipulated metric needed a person removed. The ban removed him; the arrest and the order keep him removed; and counsel, after notice, now carry that order forward in court. The cover-up is a far greater harm than the metric it protects. The values Amazon asks this Court to seal are the price end of the same figure.

## II. THE MOVANT AND WHAT HE ASKS

**7.** Oscar Ernesto Romero is a United States citizen. He is the plaintiff, in propria persona, in *Romero v. Amazon.com, Inc., Twitch Interactive, Inc., et al.*, No. 3:26-cv-02324-JO-JAC (S.D. Cal.), commenced 13 April 2026, the first-filed of the actions against Amazon.com, Inc. over the audience figures its live-video service sells. He is a viewer, a creator and a paying customer of that service, and his own sessions are among those counted.

**8.** He asks for three things: (a) leave to intervene for the limited purpose Local Civil Rule 5(g)(8) provides; (b) denial of Amazon's Motion to Seal Commercially Sensitive Information (Docket Entry 91, 28 September 2026); and (c) an order directing the Clerk to unseal the Complaint (Docket Entry 3).

**8-A. One receiver, three courts.** In his own action the movant seeks a receiver over the audience-measurement dataset, with the Federal Trade Commission and the State of California as its custodians (*Romero*, Docket Entry 128), and one decree over that dataset, maintained in the three courts where the defendants are sued: the count and the receiver in San Diego;

the training corpus and the opt-out in the Northern District of California; the price, the data sold and the inference here, with the Commission and the States. The same receiver serves all three, and the oversight is held by the three proceedings together. Unsealing is the first step: the calibration Amazon asks to seal is the part of that record this Court holds.

## III. LIMITED INTERVENTION

**9. The rule of this District.** "A non-party seeking access to a sealed document may intervene in a case for the purpose of filing a motion to unseal the document." Local Civil Rule 5(g)(8). The Ninth Circuit says the same: "Nonparties seeking access to a judicial record in a civil case may do so by seeking permissive intervention." *San Jose Mercury News, Inc. v. U.S. District Court*, 187 F.3d 1096 (9th Cir. 1999); see *Foltz v. State Farm Mutual Automobile Insurance Co.*, 331 F.3d 1122 (9th Cir. 2003).

**10. No independent basis of jurisdiction is required.** "[A]n independent jurisdictional basis is not required because intervenors do not seek to litigate a claim on the merits." *Beckman Industries, Inc. v. International Insurance Co.*, 966 F.2d 470 (9th Cir. 1992). The movant seeks no merits relief here. He asks only that the pleading be public.

**11. Timeliness and prejudice.** Amazon filed Docket Entry 91 on 28 September 2026. This motion reaches the Clerk within the fifteen days Local Civil Rule 7(d)(3) gives for a response. It delays nothing: it asks to be decided with Docket Entry 91 on the date the Court already set (Docket Entry 82, ¶ 3).

**12. The common question.** Whether the input on which Amazon calibrates what advertisers pay may be hidden from them is a question this action and the movant's action share. His action concerns the audience figure; this action concerns the price charged against it. They are two ends of one record held by one custodian. The movant's claim is live: he is the plaintiff in the pending first-filed action, on his Fourth Amended Complaint (*Romero*, Docket Entry 97) and a supplemental pleading filed on 28 September 2026 (Docket Entry 135), against the same defendant. His claim and this action share a common question of fact: what the defendant counts, how it calibrates the price charged against that count, and what it discloses. That is the common question Rule 24(b)(1)(B) requires. And his request to unseal does not depend on intervention at all: the public's right of access to a complaint needs no complaint of one's own.

## IV. OPPOSITION TO DOCKET ENTRY 91

### *A. The standard Amazon must meet*

**13.** A "strong presumption in favor of access" is the starting point. *Kamakana v. City and County of Honolulu*, 447 F.3d 1172 (9th Cir. 2006). A party seeking to seal must "articulate[ ] compelling reasons supported by specific factual findings" that "outweigh the general history of access and the public policies favoring disclosure." *Id.* The compelling-reasons standard governs whenever the matter is "more than tangentially related to the merits" of the case. *Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092 (9th Cir. 2016). A complaint is the merits.

**14.** The court must base its ruling on specific findings, "without relying on hypothesis or conjecture." *Kamakana*, 447 F.3d 1172 (quoting *Hagestad v. Tragesser*, 49 F.3d 1430 (9th Cir. 1995)). And "[t]he mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Id.* (citing *Foltz*, 331 F.3d 1122).

**15.** The question of secrecy over this data was raised first, by the party who holds it, and it has been decided. On 6 May 2026 the movant himself applied to seal his dataset in the first-filed action (*Romero*, Docket Entry 16). On 10 June 2026 the Southern District of California denied the application under *Kamakana* and *Hagestad*, because the showing rested on hypothesis or conjecture (Docket Entry 41). He accepted the ruling, sought no reconsideration, withdrew every sealing application, put the Declaration and Exhibits A–L on the public docket, and never used the leave to refile. That ruling is his affirmation, made on the record, that no seal can be applied to this dataset. It is public by order of a federal court, and it stays public. Amazon now asks this Court to hide the price end of the same figure on a weaker showing than the one already refused.

### *B. The United States does not agree*

**16.** The Federal Trade Commission holds the documents Amazon produced. By Amazon's own account, the Commission "does not consent to Amazon's proposed redactions except those at Paragraphs 4, 44, 101, and the redaction of an advertiser name and brand names at Paragraphs 253–258" (Docket Entry 91, page 2 and note 2). The agency that investigated the conduct, and read the documents, does not accept that the rest must be hidden.

***C. What Amazon asks to hide is the calibration, which is the conduct***

**17.** Amazon says it seeks to seal only "discrete values, figures, and design details" and concedes that "allegations regarding how Amazon's ad auctions operate and the alleged results of its auction system" will be public (Docket Entry 91, pages 2–3). But its own Exhibit B identifies what the redactions reach: "the definition of a proprietary input on which Amazon calibrates its proprietary auction systems" (Complaint ¶¶ 60–62, 69, 175–176, 193, 195–196), and, in the motion's words, "the operating points at which Amazon's systems are allegedly calibrated to run" (Docket Entry 91, page 5).

**18.** A description without the values cannot be tested. The public may read that the auction was tuned; it may not read what it was tuned on, or to what. That is not the protection of a trade secret from a competitor. It is the removal, from the advertisers who paid, of the one thing that would let them measure what was taken from them. Where the value is the alleged overcharge, sealing the value seals the allegation.

**19.** The movant's action shows why the input matters (paragraphs 1 to 3). The audience figure sold to advertisers is adjusted and then certified as real. A calibration run on a certified metric that has been manipulated is not a competitive secret. It is the fraud. Amazon's fear that the numbers would expose it to "further litigation" is the ground *Kamakana* says does not, "without more," justify sealing.

***D. The declaration is conjecture***

**20.** The only evidence is the Declaration of Anirban Sengupta (Docket Entry 92), Director of Sponsored Products since January 2026. It states

that a competitor "could benchmark against, reverse-engineer, and undercut" Amazon's methodology (Docket Entry 91, page 5, citing Sengupta Decl. ¶ 6). It identifies no competitor, no instance, and no mechanism by which a single historical value would let anyone rebuild a system Amazon says was developed "through years of internal experimentation." It seeks to seal historical parameters as well as current ones, on the theory that the present mechanics "build on and incorporate" the past (Docket Entry 91, page 5). On that theory nothing Amazon ever did in this auction could be public. That is the hypothesis and conjecture the Ninth Circuit forbids.

### *E. Amazon's authorities*

**21.** Amazon's lead authority, *In re Electronic Arts, Inc.*, 298 F. App'x 568 (9th Cir. 2008), is an unpublished disposition and is not precedent (Ninth Circuit Rule 36-3(a)). *Apple, Inc. v. Samsung Electronics Co.*, 727 F.3d 1214 (Fed. Cir. 2013), is a decision of another circuit. The orders Amazon cites from this Court's 2023 actions (No. 2:23-cv-00932-JHC, Docket Entry 79; No. 2:23-cv-01495-JHC, Docket Entry 108) addressed other complaints and other paragraphs. The test is applied to this record, paragraph by paragraph.

### *F. The public interest reaches every body that relies on the figure*

**22.** The figure does not stay inside the auction. Amazon certifies its financial reporting and its internal controls to its investors and to the Securities and Exchange Commission (15 U.S.C. §§ 7241, 7262; 18 U.S.C. § 1350; 15 U.S.C. § 78j(b)). As a federal contractor it owes the United States timely disclosure of credible evidence of fraud (48 C.F.R. § 52.203-13), and the Federal Acquisition Regulation states the causes on

which a contractor is debarred (48 C.F.R. § 9.406-2). The same audience figure is placed before United States Citizenship and Immigration Services in support of visa petitions for the people whose channels it measures (18 U.S.C. § 1546). Revenue booked on a calibrated figure and certified up the chain is a matter in which the public's interest in access is at its height.

**23.** It has already reached a United States citizen abroad. The arrest of 2 January 2025 (paragraph 4) was, in the movant's words, this: "I was arrested at the embassy trying to see what was wrong & stop her from the fraud metrics on visa." The order that arrest produced is still in force and is used to keep him from the metric and from her. A sealing order in this Court should not become one more instrument that keeps the figure out of view.

***G. Notice, and the use of time***

**24.** Every party here has been given notice of this motion, and of the conduct it describes, by electronic mail. Petitioning is protected; sham petitioning is not. *Kottle v. Northwest Kidney Centers*, 146 F.3d 1056 (9th Cir. 1998). Advice given in furtherance of an ongoing fraud is not privileged. *Clark v. United States*, 289 U.S. 1 (1933); *United States v. Zolin*, 491 U.S. 554 (1989). After notice, keeping the calibrated figure from the people it was sold to, and carrying the procured order forward, is done with knowledge.

**25.** This Court has already written the sentence on this Defendant's use of time: "Amazon and its counsel are admonished that their conduct during discovery was tantamount to bad faith. Similar conduct may lead to more serious sanctions." *Federal Trade Commission v. Amazon.com, Inc.*, No.

2:23-cv-00932-JHC, Docket Entry 404 (10 July 2025). A motion filed at 5:38 p.m. on the last day the Court allowed, to keep sealed what the Commission says need not be, is of a piece with it.

***H. This play has been run before, in this Court, and the delay is the continuity***

**26.** In the Prime action this Court found, on 10 July 2025, that Amazon's withholding of documents to the eve of and after the discovery cutoff "was tantamount to bad faith" (No. 2:23-cv-00932-JHC, Docket Entry 404). On 17 September 2025 it granted partial summary judgment against Amazon. On 25 September 2025, in the middle of trial, Amazon agreed to pay $2.5 billion: a $1 billion civil penalty and $1.5 billion in consumer redress (Stipulated Order, No. 2:23-cv-00932-JHC, 25 September 2025). The pattern is delay, withhold, and settle only when the record is about to be heard. Sealing the calibration here is the first step of the same play, and it will not work: the record it would hide is already public at the other end, by ruling.

**27.** The records at issue can be changed at the speed of software. The audience figure on Ms. Wilson's channel was moved in four steps within fifteen minutes on 13 September 2026 (paragraph 2). A schedule measured in months against conduct measured in minutes is not neutral. The movant asks that the evidence be set on a schedule that matches the speed at which it can be altered, in this action and in the first-filed action, with no extension that serves only delay.

**27-A. The threats, and why speed is safety.** On 13 June 2026 at 11:47:16 a.m. Pacific Time a paid message ("Cheer100") appeared on Ms. Wilson's

broadcast: "IF YOU CHEATED ON ME I WOULD CUT YOUR FLAT BREASTS OFF WITH A SCALPEL." The platform took payment for it, and the moderator account cxbaob deleted it and banned the sender within the minute; the records that identify who sent it are Defendants' (Exhibit A: Communiqué 15 as filed in *Romero*, Docket Entry 77, its times as corrected at Docket Entry 135, paragraph (s)). The extreme case is already on the public record, on this platform: in a Twitch stream in January 2024 the creator known as d4vd was recorded directing his moderators to delete the stream's recordings; Celeste Rivas Hernandez, reported to be the girl with him, was later found killed at fourteen, and on 27 July 2026 he was ordered to stand trial for her murder. He has pleaded not guilty (reported by the Los Angeles County District Attorney and CBS Los Angeles). The first-filed action pleads that the threats serve to keep the record from being uncovered. The movant and Ms. Wilson are its victims, and they ask that the record be heard at the speed of the conduct that threatens it, without vexatious delay.

**28. The same speed is asked of the first-filed court, so that one clock governs both.** In *Romero* the movant has asked for speed from the start (Docket Entries 43 and 78). The statute that governs the order of hearing binds this Court equally: "each court of the United States shall determine the order in which civil actions are heard and determined, except that the court shall expedite the consideration of … any action for temporary or preliminary injunctive relief, or any other action if good cause therefor is shown" (28 U.S.C. § 1657(a)). The movant is also a crime victim who holds "the right to proceedings free from unreasonable delay" (18 U.S.C. § 3771(a)(7)). He asks this Court for what he has asked of the first-filed

court: that Amazon be held to one clock, and not to the slowest clock among the courts where it is sued.

**29. The delay is the continuity.** A racketeering pattern requires "continuity plus relationship," and continuity may be "past conduct that by its nature projects into the future with a threat of repetition," including where "the predicates are a regular way of conducting defendant's ongoing legitimate business." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989). In the first-filed action the continuity is pleaded through the procured order and its use in court after notice (Second Supplemental Pleading, *Romero*, Docket Entry 135). The same conduct is visible here: documents withheld to the eve of trial in the Prime action; a motion to seal the calibration filed at 5:38 p.m. on the last permitted day in this one; and, in the first-filed action, a stay sought of every deadline to respond to the movant's motions (*Romero*, Docket Entry 100) while the order procured through the moderator stratum is carried forward in court after notice. Counsel who carry that forward after notice are no longer petitioning for a client; they are performing the function of a consiglieri, extending an ongoing cover-up through the courts. Delay is not a side effect of this defense. It is the regular way the conduct continues, and it is the threat of repetition *H.J. Inc.* describes.

## V. SERVICE

**30.** The movant served this motion on Amazon, the Federal Trade Commission and the Plaintiff States (through the Washington Attorney General) by electronic mail on the day he mailed it to the Clerk.

## VI. RELIEF

**31.** The movant asks the Court to:

(a) grant him leave to intervene for the limited purpose of opposing Docket Entry 91 and moving to unseal, under Local Civil Rule 5(g)(8) and Federal Rule of Civil Procedure 24(b);

(b) whether or not intervention is granted, deny Amazon's Motion to Seal (Docket Entry 91) in full on the public's right of access, which does not depend on the movant's status, and direct the Clerk to unseal the Complaint (Docket Entry 3);

(c) in the alternative, deny Docket Entry 91 as to every redaction to which the Federal Trade Commission has not consented, and order Amazon within seven days to file a public version of the Complaint limited to the redactions the Commission accepted (¶¶ 4, 44, 101, and the advertiser and brand names at ¶¶ 253–258);

(d) in any event, order that no value the Complaint alleges to be the measure of an overcharge be sealed without a finding, paragraph by paragraph, of a compelling reason supported by specific facts; and

(e) decide Docket Entry 91 on the papers on its noting date, 19 October 2026, without extension; expedite the consideration of this action under 28 U.S.C. § 1657(a), as the movant has asked of the first-filed court in *Romero*; and, in setting the schedule of this action, set an expedited schedule for the preservation and production of the evidence, matched to the speed at which the records can be altered, with no extension that serves only delay.

Dated: 30. 9, 2026.

[signature]

**OSCAR ERNESTO ROMERO**

Non-Party Movant, In Propria Persona
4107 Villa Marena, Col. Puesta del Sol, Playas de Rosarito, B.C. 22710, México
ozromeo338@gmail.com · +52 1 646 601 7866

I certify that this motion contains 4,190 words, in compliance with the Local Civil Rules.

**CERTIFICATE OF SERVICE**

I certify that on the date below I caused this motion, its Exhibit A and the proposed order to be mailed to the Clerk for filing, and served them the same day by electronic mail on counsel for Amazon.com, Inc., the Federal Trade Commission and the State of Washington at the addresses on Docket Entries 81, 83, 89, 90 and 91, the Washington Attorney General serving for the Plaintiff States.

Dated: 30. 9, 2026.

[signature]

**OSCAR ERNESTO ROMERO**

# EXHIBIT A

1. "Exhibit B ? The June 13, 2026 Threat," as filed in Romero v. Amazon.com, Inc., No. 3:26-cv-02324-JO-JAC (S.D. Cal.), on 17 June 2026 (2 pages).

2. Communiqué 15, as filed in the same action at Docket Entry 77, 6 August 2026.

Their times are one hour early; the corrected times are pleaded at S.D. Cal. Docket Entry 135, paragraph (s).

# EXHIBIT A

1. "Exhibit B ? The June 13, 2026 Threat," as filed in Romero v. Amazon.com, Inc., No. 3:26-cv-02324-JO-JAC (S.D. Cal.), on 17 June 2026 (2 pages).

2. Communiqué 15, as filed in the same action at Docket Entry 77, 6 August 2026.

Their times are one hour early; the corrected times are pleaded at S.D. Cal. Docket Entry 135, paragraph (s).

# EXHIBIT B — THE JUNE 13, 2026 THREAT (TRO CENTERPIECE)

A paid, monetized mutilation threat on Ms. Wilson's own broadcast — deleted and banned by moderator "cxbaob" (CX)
Romero v. Amazon.com, Inc., et al. — No. 3:26-cv-02324-JO-JAC — in support of the Emergency TRO

**Authentication.** Each frame below was captured and preserved by Plaintiff and is authenticated by the concurrently-filed Declaration of Oscar Ernesto Romero. Originals with SHA-256 chain-of-custody are held in Plaintiff's evidence archive and are reproducible from the cited public VODs. Words appearing within threatening messages are the senders' own, reproduced solely as evidence and never adopted as true.

## Ms. Wilson's own live broadcast — June 13, 2026, 10:47:16 PT




Twitch's paid bits-cheer alert renders "spuujmeyer cheered x100 — IF YOU CHEATED ON ME I WOULD CUT YOUR FLAT BREASTS OFF WITH A SCALPEL" as Ms. Wilson reacts at the microphone. A paid, monetized threat carried on the platform's own product, in real time. The threat is the sender's own words, recorded solely as evidence and never adopted as true.

## The sender's account card, opened by Ms. Wilson on stream — June 13, 2026




"Account Created 30 September 2024," 2 followers, "2 Messages" total — both of them the threats — "Deleted by cxbaob," "cxbaob banned spuujmeyer." A dormant burner with no footprint but two paid attacks, deleted and banned by the same moderator (CX) who brands Plaintiff a "stalker." (Card clock runs one hour ahead of our PT captures: card 11:44/11:47 = logged 10:44/10:47 PT.)


Communiqué 15 • Quinceañera
of the West Coast Offence

# COMMUNIQUÉ 15 — QUINCEAÑERA OF THE WEST COAST OFFENCE

***The case comes of age. The complete presentation — present crime first, then all the way back to where it was only kind.***

COMMUNIQUÉ 15 · VERSION BUILD 14 · 2026-06-14 09:03 PT · edit log: `CHANGELOG_CH15.md`

> *A man was building algorithmic trading models. Public-data forensics, market microstructure, pattern detection — the quiet, obsessive arithmetic of a quant. And then, in late February 2026, on a Twitch channel belonging to a friend, the chat filled with death threats and a moderator started spamming the word "creep." Bam. He turned the only skill he had toward the only thing that mattered. This communiqué runs backward — it opens with the crime they are committing today, and walks back, year by year, to the only thing at the bottom of all of it: two people who were kind to each other. The point was never to keep her. It is to love her more than enough to want her free.**

## § I · WHAT THEY ARE SAYING TODAY — the crime, in progress

*Start here, in the present, with the argument they make: "this guy's a stalker." Watch them make it — and watch each line become criminal exposure the moment you set it beside what is real.*

### The very latest — June 14, 2026: they answered the filing by deleting it

The morning after this communiqué was completed, its author shared it — respectfully — to three creators' Discords from the account `Ozkarizz`: *"Out of respect and appreciation, I share notice of what is really going on. I invite you to read, evaluate, and decide for yourself,"* the post stating on its face that the matter is before the FBI and this Court. Within the same day, the moderators answered: **Aliythia's server removed it; MistieSage's removed it and banned the sender; Berticuss's removed it and banned the sender** (the last witnessed live). Deleting a record that announces an active federal proceeding — with that notice on its face — is **destruction of evidence with knowledge of the proceeding (18 U.S.C. § 1512(c); FRCP 37(e))**; and the escalating, same-day spread across three independent servers is **coordination, not coincidence.** The identity of the deleting and banning moderators is held by Discord and is the subject of a preservation demand and a subpoena.

And on Berticuss's own live stream that same morning, the tell completed itself. On June 5 the moderators `Kanthric` and `jj928` built the "stalker" narrative **unprompted** (§ below). On June 14 they were **active in chat the entire stream** (Kanthric 63 messages, jj928 23) — and **silent on the narrative they had manufactured**, even when the host herself raised the subject of stalking; not a

word about Lydia. The story they pushed when no one was watching is the story they will not type now that it is named before the FBI and this Court — **consciousness of guilt.** And the host, on her own record, signaled the constraint plainly: *"I wish I could give you a bigger backstory to this as well... there is a bigger backstory to this troll that I cannot tell you guys."* A creator stating, in public, that there is a backstory she **cannot tell.** *(All June-14 facts captured/sourced in* `BERTI_STREAM_OBSERVATIONS_2026-06-14.md`*.)*

---

### Even closer to the present — June 13, 2026: the day the cap spoke

**Watch how she came on first.** Before any of what follows, the open set the tone: she arrived **small, apologetic, and visibly on guard,** apologizing for herself in a near-constant refrain and naming her own fear of being exposed on camera. Her words, recorded:

> `09:46:50` **Lydia:** *"I got really scared and I remember I was like, okay, oh my gosh, wait..."*
> `09:47:41` *"Wait, no, I shouldn't say that, sorry!"*
> `09:48:02` *"I'm really scared, it's gonna pop off on-stream. I write some vulnerable things on notepad."*
> `09:53:00` *"I back out because I get really scared."*
> `09:58:58` *"is it bad that I'm scared..."*
> *(threaded throughout the open, a steady self-correcting refrain:* `"Sorry."` *...* `"Sorry."` *...* `"Sorry, sorry, sorry."` *)*

This is not the bearing of a woman in command of a thriving channel of thousands. It is the bearing of someone who has learned to be careful — who writes the vulnerable things on a notepad because she is *"scared it's gonna pop off on-stream."* Hold that posture in mind. It is the human baseline against which the next two hours — the held number, the paid threat, and her own admission about the cap — have to be read. *(Verbatim from* `stream_transcript_2026-06-13.txt` */ the synced early-block transcript; offered as her recorded words.)*

On a quiet Saturday "mini stream," the reported concurrent-viewer count opened cold at **19**, ramped through the first fifteen minutes, and then **held in a tight band around 2,000 (mean 1,948, standard deviation 407, coefficient of variation 0.209) for the rest of the live-active broadcast — while the real audience, the people actually typing, stayed flat at roughly 52 unique chatters per minute throughout.** The number on top and the room underneath it are two different quantities, and across the whole session only one of them tracked what was happening on screen. *(All figures from preserved 60-second captures, June 13, 09:50–11:45 PST; fully reproducible from* `twitch_ccv_lydiaviolet_2026-06-13.csv` *and* `twitch_engagement_lydiaviolet_2026-06-13.csv` *via* `_chart_lydia_2026-06-13.py`*. We do not characterize the post-11:45 period, when the channel remained flagged "live" but chat fell to near-zero, as evidence — it has innocent explanations and is excluded.)*




**The day, on one timeline.** Reported CCV (red) ramps and then holds in a band around 2,000 for the entire live-active stream; unique real chatters (blue, ~52/min) and chat messages (bottom) rise and fall with the actual conversation while the top line does not. The first dashed line marks **10:47 — the paid bits mutilation-threat, banned 27 seconds after it aired**; the second marks **11:31 — Lydia stating on her own mic that Twitch placed a cap on her viewers.** Because the cap compresses the reported figure toward the real audience, today's engagement reads *organic* (~2.7%) — which is exactly what a capped, wound-down bot operation looks like. The proof on June 13 is not dilution; it is **the cap itself, in her voice,** and the threat that landed beside it.

And near the end, tired, she named it herself. **Her own words, recorded:** *"I've been talking to Twitch for the past few days... they told me someone is pushing my video numbers up, so they put a cap on my viewers — a limit on how high they can go... it's not helping... I would appreciate this stop... I'll keep the limit on until the activity is natural."* In one breath she confirmed what the complaint alleges: the channel is **viewbotted, Twitch knows, Twitch applied the very cap its own CEO described** — and she is, by her own account, neither the one doing it nor happy about it. Three voices now describe one mechanism on one channel: the **CEO** who explained it, the **data** that shows the flat line, and the **woman** the number is wrapped around. This is no longer inference. It is on their servers, in her voice.

**But first the elephant in the room, because it is the thing that makes everything that follows make sense.** This ~2,000 is not where she lives. She is coming *down* — hard. Days earlier she was drawing near **eight thousand** for the two-week "Scuffathon" collaboration with her friend **Aliythia** (*captured: 7,817, June 6*). Then, for the first time, **the cap came down on the collab and the number cratered to ~2,300** (*captured: 2,375*), the event was cut short, and — **[Plaintiff's account] — Aliythia left, taking with her the cameraman the two of them had**

**hired** for the production. By June 13 Lydia is alone in front of the capped figure, **rationalizing it** to a room that can see exactly what happened. And the room said so, out loud, to the integer — this is the line that set the next hour in motion:

> `10:05:28` lycis: *"I'm just here to say that 2.4 is way too low to be viewcapped — should be 3k."*
> `10:31:06` lycis *(again, unmistakable): "500 million subscribers and 2.4 chatters like Lydia's viewcapped viewcount. Classic."*
> `09:27:08` **skkarhead:** *"i hope the viewbot allegations are false."*

The audience itself is naming the cap, in her chat, using the word *"viewcapped"* — they know. **That** is the elephant: a channel that ran at 8,000 days ago, slammed to a ~2,300 ceiling that broke up a hosted collaboration and emptied the set, with the viewers themselves remarking the number is artificially low. It is the live, in-chat corroboration of the cap she would confirm in her own voice ninety minutes later.

**And it is what she walked into next.** Prompted by exactly this — the room talking about her number — around **10:06–10:07** she walked straight into the mechanism this case is about, naming the lead moderator by name, describing exactly how the bans happen, and naming who takes the blame:

> `10:06:57` Lydia: *"Say that was a rogue mod — which there isn't, I love my mods very much — but say CX one day... he was like, I'm going to put it on him."*
> `10:07:16` *"Say CX one day decided to ban 100 people. But I... didn't know. I didn't know they were banned."*
> `10:07:36` *"And then when people found out, they blamed me way more than they blamed CX. Do you know what I mean? How could you do this?"*

Then, a quarter-hour later, she named the coordination tool itself — the same *"mod discord"* the third-party room bragged about on June 5 (§ I above) — and described its operation in one sentence:

> `10:21:04` Lydia: *"It's literally — you guys put things in the discord and then CX picks it out. So blame CX."*

Read that as what it is: **the alleged victim, on her own stream, describing an apparatus in which the community feeds material into a moderator's Discord, the lead moderator** `CX` **acts on it (bans, "picks it out"), and then *she* absorbs the blame for actions she says she did not even know about.** She frames it half as a joke and folds it inside affection for "my mods" — that is precisely how coercive control sounds from inside it — but the structure she describes is exact, and it is the structure pleaded in this case. And she said why she lives the way she does:

> `10:25:12` **Lydia:** *"I have to be in a building with security — obviously... which means it has to be a building that charges a certain amount,"* walking through paying *"double the amount for parking"* just to live somewhere guarded. Earlier she had named the fear directly: `09:56:24` *"If I say the wrong political thing... I may get [deported] out of the country."*

So set the clock. She named **CX**, described the **Discord-fed ban machine**, said she gets blamed **for what the mods do**, and described a life **rearranged around the need for security** — and then, roughly twenty-five minutes later, this happened.

> → **THE CRIME.** Hear what she actually said: she **named the man who sits on her account and will not leave** — *"CX... decided to ban 100 people... I didn't know"* — the one even she cannot remove, **and the platform refuses to remove him.** That is **coercive control and forced labor by abuse of process — 18 U.S.C. § 1589 (TVPRA)**: a creator stripped of authority over her own channel. **Banning users without her knowledge or consent** — the mechanism that erases would-be witnesses — is **witness tampering, 18 U.S.C. § 1512(b)/(d).** And the admitted method — *"you put things in the discord and CX picks it out"* — is the enterprise harvesting her own community **and servers and weaponizing them** into the "stalker" file: **misleading conduct to obstruct a federal cooperator (§ 1512(b)(3)), retaliation (§ 1513(e)), and the "mod discord" as the RICO association-in-fact (§ 1962).**

The day's cruelest tell came in a single four-minute sequence, and it is preserved to the second. An account, `spuujmeyer`, **that appears in none of our captures of any channel on any date — before or since — surfaced for the first and only time, and paid to be heard.** Lydia clocked it live: *"hello first time chatter."*

> `10:44:11` **spuujmeyer** *(Cheer100 — paid): "DO YOU CHEAT ON YOUR BOYFRIEND WITH OTHER MEN?"*
> `10:47:16` **spuujmeyer** *(Cheer100 — paid): "IF YOU CHEATED ON ME I WOULD CUT YOUR FLAT BREASTS OFF WITH A SCALPEL."*
> `10:47:43` — **spuujmeyer banned, permanent.**
> `10:49:05` **spombanadl:** *"We can bring him back at unban requests."*
>
> → **THE CRIME.** This is a **death threat.** In law it is the interstate/foreign-commerce transmission **of a threat to injure the person of another — 18 U.S.C. § 875(c); cyberstalking — 18 U.S.C. § 2261A(2)**; and **California Penal Code § 422 (criminal threats) / § 646.9 (stalking).** It was a **paid** transaction the platform processed and profited from *before* it acted — and against a woman connected to a federal cooperation of record, it also feeds **witness intimidation, 18 U.S.C. § 1512.**




**This is not a log entry. It is the broadcast.** The frame is from Lydia's own live stream at the instant the threat posted. On the left, the platform's own **bits-cheer alert** renders it in full, word for word — **"spuujmeyer cheered! x100 — ♦100 IF YOU CHEATED ON ME I WOULD CUT YOUR FLAT BREASTS OFF WITH A SCALPEL"** — the purple cheer marking it a **paid** donation Twitch animated and celebrated on screen as it carried the violence, while she sits stunned at the mic. There is no interpretation needed: the threat, the payment, and the woman are in one frame, on Twitch's own product, in real time.

Read the clock. The first paid message — a stranger asserting a claim on her fidelity — **was not actioned at all; it sat live for over three minutes,** and she met it with grace on her own mic (*"I do have a boyfriend... and I would not cheat on him"*). Only when it escalated to **paid-for, mutilation-grade violence** did the lead moderator act — and **we now know exactly who, because Lydia pulled the sender's account card up on stream herself.** It was `cxbaob` — CX, the same moderator she had named by her own mouth forty minutes earlier (§ above), the same one branding the Plaintiff a "stalker." He **deleted both messages and issued the permanent ban — twenty-seven seconds after the scalpel line aired, and after the paid bits had already cleared.** Then, ninety seconds later, a regular reached for February's lever: *bring him back at unban requests.*


spirit_of_koln 265
nicholasjj98 236
kristian315 175
Hype Train
Lvl 13
spuujmeyer
Account Created 30 September 2024
2
Sep 30, 2024
Badges
Gift a Sub
Follow
Whisper
Gift Turbo
Invite
!permit 1s 10m 1h 8h
24h
2 Messages
0/0/1 Mod Actions
0 (+0) Mod Comments
13/06/2026
11:44 spuujmeyer:
~~Cheer100 DO YOU CHEAT ON YOUR BOYFRIEND WITH OTHER MEN?~~ (Deleted by cxbaob)
11:47 spuujmeyer:
~~Cheer100 IF YOU CHEATED ON ME I WOULD CUT YOUR FLAT BREASTS OFF WITH A SCALPEL~~ (Deleted by cxbaob)
11:47 cxbaob banned spuujmeyer
BANNED in lydiaviolet • by cxbaob •
7 seconds ago
Type here to search

**The card she opened herself — every element of the case in one popup.** Moments after the threat, Lydia clicks the sender to look (*"Hold on, hold on. Can I just see this guys?"*) and reads the handle aloud (*"Spooge mayor"*). The card resolves every question discovery would otherwise have to ask: **"Account Created 30 September 2024," a follower count of 2,** and **"2 Messages"** total in the channel's entire history — *both of them the threats.* A genuine viewer has a history; this is a **dormant burner** with no footprint but two paid attacks. And the moderation trail is printed right on it: **"11:44 spuujmeyer: ...DO YOU CHEAT ON YOUR BOYFRIEND... (Deleted by cxbaob)," "11:47 spuujmeyer: ...CUT YOUR FLAT BREASTS OFF WITH A SCALPEL (Deleted by cxbaob)," "11:47 cxbaob banned spuujmeyer."** `The card clock runs one hour ahead of our capture's PT timestamps (a timezone-display offset): card 11:44/11:47 = our logged 10:44/10:47 PT. Same two events.` In the chat beside her, the room says the quiet part: *"Hello, FBI? Yeah, that chatter right there."*

That is the architecture in one frame: **the platform monetized the sentence; the lead moderator who manufactures the "stalker" file is the same hand that deleted it and banned its sender — then a regular floated the button to bring him back.** They let it play, then CX banned — the same plausible-deniability rhythm as the February unban segment (§ III). And the timing is not innocent: it landed in the stretch where the room had turned to **CX** and the people he bans, on the very afternoon Lydia named him and went public about the cap. **We place authorship of that burner on the enterprise and on CX, and put it to discovery** — the platform alone holds the IP and the email behind those bits, and CX's own deletion-and-ban log is now on the record. The contrast writes itself: **targeted, paid-for violence earns a shrug, a delayed ban by the very mod accused of the cover-up, and a back door; a gentle, openly-declared, FBI-of-record message earns a restraining order.**

> → THE CRIME. Taking the **bits before acting** is the platform **monetizing a felony threat** — wire fraud, 18 U.S.C. § 1343, layered on the inflated/capped audience it bills against. **CX letting it air and then deleting-and-banning** is not protection; it is **selective enforcement that establishes the apparatus's control and consciousness** — one more **predicate act in the RICO pattern, 18 U.S.C. § 1962(c)/(d)** — and the **"bring him back at unban requests"** back door is the obstruction made routine.

**And here is the part the "stalker" frame cannot survive — her own reaction, recorded.** She did not cower and she did not perform fear for content; she called it out and named the coward:

> `10:47:34` Lydia: *"Oh, I'm so grateful."*
> `10:47:44` *"Hold on, hold on. Can I just see this guys?"*
> `10:47:56` *"Spooge mayor. Spooge mayor."* — reading the sender's own handle back to the room.
> `10:48:22` *"Okay, bud... show your, show your face next time."*
> `10:48:40` *"Chat, as you can see... we have free speech here, but this free speech..."*
> `10:48:48` *"I don't want to get clipped out of context."*
> `10:50:49` *"I'm scared to ever say anything... my words are gonna be twisted... make it seem like something that I'm really not saying."*

A woman taking a paid death-threat in stride, demanding the anonymous sender *"show your face,"* and — in the same breath — frightened that **her** words will be clipped and twisted. That last line is the whole climate of coercive control in one sentence: the violence against her is monetized and waved through, while *she* is the one who must self-censor. *(All quotes verbatim from the synced June-13 capture:* `twitch_log_lydiaviolet_2026-06-13.csv` *for the chat/bits/ban events and* `stream_transcript_2026-06-13.txt` *for her speech; the ban event is in the moderation-action log;* `spuujmeyer` *'s absence from every other capture is established by cross-file search. The characterizations in the paid messages are the sender's own — recorded as evidence, never adopted as true.)*

And she was not, in any sense that matters, safe in that room. **Plaintiff's account, from watching the stream live, offered as such:** she looked distraught through much of the broadcast and steadier only after she had said her piece; she spoke of needing a building "with security," of a life rearranged around fear. The collaboration meant to run two weeks — the "Scuffathon" with her friend **Aliythia** — had already collapsed: the first day drew nearly **eight thousand** *(captured: 7,817, June 6)*; by the third it had cratered to **2,375** and the event was cut short, the friend gone, the number never recovering. *(The CCV figures are from preserved captures; the reason the friend left is the Plaintiff's account, labeled as testimony.)* By June 13 she was alone in front of the number — taking a paid death-threat on the same afternoon she finally admitted the fraud aloud — and the only person who had gone to a United States federal court to make any of it stop was the one they had taught her to call her stalker.

**Now hold the two things side by side, because this is the whole inversion in one afternoon.** What is the word they have spent eighteen months pinning on the Plaintiff? *Threat. Danger. The man you need protection from.* And what actually happened on June 13? A **paid** message proposing to **cut a woman's body apart with a scalpel** — the literal, mutilation-grade violence they accuse *him* of — ran through her chat, was monetized by the platform, drew a **delayed** ban with a **restore button** attached, and was floated for return ninety seconds later. The **threat they describe is the threat they host.** Every adjective the mod stratum has spent on the Plaintiff — obsessive, dangerous, fixated, violent — describes, with precision, the things that occur in that room *while they are moderating it.* The accusation is a mirror. And the man holding it up to her — `cx` , named by Lydia herself that very afternoon as the one who *"picks it out"* of the Discord and bans on it — was present in the chat the whole stream ( `09:05` `"now you need more guns,"` `09:07` `"creepy"` ). **The very moderator who manufactures the "stalker" file is the constant in the room where the real threats land.** That is not a coincidence to be argued; it is a pattern to be subpoenaed.

**And it is, at bottom, a platform failure — the failure this case exists to name.** Twitch and Amazon did not merely fail to stop this. They built the conditions for it: they **authorized** and **empowered** a moderator stratum so entrenched that — by the CEO's own admission (§ II) and by Lydia's own description — the people running a creator's channel can ban, brand, and bury at will, and the creator *"might not be complicit"* and *"didn't know."* They **monetized** the violence the moment it arrived, taking the bits before taking the action. And they did all of it on top of an **inflated viewer number the platform itself secretly caps** — fraud propping up revenue. Strip the

euphemisms and the equation is naked: **a company empowered the mods who commit the fraud, profited from the inflation and even from the threats, and let a real woman's safety be the cost of the arrangement.** Authorization, empowerment, monetization, and a capped lie — at the price of a living person's peace.

**And now measure the two scales of justice against each other, because the imbalance *is* the case.** On one side: a moderator, **CX**, who on this record inflates the fraud, runs the Discord-fed ban machine, **sits on a woman's account she cannot clear**, and — on June 13 — personally deleted-and-banned a paid mutilation threat he first let air. All of it has been **documented to the FBI since March 11, 2026**, in a cooperation of record. **And he remains a supermod. No ban. No removal. Nothing.** The platform that caps her viewers will not lift a finger to lift *him* off her. On the other side: the Plaintiff, whose entire "offense" was to **get close to her.** The instant he did, **CX activated his moderator authority and branded him a "known stalker"** — the **same Twitch playbook label deployed for SweetAnita** — a template chosen precisely because of where it routes: **it weaponizes the state's monopoly on lethal force.** Brand a man a stalker, and **the police become the instrument** — the ultimate executioners of lethal force. That is what he had to navigate: **a SWAT-grade response he had to evade just to hand her a cluster of red balloons and apologize**, at the very moment he was realizing **something far bigger was going on** *(§ VII; Plaintiff's account).* **One man sends-and-shields a paid mutilation threat and keeps his moderator badge; the other brought balloons and had a lethal-force response called down on him.** That inversion is not incidental. It is the perversion of justice this case exists to name.

**And it is pressed from a position of deliberate restraint, which is the measure of the man.** The relationship was real and documented — **not a cohabitation** (the two were ever physically in the same place **only once, at TwitchCon Paris, 2023**), but the **early, mutual stages of something they were genuinely building together** — and the long-sought **on-stream proposal has now been located: a 24-hour 2023 broadcast.** The Plaintiff **holds that footage in reserve**, to be invoked **only within proceedings and only in her protection**, never to expose or embarrass her. *(Evidentiary note: located 2026-06-13; preserved, not published; offered under seal if and when the Court requires it.)* And the posture that defines him is absolute: **he refuses, completely, to testify against Lydia Wilson** — including as to the incarceration she was coerced into setting in motion **on CX's orders** — and will testify against **the perpetrators only.** In the middle of all of it, the man they call the danger is the one still shielding her.

**And step back to see what is actually unfolding around this case.** On one side, a **platform scrambling to retain its creators** — handing them, in the CEO's own words, a *plausible out*: *"the streamer might not be complicit,"* the channel *"unknowingly"* botted. On the other, a **government and a legal system facing a cyber-era #MeToo** — a wave of women coerced, surveilled, branded, and silenced through the machinery of online fame — where the only thing standing between a documented warning and a tragedy is the **enforcement of laws already on the books.** This case does not ask for new statutes. It asks that the existing ones be applied **before the cost is counted in lives.**

**And we know where this road ends, because the world has already shown us.** When the danger to a young woman in the online-fame ecosystem is dismissed, mocked as "delusion," and left to the same insiders who profit from her — the ultimate consequence is not a banned account. It is a body. In 2025 the decomposing remains of **Celeste Rivas Hernandez, fifteen years old,** were recovered from a vehicle connected to a rising music-industry figure — a case that forced a public reckoning with how the machinery around young, exploited performers can hide the worst until it is far too late. *(Public-reporting matter; the specific facts must be cited to the published record before this paragraph is filed, and it is offered as illustration of stakes, not as any assertion about these Defendants.)* That is the stakes argument, and it is why "protective measures for Lydia Wilson" is not rhetoric. **A monetized scalpel threat with a back door, against a woman who has to live in a building "with security," is the warning written in advance.** The Court is being asked to act while the warning is still only a warning.

---

On **June 5, 2026** — months into a federal cooperation they all know about — on a *third* creator's channel (Berticuss, VOD **2789148031**), the apparatus did it again, live and in writing. A VIP swung an unrelated conversation onto Lydia and laid the template down — twice, to make it stick:

> `1:43:14 jj928 [vip · 007-gun-barrel]:` *"the current one for lydia is wild"*
> `1:43:43 jj928:` *"mods get them receipts LUL"*
> `1:44:37 jj928:` *"man wrote like 600+ page manifesto on his stalking with lydia, includes something about how her singing some random song makes them engaged or some shit"*
> `1:47:31 jj928:` *(repeats it verbatim — re-seeding the room)*

The "600-page manifesto on his stalking" **is the federal docket** — the filings and the IC3 / SEC / FTC / SFO reports. jj928 converts a cooperator's evidence into a lunatic's diary in front of fifteen hundred people. And note what he derides — *"her singing some random song makes them engaged."* **Hold that word, "engaged."** He is mocking a cry for help (§ IV) and, without knowing it, naming the exact thing that proves this was a relationship, not a fixation. We come back to "engaged."

Then a **moderator**, `Kanthric`, wearing a mod badge on a channel that is not even Lydia's, does not merely agree. He *identifies* the Plaintiff and supplies the criminal frame:

> `1:45:08 Kanthric [moderator]:` *"Honestly, he's the least problematic weirdo of her problematic weirdos."*
> `1:47:45 Kanthric:` *"one of the most problematic ones got deported from the UK and is now barred from entering the US too."*
> `1:49:40 Kanthric:` *"that's a whole other Lydia stalker who went through a period of ambushing her IRL."*
> `1:50:04 Kanthric:` *"two different stalkers. Those are by far the worst two."*

**And right here is the first lie you can catch them in.** Kanthric brands the Plaintiff *"deported from the UK and now barred from the US."* It is false. **The Plaintiff was not deported.** After 161 days held following the January 3, 2025 arrest, **he withdrew his claims and left of his own accord**, returning to Baja California **a free man, on his own terms — not removed, not barred**. And far from a man with nowhere to go, he is a **political activist with his own independent basis for protection.** He has publicly charged the **Bukele regime** with **negotiating with gangs, operating extrajudicial death squads (a practice traced to his time as mayor of San Salvador), covering up democide, and the authoritarian suspension of due process** — and he has **rescued victims of that regime and supported their asylum claims**, the very claims the **current U.S. administration now denies, abandoning the international protection obligations the greatest generation built.** *(Plaintiff's political advocacy and account, stated as such — and the basis on which he, too, can claim asylum.)* He *left*. The "deported and barred" line is not a stray error; it is the narrative manufacturing a criminal silhouette for a man who walked out on his own terms. They cannot even get the central fact right, because the central fact was never theirs — it was assigned to him.

Then the room is handed its conclusion, and a chorus of strangers converts the witness into a psychiatric case on command:

> `1:48:05 Kanthric:` *"@jj928 Yup. No mental health problems there at all. oop"*
> `1:48:47 Tov_Von_Fish:` *"Sounds like schizophrenia."*
> `1:48:54 princesspeachyyyx:` *"De Clérambault's syndrome"*
> `1:49:04 Bfa07 [vip]:` *"It's called delusion of reference"*
> `1:50:18 princesspeachyyyx:` *"Erotomania is the disorder of the person"*

*"Delusion of reference." "Erotomania."* Deployed not by a clinician but by a moderator and a crowd, for the plain purpose of ensuring that when this man tells the FBI about ad fraud, he is heard as a sick man and not a witness. And the host of the room narrated the method out loud:

> Britny Ellen (Berticuss): *"ban them early... if you think someone might be just a bit odd... they haven't done anything wrong... and then eventually they'll come forward with all the stuff. So now I normally listen to the mods."*
> Britny Ellen: *"that creepy guy for her... he got sent home, not allowed back into the States... I don't know, someone told me this."*

And jj928 named where the machine lives:

> `1:50:15 jj928:` *"it does feel like every other month we look in the mod discord and there's a new lydia stalker"*
>
> THE EXPOSURE, line by line. On **March 11, 2026** the Plaintiff became a **federal cooperator of record** — FBI IC3 case #1376a0208..., with parallel reports to the SEC, FTC, and UK SFO. From that

> date the law protects him as a witness. So read the above again as what it legally is. **Under 18 U.S.C. § 1512(b)(3)** — misleading conduct to hinder a cooperator's communication to federal law enforcement: that is the "delusion / manifesto / schizophrenia" chorus, purpose-built to make his FBI reports sound insane. **Under § 1512(d)(1)** — harassing to dissuade a witness: that is Kanthric ranking him among "the worst two stalkers." **Under § 1513(e)** — retaliation for truthful information to law enforcement: that is the whole performance, three months *after* he cooperated. **The "mod discord... a new lydia stalker every month"** is the association-in-fact that turns it from chatter into a *pattern* — subpoena-able, and the spine of the RICO count. **Kanthric and jj928 are named defendants.** Their words are preserved, timestamped, badged. **And where are they now? Still moderating. Still active. Never banned, never removed** — the same stratum still at it five days later (browsertab spamming Lydia's chat, June 10) and again on June 13 (CX in-channel, then deleting-and-banning the burner he first let air). They will answer for these words in a filing, under oath — not in a chat. *(Source:* `captures\berti_VOD_2789148031\vodchat_jj928_thread_1h42-1h50.txt` *. The characterizations are the speakers' own — recorded as evidence of the narrative, never adopted as true.)*

**This is not history. They were still doing it five days later.** On June 10, 2026 the same named-defendant moderator `browsertab` worked Lydia's own chat the entire broadcast — not watching, *spamming*:

> `08:14` **browsertab:** *"wake up cameraman DinkDonk it's time for lydia and aliy stream"*
> `08:14 → 09:55` **browsertab:** *"<3 #1 STRIMMER WW SCUFFATHON AliydiaBlonket"* — the identical line, pasted **dozens of times**, the single most active "voice" in a room reporting 2,300 viewers.

So they argue *stalker.* Now we go to the captures, and we show what that argument is standing on.

---

## § II · THE GRAPHS — what is actually on the screen behind their words

*They say "real audience, sick fan." Here is the number, live. It is the thing their whole story exists to hide.*

Everything resolves to one line on a graph. On the **last captured stream — June 10, 2026** — the channel's concurrent viewers ramped up and then **pinned flat at ~2,300** (mean 2,232, coefficient of variation **0.145** — ninety-five percent of the broadcast within ten points of its peak). A real audience breathes; it rises and falls with the moment. This one was a *set-point.* And the single most active "viewer" in the chat was a named-defendant moderator, `browsertab` — the same one from § I.




**The cap, live.** Reported CCV (red) snaps to ~2,300 and holds for the entire stream; unique chatters-per-minute (orange) and chat-messages-per-minute (bottom) stay low and lively-but-small throughout. The number on top is not the audience. It is a held figure.




**The tell.** Reported CCV (red) ramps to a peak of 8,275 on March 8 — then **falls ~30% the moment the FRCP 37(e) preservation demand lands (March 9–11)** — while unique chatters (green, the *real* audience) never move. The number that collapses under legal pressure is the number that was never real.




**Five years.** Organic ~250 viewers when CX embeds (July 2021); the held average climbing as the whistleblower is removed after the January 2025 arrest and the bots run to maximum; the genuine raid-peak of 48,865 (March 2025, *not* alleged as fraud); and the collapse to the floor once the preservation demand and the litigation arrive. The fraud was always the held average — never the peaks.

**And then the man who runs the company explained the entire mechanism himself.** On his own livestream (Twitch VOD 2777712376), Twitch CEO **Dan Clancy** described, verbatim, every piece of what these graphs show. Read them against the charts above:

> **Viewbotting is real, and the company hates it:** *"We do not like viewbots, okay?"* · *"We want viewbots gone."* · *"fighting viewbots is hard, especially real time."*
> **There are two counts — a public one and a hidden true one, built on Amazon's fraud detection:** *"we have a separate system that detects bots in terms of advertising from when we detect it for the CCV calculation that you see when you're watching the stream."* · *"Amazon has significant investment in what you call detecting invalid traffic or IVT. We build upon Amazon's detection techniques."* · *"we have a pretty good sense of what is the valid traffic."*
> **The cap — exactly the flat 2,300 line above:** *"for channels where we see consistent and persistent viewbotting, we will compute a CCV cap... the CCV view will be limited by that cap,"* set to *"valid traffic... historical patterns over time,"* and — *"we will not publicly announce what channels are capped or the level of the cap."*
> **The perpetrators are the mods/community — and the streamer may be innocent:** *"three different types of bots... self-promotion bots... community promotion bots, members of a streamer's community are doing it to promote the streamer... noise and attack bots."* · *"We also do not know if it's a streamer's community that might be involved in the viewbots, and the streamer might not be complicit."*
> **Their own filter over-removes real people:** *"we do not want to eliminate real viewers from creators that are not viewbotting because our viewbotting interventions over detect."*

**SOURCED — Dan Clancy, Twitch CEO, on his own broadcast, VOD 2777712376. Full transcript + audio: `TRUTH\CLANCY_VIEWBOT_v2777712376\clancy_transcript_FULL.txt`. Every quote verified.**

So the held 2,300 is not an inference. **It is Twitch's own cap, applied to this channel** — the platform classifying it as persistently viewbotted, in its own words, naming the size of the *real* audience, and refusing to disclose it. And the CEO drew the exact line this case draws: the perpetrators are the community and the mods (CX, browsertab — § I); **the streamer is the one who may never have known.** The head of the company described Lydia's situation, and the defense of her, before this case ever had to.

So here are the crimes — and under each, the proof. Not the statute. The evidence.

Wire fraud — 18 U.S.C. § 1343. *The flat line above, and the CEO's own mouth.* Reported viewers pinned at 2,300, CoV 0.145; the number **dropped 30% the day the preservation demand** landed; Twitch's CEO described the exact mechanism. A fabricated audience figure, transmitted into advertiser invoices and the corporate 10-K. That is the wire.

RICO — 18 U.S.C. § 1962(c)/(d). *The pattern — five years, three channels, one purpose.* CX embeds in 2021 and the held average climbs; the whistleblower is jailed in January 2025 and the bots run to maximum; `browsertab` is the #1 "chatter" at the capped number on June 10; `Kanthric` moderates the narrative on Berti's channel in June (§ I). The same hands, inflating and protecting the same fraud, for years.

California UCL · § 230 **platform-design forfeit.** A platform that computes a secret viewbot cap and *"will not publicly announce"* it, while billing advertisers on the inflated figure, is not a neutral publisher — it is a participant in the unfair practice, and its own design defect (cf. *Lemmon v. Snap*) forfeits the immunity.

And none of it was done in the dark. From the first report — **FBI IC3 case #1376a0208d0840f0a3821235f3c45119, filed at 1:11 AM PT on March 11, 2026** — the FBI (San Diego & LA), DOJ, SEC, FTC, CISA, and the UK SFO/NCA/Action Fraud have been **named** recipients on every communiqué since (March 16, 20, 23, 28; May 5, 10, 19; the public release to ~70 newsrooms). Every act the enterprise has taken since March 2026 has been committed *under standing federal notice.*

---

## § III · THE DEATH THREATS — what the same hands curated

*They call him the danger. Here is what the danger actually looked like, and who built it — the morning they cried "creep," and the night they made her read her own death threat aloud.*

It started before the lawsuit, before a single email. It started with a moderator manufacturing a word. On the morning of **February 26, 2026**, at **11:11 AM PT** — hours before anything happened — two named-defendant moderators seeded the frame:

> `11:11:00` **browsertab:** *"lydiavCreep"*
> `11:11:01` **cxbaob:** *"CREEP ALERT POLICE CREEP ALERT POLICE CREEP ALERT POLICE CREEP ALERT POLICE CREEP ALERT POLICE CREEP ALERT POLICE CREEP ALERT POLICE"*

There was no incident at 11:11. There was only the mods, priming the room.

Then, that afternoon, CX ran what the channel calls an **"unban segment"** — a 46-minute bit (stream time 2:31–3:17) in which previously-banned users' messages are read **aloud to the audience** and the room "votes" whether to restore them. CX did not merely participate; **he set it up and directed it**, feeding the host her cues:

> `12:50` **cxbaob:** *"mod comment? logs @lydiaviolet"*
> `12:53` **cxbaob:** *"start from the beginning @lydiaviolet"* · *"start from the beginning @lydiaviolet"* · *"start from the beginning @lydiaviolet"* · *"start from the beginning @lydiaviolet"*

— and running the vote command, `!12 30`, nine times across the segment, putting the choice on screen: `1` = **DENY,** `2` = **UNBAN.** It was eight rounds, each one his — and in the third, the user up for restoration was one whose own ban logs contained a death threat. Because CX had told her to *start from the beginning,* **Lydia read it out loud, in her own voice** — the synced transcript catches every second of it:

> `[2:46:46]` goonmax2026: *"LL death threat"*
> `[2:47:59]` goonmax2026: *"maybe ignore the death threat lol"* — jeffjeffington12345: *"GLOCK"*
> `[2:49:19]` **LYDIA:** *"I give you one more chance."*
> `[2:49:30]` **LYDIA:** *"Does it sound like you have to take it if you love your life?"*
> `[2:50:07]` **LYDIA:** *"Maybe we should unban him if we value a chance to live?"*

That is the victim, made to perform the threat against her own life as light entertainment, on a moderator's cue. On screen as she did it: the banned user's words and the vote.




**Round 3, on screen.** A banned user's message, read to the room: **"tik tok 1 sec of you cut throat, tik tok, tik tok."** Card: **"johnny_silverhandd — Banned by cxbaob."** Vote: **"1 DENY 2 UNBAN."** In the log beneath, cxbaob himself: *"you are reported same as your shitty mods that ban me for just asking a question."* Lydia at her microphone. VOD 2708315576




**The plea she read aloud. "...I give you one more chance — chance to live and unban me... you have to take it if you love your life..."** Card: **"kottid_taha — Banned by cxbaob."** Same **1 DENY / 2 UNBAN** vote. Lydia, looking down. VOD 2708315576

One person in the room said the obvious thing:

> `[13:04:03]` **Skitzo668:** *"Isn't that a threat that needs to be reported?"*

It was not reported. The room's answer was the vote — `midorisennin: "2 give em one more chance"` — `2` = **UNBAN.** Bring him back. And the regulars who watched it happen did not flag it either; one, present the entire stream on a fifty-broadcast watch-streak, supplied not a report but the same word the mods had seeded that morning — `GingerJax: "CREEPY GF VIBES POLICE @lydiaviolet."`

This is the heart of it. **The threats were seen — by the moderators who curated them, by the regulars who echoed past them — and not one of them reported a thing.** Instead they made her read her own death threat aloud, voted to restore the man who wrote it, and pointed the word *creep* at the one person who, two weeks later, would report all of it to the FBI. *(Full synced record, 623 of her lines interleaved with 4,271 chat messages:* `synced_unban_segment.txt` *.)*

---

## § IV · ROMEO, COME SAVE ME — the plea anyone would see

*They mock "her singing some random song." Look at the song. Then tell me, objectively, what anyone watching it would call it.*

Hold § III in your mind — Lydia at her desk, eyes down, made to read *"take it if you love your life"* aloud on a moderator's cue. Now look at the same woman, three days later, on March 1, 2026, on the stream she titled herself: " **MENTAL IN SHAMBLES IF I DON'T BEAT THIS HOG EPIC BREAKDOWN INCOMING** ."

The chat had been asking her to sing all morning. Then, at offset 0:24, the request: `Maewe: "we need more beautiful singing from songstress Lydia. Tylor Swift, love story."` And she stood up, faced the camera, and sang Taylor Swift's *"Love Story"* — karaoke lyrics on screen, the words uneditable because the platform did not write them.

She is a professional broadcaster — eye-line, gesture, timing-to-camera are her trade. On June 5, **Kanthric's room watched footage of this exact performance and narrated it, line by line, into a diagnosis.** Here is each thing they typed — attributed and timestamped from the Berticuss VOD ( `vodchat_jj928_thread_1h42-1h50.txt` ) — set directly against the frame it was describing, and destroyed by it. *(jj928's gender is unknown and left so; Kanthric is a named man; both are named defendants.)*

---

`1:44:37` **jj928 *[vip]*: *"her singing some random song makes them engaged."***




"'Cause we were both young when I first saw you..." — on her feet, arm raised, the opening line of "Love Story," the song her own chat just asked for ( `Maewe: "Tylor Swift, love story"` ).

This is an open, public performance her room *requested* — nothing furtive in it. And jj928's own word gives the whole game away by accident: ***engaged.*** You cannot be "engaged" with a stranger; the word is the language of a **relationship**, and there was one. They had spent **two days together at** TwitchCon; a year before this she clipped their banter to *her own channel* and called him **"Romeo"** on camera (the Paris section, below). jj928 is mocking the proof of the relationship and naming it in the same breath. Recasting a federal cooperator's evidence as a madwoman's "random song," to make his FBI reports sound insane, is § **1512(b)(3) witness tampering.**

---

`1:48:54` princesspeachyyyx: *"De Clérambault's syndrome."*




...and on "when I first saw you," she points directly at the lens, smiling.

She turns and points *directly at the camera* — a trained broadcaster's deliberate address, and on this line it is aimed at a viewer she has **known by name since 2023.** De Clérambault's syndrome is the fantasy that a *stranger* is secretly in love with you; this is its exact opposite — a documented two-year acquaintance, her gesture, her choice, in public. A finger pointed at someone you actually know is not a symptom of anything. A stranger in chat handing an identifiable cooperator a clinical diagnosis, in front of ~1,500 people, to discredit his reports, is **§ 1512.**

---

`1:49:04` **Bfa07** ***[vip]: "delusion of reference."***




"Romeo, save me..." — her hand to her chest, to the necklace at her throat.

Her hand goes to her heart as she begins *"Romeo, save me"* — and here is the fact that breaks the entire narrative in half: **the Plaintiff's handle, for years, is `OzRomeo`. Romeo.** She knows him by no other name. A "delusion of reference" is reading secret personal meaning into things that have none — but there is nothing here to decode. She sang his **actual name,** with her hand on her chest, at the most frightened moment of her life on camera. And that is the tell that ends the "stalker" story: a woman terrified of a man does not, at her lowest, stand and sing *for that man to save her*. That is not how fear behaves — it is how a person reaches for someone she **trusts.** She knows precisely one Romeo. Reframing her plea as *his* pathology is **§ 1512.**

---

`1:48:47` Tov_Von_Fish: ***"Sounds like schizophrenia."***




An open palm extended toward the lens.

An open hand to the camera — a reach, three days after real death threats ran through *this same chat* (§ III) on a moderator's cue. Now look at who they are calling sick. On his own sworn statement: *"I have never threatened you. I have never approached you in violation of any order. I have never spoken a word against you on any platform at any time."* **There was never a threat, never an abnormal interaction.** When he spoke into her world at all, it was to protect her — he posted the federal criminal statutes and **tagged the FBI and the platform's** CEO to mark the aggressors as tracked, and the mods banned him for it. And the proof he is a stalker's *exact opposite* is on the record: before London, at the **O2 Arena** — a Fortnite event packed with stars, the kind of place thousands mob a celebrity for one photo — she walked **past him,** and he took **no photo, said no hello, made no fan interaction at all.** A stalker acts in that crowd; he let her pass, because all he ever wanted was to reach her *as himself.* Branding that man — the witness who reported the threats — "mentally ill" before ~1,500 people, three months after he cooperated, is § 1513(e) retaliation.

---

`1:50:18` **princesspeachyyyx:** ***"Erotomania is the disorder of the person."***




"I keep waiting for you but you never come — Romeo, save me." Hands thrown wide.

Hands thrown wide on *"I keep waiting for you but you never come"* — and this line indicts the very people diagnosing it. She waited for someone who never came **because the people in this chat made sure he could not reach her.** That is the engine of the whole case, and the simplest fact in it: one moderator — CX — holds so much power over her channel and her life that **no one can remove or ban him. Not even Lydia, the owner of her own channel.** Everything downstream — the bots, the "creep," the threats, the visa, the "stalker" file — exists to keep that grip in place. His entire "crime" was trying to reach her *around* a mod even she cannot escape. They engineered the waiting, then diagnosed her for it. "Erotomania" — the most clinical-sounding slur in the set, from a non-clinician, to bury a cry for help — is **§ 1512.**

---

**And the line that answers all five at once:**




"Romeo, save me, I've been feeling so alone." Standing, hands to her chest, delivered to the lens. `All six: Plaintiff's captures, VOD 2711244975, ~28:00-29:00.`

*"Romeo, save me, I've been feeling so alone."* And the reason she knew, with certainty, that he would come is not a fantasy she projected onto a stranger — it is a thing he told her, truthfully, because he **never lied to her:** he has rescued refugees and backed their asylum claims, and stood up against **the Bukele regime** — a fight that still puts him at real political risk today. She was reaching for the one person she knew had already, in the real world, put himself between the vulnerable and the powerful — and won. They watched all six of these frames and called it *erotomania, schizophrenia, delusion.* Before any neutral viewer it is a plea for help — and naming it madness is exactly how they ensure no one answers it. *(The refugee/Bukele claims are the Plaintiff's own account, offered as testimony and as the basis for her trust.)* When the song ended she said `[00:28:56] "Wow, that really took it out of me,"` and named the cause: `[00:30:26] "it's because of the horrible haters making me feel self-conscious"` and *"Bobby sent this in, CX sent this in... I feel like this is like a CX video."* The "haters" have names. She said one of them.

---

## § V · THE LEVER — what the threats were really about, and how *they* are the ones harming her

Once § IV lands — once you accept there was a **relationship**, not a fixation — the question flips. It is no longer *"why is he obsessed."* It becomes *"why is she so afraid, and who decided that for her."* The answer is a visa.

> *[VOD May 2, 2026, 01:34:22]* — Lydia: "**He signed off on my visa vouching for me as a legitimate human being.** Okay."
> *(same broadcast)* — "He is the reason that **I am here right now.**"
> *[01:35:13]* — "He got an all-girlies house!"
> *(same broadcast)* — "**I'm saving up my harassment.**"

"He" is named Defendant **Christopher Esfandiari** (EsfandTV / "Paladin"). In her own words, the offender's ringleader-orbit holds **continuing control over her U.S. immigration status** — *"the reason I am here"* — and her posture toward him is *"saving up my harassment,"* deferral under dependency, not the freedom of an adverse witness. The *"all-girlies house"* is the visa-dependent-foreign-women pattern pleaded under the TVPRA (18 U.S.C. §§ 1589, 1591, 1595).

**This is what the threats were about.** Strip it to the human shape: she refused his advances. Even holding the bot-fraud clout and the visa over her, **she would not be possessed** — and the machinery that answers a woman's "no" is the machinery in § III: the threats run through her chat, the "creep" word aimed at the one man who was kind to her, the stalker file opened on him. The visa is the lever; her refusal is the trigger; the threats and the "stalker" narrative are the punishment and the cover. Under 18 U.S.C. § 1589 that is coercion by abuse of legal process and serious harm. The capped CCV (§ II) is the proof the standing was never real: **you cannot sponsor an immigration petition, or build a career, on viewership you faked.**

> **And here is the inversion that ought to stop the room cold.** *The Plaintiff is the one defending her from prosecution.* From the start his fortified-defense posture — filed to federal authorities and the UK SFO before the lawsuit was public — is that **no proceeding of any kind may be initiated against Lydia Wilson in any jurisdiction**, that he **will never testify against her, ever**, and that he will testify against **the perpetrators only.** He is shielding her. The mods, meanwhile — by propagating the "stalker" narrative *willfully, ignorantly, or out of incompetence* — keep the perversion of justice running, keep her coerced, and keep the one person trying to free her branded a criminal. **They are the ones harming her.** Whatever they think they are doing, the *effect* is to protect her captors and attack her defender. The point of this whole case is the thing they cannot imagine because their model of her is property: **he loves her more than enough to want her free — even of him, if that is what she chooses.** *"I respect what you decide. All else is immaterial."*

**And now look at who is actually doing the stalking — in the present tense.** Read the statutory definition: a *course of conduct* directed at a person that causes substantial emotional distress or fear. Then look at the two records side by side. The Plaintiff: documented the fraud, reported it to the FBI, kept silent about the relationship out of respect for her, and **is, as of this writing, working to get the bots off her account** — to *help* her. Kanthric, jj928, browsertab, and the orbit: months after he cooperated, *still going,* on channel after channel, **instigating, talking about him, propagating the "stalker" file, never stopping** — a sustained, coordinated course of conduct against an identifiable man. **That is the stalking.** They committed the thing they accuse him of, in public, with timestamps on it, while the man they brand a stalker is the one trying to free

their victim. He has, more than once, felt the pull to simply let her go and walk away — and the only reason he has not is that walking away is exactly how they win, how she stays captured, and how the fraud keeps running. Refusing to abandon a coerced person to her captors is not stalking. It is the opposite of it.

---

## § VI · WHAT IS ON HIS DRIVES — the proof he was never a collector

*Before we go back to where this started, kill the premise. The "years of obsession" has a birthday, and his own machines hold the receipt.*

The entire narrative rests on the picture of an obsessive who spent years amassing material on this woman. **His own machines end that picture.** There is **nothing** about Lydia on his drives before **late February 2026.** The earliest file in the whole investigation is dated February 18, 2026; the first analysis script — `discord_correlation_engine.py` — is stamped **February 26, the day of the death threats.** Against that: **more than 33 gigabytes,** roughly 70,950 files, of trading and **algorithm work, going back to June 2025.** A quant's life, and not one frame of this woman until the week violence erupted on her channel.

A man with 33 GB of trading code and nothing on Lydia until the day of the threats is not a stalker. He is a researcher who, when a friend was in danger, turned the one skill he already had — public-data forensics — toward documenting the crime. **Prior to the quant, there is nothing.** The "obsession" has a birthday, and it is the day the threats started.

**And look at what the conduct actually was, objectively.** No comments. No alt accounts. No messages, no DMs, no contact campaign — *nothing.* He viewed. He observed. Day after day after day there is quant data — markets, models, the ordinary record of a working analyst — and not one **thing about Lydia.** Then, in late February, she needed help, and only then does a single file about her appear. That is the exact opposite of the "made loads of new accounts" line the mods recite (§ I): an objective observer, generating no footprint in her world at all, who broke his silence only to cite the law and call the FBI when threats ran through her chat. The record of a stalker is a trail of contact. The Plaintiff's record is a trail of *trading spreadsheets* — and then a rescue.

---

## § VII · IT STARTED AT PARIS — reverse to the source: a normal viewer, an ordinary "more"

*Now walk it all the way back. Before the cap, before the threats, before the visa — TwitchCon Paris, July 2023. Where it was two-sided, in public, and on her own camera.*

The narrative needs you to start at "stalker." The record starts here, with conduct **she** initiated and **she** has chosen to keep. One week before TwitchCon Paris, on her own broadcast, Wilson ran a bit

with the Plaintiff — and clipped it to her own channel, where it remains to this day:




**SOURCED — clip on Wilson's own channel, never deleted.**
`twitch.tv/lydiaviolet/clip/MoistCrunchyTortoiseCoolStoryBro-Tc44-Jr7bIeR3Sft` , title **"Harrizzment," 10,871 views**, created **July 1, 2023**. Whisper-verified — **Wilson instigates**: *"Rizz off the lady... how would you rizz her up?"*; Plaintiff answers with outrageous content-comedy; Wilson receives it affirmatively and **calls him "Romeo."**

A week later they met in person — ordinary, mutual, on the Plaintiff's own camera:


twitch con
Paris 2023



**Plaintiff's own cell-phone video, 11:04 AM Paris, July 8 2023 — a private meet-&-greet file, never published** (SHA256 chain-of-custody on file). Two people at the convention backdrop, comfortable, smiling, talking. **This is what they will spend three years calling "ambushing her IRL."** `PARIS_2023_PLAINTIFF_VIDEOS\20230708_110439.mp4`

**This is the most normal thing in the world:** a viewer and a streamer who genuinely liked each other, in person, an ordinary friendship that might or might not become *more.* Whether it became more was for the two of them to decide — **not for a circle of moderators to decide for them.** That is the whole point. They had been **hanging out together** — and then he gave her a gift:



**The kindness they weaponized.** At the lit Eiffel that night, **Lydia reaches up and takes the cluster of red heart balloons the Plaintiff gives her, smiling.** *A woman does not reach out and accept balloons from a stranger she fears.* This exact moment — a gift, received, after two days spent together at the convention — is the thing Kanthric would later call **"a period of ambushing her IRL."** `Frame from the Eiffel night footage, July 8 2023.`

One small detail destroys the entire "stalker" theory by itself: **she took the balloons.** She received the gift, she stood and talked with him, she smiled. Then it became an "incident."

The ejection is preserved from a third party's point of view — the EsfandTV "**Classic Paladin**" clip (r/LivestreamFail post 14ve417, July 10 2023), whose top community comment records the mechanism in plain words: *"a guy got kicked out of twitchcon specifically for a reason involving her and then after this encounter she says to Esfand 'ya that's him.'"* That is Esfand and his **sycophants** — *his* moderators, *his* community — turning a normal meeting into an ejection. The same Esfand who would later hold her visa (§ V). **This is exactly how the architecture operates: with plausible deniability.** Esfand does not lift a finger himself; his sycophant-mods do the harassing, the flagging, the security-alerting, so the man at the top keeps clean hands. The ejection was not earned by conduct; it was **procured** — security alerted on a pretext, the first run of the playbook that later produced the restraining order.

And here is what the Plaintiff actually did, surrounded by the police they summoned: he **apologized.** His only action was to say sorry — for *their* ruining her moment, for *their* terrifying her, for *their* vilifying a man who had only been kind and supportive. He then tried to intervene for her — and *that* protective instinct is what Esfand's sycophants recast, in real time, as "harassment" and "stalking."

**The short version of what followed — not a full debrief, just the shape of it:** the two of them had spent **two days together at TwitchCon**, ordinary and mutual. Then CX *activated* the machine — the Plaintiff was **kicked out on CX's say-so**, and he **avoided the swat call only long enough to apologize to her** before leaving. From that point the orbit turned **antisocial and paranoid**, and **every attempt he made afterward to normalize — to simply act like a person — was relabeled an "IRL ambush."** That October they had him **kicked out of ECX London** too; the same posture, repeated, is the chain that runs straight into the **January 2025 arrest.** Strip it all down and the absurdity is the point: **two people who were completely cool and normal with each other — and a handful of moderators can simply say "stalker," and everyone goes along with it.** The same handful who are *botting her channel.* The accusation does the work; nobody checks; and the men making it are the fraud.

> **And here is what the Paris record exposes about the mods themselves. It is now three years later.** Wilson holds sole one-click authority to delete that July-1 clip. The mods have spent those years calling the Plaintiff a stalker. **She has never taken it down.** A woman who feared a stalker does not keep, on her own channel, a clip of him *she* made and *she* narrated affectionately. Set that beside how these same moderators treat the women they "protect" — they **ridicule, humiliate, harass, demean, and badger their streamers, and brag, on stream, that they can** (Berti, § I: *"ban them early... they haven't done anything wrong... I normally listen to the mods"*). That bragging *is* the architecture this case is suing. So when the room finally turns it over, the realization writes itself: *wait — we are cool; the stalkers in this story are the ones supporting the violence, the fraud, the bots, and the visa scheme.* The men who manufactured "creep" are the danger. The man they branded is the witness.

## § VIII · BEFORE PARIS — where it was only kind

*The bottom of the whole structure. Earliest in time, last in the telling — because it is the thing they most need no one to remember.*

Before the cap, before the visa, before Esfand's security, before a single mod typed "creep," there were two people talking. Plaintiff's account: weeks of conversation, real chemistry, a connection that — like countless streamer-and-viewer connections before it — was simply becoming something. There was even a proposal, on stream, partly for content and entirely real; she said yes. None of it was abnormal. None of it was unwanted. It was the most human thing in this entire record, and it is the thing the machine was built to bury under a clinical word.

*(Evidentiary note: the earliest call screenshots and the on-stream "awkward proposal" LSF clip predate Paris and were lost in a drive reformat — the hunt continues; they are distinct from the preserved July-1 "Harrizzment" clip in § VII. This section rests on the Plaintiff's account until they are relocated, and is offered as testimony, clearly labeled.)*

This is where the communiqué ends because it is where everything began — not with a stalker and a streamer, but with kindness. Everything the mods built on top of it — the bots, the cap, the visa, the threats, the "creep," the "delusion" — was scaffolding erected to make two people forget they were ever kind to each other, so that one of them could be controlled and the other could be erased.

## § IX · THE WOMEN, THE LEVER, AND THEIR ONLY DEFENDER

Lydia. Aliythia. Berticuss. MistieSage. PerriKaryal — gifted women, each dependent on a small circle of "trusted" moderators who decide who is banned, who is "odd," who they are steered toward and away from. The cruelty wears the face of protection. *"Lydia is just so sweet,"* one of these very hosts says on stream, *"she's not doing anything wrong"* — and she is right, and she cannot see that the same is true of the man they taught her to fear. **These women are victims of the very people they are taught to trust.** Her fear is real, and it is *engineered:* the enterprise holds the two switches that end a creator's life — the **ban** and the **cancel** — and lays the **visa** on top. **Britny Ellen (Berticuss) is a victim too**, not a villain — a candid witness who said the quiet part because she trusted the room, treated here as a non-party witness. And of everyone who could have acted — the platform, the moderators, the agencies — the only one who filed in a United States federal court to defend them is the man those moderators branded a stalker.

## § X · THE CROWN'S FAILURE, COINTELPRO, AND THE FORTIFIED DEFENSE

The Plaintiff did the lawful thing in both jurisdictions. His March 11 report went to the UK authorities — SFO, NCA, Action Fraud — and stated plainly that the creator was **coerced and afraid of the**

**very people around her.** No protective follow-up came. Instead the machinery of justice was turned the wrong way: the cooperator was cast as the threat, and a restraining-order / "stalker" **posture continues to this day** — the Crown's own justice perverted into a shield for the fraud and a weapon against the witness.

He answered in his own language. **COINTELPRO is the rap** — *PELON · "Letter 2 Prez,"* over Tupac & the Outlawz' "Letter To The President" — posted to X as protected speech and petition under the First Amendment. A man petitioning the government and telling the truth in song is exercising the First Amendment, not violating an order. Everything goes public. That is the discipline.

> **The post itself —** `@OzRomeo111` **, X, June 5, 2026 (verbatim), captioning the "Letter to the President" bars:**
> *"Fire free speech protected Cointelpro still can't guard me, much less understand the complexities of Machiavelian Mamba mindset, fuk all ur dirty triks, lying wits, overzealous while shitler your honor, idgaf we'll see write history, protest/grievance no justice sure af no peace."*

This is **core political speech** — a citizen's public grievance against state and platform actors, set to a protest record, naming COINTELPRO-style retaliation against a whistleblower. It is heated, artistic, and unmistakably **protest and petition**: the paradigm of First-Amendment-protected expression, **not a true threat** (*Watts v. United States*, 394 U.S. 705 (1969) — political hyperbole is protected; *Counterman v. Colorado* (2023) — the speaker's protest intent governs). It is offered here as exactly what it is: the Plaintiff exercising, in public and on the record, the very right the "stalker" restraining order is being misused to suppress. The grievance is lawful; the suppression of it is the wrong.

And the posture has never wavered: **protect Lydia — and any other coerced creator — from the perversion of justice forced by the fraud.** Not revenge. *Repair.* The defense is fortified now: a lean, nine-defendant, motion-to-dismiss-resistant Third Amended Complaint — RICO § 1962(c)/(d), cooperator retaliation § 1513(e), the California UCL, the § 230 platform-design forfeit. Every count carries a file. Every characterization is attributed. The metrics are public and reproducible; the CEO's own words are on the record; the FBI has been copied since March.

**The procedural record, current to today.** The case is live and moving on the docket — No. **3:26-cv-02324-JO-JAC** (S.D. Cal.): the original Complaint filed April 13, 2026; Amazon and **Twitch served April 20**; the **Second Amended Complaint** (FAC2) filed May 27 (Dkt 30/31) and **granted by Hon. Jinsook Ohta on June 10 (Dkt 38)**; Reed Smith appeared for Amazon/Twitch May 28; and the **Third Amended Complaint** filed June 17, 2026 — Count V **(TVPRA, 18 U.S.C. §§ 1589, 1595)** now LIVE, carried with a Wilson-protective TRO + Order to **Show Cause** on an order-shortening-time basis. This communiqué is the update *from Communiqué 14 to now*: every event documented in it — the **June 13** paid mutilation threat and the cap admission, the **June 14** retaliatory Discord erasures and bans — **post-dates the filed record and is being added to it.** The case did not stall under pressure. It sharpened.

**And the restraint ends where her safety begins.** The Plaintiff withdrew, left, and has waited — **acting only as she would have him act.** But look at what June 13 shows: she is there by

herself, taking paid death threats, while the apparatus that put her there keeps its badges. So the posture now hardens into motion. We **suit up. FAC2 names the top targets** — the moderator stratum and its enablers across the **criminal-justice, military-intelligence, and platform-technology complex** — and challenges them **directly and fearlessly, by name, on the record.** Their names are already in our legal process; that process, held in deliberate reserve, is the one **we now unfreeze and drive — focused, in rapid succession, against the priority targets who have no immunity** (CX / Bordin, browsertab, the mod stratum). That is what FAC2 is for. The waiting was never weakness. It was a safety on a loaded posture — and the safety is off.

> *This was never a streamer and a stalker. It is a documented crime, women too frightened and too controlled to name it, a state that looked away — and one son who withdrew his claims, came home to Baja of his own free will, heard a cry for help, believed the evidence, and took it to a federal court. He did not do it to keep her. He did it to free her. Every frame here is on their servers. Every word is in their logs. They do not get to call it delusion. They get to answer it.*

*Quinceañera. All grown, real now — and built to stand.*
*Closing scene, pending: the Third Amended Complaint, filed.*

OSCAR ERNESTO ROMERO
*Plaintiff, In Propria Persona*
4107 Villa Marena, Col. Puesta del Sol
Playas de Rosarito, B.C. 22710, México
+52 1 646 601 7866 (WhatsApp)
ozromeo338@gmail.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| OSCAR ERNESTO ROMERO,<br>Plaintiff,<br>v.<br>AMAZON.COM, INC.;<br>TWITCH INTERACTIVE, INC.;<br>DANIEL CLANCY;<br>MARCELLO BORDIN, a/k/a "CX," "cxbaob," "Sh1tX," "Bob," "Bobber"; "browsertab"; TIAM ESFANDIARI, a/k/a "Esfand," "EsfandTV";<br>OTK MEDIA, INC.;<br>THE MODERATOR DEFENDANTS — "Sunny" (sunnysangha), "Harlots," "Shaheety89" (shahheet), "ash0086," "Kanthric," "kleedham," "ninefox_gambit," "jj928," and "Transvine";<br>DOE FEDERAL INTERVIEW AGENT;<br>and DOES 1 through 20, inclusive,<br>Defendants. | **Case No. 3:26-cv-02324-JO-JAC**<br><br>**PLAINTIFF'S SECOND SUPPLEMENTAL PLEADING UNDER RULE 15(D)**<br><br>Judge: Hon. Jinsook Ohta<br>Magistrate Judge: Hon. Janet A. Cabral<br><br>*Filed in person, pro se* |

# PLAINTIFF'S SECOND SUPPLEMENTAL PLEADING UNDER RULE 15(D) — THE CONDUCT SINCE 11 SEPTEMBER 2026, THE PATTERN ACT BY ACT, THE TWO NUMBERS, AND THE LEGAL COVER OF COUNTS I AND II

## TABLE OF CONTENTS


| | Page |
|---|---|
| THE EMERGENCY: OUR WORDS, AND THEIRS | 3 |
| I. WHAT THIS SUPPLEMENT IS | 6 |
| II. THE CONDUCT, AS ONE CHAIN: THE POWER TO BAN | 7 |
| III. WHO WRITES THE INSTRUMENTS AND WHO DEFENDS THEM | 15 |
| IV. STANDING, RETALIATION, AND MS. WILSON'S RIGHTS | 22 |
| V. THE TWO NUMBERS | 25 |
| VI. THE VIEWER IS A USER AND A CREATOR, AND THE INJURY IS DIRECT | 28 |
| VI-A. THE CLASS | 29 |
| VI-B. THE CORRELATED PROCEEDINGS SINCE 21 SEPTEMBER, THE ARBITRATION QUESTION, AND THE SPEED | 36 |
| VI-C. THIS PLEADING IS PLAINTIFF'S REPORT, AND WHO RECEIVES IT | 39 |
| VII. THE CONDUCT, ACT BY ACT | 40 |
| VIII. EVERY CORRECTION, MADE ONCE AND HERE | 51 |
| IX. WHAT PLAINTIFF ASKS | 58 |

## THE EMERGENCY: OUR WORDS, AND THEIRS

**A. At the center of this case are Ms. Lydia Wilson and Plaintiff.** On 13 September 2026, at about 10:55 a.m. Pacific Time, she received him into her voice channel, before her audience. She greeted him: "Hello. Hello beautiful times two. Hello, my little snuggle muffin." He answered: "Hey gorgeous, how are you? Love you more than ever, you're amazing." She returned it: "Ah, thank you! You're more amazing. Um, your, um, presence … I'm sure you smell like … um … cut grass on a nice summer's day." He was removed in the middle of it. No term of service was invoked and no ground was stated. Nothing he said was abusive, threatening or unwelcome: she had answered his voice the moment she heard it, in the same tone as always, and returned every word in kind. She said, "Oh, wait, he left!", and then, "hold on, what, did he get kicked or did he leave? I scared him." The platform's own chat log records what the holders of moderator authority told her: at 10:56:20 `browsertab`, "he's gone"; at 10:56:21 `norseman__`, "He left"; at 10:56:27 `smellydia`, "@lydiaviolet he left." Another account told her twice, at 10:56:25 and 10:56:32, "cx got him IRL." As she was being told that he had left, she turned it on air: "Okay, don't give compliments if you can't take compliments. Okay, don't say beautiful to a girl the first time you've ever met her if you can't take being complimented." Since the first time they spoke, Plaintiff has addressed her only as "beautiful" or "gorgeous"; "hello beautiful" is her greeting back to him in his own word, and in three years of her calls no one else speaks to her that way. The word she turned on air is the word that has always been between them. Then she apologised for a removal she did not perform: "sorry, maybe I came on a little too heavy with that compliment." It was not the first time. She knew his voice. The greetings are the ones that passed between them on streams

and calls before Paris, where she had accepted his proposal on a public broadcast (Fourth Amended Complaint, paragraphs 34 and 36). She spoke freely while he was there, and played it off once she was told that he was gone (paragraph 58(o); the recording and the chat log, preserved the same day; Defendants' video 2873238633).

**B. That is the "escalation."** Defendants tell this Court that what was done to Plaintiff was a response to danger. They describe users and moderators who "involved event security or law enforcement after viewing his conduct as inappropriate or concerning" as the Third Amended Complaint's focus, and they add that his record gives "additional context for the concerns allegedly expressed by other users, moderators, and security personnel regarding Plaintiff's conduct and continued efforts to maintain proximity to Ms. Wilson" (Docket Entry 72, 10 August 2026, at 1 (ECF page 11)). Paragraph A is the proximity. It is two adults speaking with affection in her own channel, and it was cut apart before everyone watching. For that, the characterisation of Plaintiff has been carried to security details, to a report to police, to an arrest and one hundred sixty-one days in custody, and to an order now asserted in this Court as the reason he may not be heard (Fourth Amended Complaint, paragraphs 29, 34 and 40; paragraph 13 below). The emergency Defendants report is affection and kindness, and a viewer working out what was being done to protect the fraud. They activated it, and what it covers is the fraud.

**C. The danger, stated specifically, runs the other way.** Death threats against Ms. Wilson appeared on her broadcast in late February 2026. They began the forensic investigation on which this action rests (Fourth Amended Complaint, paragraphs 27 and 28). They did not stop. On 13 June 2026 at

11:47:16 a.m. Pacific Time, a paid message threatening to cut her body with a scalpel cleared Defendants' own payment product and was animated on her screen before anything was done (Docket Entry 77, Communiqué 15, with the frame, the account card, the moderation log and the transcript). In five months of litigation nothing has been produced against Plaintiff to set beside that record.

**D. What the characterisation protects is a number Defendants set.** Defendants' own reply states their defense: Twitch "capped channels, eliminated payments, and deployed enhanced viewbot detection" (Docket Entry 132, 15 September 2026, at 5). A figure its publisher caps channel by channel is a figure its publisher sets. On Ms. Wilson's channel the ceiling has moved, and held flat each time. It was about 2,300 (Fourth Amended Complaint, paragraph 17(d)). On 13 September 2026 it was placed in four steps to 3,061 within fifteen minutes of her broadcast starting, then held between 2,900 and 3,095 for the rest of the day while the chat beneath it changed (paragraph 58(n)). The same method at the price layer is now pleaded by the Federal Trade Commission and twenty-two States: Amazon's Senior Vice President in charge of Amazon Ads "explained internally that in Amazon's auctions 'the second price isn't set by an actual bidder, but rather by' Amazon, in the form of a 'proxy 2nd price that we calculate'" (*FTC v. Amazon.com, Inc.*, No. 2:26-cv-03097-JHC (W.D. Wash.), Docket Entry 1, paragraph 3, at 2 (ECF page 6), filed 31 August 2026). The advertiser pays a price per unit of audience. That action pleads that Amazon calculated the price. This one pleads that the audience figure is calculated too, on information and belief under Rule 11(b)(3) as to the channels beyond Ms. Wilson's, and that the characterisation of the one viewer who questioned it is how the figure is kept.

# I. WHAT THIS SUPPLEMENT IS

**1. This pleading supplements the Fourth Amended Complaint (Docket Entry 97) and the Consolidated Supplemental Pleading (Docket Entry 118) under Rule 15(d) with what has happened since it was written.** It is filed in support of the motion for leave at Docket Entry 85. What has happened is of two kinds, and Plaintiff pleads both: conduct on Defendants' service, which has not stopped; and conduct in the defense of this action and of the five related actions, which is on the public dockets of six proceedings in three courts.

**2. Every statement in it is tied to a source the Court can open.** A statement about Defendants' terms quotes the terms, from a capture preserved under cryptographic hash with the difference against the prior version. A statement about a broadcast cites the recording and the platform's own log, to the second. A statement about this litigation cites the docket entry, its date and its page. A statement made on information and belief says so, under Rule 11(b)(3), and names the record in Defendants' possession that will prove or disprove it.

**3. Why there is this much of it, and why it is brought at this speed.** The conduct is continuing, and a supplemental pleading exists to report conduct that continues. Plaintiff reports all of it, as it is documented, because the case requires it: each motion, paper and exhibit on this docket is tied to a dated act, and each is filed so that the Court has what it needs to decide in time. These Defendants are practised at delay, and the records that prove the conduct are on retention schedules measured in months. Plaintiff's standing posture is therefore speed: the expedited schedule sought under Title 28, United States Code, Section 1657(a) and Title 18, United States Code,

Section 3771(a)(7), on conduct that has not stopped. Volume tied to dated acts is the record of continuing conduct, and it is offered as that.

**4. The order of what follows.** Section II states the conduct as one chain, from the ban executed live to the order now relied on after notice. Section III states who writes and who defends the instruments through which it operates. Standing is not re-argued in this opening: it is stated in Section IV, on the injury to both persons, in answer by name to the Order of 22 June 2026 (Docket Entry 49), and it is already before the Court at Docket Entries 76 and 95. Section V states the two numbers. Section VI states why the injury is direct; Section VI-A pleads the class; Section VI-B states the correlated proceedings; Section VI-C states to whom this report goes. Section VII is the conduct, act by act, with the statute and the source for each. Section VIII makes every correction in one place. Section IX is what Plaintiff asks. Each fact is stated once, in the place where it does its work, and is cited by paragraph after that.

## II. THE CONDUCT, AS ONE CHAIN: THE POWER TO BAN

**5. The whole case in one paragraph.** The instrument is the power to ban. A ban on Defendants' service is not an account setting. It is a conclusion about a person, published to everyone who sees it, and it carries consequences beyond the service: the characterisation that comes with it travels into reports and into courts, this one included (paragraph 8). Because it carries those consequences, the power coerces, and the threat of it induces more than its execution ever does. It was executed live against Plaintiff, and it has kept him from Ms. Lydia Wilson. Over her the same power is held in reserve: she follows the Terms of Service that hold her career or loses that career, and two other things bind what she may do, the manipulation of the

audience figure on which her income is computed and her immigration status (paragraph 9). Title 18, United States Code, Section 1589 reaches labor obtained "by means of serious harm or threats of serious harm to that person or another person" and "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint" (Section 1589(a)(2) and (a)(4)). It went as far as threats against her life and body, delivered through Defendants' own payment product. The persons through whom it runs are the strata pleaded in the Fourth Amended Complaint, and they are still in place. The greatest harm is this: a paying viewer was vilified to cover up a fraud that starts with the count of viewers like him and is sold in Defendants' market. What the chain protects is stated next; the links follow it.

**6. What the chain protects.** The published audience figure is popularity, and on Defendants' service popularity is for sale: it ranks the directory, gates the tier, prices the sponsor, and is what the advertiser bids on. Defendants' own statements establish that the figure is selective. They detect, they cap, they eliminate payment, channel by channel, and they publish no level (Section V below). A figure its publisher adjusts channel by channel is the publisher's own statement, and through it, and through the authority to remove, Defendants decide who may take part in the market the figure ranks. What the moderation action was concerned with is on the record: that Plaintiff loves Ms. Wilson, that she received him, and that he asked about her. The figure does not stay on Defendants' service. It is what sponsors, agencies and every other platform read as a creator's worth. And when the question was brought to a court, the answer has been legal process used so that it is not reached (Section III below).

**7. The first link is a ban executed live.** The exchange of 13 September 2026 is set out in full at paragraph A, and to the second, with the platform's own chat log, at paragraph 58(o). Who executed the removal is not asserted. Every holder of that authority upheld it, and upholds it still: that uniform allegiance is what the structure demands and is designed to produce. A ban performed before an audience is not an account decision. It is a public act by the platform's own authority, it tells everyone watching what happens to a person who stands where Plaintiff stood, and it deters contact, inquiry and follow-up by anyone who sees it. It was the official intervention, and the deterrence is how it operates. It is pleaded as injury to business and property and as deterrence within Title 42, United States Code, Section 1985(2) (Fourth Amended Complaint, paragraphs 34, 44, 53 and 77; paragraph 58(o) below).

**8. The second link is the characterisation the ban carried, and the record Defendants give as its basis is the record of a citizen.** Plaintiff is a citizen of the United States, and has been since 30 May 1996 by operation of law. Defendants' Motion to Dismiss (Docket Entry 72, 10 August 2026, at 1 (ECF page 11)) tells this Court that his removal from the United States, a reentry charge and a foreign detention are "additional context for the concerns" about his "proximity to Ms. Wilson." Defendants chose to put that record before the Court as their justification. It is the record of what was done to a citizen on a false premise, which is why Plaintiff states it himself and does not leave it to them. The conviction belongs to the courts that entered it and he is before them. What is pleaded here is the use: Defendants took that record and deployed it in this action, after it was filed, to justify what they did to him. The re-deployment is the act, and it is continuing (Section VII below).

**9. The third link is the coercion: three factors decide what Ms. Lydia Wilson has to abide by.** The Terms of Service, the manipulated audience figure, and her visa. The platform acts; the persons to whom it has conferred moderator authority follow the ban; and she follows the Terms of Service or loses the career built under them. Her audience on Defendants' service is on the order of three thousand concurrent viewers; on any other service she would begin again from a small fraction of it, and the Terms give her one remedy for any dissatisfaction with any policy or practice, which is to leave. Her continued presence in this country depends on the same career. Title 18, United States Code, Section 1589 reaches labor obtained by serious harm, which Section 1589(c)(2) defines to include financial and reputational harm, and by abuse of legal process, Section 1589(a)(3). On 13 September 2026 the same authority operated in her own channel, over her stated choice, and she was told by name that he had left (paragraph A). She has stayed and she has kept every channel open. Plaintiff asserts her rights alongside his own.

**10. The fourth link is what the same act does to Plaintiff.** The exclusion was propagated across channels and services and has not been lifted or explained. It bars him from operating anywhere the same audience is assembled, which in this field is the whole of it. He is a user and a creator: the viewer is the unit the published figure is made of, he is a purchaser from these Defendants, and he competes for audience in a directory ranked by that figure. The ban is therefore not a limit on a chat window. It is exclusion from the market in which creators are made and audiences are acquired, and it is not the only market, but it is the one this audience gathers in. It is imposed unilaterally. No ground is stated, no review is offered, and the one avenue of redress, a formal request to lift it, was never answered (Fourth Amended Complaint, paragraph 29). It is carried by the holders of

moderator authority across every channel in which the same audience gathers, so that one exclusion operates as a cancellation by all of them. The Terms give a person so treated one remedy, which is to leave (paragraph 9). And the courts are closed next: Amazon.com, Inc.'s arbitration agreement and class-action waiver of 14 August 2026 excepts only litigation already pending (paragraph 19). A power that removes a person from the market, states no reason, allows no review and is followed by the closing of the courts is a weapon held over every creator on the service, and it cannot be left to stand. The injury is to both persons, by one course of conduct, and it is stated at Section IV.

**11. The fifth link is that it went to threats, and the proof runs one way.** The threats are stated at paragraph C. Defendants insist on a characterisation of Plaintiff for which no record has been produced in five months of litigation. One side of this case is asserted. The other is recorded, and the records that would identify who holds authority on her channel are the records Defendants have moved to be excused from preserving (Docket Entry 106, Request One; Docket Entry 112; Docket Entry 100).

**12. The sixth link is why this Court.** In the structure Defendants built, Plaintiff is the person with the least: no audience to carry, no tier, no contract to invoke, no counsel. Every private remedy is closed to such a person by the Terms themselves. A United States District Court is the forum in which the instrument used against him, the way it was procured, and its continued use can be examined on a record, and he came to it under his own name, on a public docket, on notice to counsel.

**13. The seventh link is the order: how it was procured, and its use in this Court after notice, which is the continuity.** The facts of the procurement are pleaded in the Fourth Amended Complaint: the security detail and the threat of police at TwitchCon Paris on 8 July 2023 (paragraph 34); the report of 2 January 2025, when the moderator ash0086 wrote "I'm contacting the police" and Defendant Bordin wrote "we'll get that creep arrested first" (paragraph 29); and the order that followed, obtained through the persons who made that report (paragraph 40(d)). The stratum that holds Ms. Wilson to the characterisation is the stratum pleaded as running her count: Defendant Bordin embedded as the channel's controlling moderator in 2021 (paragraph 17(a)), wrote those words on the day of the report, and after that arrest the reported audience was driven to its maximum and decoupled from real participation (paragraph 17(b)). The foreign order is therefore pleaded as procured through the witness-tampering predicate, Title 18, United States Code, Section 1512(b) (Fourth Amended Complaint, paragraphs 29, 41 and 51(b)), and as the abuse of legal process defined at Section 1589(c)(1) (paragraphs 34, 51(e) and 66). No Defendant has moved against that allegation. Plaintiff does not act on his own view of the order. He brings its procurement to this Court and asks the Court to decide it on the record; the discovery and preservation that decide it are asked at paragraph 69. What Defendants have done with the order since is the use. Arguing against the abuse-of-process count, since withdrawn (Docket Entry 82), Defendants told this Court that they "had no involvement in the U.K. police report" (Docket Entry 72 at 21). They cannot disclaim the report and rely on what it produced, and they have relied on it: counsel has asserted the order to this Court six times, the last two after the motion for sanctions under Title 28, United States Code, Section 1927 (Docket Entry 129, 11 September 2026, with its notice at Docket Entry 120) asked the Court to require an

election between the witness-tampering allegation and the order. Those two are Docket Entry 132, footnote 4, pages 8 to 9 (15 September 2026), and the reply in support of the stay (Docket Entry 133, 16 September 2026, page 5). Defendants' counsel has been on notice of these allegations since 31 July 2026 (Fourth Amended Complaint, paragraph 40), and of the procurement pleaded under Section 1512(b) since the complaint was served. Protection for petitioning a court covers its good-faith use. It does not cover intentional misrepresentation to a court, *Kottle v. Northwest Kidney Centers*, 146 F.3d 1056 (9th Cir. 1998), and privilege does not reach what is done in furtherance of a crime or a fraud (paragraph 21). There is a point at which a party knows what an instrument is and may not go on using it. Once Defendants were told, on the docket, how the order was obtained, and were asked to elect, each further assertion of it as the ground on which Plaintiff may not be heard is pleaded as the continuation of the Section 1512(b) act into this forum, past that line, under Counts I and II, on information and belief under Rule 11(b)(3) (paragraph 60; correction (v)). Responsibility does not wait for a ruling; it attaches on knowledge. Section 1595(a) reaches "whoever knowingly benefits … from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." The knowledge runs to the top: Defendants' Chief Executive said of the practice on his own broadcast, "it is a form of fraud" (Fourth Amended Complaint, paragraph 18(a); paragraph 28), and whoever keeps the story keeps the figure. Defendants' own defense supports what is pleaded: their reply offers as its defense that Twitch capped channels and eliminated payments (Docket Entry 132 at 5; paragraph 31), and it rests on the order. Defending this action is Defendants' right. Relying on the order after that notice is not. The order was procured through the moderators Defendants empower, it upholds the ban they carry out, and it restrains no

one but a concerned viewer bringing the fraud to adjudication. Each such use is pleaded as a further act of the pattern (paragraph 60).

**14. The escalation is the moderators', and Defendants adopt it as their own while disclaiming it.** Every step of the "escalating conduct" was taken by the persons to whom Defendants confer moderator authority: the security detail and the threat of police at Paris, the report to police of 2 January 2025 (paragraph 13), and the bans that followed, which ran across channels and services (Fourth Amended Complaint, paragraph 7). Defendants now take three positions on that authority at once:

(a) **They claim it.** The suspension of his "Ozkarizz" account, six days after his referral to the Federal Bureau of Investigation, is "Twitch's enforcement of its moderation and safety systems" (Docket Entry 72 at 5; Fourth Amended Complaint, paragraph 16-A). No moderator took that act. Only Twitch can suspend a Twitch account (paragraph 58(f)), so the term that disclaims the acts of the accounts a creator authorises (paragraph 17) does not reach it. The account had no posted content and no activity, so no violation could be named, and none was: the notice recites "the severe nature of this violation" and identifies no act. Twitch suspended it as linked to his account "OzRomeo" (paragraph 58(f)): the link is the person, not any conduct, six days after his report to the Federal Bureau of Investigation. It is retaliation (paragraph 26). That is the black box Defendants operate. It is applied selectively; it states no ground against which good faith can be tested; it answers to no oversight; and it offers no redress (paragraph 10). It is the tool that covers the fraud: the person who questions the figure is removed, and no reason is left on the record to be examined. The ban excludes; redress is answered with police and prosecution (paragraph 13).

(b) **They disclaim what it produced.** Defendants told this Court that they had no involvement in the report to police (Docket Entry 72 at 21; paragraph 13). The statement stands as theirs whatever count it was made against.

(c) **They wrote the disclaimer into the contract on the day this action was filed.** The version of the Terms last modified on 13 April 2026, the day this action was filed, disclaims Twitch's liability for the acts of the accounts a creator authorises; the version of 8 December 2025 had no such term (paragraph 17). The same Terms, since 8 December 2025, concede that nothing in them restricts Twitch's liability for its own fraud, and in California the law that requires that concession is Civil Code Section 1668, so the exception applies in full (paragraph 16).

The structure is therefore stated by the defense itself. The moderators escalate. The platform adopts the escalation as its own safety enforcement. The contract disclaims the moderators' acts, but it cannot disclaim fraud. And the order the escalation produced is put before this Court as the reason Plaintiff may not be heard. When Defendants call the ban "escalating conduct," they are adjudicating on their own behalf the question this action asks the Court to decide. Who writes the instruments that do this, and who defends them, is the next Section.

## III. WHO WRITES THE INSTRUMENTS AND WHO DEFENDS THEM

**15. A corporation of Defendants' size does not act without advice.** On information and belief, so identified under Rule 11(b)(3), no amendment to the Terms of Service, no arbitration agreement, no class-action waiver and no response or non-response to a preservation demand issues from

Amazon.com, Inc. or Twitch Interactive, Inc. without the work of lawyers. The records that identify them are the privilege log that the production sought at Docket Entry 106 will require.

**16. The drafters know where the line is, because they wrote it down.** Defendants' Terms of Service state, in the version of 8 December 2025 and unchanged in the version of 12 August 2026: "To the extent required by applicable law, nothing in these Terms shall restrict our liability … for damages caused by Twitch's fraud, willful misconduct, or gross negligence." The sentence follows the clause that caps Twitch's liability at the greater of what the user paid in the preceding twelve months or one hundred dollars, and it is the exception to that cap: liability for Twitch's own fraud is not limited. In California the law that requires the exception is Civil Code Section 1668, so it applies in full. It is Section 1668 in Defendants' own words: a contract may not exempt a party from responsibility for its own fraud or wilful injury. The persons who wrote that sentence knew that the limitation of liability does not reach fraud. Their knowledge is Defendants' knowledge, and it is pleaded as scienter, up to the Chief Executive, who said of the practice on his own broadcast that it is a form of fraud (paragraph 28). The identity of the drafters is pleaded on information and belief under Rule 11(b)(3); the privilege log sought at Docket Entry 106 will show it (paragraph 15).

**17. The same instrument requires the moderation, disclaims the moderators, and took that form on the day this action was filed.** Defendants' Community Guidelines require a creator to moderate: "you are responsible for all content in your streams, including policy violations by third parties," and "we expect streamers to take the necessary steps to

mitigate harassing content that appears on their stream or in their chat," with suspension withheld only from broadcasters "acting in good-faith (including by using tools such as AutoMod, timeouts, and channel bans)" (Community Guidelines, captured 21 June 2026, pages 4 and 9). The tools named are the powers a moderator holds. The Terms then allocate the consequences. In the version last modified on 13 April 2026, the day this action was filed, and absent from the version of 8 December 2025, a creator who authorises another account represents that "you are solely responsible for all of their activities occurring under your account" and that "Twitch does not and will not have liability for the Authorized User's acts or omissions." Defendants require the moderation, build its tools, confer its authority and alone can revoke it. They disclaim the moderators' acts, and they leave those acts in place: the removal of 13 September 2026 was performed with that authority, over Ms. Wilson's stated choice, and it stands (paragraph A). The exception for fraud governs this term as it governs every other, because it applies to "nothing in these Terms" (paragraph 16). What the term changes is not Twitch's liability for its own fraud but who is told to answer for the moderators' acts: the creator, while this action pleads that those acts are the means of the conduct (Section VII below). The timing is part of the record. Defendants had Plaintiff's preservation demand and written notice of 9 March 2026 and his written notice of 11 March 2026 (Fourth Amended Complaint, paragraphs 7(e) and 17(c)). On 17 March 2026 Twitch itself suspended his "Ozkarizz" account (paragraph 16-A). The term that separates Twitch from the moderators appears in the version of the Terms last modified on 13 April 2026, the day this action was filed. Why it was written then is within Defendants' records, and Plaintiff pleads it on information and belief under Rule 11(b)(3). With notice of what the moderators had done and of what this action would plead, Defendants wrote a term placing the

moderators' acts on the creator. The platform had suspended him. The moderators removed him, characterised him and upheld the exclusion, and continue to. The platform that suspends, the moderators who remove and uphold, and the instrument that separates them on paper are one course of conduct. It is pleaded as the conduct of the affairs of the ViewBot Enterprise at Count I and as the agreement at Count II (Fourth Amended Complaint, paragraph 47), to keep the figure on her channel from being examined. The same instrument was amended once more, two days after Defendants moved to dismiss, and that amendment concerns the records.

**18. What the records are, why their custody matters, and what the amendment of 12 August 2026 did to them.** On information and belief, so identified under Rule 11(b)(3), the records at issue are more than a ledger. The live broadcasts, the chat that reacts to them second by second, the viewer sessions counted against them, and the detection that labels each session as genuine or manufactured together form an open-ended, real-time record of human reaction, labelled and quantified. It is a training corpus for inference about how people respond, and a window into how audiences behave across social media. Plaintiff alleges that it is among the most valuable assets Defendants hold. Since the version of 13 April 2026 Defendants' Terms have provided that a broadcaster is "directing Twitch to also cache and/or store your User Content and every individual piece of it (such as each video clip, audio segment, image, or text)". On 12 August 2026, two days after moving to dismiss, the Terms were amended again: the words that limited the purpose of that storage, "with an aim to providing or improving the Twitch Services," were struck, and the rights Twitch takes in that content, exercisable in the prior version "in connection with monetizing the Twitch Services," became exercisable "in connection with Twitch and/or

its affiliates' business." That sits beside a license already in those Terms that is "irrevocable," "royalty-free" and granted "in perpetuity if permitted under applicable law." Eight days later the complaint in *Pandiscia v. Twitch Interactive, Inc.*, No. 3:26-cv-08721 (N.D. Cal.), pleaded that "The default configuration allows Amazon to collect live broadcasts, recorded videos, clips, chat logs, channel imagery, and text" for generative artificial-intelligence training, and quoted Defendants' Chief Product Officer: "If it was opt-in, nobody would opt in." The persons recorded, viewers and creators alike, were not told what the labels made from their sessions are worth or how they are used. That is why custody of the record is the relief sought at Docket Entries 54 and 128.

**19. On 14 August 2026 at 12:18 p.m. Pacific Time, four days after moving to dismiss, Amazon.com, Inc. adopted an arbitration agreement and class-action waiver,** with notice by electronic mail stating that it "does not apply to litigation pending before August 14, 2026." The instrument excepts the one action already pleading the scheme and closes the courts to the class. It is the act on which the motion under Title 9, United States Code, Section 402(b) rests (Docket Entry 91, unopposed since 14 August 2026; Section VII below).

**20. The defense is one defense in six proceedings, and it moves on notice from this action.** On 8 September 2026 at 6:24 a.m. Pacific Time Plaintiff gave written notice to counsel in all three Northern District of California actions and to Defendants' counsel here that he was moving to intervene. On 10 September 2026 four attorneys, each listed by the State Bar of California at one firm, entered twelve appearances across the three actions in one day, in the same order in each (Pandiscia Docket Entries 10 to 13; Gordley 10 to

13; Gamlen 13 to 16). The interventions were docketed on 14 and 16 September 2026. On 16 September 2026 one filer entered a stipulation on all three dockets within minutes (Pandiscia 16; Gamlen 17; Gordley 15). On 17 September 2026 a consent or declination as to the magistrate judge was filed in all three (Pandiscia 19; Gamlen 20; Gordley 17), and on 18 September 2026 two of the three were reassigned. Appearances, stipulations and declinations are petitioning and are not pleaded as predicate or overt acts. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006). They are pleaded as what they are on their face: evidence that one set of persons acts for these Defendants in every forum, with knowledge of every forum, in coordination (Section VII below).

**21. Notice changes what counsel may do.** Rule 11(b) reaches not only the signing of a paper but "later advocating" it. Title 28, United States Code, Section 1927 reaches an attorney who multiplies proceedings unreasonably and vexatiously. And the attorney-client privilege does not extend to communications made in furtherance of a crime or a fraud. *Clark v. United States*, 289 U.S. 1 (1933); *United States v. Zolin*, 491 U.S. 554 (1989). Plaintiff has given that notice in this Court, on the docket, and gives it again here. On 25 September 2026 the notice went to counsel in all six proceedings: twenty-nine lawyers at eight firms, and the Federal Trade Commission (paragraph 49). What is done with the instruments and the records after it is pleaded as the continuation of the pattern, and continuity is the element. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989).

**22. The defense of this action is conducted the same way, and it is on this docket.** Defendants' reply on their motion to dismiss (Docket Entry 132, 15

September 2026) and their reply on their motion to stay (Docket Entry 133, 16 September 2026) argue the Third Amended Complaint. Neither names the Fourth Amended Complaint at Docket Entry 97 or the motion for leave at Docket Entry 85. The reply on the stay rests on a count of docket entries, and the seventeen entries it lists are one mailing, docketed by the Clerk on one day, 11 September 2026, for a litigant without electronic filing access. The Clerk entered nineteen papers from that mailing (Docket Entries 112 to 130); the two the reply leaves off its list, Docket Entries 113 and 114, are Plaintiff's response and opposition to the motion to stay. Defendants operate a service that detects, ranks, bills and removes in seconds. In this Court they ask for time. These papers are petitioning and are not pleaded as predicate acts, *Sosa*, above. They are pleaded as what they show: that the delay of adjudication is part of how the conduct is kept in place, which is why Plaintiff's posture is speed (paragraph 3). The same practice runs in the Northern District. There, more time was sought and filed without service on the pro se movant and before his answer to the request had arrived (paragraph 49; ledger row (s-2)). It belongs to the pattern of delay set out in the motion under Title 28, United States Code, Section 1927 (Docket Entry 129).

**23. A federal court has already written the sentence on this Defendant's use of time.** In *Federal Trade Commission v. Amazon.com, Inc.*, No. 2:23-cv-00932-JHC (W.D. Wash.), Docket Entry 404 (10 July 2025), the court, applying the clear and convincing standard, found that "Amazon's withholding of almost 70,000 documents until the eve of, and after, the April 25, 2025 discovery cutoff … was tantamount to bad faith," that "it appears that the desire to gain a tactical advantage led to such conduct," and closed: "Amazon and its counsel are admonished that their conduct during discovery

was tantamount to bad faith. Similar conduct may lead to more serious sanctions." That order was entered in another action and does not name the firm that appears here. Plaintiff pleads it for one fact: holding a record back until time has run is this Defendant's known practice. What was advised about records under a preservation demand since 9 March 2026 is a question the privilege log will put (Docket Entry 106), and the rule at paragraph 21 answers it.

**24. Every stage of the enterprise is now defended by counsel, and every stage is pleaded below.** The count: the published figure is placed and held (Sections V and VII below). The label set: a detection system that separates genuine from manufactured activity produces a labelled set, and Defendants' own widened definition of stored content puts its use in issue (paragraph 18; Section V below). The inference: a figure computed from identified sessions is an inference drawn from personal information (California Civil Code Section 1798.140). The market: the figure is what advertisers are billed against and what a creator's tier and pay are set by (Section V below). No new count is pleaded and no person is added. The Fourth Amended Complaint already pleads the conduct of the enterprise's affairs at Count I, Title 18, United States Code, Section 1962(c), and the conspiracy at Count II, Section 1962(d). What is pleaded in this Section is the legal cover of those two counts: the instruments that carry the scheme, the handling of the records that would prove it, and its defense after notice, each pleaded as the continuation and the concealment of the pattern already before the Court. Who is injured by it, and on what showing each of them stands, is the next Section.

## IV. STANDING, RETALIATION, AND MS. WILSON'S RIGHTS

**25. Both persons are injured by one course of conduct, and Plaintiff sues on his own injury.** The Fourth Amended Complaint (Docket Entry 97) pleads one course of conduct with two victims (paragraphs 1, 2, 63 and 74) under Title 18, United States Code, Section 1589(a)(2), which reaches serious harm "to that person or another person." Section 1595(a) gives the civil action to "an individual who is a victim of a violation of this chapter." Congress wrote the other person into the offense, and the remedy follows the victim; whether a plaintiff is within the class Congress authorised to sue is decided under *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). Injuring a person because of his relationship to another is action against him: in *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011), the fiancé of the person targeted sued in his own name. Plaintiff pleads no claim under the statute construed in *Thompson*; he relies on it for the proposition it settles. His claim under Count III is pleaded on his own injury, for damages, and not in the alternative. It does not depend on Ms. Wilson appearing, electing or doing anything. The motion at Docket Entry 76 and its supplement at Docket Entry 95 assert the same position.

**26. Retaliation is sufficient for Plaintiff's own claim.** The acts aimed at him are pleaded by date in Section VII: the suspension of his "Ozkarizz" account on 17 March 2026, six days after his federal referral, the report and the arrest of 2 January 2025, pleaded as witness tampering (Fourth Amended Complaint, paragraph 29-A), the turning-away of 7 May 2026 after his cooperation of 11 March 2026, and the removal of 13 September 2026 after every paper then on this docket was filed. Each ban among them is exclusion from the market, without ground, review or redress (paragraph 10). Each is an injury to him, in his own person and property, by an act directed at him.

**27. Ms. Wilson's rights are asserted alongside his, and each of the four showings the Court named on 22 June 2026 (Docket Entry 49) is now made on the record.** (a) *The close relationship*, *Sessions v. Morales-Santana*, 582 U.S. 47 (2017). Plaintiff proposed to her publicly, on a livestream, and she accepted. She has kept every channel between them open. On 13 September 2026, on her own broadcast, she received him into her voice channel, greeted him twice, returned his compliment, and asked on air what had happened to him once he was gone (paragraph A). (b) *The genuine obstacle*, *Singleton v. Wulff*, 428 U.S. 106 (1976). She asked the true question, "did he get kicked or did he leave?", and holders of moderator authority in her own channel told her by name that he left. She then apologised for a removal she did not perform. The hindrance is recorded, not alleged. The record of how her channel's figure is adjusted is one she cannot obtain from Defendants (Docket Entry 106, Request Two). (c) *The effective proponent*, *Singleton*. Plaintiff built the record, measured the conduct of 13 September as it happened, and preserved it the same day. (d) *Redressability*, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998). The conduct against her and the conduct against him is one mechanism, exercised by one authority, on 13 September in the same minute. Relief that reaches that mechanism remedies his injury as it remedies hers: the disclosure, the accounting, the officer, the freeze, and securing her from the authority that operated over her choice. The Order decided standing for the injunctive relief then sought, on an ex parte record, against the Second Amended Complaint, since superseded by the Third Amended Complaint and followed by the Fourth Amended Complaint now before the Court on the motions for leave. And Defendants themselves have certified her interest, three times: their notices under Civil Local Rule 40.2 (Docket Entries 73 and 74, 10 August 2026, and Docket Entry 99, 28 August 2026)

each list "Lydia Wilson – Interested Party" among those who may have a financial interest in the outcome. The mechanism that injures both of them is operated to keep a number, and the number is next.

## V. THE TWO NUMBERS

**28. Defendants compute two numbers from the same traffic, and they have said so.** The Chief Executive, on his own broadcast, pleaded at paragraph 18 of the Fourth Amended Complaint and, as its paragraph 19 pleads, adopted by Defendants in their motion at Docket Entry 72, said of the practice, "it is a form of fraud," and "you are defrauding your viewers," and described the payment eliminated from channels found committing it (Fourth Amended Complaint, paragraphs 8 and 18(a) to 18(c); Twitch video 2777712376): "after the fact where we identify channels that are committing ad fraud, we eliminate any payment to those channels and we do not charge advertisers"; "we will compute what will be a CCV cap for that channel"; "we will not publicly announce what channels are capped or the level of the cap."

**29. The Chief Product Officer stated the separation in terms.** Mike Minton, to the publication Dexerto, in an article dated 28 August 2025: "The technology that we use to detect invalid traffic for ads is separate from what we use to calculate active concurrent viewer count. Advertisers are not charged for invalid impressions – including viewbots – and creators do not get paid out for these impressions." Plaintiff preserved the article under cryptographic hash on 19 September 2026.

**30. The unfiltered number is the one everything else is priced on.** Defendants' own eligibility page requires "an average 3 concurrent viewers

(watching at the same time)" before a creator may earn at all. Defendant Twitch Interactive, Inc. pleaded in *Twitch Interactive, Inc. v. Johnston*, No. 5:16-cv-03404 (N.D. Cal.), complaint paragraphs 28 and 29, that "higher viewership numbers may lead to a higher position in the directory of channels" and that "Higher viewership numbers can be used by broadcasters to obtain third-party sponsors for their channel."

**31. So the cap is not a defense. It is knowledge, and Defendants now plead it themselves.** To cap a channel Defendants must detect the manufactured traffic, measure it, and decide what figure to publish. Their reply of 15 September 2026 offers exactly that as their defense: that Twitch "capped channels, eliminated payments, and deployed enhanced viewbot detection" (Docket Entry 132, page 5). A party that detects, caps and eliminates payment channel by channel is not a party unable to stop third parties. It is a party that selects what is counted. They filter that traffic out of the number a buyer with an auditor pays on, and leave it in the number that ranks the directory, gates the tier and prices the sponsor. A cap that removes and discloses is enforcement. A cap that retains, conceals and sells is the conduct pleaded. To the extent any earlier paper of Plaintiff's says he does not complain of the cap, it is corrected to that sentence.

**32. Ms. Wilson's channel is the instance, in her own words.** On her broadcast of 13 June 2026, from about 12:31 p.m. Pacific Time, she said: "I've been talking to Twitch for the past few days. … They told me that someone is pushing my video numbers up, so I have set a cap on my viewers … for the time being … just a limit on how high they can go. … I'm just gonna keep the limit on until the activity is natural" (recording preserved by Plaintiff, which began at 11:38 a.m.; these words from 52 minutes 59

seconds to 53 minutes 43 seconds). Set that beside the Chief Executive's words at paragraph 28: "we will compute what will be a CCV cap for that channel," and "we will not publicly announce what channels are capped or the level of the cap." Defendants ran their detection on her channel. That is an investigation of her channel, and they hold its results. She was given a conclusion and a control. She was not given who was identified, how many sessions, since when, whether any payment to her was eliminated on account of it, who computes the level, or the measure by which activity is judged "natural." She said it forty-four minutes after the message threatening her body cleared Defendants' payment product on the same broadcast (paragraph C). The detection outputs for her channel, and the identity of the account behind that message, are in Defendants' records and nowhere else (Docket Entry 54, relief item 2; Docket Entry 106, Requests One and Two).

**33. The cap shows in the count over time, and it moves.** Measured the same way throughout, the published figure on her channel has run to a ceiling and held flat beneath it. The ceiling pleaded in the Fourth Amended Complaint was about 2,300 (paragraph 17(d)). The published peak passed 2,405 in six of nine sessions before 24 July 2026 (Plaintiff's measurement record, preserved under hash). On 13 September 2026 it stood at 3,095 and held between 2,900 and 3,095 until the broadcast ended (paragraph D; paragraph 58(n); nineteen capture files of that day, each recording a maximum of 3,087 to 3,095). A ceiling that moves and then holds is a setting, not an audience.

**34. The first record that decides this case is the difference between the two numbers.** For each channel and each hour: the ad impressions after invalid-traffic filtering, against the concurrent-viewer figure displayed. It

lies within the detection-code outputs named in the motion at Docket Entry 54 (9 July 2026, relief item 2) and within Request Two at Docket Entry 106 (27 August 2026: the concurrent-viewer history with the organic figure and every channel-level adjustment or cap). Both are unopposed. The method that computes the count from those records is already published by Plaintiff under the Apache 2.0 licence, free to Defendants and to every other operator (Docket Entry 112). The figure is made of viewers, and Plaintiff is one of them; that is where the directness of his injury begins.

## VI. THE VIEWER IS A USER AND A CREATOR, AND THE INJURY IS DIRECT

**35. The viewer is the unit the figure is made of, and Plaintiff is that viewer.** His sessions are what is counted and sold. He is a purchaser from these Defendants: a Tier 3 subscription, the highest they offer, to the channel lydiaviolet, and admission to their own event. He streamed on her channel, and that access was secured with his own funds, the subscription and the flights. And he is a creator: appearing alongside an established creator is the ordinary way an audience is acquired on Defendants' service (Fourth Amended Complaint, paragraph 44).

**36. Plaintiff meets the directness requirement by name.** *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), and *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010), require that the injury flow directly from the racketeering act. Plaintiff's injury does not flow from the inflation of the figure at one remove. It flows from the acts aimed at him, pleaded in Section VII as tampering, retaliation and the means of forced labor, committed to protect the figure. The figure is the motive. The acts against him are the

injury. He asked about Ms. Wilson and went to see her. Defendants reacted, and he did not know why. He followed up, and he was vilified for asking. The ban is the harm. Only after the threats against her in 2026 did he find the reason: the audience figure, all along. A removal performed live, which carries legal consequences for the person removed, has to rest on a real offense by that person. This one rests on his inquiry into theirs.

**37. As a creator he stands where the losing bidders stood in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008).** There the false statements were made to a third party, and the persons who lost out in the rigged allocation were held directly injured, without any reliance of their own. Audience on Defendants' service is allocated by a directory ranked on the published figure. A person excluded from that market, while the figure that ranks it is placed by the party that excluded him, is injured by the allocation itself (Fourth Amended Complaint, paragraphs 44 and 53(b)). He is not the only person so placed, and the class follows.

## VI-A. THE CLASS

**38. Plaintiff pleads the class here so that the motions to certify it are decided on allegations that are on file.** The class allegations referred to at Docket Entries 121 and 127 were never entered on the docket (correction (p), Section VIII). The motions are the Notice of Pendency and Motion to Certify the Class and Appoint Class Counsel (Docket Entry 124, 11 September 2026) and the Unified Motion (Docket Entry 128, 11 September 2026). Two classes are stated, because there are two. Plaintiff represents the first. He declines the second, which belongs to counsel who can build its certification.

**39. The class Plaintiff represents: Class 311.** Plaintiff, and the creators and other persons with whom he has had recorded interaction on Defendants' service or on social media: a view, a follow, a subscription, a message, a payment, a collaboration, or inclusion on a list he kept. The interaction is the membership fact. The class is on the order of three hundred and eleven creators, the foundational pool that its designation has always counted, and it extends as far as his recorded social media contact extends. It resolves to a certified list (Docket Entry 128). Excluded are Defendants, their officers and directors, the holders of moderator authority whose conduct is pleaded in this action, and any judicial officer presiding over it.

**40. The greater class, which Plaintiff does not represent and declines.** All persons who used the Twitch service, by broadcasting, viewing, chatting or purchasing, whose activity, telemetry, communications or audience measurements were taken in and processed by Defendants' systems without disclosure of what was computed from them, in the subclasses pleaded at Docket Entry 118, paragraph 24 (A Measured, B Counted, C Trained-upon, D Undisclosed-function, E Contracted, F Purchasers, with the federal and twenty-two State purchaser subclasses). That class is too large for one person to carry, and Plaintiff does not purport to carry it (Docket Entry 128, paragraph 22). Its members are the members of the classes proposed in *Pandiscia v. Twitch Interactive, Inc.*, No. 3:26-cv-08721-WHO, *Gamlen v. Amazon.com, Inc.*, No. 3:26-cv-08758-WHO, and *Gordley v. Amazon.com, Inc.*, No. 3:26-cv-09036-WHO (N.D. Cal.), who fall within Subclass C, and the purchasers for whom the United States and twenty-two States sue in *Federal Trade Commission v. Amazon.com, Inc.*, No. 2:26-cv-03097-JHC (W.D. Wash.), who fall within Subclass F. As those actions now plead them: *Pandiscia* proposes a Nationwide Class of "All content creators who used

the Twitch platform at twitch.tv and whose content was used to train Amazon's AI products without consent" (Complaint, paragraph 108). *Gamlen* proposes a class of "All natural persons who resided in California during the Class Period who maintained or appeared as the primary or featured streamer on a Twitch channel and were readily identifiable by name, voice, photograph, likeness, or other indicia of identity in that channel content, and whose Twitch channel content Amazon used for Amazon generative-AI training" (Complaint, paragraph 79). *Gordley* proposes a class of Twitch creators whose content and likenesses were used for Amazon's artificial-intelligence training; its complaint is not available to Plaintiff from a free source, and its definition is not quoted. The action of the Federal Trade Commission and the twenty-two States is not a class action: the sovereigns sue for the advertisers, about 1.2 million of them (No. 2:26-cv-03097-JHC, Docket Entry 1). Each of those classes is defined by the use of creators' content, and the sovereigns' action by the price of advertising. None is defined by the measurement of the audience, which is the question on which Class 311 and Subclasses A, B and D rest. Plaintiff has measured that audience on Defendants' service as a viewer, a purchaser and a creator, and knows the records in which the three classes and the advertisers meet: the count, the sessions it is computed from, and the labels made from them. That is why he asks that the actions be coordinated around one record (Docket Entry 128). The greater class's record is held by the enforcement authorities as custodians, as Docket Entry 128 asks. Plaintiff pleads its definition so that the Court and counsel have it in one place, and so that no release entered in any forum is read to reach Class 311, whose claims rest on a different factual predicate.

**41. Co-counsel, and why both motions are before the Court.** Counsel in the related actions have the class-action expertise that builds the certification of the greater class, and Plaintiff asks that they be appointed for it under Rule 23(g) (Docket Entry 128, paragraph 5). Each is welcome in this action in its own lane (Docket Entry 126). Plaintiff asks that Class 311 be certified here, with him as its representative. He sought counsel for it: on 4 September 2026 he offered counsel in all three Northern District actions the role, with an introduction under a stipulated agreement, and none of them answered. He has carried the class himself since, and built its record. Only in the alternative, if the Court holds that a party who represents himself may not represent the class, he asks that class counsel be appointed for Class 311 under Rule 23(g), with him remaining its representative. He asks that the accounting go forward for everyone by the method he has tendered: the Market Integrity System, published under the Apache 2.0 licence, free to every party. That method audits a published audience figure and values what was taken in from each creator, from the same per-creator, per-session record, and the receiver sought at Docket Entry 128 carries it forward for the greater class. Certification of Class 311 and the forward accounting are the two halves of one structure. That is why Docket Entries 124 and 128 are both before the Court, and why neither is withdrawn.

**42. What Class 311 holds in common.** The members of Class 311 are the channels and persons among whom Plaintiff took part: the same service, the same published figure, and the same stratum of conferred moderator authority operating over each channel's community. The common questions are answered by one body of records in Defendants' custody: whether the figures published for those channels were adjusted, capped or suppressed without disclosure; whether moderator authority conferred by Defendants

was used to remove, ban, restrict or characterize persons who questioned the control exercised over a channel or the figure published for it; and whether any of it was disclosed to the creator whose channel it was. Those questions resolve "in one stroke," and each is "central to the validity of each one of the claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

**43. Plaintiff's own injury is the class's injury at its sharpest.** Plaintiff questioned the coercion and the control exercised over Ms. Wilson's channel. He was banned for it, and the characterization of him that followed has been carried to the point of police being called on him (Fourth Amended Complaint, paragraphs 29, 31, 34 and 40). Defendants attribute that characterization to "other users, moderators, and security personnel" (Docket Entry 72, 10 August 2026). The fraud in the figure was found only after the first threats against Ms. Wilson, the death threats of late February 2026, and the threats continued to 13 June 2026 (paragraph C). The characterization stands because he followed up. He is not the danger, and the authority pointed at him belongs pointed at the danger: the paid threat of 13 June 2026 to cut Ms. Wilson with a scalpel, which cleared Defendants' own payment product (Fourth Amended Complaint, paragraph 16; correction (s)); the accounts that inflate the count and are left to do it; and the fraud the related actions sue on. The retaliation for questioning the control of a channel is the conduct Class 311 has in common, and Plaintiff stands where its members stand.

**44. Why a class is the only way this conduct is examined: Defendants advertise the deterrent.** In *Varga v. Twitch Interactive, Inc.*, No. CGC-18-564337 (Cal. Super. Ct., San Francisco), a streamer banned by Twitch won a jury verdict of $20,720.34, and costs of $396,733 were then taxed against

him; about $170,000 of those costs was reversed on appeal (Cal. Ct. App. No. A166747, 17 July 2024). Defendants' counsel publishes the result as a credential: "Following a three-week jury trial, Varga was awarded ONLY $20,720" (Docket Entry 114). That is an advertisement of defense and of deterrence, and it is addressed to every creator who might sue alone. A class action is superior because Defendants have made individual litigation over this conduct a loss even when it is won.

**45. Rule 23(a), as to Class 311.** *(1) Numerosity:* on the order of three hundred and eleven creators and the further persons within his recorded social media contact, spread across channels, platforms and countries; joinder is impracticable. *(2) Commonality:* paragraph 42. *(3) Typicality:* Plaintiff's claims arise from the same systems, the same figure and the same moderator authority, and from the same retaliation for questioning them (paragraph 43). *(4) Adequacy:* Plaintiff is a member of the class. He has prosecuted this action continuously since 13 April 2026, identified and measured the conduct, and preserved the record under cryptographic hash. He seeks no fee and no money from any member, and he seeks for the class the full measure of what was taken.

**46. Rule 23(b) and (c), as to Class 311.** *(b)(2):* Defendants have acted on grounds that apply generally to the class, so that final injunctive and declaratory relief is appropriate for the class as a whole: disclosure to each creator of any adjustment applied to the channel's figure and of the uses made of its audience data; the accounting of that data by an auditable and independently verifiable method; and the suspension of the moderator authority whose conduct is pleaded (Docket Entry 112, relief 5). *(b)(3):* full monetary relief, asserted in full and hedged in no part: compensatory and

restitutionary damages, disgorgement of revenue earned on the undisclosed figure, and punitive and treble damages where the statutes provide them. The common questions predominate because one record held by one party answers them. The damages model is consistent with the theory of liability, *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), because it runs on the same per-creator, per-session record whose non-disclosure is the wrong, and individual damages calculations do not defeat predominance, *Leyva v. Medline Industries, Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013). The (b)(2) and (b)(3) classes are sought together; neither is sought instead of the other. *(c)(4):* should any individual question be found to predominate, certification as to the particular issues in paragraph 42. No member's claim is released by anything sought here (Rule 23(e)), and every member certified under Rule 23(b)(3) keeps the absolute right to opt out (Rule 23(c)(2)(B)(v)).

**47. The arbitration question, the class period, and the record.** Amazon.com, Inc.'s arbitration agreement and class-action waiver of 14 August 2026 "does not apply to litigation pending before August 14, 2026" (paragraph 19); this action was filed on 13 April 2026. Any member Defendants say is bound by it forms a separate division, so that the question is decided as to that member alone; it is a question for this Court (Docket Entry 91, unopposed). The class period runs from the first recorded interaction to judgment. Membership is read from Plaintiff's own records of contact and from Defendants' records: the cap ledger sought at Category 1 of Docket Entry 54 (9 July 2026, the noticed six-part preservation and production motion), the moderation and ban records, and the session and payment records. Facts within Defendants' exclusive custody are pleaded on information and belief under Rule 11(b)(3). The class is one of the lanes in

which the related proceedings meet this action, and those proceedings are next.

## VI-B. THE CORRELATED PROCEEDINGS SINCE 21 SEPTEMBER, THE ARBITRATION QUESTION, AND THE SPEED

**48. Best efforts, and leave.** Plaintiff proceeds in propria persona against two corporations defended by counsel in six proceedings in three courts. Every paper in this action is his best effort at the proper form, and where a paper's form or length needs the Court's leave he asks for it (Docket Entry 127, 11 September 2026, the application for leave under Civil Local Rule 7.1(h); and paragraph 65). The casework is fluid. The related proceedings move every week, each move bears on this action, and Plaintiff answers each one at the speed it moves (paragraph 3).

**49. The Northern District, after correction (g).** On 23 September 2026 counsel at Ashurst Perkins Coie wrote to Plaintiff that the firm represents Amazon.com, Inc. and Twitch Interactive, Inc. in the three related actions before Judge Orrick. The email calls Plaintiff's motion (Pandiscia Docket Entry 14) an "Emergency Motion to Transfer." It asks his consent to extend Defendants' response from 28 September to 8 October 2026, and offers a matching extension of his reply. The firm did not wait for his answer. At 3:00 p.m. on 25 September 2026 it filed its own Motion for Extension of Time to File Response/Reply as to Plaintiff's motion, with a declaration of counsel and a proposed order (Pandiscia Docket Entry 25; Gamlen Docket Entry 26; Gordley Docket Entry 20). None of it was served on Plaintiff. He is not a registered filer, he has no access to those papers beyond the public docket labels, and he learned of the motion from the label alone. His written consent reached the firm at 6:26 p.m. the same day, three and a half hours

after the motion was filed, by a stipulation for that firm to file, with his Joint Re-Notice and the Fourth Amended Complaint attached as its exhibits; he served that email on counsel in all six proceedings (paragraph 21). The firm did not file the stipulation. Plaintiff does not oppose the time; he states how it was obtained. To the extent the declaration filed with the motion states his position, it was written before he had given it. The Joint Re-Notice, served that day, notices the motion for hearing before Judge Orrick on 21 October 2026 at 2:00 p.m. It asks that intervention be decided first, for limited purposes: to be heard before any class is certified, any settlement approved or any release entered that would reach the claims pleaded in this action, and to be heard on coordination with it. The request to transfer those actions under Title 28, United States Code, Section 1404(a) and the first-to-file rule is held in abeyance, not abandoned. Plaintiff will call it up if any party moves to compel arbitration of claims that overlap those pleaded here, presents a class settlement or release that would reach them, or moves to transfer or stay this action. He seeks nothing under Section 1407.

**50. The arbitration question, as put to each court.** In this Court, whether any agreement to arbitrate is valid and enforceable is a question Title 9, United States Code, Section 402(b) commits to the court, and it is before this Court at Docket Entry 91, unopposed. Amazon.com, Inc.'s own instrument of 14 August 2026 does not reach this action (paragraph 19). The conduct directed at Plaintiff for how he speaks to her (an older man's affection characterised as predation, carried by holders of moderator authority across channels, to security and to police) is the conduct on which his election under Title 9, United States Code, Section 402(a) rests (Docket Entry 91). In the Northern District, the Joint Re-Notice tells that court the same thing from the other side: should any claim there be compelled to arbitration, this

action, which no arbitration agreement reaches, remains open to it in its own lane. No Defendant has moved to compel arbitration in this action or in any of the three Northern District actions. Their only statement on Plaintiff's motion there is the email of 23 September, which names it a motion to transfer and asks for time.

**51. The Western District of Washington.** In *Federal Trade Commission v. Amazon.com, Inc.*, No. 2:26-cv-03097-JHC, Plaintiff's only paper is a motion for leave to file a brief as amicus curiae in support of the plaintiffs, under Local Civil Rule 7(o), noted for 9 October 2026 and submitted for filing with this pleading (correction (j)). It asks for no transfer, no stay and no change to any date. It tells that court the plan stated here: the enforcement authorities as custodians of the record the receiver sought at Docket Entry 128 would hold. It was served by electronic mail on 25 September 2026 on counsel for the Federal Trade Commission and on counsel for Amazon.com, Inc. Service on the twenty-two Plaintiff States follows, through their counsel of record, including the California Attorney General's office and the Washington Attorney General's office as local counsel, and each Plaintiff's position will be stated to that court under Local Civil Rule 7(o)(2).

**52. Why this action moves at this speed.** In the next weeks: Defendants' response in the Northern District falls due on 28 September 2026, or on 8 October 2026 if that court grants the motion they filed to extend it (paragraph 49); Defendants' motion to dismiss is set for decision here on the papers on 8 October 2026; the amicus motion is noted in Seattle for 9 October 2026; the Northern District hearing is set for 21 October 2026; and TwitchCon runs from 13 to 15 November 2026 at the San Diego Convention Center, in person. Each development in a related proceeding bears on what

this Court decides, and this Court is where the gravest harm is pleaded. Plaintiff asks that no extension granted in another forum be read as a reason for delay here (paragraph 70). What this Court receives, the authorities on the same market receive with it.

## VI-C. THIS PLEADING IS PLAINTIFF'S REPORT, AND WHO RECEIVES IT

**53. One report, made in this Court.** This pleading is Plaintiff's report of the conduct it describes. He makes it here, on a public docket, under penalty of perjury, rather than in a separate paper to each authority. It carries forward the reports already made: Federal Bureau of Investigation Internet Crime Complaint Center No. 1376a0208d0840f0a3821235f3c45119, filed 11 March 2026; Securities and Exchange Commission TCR No. 17745-570-518-188; Federal Trade Commission Report No. 199599129; and United Kingdom Serious Fraud Office Reference 22088 (Fourth Amended Complaint, paragraph 5). The conduct reported runs from the published figure, through the moderator authority that removes the persons who question it, to the order relied on after notice by those who defend it (paragraphs 13, 17 and 60).

**54. The authorities already before a court on the same market receive it.** The Federal Trade Commission and twenty-two States, among them the People of the State of California through the Attorney General's consumer-protection section, sue Amazon.com, Inc. over the price of the advertising sold against audience (*Federal Trade Commission v. Amazon.com, Inc.*, No. 2:26-cv-03097-JHC (W.D. Wash.); paragraph D). This pleading reports the other half of that transaction: the audience figure itself. Plaintiff serves it on their counsel of record in that action, with his papers there (paragraph 51),

so that the authorities with power over the market have the count before them as well as the price. He is a victim of the conduct and a witness to it, and the record he has built is available to them.

**55. The creators receive notice, as members of Class 311 and as witnesses.** The creators with whom Plaintiff has recorded interaction are members of Class 311 (paragraph 39), and many of them saw the conduct pleaded here as it happened. Each receives notice of this action through the creator's management or legal representatives. The notice states only that this action and the related actions are pending and public, that the creator may be a member of a proposed class, that nothing is required of the creator, and that it comes from a plaintiff in propria persona and is not legal advice. It makes no demand. The list resolves to the certified list sought at Docket Entry 128.

**56. The report continues as the case does.** Plaintiff measures and preserves as the conduct occurs, and each finding is brought to this Court and to the authorities named in paragraph 54 in the same form, on this docket. No finding is withheld for a separate channel. The disclosure is continuing because the conduct is. The conduct, act by act, with the statute and the source for each, follows.

## VII. THE CONDUCT, ACT BY ACT

**57. What counts as a predicate, stated first so that the pattern rests only on what the statute lists.** "Racketeering activity" is defined by list in Title 18, United States Code, Section 1961(1). The acts pleaded below as predicates are confined to sections on that list: wire fraud (Section 1343); obstruction of justice (Section 1503); tampering with a witness, victim or

informant (Section 1512); retaliating against a witness, victim or informant (Section 1513); and forced labor (Section 1589, within "sections 1581–1592"). Other conduct in the table, including threats, false reports and statements made in court papers, is pleaded as fact showing purpose, relationship, knowledge and continuity, and is marked "not a predicate".

**58. The acts, in order of date. Each entry states the act, the layer of the enterprise that performed it, how it is pleaded, and its source. Where an act is told in full elsewhere in this pleading, the entry cites that paragraph and adds only what the ledger needs.**

**(a) February 2023 to the present.** Non-human viewers injected into Ms. Lydia Wilson's channel; the inflated figure transmitted by wire to every viewer, sponsor and advertiser, each transmission a separate act. *Layer:* Operators; the platform transmits. *Pleaded as:* Section 1343. *Source:* Fourth Amended Complaint paragraphs 16-B, 17 and 35 — RECORDED (the five-year series).

**(b) 2 January 2025.** Plaintiff arrested abroad on a report pleaded as manufactured; one hundred and sixty-one days in custody; the foreign order follows (paragraph 13). *Layer:* Operators and moderators. *Pleaded as:* Section 1512(b). *Source:* Fourth Amended Complaint paragraph 29 — RECORDED (the Discord log, hashed).

**(c) 21 August 2025 and 28 August 2025.** The platform deploys detection that cuts reported viewership platform-wide, and its Chief Product Officer states that the invalid-traffic technology for ads is separate from the technology that calculates the concurrent-viewer count, and that advertisers

are not charged for invalid impressions (paragraph 29). *Layer:* Platform. *Pleaded as:* Knowledge; not a predicate. *Source:* Paragraph 29; the Dexerto article, preserved and hashed 19 September 2026 — ADMITTED.

**(d) (his broadcast, pleaded at paragraph 18 of the Fourth Amended Complaint).** The Chief Executive's statements set out at paragraph 28: the practice is a form of fraud, a cap is computed for the channel, and the channels capped and the level of the cap are not announced. *Layer:* Platform. *Pleaded as:* Knowledge; and the cap as a continuing Section 1343 scheme: the figure is published after it is decided. *Source:* Fourth Amended Complaint paragraph 18, adopted by Defendants in Docket Entry 72 — ADMITTED.

**(e) 9 March 2026 to the present.** Two preservation demands naming the moderation, ban, timeout and conferral logs and the channel-level adjustment records; no answer; the records on retention measured in months. *Layer:* Platform and parent; legal cover. *Pleaded as:* Section 1512(c)(1); Section 1503. *Source:* INFORMATION AND BELIEF — proved or disproved by the retention status sought at Docket Entry 106, relief 3, and the privilege log.

**(f) 17 March 2026.** Twitch indefinitely suspended Plaintiff's "Ozkarizz" account six days after his referral of 11 March 2026 to the Federal Bureau of Investigation, on an account with no posted content and no violation, the notice reciting "the severe nature of this violation"; not lifted or explained. His primary account, "OzRomeo", the account he used at TwitchCon Paris, had been banned on-stream in July 2023 (Fourth Amended Complaint paragraph 34). *Layer:* The platform itself; only Twitch can suspend a Twitch

account. *Pleaded as:* Section 1512(b); the means pleaded at Count III, Section 1589(a)(2) "to that person or another person". *Source:* Fourth Amended Complaint paragraphs 16-A, 34, 44 and 78 — RECORDED.

**(f-1) 13 April 2026, the day this action was filed.** Terms of Service last modified: the term making a creator who authorises another account solely responsible for its activities and disclaiming Twitch's liability for that account's acts or omissions, absent from the version of 8 December 2025; the Community Guidelines require her to moderate and name the tools (paragraph 17). *Layer:* Platform; legal cover. *Pleaded as:* Act in furtherance; the instrument of continuity. *Source:* The captures of 8 December 2025 and 21 June 2026 (the version last modified 13 April 2026), hashed — RECORDED (their text).

**(g) 7 May 2026.** At the San Ysidro Port of Entry, after his cooperation of 11 March 2026, Plaintiff is turned away on the subject of this lawsuit. *Layer:* Doe federal agent. *Pleaded as:* Section 1513(e). *Source:* Fourth Amended Complaint paragraph 26; Docket Entry 19 (the declarations) — DOCKET.

**(g-1) 5 June 2026.** On a third party's broadcast (video identifier 2789148031; the full chat of 6,870 messages preserved with the platform's badge data), the account `jj928`, carrying a VIP badge, turns to Ms. Wilson unprompted ("the current one for lydia is wild"), twice states the characterisation this action concerns, and describes a standing practice across channels: "every other month we look in the mod discord," and "mods get them receipts LUL". *Layer:* Moderator stratum. *Pleaded as:* Fact showing the origin of the characterisation and the relationship among those

who carry it; not a predicate; no person is added. *Source:* The preserved capture — RECORDED.

**(h) 13 June 2026, 11:44 and 11:47 a.m. Pacific Time.** Two paid messages reach her channel through Defendants' payment product, the second threatening to cut her body; the payment clears before anything is done (paragraph C). *Layer:* Platform's own rail. *Pleaded as:* Not a predicate against Defendants and no procurement is alleged; pleaded as the serious harm within Section 1589(c)(2) under which her labor continues. *Source:* Docket Entry 77 (Communiqué 15) — RECORDED.

**(i) 13 June 2026, 12:31 p.m. Pacific Time.** She states on air what the platform told her: someone is pushing her numbers, there is a limit on how high they can go; not who, how much, or what it cost (paragraph 32). *Layer:* Platform. *Pleaded as:* Section 1343 (concealment of a material fact by the party that decides the figure). *Source:* Fourth Amended Complaint paragraph 15; paragraph 32 above — RECORDED.

**(j) 10 August 2026.** The motion to dismiss gives Plaintiff's removal, reentry charge and foreign detention as context for the concerns about his proximity to Ms. Wilson (paragraphs B and 8). *Layer:* Legal cover. *Pleaded as:* Not a predicate (petitioning); pleaded as Defendants' statement of the reason he was acted against, and as the re-deployment of a record made against a United States citizen. *Source:* Docket Entry 72, at 1 (ECF page 11) — DOCKET.

**(k) 12 August 2026.** Terms of Service amended two days after the merits motion: the stated purpose of caching and storing every piece of a creator's

content struck; the rights taken in that content extended from monetizing the Twitch Services to the business of Twitch and its affiliates; the concession of liability for Twitch's fraud, willful misconduct or gross negligence unchanged (paragraphs 16 and 18). *Layer:* Platform; legal cover. *Pleaded as:* Act in furtherance; the instrument of continuity. *Source:* The captures of 21 June 2026 and 15 August 2026, hashed — RECORDED (their text).

**(l) 14 August 2026, 12:18 p.m. Pacific Time.** Arbitration agreement and class-action waiver adopted and sent by electronic mail, excepting litigation pending before that date (paragraph 19). *Layer:* Parent; legal cover. *Pleaded as:* Section 1343: a wire sent in furtherance of the scheme need not itself be false, *Schmuck v. United States*, 489 U.S. 705 (1989) — intent on INFORMATION AND BELIEF. *Source:* The notice, preserved; Docket Entry 91 (Title 9, Section 402(b)), unopposed.

**(l-1) 22 August 2026.** On her five-year anniversary broadcast (video identifier 2853483717), a message is delivered into her channel by the text-to-speech function Defendants operate, triggered by a paid transaction on which Defendants take a share: "We were [at] dinner with Dan." "unequal treatment and presumption of shame, along with the stalking — that's all Dan's game." "[T]OS is fine, there's no need to fret." It comes while the Terms disclaim, since 13 April 2026, Twitch's liability for the acts of the accounts a creator authorises, and ten days after they were amended to extend the rights taken in her content to the business of Twitch and its affiliates (paragraphs 17 and 18). Plaintiff does not allege that Mr. Clancy said any of it. *Layer:* Platform's own paid rail. *Pleaded as:* Not a predicate; fact showing that the characterisation is carried, attributed by name to the

Chief Executive, on Defendants' monetised rail, beside a statement that the Terms are "fine". *Source:* The broadcast — RECORDED.

**(m) 28 August 2026.** Counsel certifies "38 motions are still pending" to obtain a stay of every deadline, including the preservation motion; the docket showed fifteen. *Layer:* Legal cover. *Pleaded as:* Not a predicate; before the Court on the motion under Title 28, Section 1927. *Source:* Docket Entries 100, 120, 129 — DOCKET.

**(n) 13 September 2026, 09:12 to 14:14 Pacific Time.** The published figure on her channel is placed in four steps between 09:15 and 09:27 (2 to 763 to 1,957 to 2,646 to 3,061) and then held between 2,900 and 3,095, a range of 195, until the broadcast ends at 14:14. Over the same broadcast 869 distinct accounts, automated accounts excluded, speak in her chat; 606 of them first appear in its first half and 263 in its second, while the published figure does not move. *Layer:* Platform. *Pleaded as:* Section 1343, each publication. *Source:* Plaintiff's record of the published figure, sampled about once a minute, and the chat log of the broadcast, both preserved the same day — RECORDED.

**(o) 13 September 2026, about 10:55 to 10:58 Pacific Time.** She receives Plaintiff into her voice channel, and he is removed in the middle of the exchange set out verbatim at paragraph A; no term of service is invoked and no ground is stated. The platform's chat log, with its own badges, records who told her he had left: at 10:56:20 `browsertab`, a moderator; at 10:56:21 `norseman__`, a moderator; at 10:56:25 and 10:56:32 `felkdav`, to her, that "cx got him IRL"; at 10:56:27 `smellydia`, a moderator, tagging her by name. `cxbaob`, the channel's lead moderator, tagged by `smellydia` at

10:55:51, posts a salute at 10:56:06 and issues channel commands at 10:58. The badges establish authority held, not the act performed. Which account executed the removal is not asserted; it is the question the records sought at Docket Entry 106, Request One, and Docket Entry 112 answer. *Layer:* Operators through platform authority. *Pleaded as:* Section 1512(b)(1): misleading conduct toward another person with intent to influence or prevent testimony — intent on INFORMATION AND BELIEF; and the means under Section 1589. *Source:* The recording of the broadcast and the platform's chat log, preserved the same day; Defendants' video 2873238633 — RECORDED.

**(p) 15 September 2026.** Defendants' reply states, as its defense, that Twitch capped channels, eliminated payments and deployed enhanced viewbot detection (paragraph 31); and asserts the foreign order, for the fifth time, as the reason Plaintiff is not "the appropriate party" — after the motion of 11 September asked for an election (paragraph 13). *Layer:* Platform (the admission); legal cover (the assertion). *Pleaded as:* The admission: knowledge and control. The assertion: made after notice and after the motion to elect, it carries the Section 1512(b) act into the forum, and is pleaded as outside petitioning protection (paragraphs 13 and 60). *Source:* Docket Entry 132, page 5, and footnote 4, pages 8 to 9 — DOCKET.

**(q) 16 September 2026.** The reply on the stay asserts the order a sixth time (paragraph 13), and says Defendants addressed five withdrawn counts "only to learn" afterwards of a withdrawal their counsel received by electronic mail on 7 August 2026 at 9:48 a.m. *Layer:* Legal cover. *Pleaded as:* Not a predicate; a statement to the Court the record contradicts, *Kottle*, paragraph

13. *Source:* Docket Entry 133; the 7 August electronic mail, preserved with headers — DOCKET and RECORDED.

**(r) 16 September 2026.** The "Following Since" signal removed from public view for all users and left to streamers and moderators. *Layer:* Platform. *Pleaded as:* Concealment; not pleaded as a predicate on the present record. *Source:* Preserved 16 September — RECORDED.

**(s) 8, 10, 14, 16, 17 and 18 September 2026.** The sequence set out at paragraph 20: Plaintiff's notice to counsel in all three Northern District actions; two days later twelve appearances by four attorneys of one firm in one day; the interventions docketed; two days later a stipulation on all three dockets within minutes; a magistrate-judge consent or declination in all three the next day; two cases reassigned. *Layer:* One defense in six proceedings. *Pleaded as:* Not predicates and not overt acts (petitioning, *Sosa*, paragraph 20); evidence of knowledge of every forum and of coordination. *Source:* The three public dockets — DOCKET (labels; the texts are not free).

**(s-1) After this action was filed, on a date shown in the platform's ban record.** After Plaintiff gave notice of this action to the creator broadcasting as "Angelic", the account `Transvine`, holding conferred moderator authority over her channel, bans him from it through the channel's associated Discord, while she is speaking. What is said to him is that he is not an advertiser and would ruin it, together with remarks on his litigating without counsel and with the assistance of a machine. *Layer:* Moderator stratum through platform authority. *Pleaded as:* Not a predicate on the present record; fact showing that conferred authority overrides the creator it is said

to serve and removes the person who gives notice. *Source:* Plaintiff's own observation; the ban record in Defendants' possession.

**(s-2) 25 September 2026, 3:00 p.m. Pacific Time.** In the three Northern District actions, Defendants' counsel files a Motion for Extension of Time to File Response/Reply as to Plaintiff's motion to intervene, with a declaration of counsel and a proposed order, and serves none of it on Plaintiff, a pro se movant who is not a registered filer; his written consent reaches counsel at 6:26 p.m., and the stipulation that carried it, with his Joint Re-Notice, is not filed. *Layer:* Legal cover. *Pleaded as:* Not a predicate (petitioning); the filing without service and ahead of his answer is pleaded as conduct of the delay placed before this Court at Docket Entry 129, and as evidence that one defense acts in every forum. *Source:* Pandiscia Docket Entry 25, Gamlen Docket Entry 26, Gordley Docket Entry 20 (public labels); Plaintiff's electronic mail of 25 September 2026 at 6:26 p.m. — DOCKET and RECORDED.

**(t) Every day since notice.** The exclusion is maintained, with the knowledge admitted above, while the figure it protects is still placed and the records that would prove it age. *Layer:* Every layer. *Pleaded as:* The continuing act: Section 1512(b) and Section 1589 as to the two persons; Section 1343 as to the figure. *Source:* This ledger.

**59. Relationship and continuity.** Every act has the same participants, the same channel, the same two persons acted against and the same purpose pleaded at paragraph 47 of the Fourth Amended Complaint: to sustain a reported figure known to be inflated and to remove those positioned to expose it. The acts run from February 2023 to this month, they continued

after every step of this litigation, and the instrument through which they run does not expire. That is open-ended continuity, *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989), and it meets Section 1961(5) many times over.

**60. The legal cover, stated once.** The rows marked "legal cover" add no count and no defendant. Appearances, stipulations and scheduling papers are petitioning and are not pleaded as acts of the pattern (*Sosa*, paragraph 20). Protection for petitioning a court covers its good-faith use and does not cover intentional misrepresentation to a court (*Kottle*, paragraph 13), and privilege does not reach what is done in furtherance of a crime or a fraud (paragraph 21). The assertions of the order after Defendants were told on this docket how it was obtained (paragraph 13), the drafting of the instruments (paragraphs 16 to 18; correction (v)), and the records left to age under a preservation demand are pleaded under Counts I and II as the means by which the pattern is continued and concealed, on information and belief as to intent under Rule 11(b)(3).

**61. The predicates are the ones the Fourth Amended Complaint already pleads.** Paragraph 51 of the Fourth Amended Complaint pleads as predicate acts only offenses listed in Section 1961(1): wire fraud, Section 1343; witness tampering, Section 1512; retaliation, Section 1513(e); obstruction of justice, Section 1503; and forced labor, Section 1589, which falls within the range the statute lists. It identifies separately the related conduct that is not pleaded as a predicate. Every act in this Section is pleaded on those same five sections or is marked as not a predicate. Nothing in this pleading adds to that list or changes it.

## VIII. EVERY CORRECTION, MADE ONCE AND HERE

**62. Plaintiff corrects the following in his own papers, on his own initiative, before any response to them is due. No correction adds a claim or narrows one.**

**(a) Docket Entry 105 described a cap "never disclosed to her." That is withdrawn, and her own words replace it (paragraph 32).** Ms. Wilson was told, by Defendants, that someone was pushing her numbers, and she spoke of a cap as hers to set and to lift; she said so on her broadcast of 13 June 2026 and Plaintiff heard it. What she was not told is who, how much, since when, what it cost her, and who computes the level.

**(b) There are six related proceedings, not five.** The sixth is *Federal Trade Commission v. Amazon.com, Inc.*, No. 2:23-cv-01495-JHC (W.D. Wash.), noticed at Docket Entry 122. Docket Entries 113, 114, 117, 118, 119, 125 and 128 are to be read as referring to six.

**(c) *Gordley v. Amazon.com, Inc. and Twitch Interactive, Inc.*, No. 3:26-cv-09036-WHO (N.D. Cal.), names both corporations.** Plaintiff's statement of 10 September 2026 that it is brought against Twitch Interactive, Inc. alone was wrong and is withdrawn. Docket Entries 113, 114, 115, 125 and 126 are to be read accordingly.

**(d) The order admonishing "Amazon and its counsel" that their discovery conduct was "tantamount to bad faith" is in *Federal Trade Commission v. Amazon.com, Inc.*, No. 2:23-cv-00932-JHC (W.D. Wash.), Docket Entry 404, 10 July 2025.** Where Plaintiff's opposition to the stay

(Docket Entries 113 and 114) gives No. 2:23-cv-01495, it is corrected to No. 2:23-cv-00932.

**(e) The notice at Docket Entry 82 was mailed to the Clerk on 6 August 2026, delivered to Defendants' counsel by electronic mail, as notice, on 7 August 2026 at 9:48 a.m. Pacific Time, and docketed on 11 August 2026.** Any sentence of Plaintiff's giving a single date for it is corrected to those three.

**(f) In the Consolidated Supplemental Pleading (Docket Entry 118) the row for the *Gamlen* action reads "allegations to be conformed from the complaint."** Plaintiff has since obtained that complaint, filed 21 August 2026; its class is stated at paragraph 40, and no other allegation of that action is pleaded here. Paragraph 31 of the same paper, and the motions at Docket Entries 92, 105 and 115, asked that the Early Neutral Evaluation be set with all six proceedings present. The Order of 14 September 2026 (Docket Entry 131) denied those motions without prejudice: the evaluation is mandatory within forty-five days of an answer. Plaintiff's papers are to be read with that Order.

**(g) Plaintiff's motions to intervene in the three Northern District actions were docketed on 14 and 16 September 2026** (Pandiscia Docket Entry 14; Gordley Docket Entry 14; Gamlen Docket Entry 18). Any statement in an earlier paper that he had not appeared there is superseded. On 21 September 2026 the Honorable William H. Orrick, United States District Judge, found the three actions related and ordered *Gamlen* and *Gordley* reassigned to him with *Pandiscia* (Pandiscia Docket Entry 23; Gamlen Docket Entry 25; Gordley Docket Entry 18). The three now proceed before one judge as Nos.

3:26-cv-08721-WHO, 3:26-cv-08758-WHO and 3:26-cv-09036-WHO, and Plaintiff's motions to intervene are pending before him in each. Any reference in Plaintiff's papers to Magistrate Judge Cisneros or Magistrate Judge Kang as presiding in those actions is to be read accordingly.

**(h) Paragraph 5 of the Fourth Amended Complaint states that a derivative-citizenship route "is unavailable on the present record; it required a legal separation of Plaintiff's parents, which did not occur." That sentence is withdrawn. It is not Plaintiff's position.** The facts are these. Plaintiff's father was deported by the United States on 14 May 1992. Plaintiff's mother naturalised on 30 May 1996, when Plaintiff was sixteen years old, a lawful permanent resident, and in her custody. On those facts Plaintiff is a citizen of the United States by operation of law, and has been since that day, as stated at paragraph 8 above. The remainder of paragraph 5 of the Fourth Amended Complaint is to be read accordingly. The same paragraph states that vacatur of the underlying conviction is in progress through the San Bernardino County Public Defender. It is not. That office wrote on 2 September 2026 that it "will not be filing anything on your behalf," and Plaintiff proceeds in propria persona.

**(i) Paragraphs 25 and 57 of the Fourth Amended Complaint quote the words "you put things in the discord and CX picks it out." The words are Ms. Wilson's.** She spoke them on her broadcast of 13 June 2026 at 11:21:04 a.m. Pacific Time, describing how material for a segment of her own broadcast is chosen: "you guys put things in the discord and then CX picks it out." They are her description of the role Defendant Bordin holds on her channel. They are not a statement by him, and any reading of those paragraphs as quoting him is corrected.

**(j) Plaintiff had filed nothing in *Federal Trade Commission v. Amazon.com, Inc.*, No. 2:26-cv-03097-JHC (W.D. Wash.), when Docket Entry 117 (paragraph 2) and Docket Entry 128 (relief paragraph (d)) stated that he "has moved" in that action to intervene and to transfer it.** His motions docketed in the Northern District of California (*Pandiscia* Docket Entry 14; *Gordley* Docket Entry 14) said the same. Those statements are withdrawn: he has not moved there to intervene or to transfer that action. His only paper there is a motion for leave to file a brief as amicus curiae in support of the plaintiffs, submitted for filing with this pleading, which asks for no transfer (paragraph 51). Any relief sought in this Court that depends on the transfer of that action is not pursued.

**(k) Docket Entry 129 states that the report of 27 August 2026 under Title 18, United States Code, Section 4 went to ninety-four offices.** It was sent to them that day. Delivery failed at four addresses of the Securities and Exchange Commission and at one other federal address, and the failure notices are preserved. The statement is corrected to that.

**(l) Plaintiff's own claims are four: the counts of the Fourth Amended Complaint.** His own California claims were withdrawn by notice on 6 August 2026 (Docket Entry 82) and are not revived. Paragraph 26(b) through (e) of the Consolidated Supplemental Pleading (Docket Entry 118) states something different: the claims pleaded in the related actions, among them unjust enrichment and an accounting, the state consumer-protection claims including California's Unfair Competition Law, the contract and implied-covenant claims, and the California right-of-publicity and digital-replica claims, set out in their lanes so that the conduct is resolved in one proceeding. Plaintiff does not assert those claims as his own. They stand in

this action as the claims of the integrated lanes, carried by those who plead them, so that no part of one record is resolved alone.

**(m) Docket Entries 55 and 57 are maintained.** Section III.B of Docket Entry 104 lists the motion to extend the time for service (Docket Entry 55) and the request for docket copies and electronic access (Docket Entry 57) among papers withdrawn. The Clerk did not mark either one withdrawn, and to the extent that section withdrew them, it is corrected. Plaintiff maintains both. Service on the remaining Defendants is carried forward by Docket Entry 130.

**(n) No Defendant has answered.** Docket Entry 121 refers to "Defendants having answered on the merits." They have not. Defendants moved to dismiss (Docket Entry 72), and the Order of 14 September 2026 (Docket Entry 131) records that no answer has been filed. Where Docket Entries 118 and 119 describe the motion to dismiss as "submitted," it stands submitted on 8 October 2026.

**(o) Docket Entry 54 refers to a temporary restraining order and an order to show cause "entered on the Ex Parte Application."** No such order was entered. The ex parte application was not docketed and was withdrawn (Docket Entry 59, 24 July 2026). Docket Entry 54 stands as a motion on notice for a preliminary injunction and for the other relief it states, each on its own ground. Its request that the hearing be set "within the life of the TRO" is withdrawn, and the bracketed pre-filing note printed on its page 10 is struck.

**(p) Docket Entries 120 and 121 rely on a "consolidated memorandum filed herewith," and Docket Entries 121 and 127 on a supplemental pleading "filed herewith" with class allegations at its "Section XI-B."** Neither paper was entered on the docket. The class structure those entries rely on is stated in the motion at Docket Entry 124, and the matter of that supplemental pleading on which Plaintiff relies is carried in this pleading (Section VI-A).

**(q) Paragraph 52(c) of the Fourth Amended Complaint says: "Why it is a predicate: 18 U.S.C. § 1519."** Paragraph 51 of the same pleading states that the conduct pleaded under Section 1519 is not pleaded as a predicate. Paragraph 51 governs. The act in paragraph 52(c) is pleaded as conduct of the enterprise and as evidence of its purpose and continuity.

**(r) The class.** Plaintiff represents Class 311, as pleaded at Section VI-A, paragraph 39. The greater class is pleaded at paragraph 40; he declines to represent it, and its record is held by the enforcement authorities as custodians, as Docket Entry 128 asks. The two papers are to be read together, and neither is withdrawn. Docket Entry 54's statement that a monitor or special master "is not an adequate substitute" is read as to the custody of the records: the monitor Plaintiff asks for at paragraph 71 follows the receiver and does not replace it.

**(s) The times of 13 June 2026 are one hour later than stated.** The times Plaintiff has given for events of that day were read from a log whose clock recorded Pacific Standard Time while Pacific Daylight Time was in effect, so each is one hour early. Corrected: the paid messages at 11:44:11 a.m. and 11:47:16 a.m., the ban at 11:47:43 a.m., and the moderator action at

11:48:46 a.m. (Fourth Amended Complaint paragraph 16; Docket Entry 77); and her words about a cap from about 12:31 p.m. (paragraph 32). The order of events and the intervals between them are unchanged. The original logs are preserved unaltered, and the corrected times are stated beside them in a hashed record.

**(t) Paragraph 2 of the Fourth Amended Complaint states: "Ms. Wilson's own remedies are hers, are preserved to her, and are not sought here." That sentence is superseded.** Plaintiff asserts Ms. Wilson's rights alongside his own, on the four showings made in Section IV, and seeks the relief that protects them both: the protective relief and the preservation of the records of her channel (Docket Entries 54, 76, 95 and 106), independent counsel for her under Section 1595, and her place at the evaluation. What remains hers alone is her own claim for money damages, which nothing decided in this action is to bar.

**(u) Docket Entry 124, relief 2, asks that Plaintiff be appointed class counsel.** That request is conformed to Docket Entry 128: Plaintiff seeks appointment as representative of Class 311, and asks that counsel in the related actions be appointed for the greater class under Rule 23(g).

**(v) The attorney disclaimer is withdrawn.** The sentence "he alleges no wrongdoing of any kind by any attorney" in paragraph 30 of the Fourth Amended Complaint, and paragraph 82(f), are withdrawn under Rule 15(a)(2). Statements made to a court in good faith are protected; the continued assertion of the order after notice is pleaded as outside that protection (paragraphs 13 and 60). The drafting of Defendants' Terms of Service is not a statement made to a court at all. The persons who drafted the Terms wrote

the exception for Twitch's own fraud down, since 8 December 2025, and on 13 April 2026, the day this action was filed, amended the same instrument to disclaim liability for the acts of authorised accounts, with no exception of its own for fraud (paragraphs 16 and 17). The persons who wrote both knew where the line was, and their knowledge is pleaded as Defendants' scienter (paragraph 16).

**(w) The dates of the Terms.** The term making a creator "solely responsible" for accounts she authorises, and stating that "Twitch does not and will not have liability for the Authorized User's acts or omissions," appears in the version of the Terms last modified on 13 April 2026, and so does the direction to "cache and/or store" every piece of her content; neither is in the version of 8 December 2025. The amendment of 12 August 2026 struck the stated purpose of that storage and extended the rights taken to "Twitch and/or its affiliates' business" (paragraphs 17 and 18). Any statement in Plaintiff's papers, including the copy of this pleading served by electronic mail on 25 September 2026, that the Authorized Users term or the storage direction was added on 12 August 2026 is corrected to these dates.

## IX. WHAT PLAINTIFF ASKS

**63. Leave under Rule 15(d), on the motion pending at Docket Entry 85, to supplement the Fourth Amended Complaint (Docket Entry 97) and the Consolidated Supplemental Pleading (Docket Entry 118) with the matters in Sections I through VII, each of which occurred or was learned after those papers.**

**64. That the Fourth Amended Complaint, the Consolidated Supplemental Pleading and this Second Supplemental Pleading together**

be deemed the operative pleading, and that Defendants' pending motion (Docket Entries 72 and 98) be applied to it on the date already set, 8 October 2026; in the alternative only, that the motion be denied as moot without prejudice to a response to the operative pleading within fourteen days.

65. That the corrections at Section VIII be received; and, to the extent any of them amends the Fourth Amended Complaint rather than supplementing it, including corrections (h), (i), (s), (t), (v) and (w), and the facts that predate 14 August 2026 in paragraphs 16, 17, 18, 29, 30, 33 and 35, that leave be granted under Rule 15(a)(2), which provides that "[t]he court should freely give leave when justice so requires."

66. The class. That the class allegations at Section VI-A be received as part of the operative pleading; that Class 311 be certified with Plaintiff as its representative (in the alternative only, with class counsel appointed for it under Rule 23(g), paragraph 41); that counsel in the related actions be appointed for the greater class under Rule 23(g); and that the motions at Docket Entries 124 and 128 be decided on these allegations, together with the motions to join the related actions and the sovereigns (Docket Entries 125 and 126).

67. Intervention and joinder. That the motion to join the United States and the Plaintiff States (Docket Entry 125) and the motion to join the related actions (Docket Entry 126) be decided with this pleading; and that the Clerk transmit a copy of Docket Entry 125 and of this pleading to the United States Attorney for this District and to the Attorney General of each of the fifty States, so that the sovereigns Plaintiff asks

**the Court to join, and every State whose residents are measured by the same records, have notice of the request and may consider joining; and that the same copy go to counsel of record for the Federal Trade Commission and for each of the twenty-two Plaintiff States in *Federal Trade Commission v. Amazon.com, Inc.*, No. 2:26-cv-03097-JHC (W.D. Wash.), as the report stated in Section VI-C.**

**68. Both persons secured. That the relief sought for both persons be decided forthwith: the suspension of the moderator authority conferred on the persons whose conduct is pleaded and the order against contact with either person (Docket Entry 112, reliefs 5 and 6), with the witness-protective relief of Docket Entry 54. That Ms. Wilson be secured from the authority that operated over her choice in her own channel and be afforded the opportunity to be heard, through independent counsel of her own choosing whose reasonable fees Defendants bear, as first sought at Docket Entry 47 and now pressed at Docket Entries 54, 76 and 95, so that she may come before the Court by either course the Order of 14 September 2026 names. And, under Title 18, United States Code, Section 3771(d)(3), that the United States, through the Federal Bureau of Investigation, within fourteen days assign and identify to Plaintiff a Victim-Witness Coordinator for Internet Crime Complaint Center Case No. 1376a0208d0840f0a3821235f3c45119, afford him a reasonable opportunity to confer with the attorney for the Government, conduct a reasonable protection assessment, and file a compliance report within thirty days, as first sought at Docket Entry 52, consolidated into the motion pending at Docket Entry 83 (Docket Entry 104), and now asserted at Docket Entry 128, Relief C.**

**69. That the preservation and production sought at Docket Entries 54, 106 and 112 proceed now under Rule 26(d)(1), beginning with the record described at paragraph 34 and the record of who holds moderator authority on the affected channel; and that the same discovery reach the report of 2 January 2025: who made it, on whose direction and with what knowledge, with the Discord records of that day and the moderator-coordination records, preserved in the meantime (Docket Entry 106, Request One; paragraph 13).**

**70. Speed. That this action proceed on the expedited schedule sought in Plaintiff's motion under Title 28, United States Code, Section 1657(a), filed herewith; that the Court set a date for Defendants' answer, from which the Early Neutral Evaluation runs under the Order of 14 September 2026, and a date for trial; and that no deadline be extended and no briefing restarted by reason of this pleading.**

**71. The end state. That the Court retain jurisdiction over this action and its resolution; that the receiver sought at Docket Entries 54 and 128 be followed, for a term the Court sets, by a master or monitor who reports to the Court at intervals it sets on the measurement and on the moderation authority at issue; and that any resolution of this action be entered as a consent decree under the Court's continuing supervision, with the United States a party to its equitable terms. Title 18, United States Code, Section 1964(a) gives this Court jurisdiction "to prevent and restrain violations of section 1962," and Section 1964(b) provides that "The Attorney General may institute proceedings under this section" and that "Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions ... as it shall**

**deem proper." Plaintiff seeks no injunctive relief under that statute for himself (Fourth Amended Complaint, paragraph (A) of the prayer). He asks that the party to whom Congress gave that remedy be joined (Docket Entry 125), so that the decree the Court supervises carries it.**

---

I declare under penalty of perjury under the laws of the United States of America that the facts stated above of my own knowledge are true and correct, and that the facts stated on information and belief I believe to be true.

Executed on **__ September 2026.**

——–

**OSCAR ERNESTO ROMERO**
Plaintiff in Propria Persona
ozromeo338@gmail.com
*Romero v. Amazon.com, Inc., Twitch Interactive, Inc., et al.*
No. 3:26-cv-02324-JO-JAC (S.D. Cal.)

*This paper was delivered to the Clerk of the Court for filing. Service on counsel of record for Defendants is made by electronic mail and is certified in a separate Certificate of Service filed when service is made.*